UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'08 CIV 8093**

------------------------------------------------------------x

NEW JERSEY CARPENTERS HEALTH FUND,
on behalf of itself and all others similarly situated,

                Plaintiff,

        v.

BEAR STEARNS MORTGAGE FUNDING
TRUST 2006-AR1, STRUCTURED ASSET
MORTGAGE INVESTMENTS II, INC.
JEFFREY L. VERSCHLEISER, MICHAEL B.
NIERENBERG, JEFFREY MAYER, THOMAS
F. MARANO, JOSEPH T. JURKOWSKI, BEAR
STEARNS & CO., INC., and JPMORGAN
CHASE, INC. as successor in interest to
Bear Stearns & Co., Inc.

                Defendants

------------------------------------------------------------x

Case No. 

## NOTICE OF REMOVAL

      PLEASE TAKE NOTICE that Defendants Bear Stearns Mortgage Funding Trust 2006-AR1 ("BSMFT"), Structured Asset Mortgage Investments II, Inc. ("SAMI"), Bear Stearns & Co., Inc. ("BSC") and JPMorgan Chase & Co., Inc. (incorrectly named by Plaintiff as JP Morgan Chase, Inc.) ("JPMorgan Chase") (collectively, the "Removing Defendants"), by and through their undersigned attorneys, hereby remove the above-captioned civil action, and all claims and causes of action therein, from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1332(d).  The Removing Defendants appear for the purpose of removal only and for no other purpose, reserve all defenses and rights available to them, and state as follows:

# I. PROCEEDINGS TO DATE

1.    Plaintiff New Jersey Carpenters Health Fund ("Plaintiff") filed the above-captioned class action on August 20, 2008 in the Supreme Court of the State of New York, County of New York, under Index No. 08-602426 (the "State Court Action").  Pursuant to 28 U.S.C. § 1446(a) and Rule 81.1(b) of the Local Civil Rules of the United States District Court for the Southern District of New York, copies of the Summons and Complaint filed in the State Court Action are attached hereto as Exhibit A.

2.    Plaintiff purports to bring this case as a class action[1] on behalf of all purchasers of Bear Stearns Mortgage Loan Pass-Through Certificates ("BSM Certificates" or "Certificates") who purchased pursuant to or traceable to the Offering of $973,112,000 of Mortgage Loan Pass-Through Certificates, Series 2006-AR1 Groups I and II, issued by Bear Stearns Mortgage Funding Trust 2006-AR1 on or about July 28, 2006.  (Exhibit A, Complaint at ¶1.)

3.    Plaintiff alleges that the offering documents for the Certificates contained various misstatements and omissions in violation of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (the "Securities Act").  (*See, e.g.*, Exhibit A, Complaint at ¶¶ 1-3, 32-37.)  In particular, Plaintiff asserts claims against all Defendants under Section 11 of the Securities Act (Exhibit A, Complaint at ¶¶ 52-61), and against all Defendants except the Individual Defendants under Section 12(a)(2) of the Securities Act (Exhibit A, Complaint at ¶¶ 62-70).  Plaintiff also asserts claims for control person liability against SAMI, BSMFT and the Individual Defendants under Section 15 of the Securities Act.  (Exhibit A, Complaint at ¶¶ 71-83.)

---

[1] The Removing Defendants do not concede that this action may be properly certified as a class action; they merely restate the allegations set forth in Plaintiff's Complaint.

## II. TIMELINESS

4.      Plaintiff served JPMorgan Chase on or after August 20, 2008. This Notice of Removal is filed within 30 days of August 20, 2008, in compliance with 28 U.S.C. § 1446(b). The thirty-day removal period set forth in 28 U.S.C. § 1446(b) is measured from the date of service. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48 (1999).

## III. GROUNDS FOR REMOVAL

5.      This action is removable under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified at 28 U.S.C. §§ 1332(d) and 1453). Under CAFA, a class action "may be removed to a district court of the United States in accordance with Section 1446...without regard to whether any defendant is a citizen of the State in which the action is brought." 28 U.S.C. § 1453. CAFA provides that federal district courts shall have original jurisdiction over any class action commenced after February 18, 2005, "in which the matter in controversy exceeds the sum or value of $ 5,000,000, exclusive of interests and costs" and "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). All of the required elements have been satisfied here.

6.      Under CAFA, a "class action" is defined as a "civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). This action is within CAFA's definition of "class action," because Plaintiff brought this action pursuant to Article 9 of the New York Civil Practice Law and Rules (Exhibit A, Complaint at ¶ 22), and C.P.L.R. 901 is New York's equivalent of Rule 23 of the Federal Rules of Civil Procedure.

7.      This action was filed after February 18, 2005, and is an action in which at least one member of the purported plaintiff class is a citizen of a State different from a defendant.

Plaintiff asserts that it is a benefit fund with offices located in New Jersey. (Exhibit A, Complaint at ¶ 7.) Defendant Structured Asset Mortgage Investments II, Inc. is a Delaware corporation with its principal place of business in New York, is a citizen of Delaware and New York. 28 U.S.C. § 1332(c)(1). Defendant JPMorgan Chase & Co., Inc., is a Delaware corporation with its principal place of business in New York, and is a citizen of Delaware and New York. Defendant Bear Stearns & Co., Inc. is a Delaware corporation with its principal place of business in New York, and is a citizen of Delaware and New York. Because at least one member of the purported plaintiff class is a citizen of a State different from a defendant, CAFA's minimal diversity requirements have been satisfied.

8.    Upon information and belief, the amount in controversy in this action exceeds $5,000,000, exclusive of interests and costs. Pursuant to CAFA, "the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000." 28 U.S.C. § 1332(d)(6). Plaintiff alleges that its investment in BSM Certificates has declined by approximately 85%, from $144,954.69 at the time of the Offerings to $22,878.10 at the time this action was filed. (Exhibit A, Complaint at ¶ 51.) Thus, Plaintiff claims that it has incurred damages of $122,076.59. Plaintiff also alleges that "there are thousands of members" in the proposed class (Exhibit A, Complaint at ¶ 23), which by definition means that there are at least 2,000 potential class members. The number of alleged class members combined with Plaintiff's claim of individual damages greater than $120,000 suffices to satisfy CAFA's amount in controversy requirement.

9.    While CAFA sets forth certain exceptions to jurisdiction in 28 U.S.C. §§ 1332(d)(4), (5) and (9), this action does not fall within any of these exceptions.

10. Under 28 U.S.C. § 1332(d)(4), a district court is prohibited from exercising jurisdiction over a class action in which, among other things, "greater than two-thirds of the members" of the proposed class are "citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(A). Because there is no indication that greater than two-thirds of the members of the proposed class in this action are residents of New York, this exception does not apply.

11. Pursuant to 28 U.S.C. § 1332(d)(5), a proposed class action should not be removed from state to federal court when "the primary defendants are States, State officials, or other governmental entities," or when "the number of members of all proposed plaintiff classes in the aggregate is less than 100." Here, none of the defendants are States, State officials, or governmental entities, and Plaintiff has alleged that there are "thousands" of potential class members. (Exhibit A, Complaint at ¶ 23.) Accordingly, the exception to removal set forth in 28 U.S.C. § 1332(d)(5) does not apply.

12. The exceptions set forth in 28 U.S.C. § 1332(d)(9) also do not preclude removal of this action. First, this action does not involve "a covered security as defined under 16(f)(3) of the Securities Act of 1933," and therefore the exception set forth in 28 U.S.C. § 1332(d)(9)(A) does not apply.[2] Second, 28 U.S.C. § 1332(d)(9)(B) does not preclude removal because this action does not "relate[] to the internal affairs or governance of a corporation or other form of business enterprise." Third, removal is not precluded by 28 U.S.C. § 1332(d)(9)(C), which prohibits federal jurisdiction over any class action that "relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security."

---

[2] To the extent that Plaintiff argues otherwise and this Court agrees, this action would be removable under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub. L. No. 105-353, 112 Stat. 3227.

28 U.S.C. § 1332(d)(9)(C). The Second Circuit recently interpreted this provision and held that claims:

> that 'relate[] to the rights…and obligations' 'created by or pursuant to' a security must be claims grounded in the <u>terms of the security itself</u>, the kind of claims that might arise where the interest rate was pegged to a rate set by a bank that later merges into another bank, or where a bond series is discontinued, or where failure to negotiate replacement credit results in a default on principal. The present claim – that a debt security was fraudulently marketed by an insolvent enterprise – does not enforce the rights of the Certificate holders as holders, and therefore it does not fall within § 1332(d)(9)(C) and § 1453(d)(3).

*Estate of Pew v. Cardarelli*, 527 F.3d 25, 31-32 (2d Cir. 2008) (emphasis added). Because this action is based on allegations of misstatements and omissions in the offering documents for the Certificates, and is not grounded in the "terms of the security itself," the exception set forth in 28 U.S.C. § 1332(d)(9)(C) does not apply.

13.     Congress' purpose in adopting CAFA was to curb "[a]buses in class actions [that] undermine the national judicial system," Pub. L. No. 109-2, 119 Stat. 4, particularly with respect to "interstate class actions" that, like the allegations in the Complaint herein, "involve large amounts of money and many plaintiffs, and have significant implications for interstate commerce and national policy." S. Rep. No. 109-14, at 27 (2005). Accordingly, Congress stated that the three subject matter exceptions in § 1332(d)(9) "be narrowly construed." <u>Id.</u> at 45.

14.     Finally, none of the discretionary bases for declining jurisdiction under 28 U.S.C. § 1332(d)(3) applies. As a preliminary matter, there is no evidence that "greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(3). Even if this requirement was met, declining jurisdiction would be inappropriate because claims asserted under Sections 11, 12 and 15 of the Securities Act are "matters of national or interstate interest." 28 U.S.C. § 1332(d)(3)(A). In fact, Congress has

clearly evidenced its intention that such claims be brought in federal court, and Plaintiff's attempt to bring this action in state court appears to be intended to thwart Congressional intent by attempting to avoid the reach of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub. L. No. 105-353, 112 Stat. 3227. Consequently, declining jurisdiction would be inappropriate because this action "has been pleaded in a manner that seeks to avoid Federal jurisdiction." 28 U.S.C. § 1332(d)(3)(C).

15.     Because all of the CAFA jurisdictional requirements have been satisfied, and none of the CAFA exceptions apply, it is proper for this Court to accept jurisdiction over this action.

## IV. JURISDICTION

16.     Pursuant to 28 U.S.C. § 1441(a), this Court has removal jurisdiction of this action because it embraces the place where this action is pending, the Supreme Court for New York County.

## V. NOTICE

17.    Defendants will promptly file a copy of this Notice of Removal with the

Clerk of the Supreme Court of the State of New York, County of New York, in which the action

has been pending, and will serve such notice upon all adverse parties.

Dated: September 18, 2008

MORGAN, LEWIS & BOCKIUS LLP

By: _____
John D. Gordan, III (JG-7423)
John M. Vassos (JV-3504)

101 Park Avenue
New York, New York 10178
(212) 309-6000

*Attorneys for Defendants Bear Stearns Mortgage
Funding Trust 2006-AR1, Structured Asset Mortgage
Investments II, Inc., Bear Stearns & Co., Inc., and
JPMorgan Chase & Co., Inc.*

## CERTIFICATE OF SERVICE

I, Alice L. McCarthy, hereby certify that on September 18, 2008, I caused a true and correct copy of the foregoing Notice of Removal, with exhibits annexed thereto, to be served via hand delivery upon:

> Samuel P. Sporn
> Joel P. Laitman
> Christopher Lometti
> Frank R. Schirripa
> Daniel B. Rehns
> Schoengold Sporn Laitman & Lometti, P.C.
> 19 Fulton Street, Suite 406
> New York, NY 10038
> Telephone: (212) 964-0046

*Counsel for Plaintiff and the Proposed Class*

Alice L. McCarthy

Dated:  September 18, 2008

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

———————————————————— X

New Jersey Carpenters Health Fund, On Behalf of :
Itself and All Others Similarly Situated,          :          Index No.

:                                    08602426
Plaintiff,          :

:
v.          :

:          **SUMMONS**
Bear Stearns Mortgage Funding Trust 2006-AR1, :
Structured Asset Mortgage Investments II, Inc., :
Jeffrey L. Verschleiser, Michael B. Nierenberg, :          **FILED**
Jeffrey Mayer, Thomas F. Marano, Joseph T. :
Jurkowski, Bear Stearns & Co., Inc. and JPMorgan :          AUG 20 2008
Chase, Inc. as successor-in-interest to Bear :
Stearns & Co., Inc. :          COUNTY CLERK'S OFFICE
                                                    NEW YORK
Defendants.          :

———————————————————— X

To the above named Defendants:

    **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorneys a
Verified Answer to the Verified Complaint in this action within twenty (20) days after the
service of this summons, exclusive of the day of service, or within thirty (30) days after service
is complete if this summons is not personally delivered to you within the State of New York. In
case of your failure to answer, judgment will be taken against you by default for the relief
demanded in the complaint.

Dated: August 20, 2008

                                        Daniel B. Rehns, Esq.
                                        Schoengold Sporn Laitman & Lometti, PC
                                        19 Fulton Street, Suite 406
                                        New York, New York 10036
                                        Tel:  (212) 964-0046
                                        *Counsel for Plaintiff and*
                                                *the Proposed Class*

Trial is desired in the County of New York.

The basis of venue designated above is that Defendants maintain and/or conduct their business in
the County of New York.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

———————————————————————X

New Jersey Carpenters Health Fund, On Behalf of
Itself and All Others Similarly Situated,

                   Plaintiff,

                v.

Bear Stearns Mortgage Funding Trust 2006-AR1,
Structured Asset Mortgage Investments II, Inc.,
Jeffrey L. Verschleiser, Michael B. Nierenberg,
Jeffrey Mayer, Thomas F. Marano, Joseph T.
Jurkowski, Bear Stearns & Co., Inc. and JPMorgan
Chase, Inc. as successor-in-interest to Bear
Stearns & Co., Inc.

                 Defendants.

———————————————————————X

Index No.

**08602426**

**CLASS ACTION**

**COMPLAINT FOR VIOLATION
OF SECTIONS 11, 12 and 15 OF
THE SECURITIES ACT OF 1933**

FILED

AUG 2 0 2008

COUNTY CLERK'S OFFICE
NEW YORK

      Plaintiff alleges the following based upon the investigation of their counsel, Schoengold

Sporn Laitman & Lometti, P.C., which included a review of United States Securities and

Exchange Commission ("SEC") filings by Structured Asset Mortgage Investments II, Inc. (the

"Depositor" or "SAMI"), EMC Mortgage Corporation ("Sponsor", "Servicer" or "EMC") and

Bear Stearns Mortgage Funding Trust 2006-AR1 (the "Issuer" or "BSMFT"), as well as

regulatory filings and reports, ratings agency reports and advisories about Bear Stearns & Co.,

Inc. ("Bear Stearns" or "BSC"), EMC and BSMFT, press releases and other public statements

issued by the ratings agencies about Bear Stearns, EMC, and BSMFT, and their own internal

investigation.  Plaintiff believes that substantial additional evidentiary support will exist for the

allegations set forth herein after reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action is brought by New Jersey Carpenters Health Fund on behalf of purchasers of Bear Stearns Mortgage Loan Pass-Through Certificates ("Certificates" or "BSM Certificates") who purchased pursuant to or traceable to the Offering of $973,112,000 of Mortgage Loan Pass-Through Certificates, Series 2006-AR1 Groups I and II, issued by Bear Stearns Mortgage Funding Trust 2006-AR1 on or about July 28, 2006 ("July 2006 BSMFT Offering"). The BSM Certificates here are the quintessential mortgage-backed securities ("MBS"). It has become apparent in recent months that one of the prime drivers of the current credit crisis in the United States is that over the last several years, financial institutions, in an effort to amass massive underwriting fees, have issued billions of MBSs collateralized with what has now been recognized to be impaired and defective mortgage loans. SAMI, Bear Stearns, and the loan originators, EMC and Bear Stearns Residential Mortgage ("BSRM"), had no incentive to carefully underwrite the mortgage loans because they were being immediately packaged and sold in public offerings to investors such as Plaintiff. The Underwriter of the BSM Certificates, BSC, had no incentive to do the due diligence as required under the Securities Act of 1933 because it was obtaining millions of dollars in fees upon the completion of these massive MBS offerings. All of these conflicts leading up to the issuance of impaired securities were based on material misstatements and omissions in the Registration Statements and Prospectuses in violation of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (the "Securities Act"). As set forth more fully below, Registration Statements issued in connection with these Offerings were issued and sold by the same or related entities and contained substantially similar material misstatements and omissions in violations of Sections 11, 12 and 15 of the Securities Act. The issuer of the Certificates was a trust created by BSC for the

2

purpose of the issues. The Depositor was SAMI; the Sponsor and Servicer was EMC; and the Underwriter for this Offering was BSC. The Bonds are not listed on a national securities exchange.

2.      The Offering was of mortgage-backed securities, collateralized with loans originated and underwritten by both EMC and BSRM. The March 06, 2006 Form S-3/A Registration Statement, filed with the SEC by SAMI, issued in connection with the Offering, *inter alia*, materially misstated or failed to disclose the true impaired and defective quality of the loans collateralizing the Certificates; that the loans underlying the Certificates were not originated pursuant to the underwriting guidelines originated in the Registration Statement and that the prices of the Certificates were inaccurate, inappropriate and inflated. The misstatements and omissions were issued as a result of Defendants' failure to conduct meaningful and required due diligence in connection with the Offering.

3.      It is only of late that the material misstatements and omissions in the Registration Statement have begun to come to light. Bear Stearns has come under federal investigation for having engaged in improper underwriting of loans including those used as collateral in connection with asset backed securities offerings. This investigation has shown that the loan underwriting standards described in the Registration Statements in connection with the Bonds was rampantly disregarded in favor of simply generating sufficient loans to sell to investors in MBS offerings. For example, EMC, a wholly owned subsidiary of BSC, has become the focus of a Federal Trade Commission ("FTC") probe into the collapse of the subprime mortgage market and has been asked by the FTC to turn over its data and documents in connection with an investigation of mortgage lending to risky borrowers.

3

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

5.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

6.      Venue is proper in this County pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of many of the material misstatements contained in the Registration Statement and Prospectus, occurred in substantial part in this County. Additionally, the Offerings were actively marketed and sold in this County. Moreover, Defendant Bear Stearns maintains an office in this County.

## PARTIES

7.      Plaintiff, the New Jersey Carpenters Health Fund, is a Taft-Hartley benefit fund with offices located in Edison, New Jersey. The New Jersey Carpenters Health Fund purchased the Mortgage-Pass Through Certificates, Series 2006-AR1 at par value on the Offerings on or about July 2006. Plaintiff and the Class purchased pursuant to the Registration Statement and Prospectus which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. Plaintiff relied on the misstatements in the Prospectus and has suffered damages pursuant to Sections 11 and 12 of the Securities Act.

8.      Defendant Bear Stearns Mortgage Funding Trust, Series 2006-AR1 ("BSMFT") was the issuing entity for the July 2006 Offering. Per its filings with the SEC, BSMFT 2006-AR1 has listed 383 Madison Avenue, New York, New York 10179 as its principal office

4

location. Defendant BSMFT 2006-AR1 is a trust formed under the laws of the State of New York.

9.      Defendant Structured Asset Mortgage Investments II, Inc. ("SAMI") is the Depositor for the Offerings, and a wholly-owned subsidiary of The Bear Stearns Companies Inc. According to its SEC filings, SAMI is a Delaware corporation and maintains its principal offices at 383 Madison Avenue, New York, New York 10179.

10.     Defendant Jeffrey L. Verschleiser was, at all relevant times, President and Principal Executive Officer of SAMI. Mr. Verschleiser signed the July 2006 Registration on behalf of himself.

11.     Defendant Michael B. Nierenberg ("Nierenberg") was, at all relevant times, Treasurer, Principal Financial Officer, and Principal Accounting Officer of SAMI.

12.     Defendant Jeffrey Mayer ("Mayer") was, at all relevant times, a Director of SAMI.

13.     Defendant Thomas F. Marano ("Marano") was, at all relevant times, a Director of SAMI.

14.     Defendant Joseph T. Jurkowski (Jurkowski") served as the Attorney-in-fact for SAMI.

15.     Defendant Verschleiser, Nierenberg, Mayer, Marano and Jurkowski are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with SAMI, possessed the power and authority to control the contents of SAMI's submissions to the SEC and the market, and participated in the drafting and editing of the Prospectuses. The Individual Defendants all conducted business and had business residences at 383 Madison Avenue, New York, New York 10179.

5

16.     The Individual Defendants were officers and/or directors of SAMI at the time the Registration Statements and Prospectuses for the Offerings became effective, and with their consent were identified as such in the Registration Statements.  In addition, they signed the Registration Statements or authorized it to be signed on their behalf.

17.     The Individual Defendants, as officers and/or directors each had a duty to promptly disseminate accurate and truthful information with respect to the BS Certificates, and to correct any previously issued statements issued by, or on behalf of SAMI that had become materially misleading.  The Individual Defendants' misrepresentations and omissions in the Prospectus violated these specific requirements and obligations.  The Individual Defendants were signatories to the Registration Statement filed with the SEC and incorporated by reference in the Prospectus.

18.     The Defendants are all liable, jointly and severally, as participants in the issuance of the BSMFT Certificates, including issuing, causing, or making materially misleading statements in the Prospectuses and omitting material facts necessary to make the statements contained therein not misleading.

19.     Defendant Bear Stearns & Co., Inc. is an investment banking firm principally located at 383 Madison Avenue, New York, New York 10179.  Defendant BSC was intimately involved in the Bear Stearns Offerings as the parent company of SAMI, EMC, and BSRM. Defendant BS failed to perform the requisite level of due diligence not merely once, but on all times in connection with all five of the Bear Stearns Offerings complained of herein.  The Prospectus disseminated in connection with each of the Offerings contained the same material misstatements and omissions of material fact relating to the "Underwriting Practices" employed in originating the underlying mortgage loans.  BS is the leading underwriters in mortgage-backed

6

securities in the United States. BSC, as an essential part of its investment banking business, has substantial contacts within this County and regularly and continually transacts business in New York – specifically New York County (i.e., Wall Street and the financial markets) including through the Offerings. BSC is a wholly owned subsidiary of The Bear Stearns Companies Inc.

20.    Pursuant to a Merger Agreement effective May 30, 2008, The Bear Stearns Companies Inc. merged with BSC Merger Corporation, a wholly owned subsidiary of JPMorgan Chase, Inc. ("JPM"), and Bear Stearns Companies Inc. became a wholly owned subsidiary of JPM.

21.    Defendant JPM is a investment banking holding company incorporated in Delaware, and principally located at 270 Park Avenue, New York, New York 10017. Pursuant to the Merger between Bear Stearns Companies Inc. and the wholly owned subsidiary of JPM, Defendant BSC became a non-bank operating wholly owned subsidiary of JPM, BSC's successor-in-interest.

## CLASS ACTION ALLEGATIONS

22.    Plaintiff brings this action as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR") on behalf of a class consisting of all persons who purchased or acquired the Certificates (the "Class") pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with the Offerings from the effective date through the date of the filing of this action. Excluded from the Class are Defendants, their respective officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

7

23.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants and/or the Trustee for the Certificates and may be notified of the pendency of this action by mail, the internet or publication using the form of notice similar to that customarily used in securities class actions.

24.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory law complained of herein.

25.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained Schoengold, Sporn, Laitman & Lometti, P.C., counsel competent and experienced in class and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the provisions of the Securities Act of 1933 were violated by the Defendants as alleged herein;

b)      whether the Registration Statements and Prospectus contained materially untrue statements or omitted statements of material fact; and

c)      to what extent the members of the Class have sustained damages pursuant to the statutory measure of damages.

27.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

28.    Currently, the United States is ensnared in a financial crisis arising, in material part, from the greed which drove financial firms to issue billions of dollars of debt securities "collateralized" or securitized with mortgages which only recently have been revealed to have been recklessly underwritten and originated. The Plaintiff and Class as purchasers of the Certificates have been the victims of just such negligent practices, having purchased the Certificates pursuant to a Registration Statements which contained misstatements and omissions concerning the mortgage collateral "securitizing" the Certificates. SAMI and other entities related to the Offerings, *i.e.*, the Depositor and Underwriter Defendant, had enormous financial incentive to consummate the Offerings of the Certificates as quickly as possible since they were paid upon completion a percentage of the total dollar amount of the Offering sold to investors. Since the risk of the Certificates' collateral failing was not assumed by SAMI, BSMFT or the Underwriters, they all had enormous incentive not to conduct full complete and meaningful due diligence of the statements in the Registration Statement including those relating to the mortgage collateral.

29.    The structure of the Offerings was as follows: on or about March 06, 2006, SAMI filed a Registration Statement with the SEC in connection with the issuance of various series and

9

classes of debt securities which would be governed by said Registration Statement. At some time prior to the Offerings, SAMI formed a trust under the laws of the State of New York, Bear Stearns Mortgage Funding Trust, Series 2006-AR1, which then filed a Prospectus as the Issuing entity of the Certificates at issue herein.

30.    Typically, the loans are originated by the Sponsor, who then disposes of its loans primarily by selling them to third parties and through securitizations. The Sponsor works with the underwriters and the rating agencies to select the pool of mortgage loans and structure the securitization transaction. The Sponsor also services the mortgage loans. On the closing date of the Offerings, the Sponsor conveys the initial mortgage loans and the related mortgage insurance policies to the Depositor, who will in turn convey the initial mortgage loans and the related mortgage insurance policies to the Trustee. The Certificates are backed by the Issuer, and consist of, *inter alia*, the mortgage loans; collections in respect of principal and interest of the mortgage loans received; and the amounts on deposit in the collection account, including the payment account in which amounts are deposited prior to payment to the certificate holders. On the payment date, the certificate holders receive payments from the Trustee based on the particular tranche purchased; typically, available funds for each distribution date will equal the amount received by the trustee and available in the payment account on that distribution date, including interest which differs depending upon the tranche held.

31.    In connection with the Bear Stearns Offering, SAMI, BSMFT, and BS prepared and disseminated the Registration Statement and Prospectus that contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading that were reasonably relied upon by Plaintiff and the Class to their own detriment.

10

**The Registration Statement And Prospectus Contained**
**Material Misstatements And Omissions of Fact**

32.    The Registration Statement and Prospectus represented that all of the loans which made up the pool of residential, subprime mortgages used to support the Certificate were subject to certain underwriting guidelines which assessed the borrower's creditworthiness, including multi-level reviews of loan applications and appraisals with only "case by case" exceptions to guidelines. The Registration Statements disclosed that the majority of the underlying loans were originated by two entities for the Offering – Bear Stearns Residential Mortgage Corp., and EMC Mortgage Corp. – and described the mortgage pool as follows:

### THE MORTGAGE POOLS

#### General

Each mortgage pool will consist primarily of mortgage loans. The mortgage loans may consist of single family loans, multifamily loans, commercial loans, mixed-use loans and Contracts, each as described below.

The single family loans will be evidenced by mortgage notes and secured by mortgages that, in each case, create a first or junior lien on the related mortgagor's fee or leasehold interest in the related mortgaged property. The related mortgaged property for a single family loan may be owner-occupied or may be a vacation, second or nonowner-occupied home.

If specified in the related prospectus supplement relating to a series of securities, the single family loans may include cooperative apartment loans evidenced by a mortgage note secured by security interests in the related mortgaged property including shares issued by cooperatives and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the related buildings.

The multifamily loans will be evidenced by mortgage notes and secured by mortgages that create a first or junior lien on residential properties consisting of five or more dwelling units in high-rise, mid- rise or garden apartment structures or projects.

The commercial loans will be evidenced by mortgage notes and secured mortgages that create a first or junior lien on commercial properties including

11

office building, retail building and a variety of other commercial properties as may be described in the related prospectus supplement.

The mixed-use loans will be evidenced by mortgage loans and secured by mortgages that create a first or junior lien on properties consisting of mixed residential and commercial structures.

The aggregate concentration by original principal balance of commercial, multifamily and mixed-use loans in any mortgage pool will be less than 10% of the original principal balance of the mortgage pool.

Mortgaged properties may be located in any one of the 50 states, the District of Columbia or the Commonwealth of Puerto Rico.

The mortgage loans will not be guaranteed or insured by the depositor or any of its affiliates. However, if so specified in the related prospectus supplement, mortgage loans may be insured by the FHA or guaranteed by the VA. See "Description of Primary Insurance Policies—FHA Insurance" and "—VA Mortgage Guaranty."

A mortgage pool may include mortgage loans that are delinquent as of the date the related series of securities is issued. In that case, the related prospectus supplement will set forth, as to each mortgage loan, available information as to the period of delinquency and any other information relevant for a prospective investor to make an investment decision. No mortgage loan in a mortgage pool shall be non-performing. Mortgage loans which are more than 30 days delinquent included in any mortgage pool will have delinquency data relating to them included in the related prospectus supplement. No mortgage pool will include a concentration of mortgage loans which is more than 30 days delinquent of 20% or more.

A mortgage pool may contain more than one mortgage loan made to the same borrower with respect to a single mortgaged property, and may contain multiple mortgage loans made to the same borrower on several mortgaged properties.

*The mortgage loans may include "sub-prime" mortgage loans. "Sub-prime" mortgage loans will be underwritten in accordance with underwriting standards which are less stringent than guidelines for "A" quality borrowers. Mortgagors may have a record of outstanding judgments, prior bankruptcies and other credit items that do not satisfy the guidelines for "A" quality borrowers. They may have had past debts written off by past lenders.*

*See* SAMI, July 2006 Offering Prospectus, at S-11-13. (Emphasis added).

12

33.     The statements in the preceding paragraph contained misstatements and material omissions including in connection with the underwriting of the collateral mortgages. As set forth below, a material portion of the underlying collateral for the BSMFT Certificate originated by EMC and BSRM were not in accordance with applicable credit, appraisal and underwriting standards.

34.     The Registration Statement and Prospectus represented, with respect to the collateral originated by EMC and BSRM, that all the underlying loans were subject to underwriting guidelines which stressed homeowner credit-worthiness, allowing for exceptions only when the seller's performance supports such actions and the exception is then approved by credit management:

### EMC Underwriting Guidelines

The following is a description of the underwriting policies customarily employed by EMC with respect to the residential mortgage loans that EMC originated during the period of origination of the mortgage loans. EMC has represented to the depositor that the mortgage loans were originated generally in accordance with such policies.

The mortgage loans originated by EMC, or EMC mortgage loans, are "conventional non-conforming mortgage loans" (i.e., loans that are not insured by the Federal Housing Authority, or FHA, or partially guaranteed by the Veterans Administration or which do not qualify for sale to Fannie Mae or Freddie Mac) and are secured by first liens on one-to four-family residential properties. These loans typically differ from those underwritten to the guidelines established by Fannie Mae and Freddie Mac primarily with respect to the original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property, property types and/or S-31 mortgage loans with loan-to-value ratios over 80% that do not have primary mortgage insurance. *The EMC mortgage loans have either been originated or purchased by an originator and were generally underwritten in accordance with the standards described herein. Exceptions to the underwriting guidelines are permitted when the seller's performance supports such action and the variance request is approved by credit management.*

Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of

13

the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations. Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.

Generally, each mortgagor will have been required to complete an application designed to provide to the lender pertinent credit information concerning the mortgagor. The mortgagor will have given information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and will have furnished the lender with authorization to obtain a credit report which summarizes the mortgagor's credit history. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to second homes or vacation properties, no income derived from the property will have been considered for underwriting purposes.

*    *    *

In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income. Such ratios vary depending on a number of underwriting criteria, including loan-to-value ratios, and are determined on a loan-by-loan basis.

Each lender also examines a prospective borrower's credit report. Generally, each credit report provides a credit score for the borrower. Credit scores generally range from 350 to 840 and are available from three major credit bureaus: Experian (formerly TRW Information Systems and Services), Equifax and Trans Union. If three credit scores are obtained, the originator applies the middle score of the primary wage earner. If a primary wage earner cannot be determined because of the documentation type, the lowest middle score of all borrowers is used. Credit scores are empirically derived from historical credit bureau data and represent a numerical weighing of a borrower's credit characteristics over a two-year period. A credit score is generated through the statistical analysis of a number of credit-related characteristics or variables. Common characteristics include the number of credit lines (trade lines), payment history, past delinquencies, severity of delinquencies, current levels of indebtedness, types of credit and length of credit history. Attributes are the specific values of each characteristic. A scorecard (the model) is created with weights or points assigned to each attribute. An individual loan applicant's credit score is derived by summing together the attribute weights for that applicant.

14

The mortgage loans have been underwritten under one of the following documentation programs: full/alternative documentation ("Full/Alt Doc"), stated income/verified asset documentation ("SIVA"), no ratio documentation ("No Ratio"), and stated income/stated assets ("SISA") documentation.

Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified.

Under the no ratio documentation program the borrower's income is not stated and no ratios are calculated. Although the income is not stated nor verified, lenders obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified.

Under the stated income/stated asset documentation program, the borrower's income and assets are stated but not verified. The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower.

Under the no income/no asset documentation program, the borrower's income and assets are neither stated nor verified. The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower

Each mortgaged property relating to an EMC mortgage loan has been appraised by a qualified independent appraiser who is approved by each lender. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used.

*See* SAMI, July 2006 Prospectus, at S-30-32. (Emphasis added).

15

35.    The statements in the preceding paragraph contained misstatements and material omissions including in connection with the underwriting of the collateral mortgages. As set forth below, a material portion of the underlying collateral for the BSMFT Certificates originated by EMC were not in accordance with its credit, appraisal and underwriting standards.

36.    Moreover, with respect to the loans originated by BSRM, the Prospectuses stated as follows:

### BSRM Underwriting Guidelines

The BSRM Alt–A Underwriting Guidelines are intended to ensure that (i) the loan terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability of the property are acceptable. Both the Bear Stearns Option ARM loans originated by BSRM and the 5 Yr. Bear Stearns Secure Option ARM loans are originated pursuant to the BSRM Alt-A Underwriting Guidelines.

The BSRM Alt-A Underwriting Guidelines are less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac with regard to: (i) documentation parameters and (ii) debt to income ratios. The BSRM Underwriting Guidelines establish the maximum permitted loan-to-value ratio and maximum loan amount for each loan type based upon prior payment history, credit score, occupancy type and other risk factors. The maximum loan amount allowable for the Alt A program is $3,000,000.

All of the Alt-A mortgage loans originated by BSRM are based on loan application packages submitted through the wholesale or correspondent channel. Based on the documentation type each loan application package has an application completed by the prospective borrower that includes information with respect to the applicant's assets, liabilities, income, credit and employment history, as well as certain other personal information. During the underwriting process, BSRM calculates and verifies the loan applicant's sources of income (except documentation types, which do not require such information to be stated or independently verified), reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the BSRM Underwriting Guidelines. The mortgage loan file also contains a credit report on each applicant from an approved credit reporting company. Credit history is measured on credit depth, number of obligations, delinquency patterns and demonstrated intent to repay debts, which can be used to underwrite any file.

The maximum allowable loan-to-value ratio varies based upon the income documentation, property type, creditworthiness, debt service-to-income ratio of

16

the applicant and the overall risks associated with the loan decision. BSRM may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to a maximum combined loan-to-value ratio of 100%. BSRM's Underwriting Guidelines do not prohibit or otherwise restrict a borrower from obtaining secondary financing from lenders other than BSRM, whether at origination of the mortgage loan or thereafter.

With respect to purchase money or rate/term refinance loans secured by single family residences the following loan-to-value ratios and original principal balances are allowed: loan-to-value ratios at origination of up to 95% for BSRM mortgage loans with original principal balances of up to $500,000 if the loan is secured by the borrower's primary S-34 residence, up to 90% for BSRM mortgage loans secured by one-to-two family, primary residences with original balances up to $650,000, up to 80% for BSRM mortgage loans secured by one-to-two family, primary residences with original balances up to $1,000,000, up to 75% for mortgage loans secured by one-to-two family, primary residences with original principal balances of up to $3,000,000, up to 90% for BSRM mortgage loans secured by single family second homes with original principal balances of up to $500,000, up to 80% for BSRM mortgage loans secured by single family second homes with original principal balances of up to $1,000,000, up to 70% for mortgage loans secured by single family second homes with original principal balances of up to $1,500,000 and up to 65% for mortgage loans secured by single family second homes with original principal balances of up to $2,000,000. For cash out refinance loans, the maximum loan-to-value ratio generally is 90% and the maximum "cash out" amount permitted is based in part on the original amount of the related, BSRM mortgage loan.

With respect to mortgage loans secured by investment properties, loan-to-value ratios at origination of up to 90% for mortgage loans with original principal balances up to $650,000 are permitted. Mortgage loans secured by investment properties may have higher original principal balances if they have lower loan-to-value ratios at origination. For cash out refinance loans, the maximum loan-to-value ratio generally is 90% and the maximum "cash out" amount permitted is based in part on the original amount of the related mortgage loan.

Exceptions to the BSRM Underwriting Guidelines are considered with reasonable compensating factors on a case-by-case basis and at the sole discretion of senior management. When exception loans are reviewed, all loan elements are examined as a whole to determine the level of risk associated with approving the loan including appraisal, credit report, employment, compensating factors and borrower's willingness and ability to repay the loan. Compensating factors may include, but are not limited to, validated or sourced/seasoned liquid reserves in excess of the program requirements, borrower's demonstrated ability to accumulate savings or devote a greater portion of income to housing expense and borrowers' potential for increased earnings based on education, job training, etc. Loan characteristics such as refinance transactions where borrowers are reducing

17

mortgage payments and lowering debt ratios may become compensating factors as well.

*See* SAMI, July 2006 Prospectus, at S-33-34.

37.    The statements in the preceding paragraph contained misstatements and material omissions including in connection with the underwriting of the collateral mortgages. As set forth below, a material portion of the underlying collateral for the BSMFT Certificates originated by BSRM were not in accordance with its credit, appraisal and underwriting standards, and moreover, "credit risk" and "quality control" were materially disregarded in favor of generating sufficient loan volume to complete the massive Certificate securitizations alleged herein.

**The Truth Begins To Emerge:  Bear Stearn and EMC's**
**Systematic Improper Lending Practices and Collapse**

38.    The FTC began investigating EMC in 2005 when it began purchasing sub-prime mortgage loans from its former parent Company, Bear Stearns.  EMC, the sixteenth largest servicer of $89 billion in mortgage loans, was founded and controlled by BSC.  EMC came under fire by Federal Trade Commission ("FTC") surrounding allegations of predatory lending – a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest and fees that are unreasonably high.   EMC's increased risk of not being able to collect on these predatory mortgage loans puts the BSMFT Certificates underlying mortgage collateral at risk, thereby further increasing the risk to Plaintiff and the Class.  Bear Stearns said that the FTC issued the request as part of an investigation into subprime lenders, loan servicers and loan brokers to determine whether they have broken consumer-protection laws.

39.    Beginning in early 2007, disclosures began to emerge that revealed investment banks and home loan lenders had issued billions of dollars of mortgage backed securities

18

collateralized with home loans which were made to uncreditworthy borrowers, significantly inflating the value of those securities. At the center of these predatory lending practices was the biggest packager and underwriter of residential U.S. mortgage-backed securities for the past three years, Bear Stearns.

40.    In March, 2007, Bear Stearns claimed that it has "no exposure" to troubled subprime home lenders. However, these claims were short-lived. From November 2007 to February 2008, Bear Stearns disclosed that it had been hurt by the mortgage crisis and that profits plunged by almost 80%. In February 2008, Bear Stearns stated that net income dropped from $554 million to $115 million and net revenues were down 40 per cent to $1.48 billion.

41.    In March 2008, the FTC had finally culminated their three year investigation into EMC and its Parent Company. The FTC's investigation revealed a host of predatory lending practices and consumer fraud violations at EMC as well as at Bear Stearns, according to a letter send to investors in Bear Stearns in March 2008. Thereafter, in June 2008, according to a June 10, 2008 article published in Mortgage Line, FTC Director of Consumer Protection Lydia Parnes reported to a Senate panel that the FTC staff believes EMC and its parent, Bear Stearns, had violated a number of federal consumer protection statutes in connection with its servicing activities. The FTC is prepared to file a complaint against the Lewisville, Texas, servicing company, Ms. Parnes states in the article, but the company has agreed to engage in discussions that could lead to a resolution of the issues through consent negotiations.

42.    As a result of the disclosures that EMC had engaged in the practice of writing bad loans to uncreditworthy borrowers and that it was much more heavily invested in the failing subprime and non-traditional loan markets than had been previously disclosed, rating agencies began discussing possible ratings downgrades on EMC. According to Fitch Ratings, servicers

19

who achieve top ratings from Fitch are expected to have the operational, legal, and financial resources to respond effectively to such scrutiny, and to potentially effectuate any remedies required by regulators, without undue impact on servicing quality. Fitch stated that it would continue to monitor the progress of the FTC investigation of EMC, and will communicate any findings or concerns to the market as they rise.

43.     In response to the findings of the FTC regarding EMC and Bear Stearns's underwriting and lending practices the BSMFT Certificates declined in value by 60% over the first few months of 2008 and by the end of March 2008 had experienced a total decline of 80% from their original face value of $100.00 down to just $20.

44.     By March 2008, Bear Stearn's demise was almost complete. On or about March 13, 2008, the New York Times reported that Carlyle Capital Corporation, or Carlyle Capital Group as it is commonly referred to ("CCC"), a $22 billion hedge fund of which Bear Stearn's was the founder and 15% owner of, had faltered due to its exposure to the sub-prime markets.

45.     Just days later, on March 18, 2008, Alan Schwartz, newly appointed CEO of Bear Stearns in January 2008, after the resignation of Jimmy Cayne, is reported by the Wall Street Journal to have stated in an interview with CNBC, in regards to the collapse of CCC, that the firm's *"balance sheet has not weakened at all."*

46.     Almost immediately after the collapse of CCC, on March 14, 2008, JPM and the New York Federal Reserve came to Bear Stearn's rescue. Just two days later, on March 16, 2008, JPM brokered a deal with Bear Stearns in which Bear Stearn's outstanding common stock was purchased at a price of $2.00 per share, with JPM exchanging only .05473 of its shares for each share of Bear Stearns.

47.    On March 16, 2008, The New York Times published a tongue-in-cheek article entitled "Rescue Me: A Fed Bailout Crosses a Line," in which the innocence of Bear Stearns and EMC Mortgage was questioned.

> WHAT are the consequences of a world in which regulators rescue even the financial institutions whose recklessness and greed helped create the titanic credit mess we are in? Will the consequences be an even weaker currency, rampant inflation, a continuation of the slow bleed that we have witnessed at banks and brokerage firms for the past year?

> Or all of the above?

> Stick around, because we'll soon find out. And it's not going to be pretty.

> Agreeing to guarantee a 28-day credit line to Bear Stearns, by way of JPMorgan Chase, the Federal Reserve Bank of New York conceded last Friday that no sizable firm with a book of mortgage securities or loans out to mortgage issuers could be allowed to fail right now. It was the most explicit sign yet of the Fed's "Rescues 'R' Us" doctrine that already helped to force the marriage of Bank of America and Countrywide.

> But why save Bear Stearns? The beneficiary of this bailout, remember, has often operated in the gray areas of Wall Street and with an aggressive, brass-knuckles approach. Until regulators came along in 1996, Bear Stearns was happy to provide its balance sheet and imprimatur to bucket-shop brokerages like Stratton Oakmont and A. R. Baron, clearing dubious stock trades.

> And as one of the biggest players in the mortgage securities business on Wall Street, Bear provided munificent lines of credit to public-spirited subprime lenders like New Century (now bankrupt). It is also the owner of EMC Mortgage Corporation, one of the most aggressive subprime mortgage servicers out there.

> Bear's default rates on so-called Alt-A mortgages that it underwrote also indicates that its lending practices were especially lax during the real estate boom. As of February, according to Bloomberg data, 15 percent of these loans in its underwritten securities were delinquent by more than 60 days or in foreclosure. That compares with an industry average of 8.4 percent.

> Let's not forget that Bear Stearns lost billions for its clients last summer, when two hedge funds investing heavily in mortgage securities collapsed. And the firm tried to dump toxic mortgage securities it held in its own vaults onto the public last summer in an initial public offering of a financial company called Everquest Financial. Thankfully, that deal never got done.

21

Recall, too, that back in 1998, when the Long Term Capital Management hedge fund required a Fed-arranged bailout, Bear Stearns refused to join the rescue effort. Jimmy Cayne, then chief executive at the firm, told the Fed to take a hike. And so, Bear Stearns, a firm that some say is this decade's version of Drexel Burnham Lambert, the anything-goes, 1980s junk-bond shop dominated by Michael Milken, is rescued. Almost two decades ago, Drexel was left to die.

Bear Stearns and Drexel have a lot in common. And yet their differing outcomes offer proof that we are in a very different and scarier place than in the late 1980s. "Why not set an example of Bear Stearns, the guys who have this record of dog-eat-dog, we're brass knuckles, we're tough?" asked William A. Fleckenstein, president of Fleckenstein Capital in Issaquah, Wash., and co-author with Fred Sheehan of "Greenspan's Bubbles: The Age of Ignorance at the Federal Reserve." "This is the perfect time to set an example, but they are not interested in setting an example. We are Bailout Nation."

And so we are. After years of never allowing any of our financial institutions to fail, they have become so enormous that nobody will be allowed to sink beneath the waves. Otherwise, a tsunami would swamp the hedge funds, banks and other brokerage firms that remain afloat.

If Bear Stearns failed, for example, it would result in a wholesale dumping of mortgage securities and other assets onto a market that is frozen and where buyers are in hiding. This fire sale would force surviving institutions carrying the same types of securities on their books to mark down their positions, generating more margin calls and creating more failures.
As of last Nov. 30, Bear Stearns had on its books approximately $46 billion of mortgages, mortgage-backed and asset-backed securities. Jettisoning such a portfolio onto a mortgage market that is not operative would, it is plain to see, be a disaster.

But, who knows what those mortgages are really worth? According to Bear Stearns's annual report, $29 billion of them were valued using computer models "derived from" or "supported by" some kind of observable market data. The value of the remaining $17 billion is an estimate based on "internally developed models or methodologies utilizing significant inputs that are generally less readily observable."

In other words, your guess is as good as mine.

To some degree, what happened at Bear, of course, was a classic run on the bank — the kind immortalized in Frank Capra's homage to financial responsibility, "It's a Wonderful Life." As fears about Bear's financial position heightened, its customers began demanding their cash and big hedge funds that were using the firm as an administrative back office or lender moved their accounts elsewhere.

22

In addition, institutions that had bought credit default swaps from Bear Stearns, insurance policies that protect against corporate bond defaults, were scrambling to undo those trades as the firm's ability to pay the claims looked dicier.

"For the government to print money at the expense of taxpayers as opposed to requiring or going about a receivership and wind-down of any insolvent institutions should be troubling to taxpayers and regulators alike," said Josh Rosner, an analyst at Graham Fisher & Company and an expert on mortgage securities. "The Fed has now crossed the line in a very clear way on 'moral hazard,' because they have opened the door to the view that they are required to save almost any institution through non-recourse loans — except the government doesn't have the money and it destroys the U.S.'s reputation as the broadest, deepest, most transparent and properly regulated capital market in the world."

And here is the unfortunate refrain. Investors, already mistrusting many corporate and government leaders, were once again assured that nothing was wrong — right up until the very end. So is it any wonder investors react to every market rumor of an impending failure with the certainty that it's true? In too many cases, the rumors turned out to be true, notwithstanding the attempts at reassurance by executives and policy makers.

Only last Monday, for example, Bear put out a press release saying, "there is absolutely no truth to the rumors of liquidity problems that circulated today in the market." The next day, Christopher Cox, the chairman of the Securities and Exchange Commission, said he was comfortable that the major Wall Street firms were resting on satisfactory "capital cushions."
Three days later, it was bailout time for Bear.

HERE is the bind the Fed is in: Like the boy who puts his finger in the dike to keep sea water from pouring in, the Fed finds that new leaks keep emerging.

Regulators must do whatever they can to keep the markets open and operating, and much of that relies upon the confidence of investors. But by offering to backstop firms like Bear, who were the very architects of their own — and the market's — current problems, overseers like the Fed undermine a little bit more of that confidence.

Another worry? How many well-capitalized institutions remain at the ready to take over those firms that may encounter turbulence in the future? Banks just do not have the capital that is needed to rescue troubled firms.

That will leave the taxpayer, alas. As usual.

48.    On May 30, 2008, BSC Merger Corporation, a wholly owned subsidiary of JPM,

purchased BSC and BSC became a wholly owned investment banking arm of JPM.

23

49.     On June 20, 2008, <u>The New York Times</u> published an article entitled "Prosecutors Build Bear Stearns Case on E-Mails" in which Bear Stearns management revealed its knowledge about the worsening subprime market.

In the spring of 2007, as the mortgage market came unglued, two Bear Stearns executives shared their growing fears in a series of e-mail messages to each other about the perilous condition of the giant hedge funds they oversaw.

"I'm fearful of these markets," one wrote.

*The other said later, "Believe it or not — I've been able to convince people to add more money." He concluded that "I think we should close the funds now."*

*But three days later, the pair, Ralph R. Cioffi and Matthew M. Tannin, presented an upbeat picture to worried investors without disclosing that the two funds were plummeting in value and that Mr. Cioffi had already pulled some assets from one of them.*

A little more than a month later, the funds, filled with some of the most explosive and high-risk securities available, imploded, evaporating $1.6 billion of investor assets and setting off a financial chain reaction that has rattled global markets, caused more than $350 billion in write-downs, cost a number of executives their jobs and culminated in the demise of Bear Stearns itself.

On Thursday, Mr. Cioffi and Mr. Tannin surrendered to federal agents at 7 a.m. They were fingerprinted and taken in handcuffs to the federal courthouse in Brooklyn where they were charged with nine counts of securities, mail and wire fraud.

The two men, who were forced out of their jobs last year, are the first senior executives from Wall Street investment banks to face criminal charges stemming from the credit mess, and the investigation by federal prosecutors based in Brooklyn is likely to become a test case of the government's ability to make successful prosecutions of arcane financial transactions.

"This is not about mismanagement of a hedge fund investment strategy," said Mark J. Mershon, the head of the New York office of the Federal Bureau of Investigation, at a news conference Thursday. "It is about premeditated lies to investors and lenders."

Yet, despite the drama, there is no guarantee that cases that rely on e-mail exchanges and unclear states of mind result in jail time. In one prominent case involving e-mail exchanges, for example, charges were ultimately dropped

24

against Frank P. Quattrone, the high-level Credit Suisse banker accused of interfering with a government investigation.

Despite the publicity surrounding the Enron scandal, some high-profile cases, which like this one were based on e-mail exchanges and complicated financial arrangements, were successfully challenged.

"We have to be wary of a rush to judgment," said Robert A. Mintz, a former federal prosecutor and a lawyer at McCarter & English. "The question is whether these managers crossed the line from permissible spin to willful misrepresentation."

Mr. Cioffi posted bail of $4 million, secured by his house in Tenafly, N.J., property in Naples, Fla., and a $600,000 individual retirement account. Mr. Tannin's bail was $1.5 million, to which he attached an apartment on West End Avenue in Manhattan.

Despite the highly complex nature of the subprime investments, the government's base claim is simple: Mr. Cioffi and Mr. Tannin, in a desperate bid to keep fretful investors from heading for the exits, deceived investors by not disclosing how badly the two funds were doing.

In an indictment made public Thursday, prosecutors relied heavily on e-mail exchanges between Mr. Cioffi and Mr. Tannin in trying to paint a picture of fear and desperation inside Bear Stearns as the firm grappled with a crisis that would eventually lead to its end.

In a statement, Edward J. Little, a lawyer for Mr. Cioffi, said that the credit market had spread losses throughout Wall Street. "Ralph Cioffi's funds lost money in exactly the same way," Mr. Little said. "Because his funds were the first to lose might make him an easy target, but doesn't mean he did anything wrong."

Susan Brune, a lawyer for Mr. Tannin, said her client had been made a scapegoat for the wider market crisis.

The two funds had names as abstruse as the complex subprime securities in their portfolios — High Grade Structured Credit Strategies Fund and its riskier sister offering, the High Grade Structured Credit Strategies Enhanced Leverage Fund.

Overseen by Mr. Cioffi, a well-regarded executive with more than 22 years of experience at Bear Stearns, the funds were in essence a symbol of the frenzy and greed that characterized the booming subprime mortgage market from 2003 through 2006. The funds were highly leveraged, in some cases borrowing as much as $20 for every dollar invested and were sold to Bear's most exclusive clients.

25

Through 2006, the High Grade fund did well, gaining as much as 40 percent in one year. In August, to satisfy demand from clients, Bear started a second fund at what would prove to be the top of the market.

According to the indictment, Mr. Cioffi and Mr. Tannin became aware of the funds' difficulties in March. Mr. Cioffi gathered his team and led a vodka toast in celebration of their overcoming a rocky February. But as the markets got worse, Mr. Tannin became increasingly worried about the funds' exposure to securities backed by subprime mortgages.

Mr. Cioffi calmed him: "We are not 19 year olds in Iraq," he said in an e-mail message that was part of the indictment. But his own worries were growing. After a bad March, he told a colleague, "I'm sick to my stomach over our performance in March."

The indictment claims that the two men hid their concerns from investors, lenders and even Bear's own brokers. "We have an awesome opportunity," Mr. Cioffi said to a Bear Stearns broker. Mr. Tannin congratulated himself: "Believe it or not I've been able to convince people to add more money," he said to a colleague.

In late March, the indictment claims that the funds' decline prompted Mr. Cioffi to transfer $2 million out of the $6 million he had in the Enhanced Fund and put it in a less risky fund that was showing better performance.

Prosecutors claim that the move — which he never disclosed to outside investors who themselves were desperate to exit — was proof that he was putting his interests ahead of clients.

Bear Stearns and Mr. Cioffi's lawyers say that there was no such motive and that Mr. Cioffi's investment was done in support of the other fund in which he was not previously invested and that he managed.

In late April, investors were becoming concerned. One investor tried to pull $57 million. Mr. Cioffi, in a bid to keep the investor in the fund, said that he himself had $8 million invested. The indictment says that was a lie.

A few days later, Mr. Tannin, who was known within the group as a worrier, sent an e-mail message to Mr. Cioffi in which he suggested closing down the funds after a report showed that the securities they were holding were rapidly losing value. "If the report was true, the entire subprime market was toast," he wrote to Mr. Cioffi. The subprime market looked "pretty darn ugly," he wrote from his home, early Sunday morning.

It was a radical proposition from one of the funds' managers, and Mr. Tannin took the precaution of not using Bear's e-mail system, prosecutors said. He sent the note to the e-mail account of Mr. Cioffi's wife.

26

A few days later, on an April 25 conference call, Mr. Cioffi and Mr. Tannin presented a sanguine face to investors, arguing that the funds were in good shape.

The two managers did all they could to right their sinking funds, even going so far as to pitch to their group's pricing team that the securities should receive higher values, thus mitigating the funds' decline, according to the indictment. Their request was rejected.

In June, as the market continued its descent, Mr. Cioffi told investors that they could not withdraw funds. Despite a last-ditch effort by Bear Stearns to bail the funds out by offering a $3.2 billion loan, clients in both funds lost 100 percent of their investments.

Just before the funds' collapse, Mr. Cioffi, who just a year earlier was making an eight-figure salary, gave voice to his fears. "I've effectively washed a 30-year career down the drain," he said.

*Two Face Fraud Charges In Bear Stearns Debacle*, The New York Times, June 20, 2008, at 1.

50.    By July 2008, the price of the Certificates had fallen to less than 15% of face

value, a decline of more than 85% of the original face value in just over a year.

## LOSS CAUSATION

51.    As a result of the foregoing disclosures, the value of the Certificates had

substantially collapsed.  The Carpenters Health Fund's investment in BSMFT Certificate has

declined by approximately *85 percent* – from $144,954.69 at the time of the Offerings to

$22,878.10 at the time this action was commenced.

## COUNT I

### Violation of Section 11 of The Securities Act
### (Against All Defendants)

52.    Plaintiff repeats and realleges each and every allegation contained above.

53.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act and

asserted on behalf of all other members of the Class who purchased or acquired a BSMFT

Certificate on or traceable to the Offering.

54.    Defendants SAMI is the registrant for the Offering and filed the Registration Statements and Prospectuses as the issuer of the BSMFT Certificate, as defined in Section 11(a)(1) of the Securities Act.

55.    The Individual Defendants were officers and/or directors of SAMI at the time the Registration Statement before the Offering became effective, and at the time of the Prospectus, and with their consent were identified as such in the Registration Statement.  The Individual Defendant is liable for the misstatements and omissions in the Registration Statement alleged herein under Section 11(a)(1) of the Securities Act.

56.    Defendant Bear Stearns & Co. served as the Underwriter for the Offerings and qualifies as such according to the definition in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, Bear Stearns & Co. participated in the solicitation, Offerings, and sale of the BSMFT Certificate to the investing public pursuant to the Registration Statement and the Prospectus.

57.    The Registration Statement and the Prospectus, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectus.

58.    The Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Registration Statement and Prospectus were true, did not omit any material fact, and were not materially misleading.

59.    Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Registration Statement and the Prospectus.

60.    Plaintiff and other Class members sustained damages as a result of misstatements and omissions in the Registration Statement and the Prospectus, for which they are entitled to compensation.

61.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

### COUNT II

#### Violation of Section 12(a)(2) of the Securities Act
#### (Against BSMFT, SAMI, BSC and JPM)

62.    Plaintiff repeats and realleges each and every allegation contained above.

63.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

64.    By means of the Registration Statements and Prospectuses, and by using means and instruments of transportation and communication in interstate commerce and of the mails, the Defendants through the Offering sold a BSMFT Certificate to Plaintiff and other members of the Class.

65.    Defendants SAMI, the Individual Defendants and the Underwriter Defendant each successfully solicited these purchases, motivated at least in part by their own financial interest. The Defendants each reviewed and participated in drafting the Prospectus. Through ensuring the successful completion of the Offerings, the Underwriter Defendant obtained substantial underwriting fees.

29

66.     The Registration Statement and the Prospectus, at the time it became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectus.

67.     Defendants as "sellers" owed to the purchasers of the BSMFT Certificate, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

68.     Plaintiff and other members of the Class purchased or otherwise acquired a BSMFT Certificate pursuant to the defective Registration Statement and Prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement and the Prospectus.

69.     Plaintiff, individually and representatively, hereby offers to tender to Defendants those securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon. Class members who have sold their BSMFT Certificate are entitled to rescissionary damages.

70.     By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold a BSMFT Certificate purchased pursuant and/or traceable to

the Offerings have the right to rescind and recover the consideration paid for their BSMFT Certificate and hereby elect to rescind and tender their BSMFT Certificate to the Defendants sued herein. Plaintiff and Class members who have sold their BSMFT Certificate are entitled to rescissionary damages.

**COUNT III**

**Violation of Section 15 of The Securities Act**
**(Against Defendants SAMI, BSMFT and the Individual Defendants)**

71.    Plaintiff repeats and realleges each and every allegation contained above.

72.    This claim is brought by Plaintiff pursuant to Section 15 of the Securities Act and asserted on behalf of all Class members who purchased or acquired a BSMFT Certificate in the Offering.

73.    The Individual Defendants at all relevant times participated in the operation and management of SAMI, and conducted and participated, directly and indirectly, in the conduct of SAMI's business affairs.

74.    As officers and/or directors of SAMI, the Individual Defendants had a duty to disseminate accurate and truthful information in the Registration Statement and the Prospectus.

75.    Defendant SAMI is the Parent Corporation and sole owner of BSMFT, and at all relevant times participated in the operation and management of the BSMFT, and conducted and participated, directly and indirectly, in the conduct of BSMFT business affairs.

76.    As set forth above, it is alleged that the Registration Statement and Prospectus issued in connection with the BSMFT Offering contained material misstatements of fact, and omitted facts necessary to make the facts contained therein not misleading, in violation of Sections 11 and 12 of the Securities Act.

31

77.     Because of their positions of control and authority as senior officers and directors of SAMI, the Individual Defendants were able to, and did, control the contents of the Registration Statement and Prospectus which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The Individual Defendants were therefore "controlling persons" of SAMI within the meaning of Section 15 of the Securities Act.

78.     In addition, because of its sole ownership of SAMI and its control and authority as Parent Corporation, Defendant Bear Stearns was able to, and did, control the contents of the Registration Statements and the Prospectus which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. Defendant Bear Stearns was therefore a "controlling person" of SAMI within the meaning of Section 15 of the Securities Act.

79.     Plaintiff and other Class members purchased a SAMI Certificate issued pursuant to the Offering. The Offering was conducted pursuant to the Registration Statement and the Prospectus.

80.     The Registration Statement and Prospectus, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectus.

81.     Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Registration Statement and the Prospectus.

82.    Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Registration Statement and the Prospectus, for which they are entitled to compensation.

83.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offering.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

        (a)    Determining that this action is a proper class action under CPLR Article 9;

        (b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

        (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

        (d)    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

    Plaintiff hereby demands a trial by jury.

Dated:    August 20, 2008
           New York, New York

                            Respectfully submitted,

                            By: _____
                                Samuel P. Sporn
                                Joel P. Laitman
                                Christopher Lometti
                                Frank R. Schirripa
                                Daniel B. Rehns
                    **SCHOENGOLD SPORN LAITMAN & LOMETTI , P.C.**
                    19 Fulton Street, Suite 406
                    New York, New York 10038
                    Telephone: (212) 964-0046
                    Facsimile: (212) 267-8137

                    *Counsel for Plaintiff and the Proposed Class*

35

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|   |   |   |
|---|---|---|
| New Jersey Carpenters Health Fund, On Behalf of Itself and All Others Similarly Situated, | : | Index No. |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | **VERIFICATION** |
|  | : |  |
| Bear Stearns Mortgage Funding Trust 2006-AR1, Structured Asset Mortgage Investments II, Inc., Jeffrey L. Verschleiser, Michael B. Nierenberg, Jeffrey Mayer, Thomas F. Marano, Joseph T. Jurkowski, Bear Stearns & Co., Inc. and JPMorgan Chase, Inc. as successor-in-interest to Bear Stearns & Co., Inc. | : | |
|  | : |  |
| Defendants. | : |  |

(STATE OF NEW YORK        )
(CITY OF NEW YORK          )
(COUNTY OF NEW YORK    )

    Daniel B. Rehns, being duly sworn, states that he is one of the attorneys for Plaintiff in this action and that the foregoing complaint is true to his own knowledge, except as to matters therein stated on information and belief and as to those matters he believes to be true; that the ground of his belief as to all matters not stated upon his knowledge are upon review of publicly available information filed with the United States Securities and Exchange Commission, media and newspaper articles and information contained on the internet; and that the reason why the verification is not made by Plaintiff is that Plaintiff, New Jersey Carpenters Health Fund, is not in the county where Plaintiff's attorney has their office.

                                     Daniel B. Rehns, Esq.

Notary Public

JAY P. SALTZMAN
Notary Public, State of New York
No. 02SA5064567
Qualified in Nassau County
Commission Expires September 27, 20 10

Sworn to me before this
19th day of August, 2008

36

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| ————————————————X | |
| New Jersey Carpenters Health Fund, On Behalf of : | |
| Itself and All Others Similarly Situated, : | Index No. |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| Bear Stearns Mortgage Funding Trust 2006-AR1, : | |
| Structured Asset Mortgage Investments II, Inc., : | |
| Jeffrey L. Verschleiser, Michael B. Nierenberg, : | |
| Jeffrey Mayer, Thomas F. Marano, Joseph T. : | |
| Jurkowski, Bear Stearns & Co., Inc. and JPMorgan : | |
| Chase, Inc. as successor-in-interest to Bear : | |
| Stearns & Co., Inc. : | |
| : | |
| Defendants. : | |
| ————————————————X | |

---

### VERIFIED COMPLAINT

---

**CERTIFICATION:** I, Daniel B. Rehns, Esq. hereby certify that all of the papers that I have served, filed or submitted to the court in this action are not frivolous as defined in subsection (c) of Section 130-1.1 of the Rules of the Chief Administrator of the Courts.

Dated:     August 20, 2008

Daniel B. Rehns, Esq.
**SCHOENGOLD SPORN LAITMAN &**
**LOMETTI , P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137

*Counsel for Plaintiff and*
*the Proposed Class*