**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY CARPENTERS HEALTH FUND and BOILKERMAKER BLACKSMITH NATIONAL PENSION TRUST, *on Behalf of Themselves and All Others Similarly Situated,*<br><br>               Plaintiffs,<br><br>          v.<br><br>STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., BEAR STEARNS ASSET BACKED SECURITIES I, LLC, JEFFREY L. VERSCHLEISER, MICHAEL B. NIERENBERG, JEFFREY MAYER, THOMAS F. MARANO, MATTHEW E. PERKINS, SAMUEL L. MOLINARO, JR., KIM LUTTHANS, KATHERINE GARNIEWSKI, JOSEPH T. JURKOWSKI, JR., EMC MORTGAGE CORPORATION, JPMORGAN CHASE, INC. *as successor-in-interest to* BEAR STEARNS & COMPANY, INC, MOODY'S INVESTORS SERVICE, INC. and THE MCGRAW-HILL COMPANIES, INC.,<br><br>               Defendants. | Case No.: 08-CV-8093 (LTS)<br><br>**FIRST CONSOLIDATED AMENDED SECURITIES CLASS ACTION COMPLAINT**<br><br><u>**ECF CASE**</u><br><br> |

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ......................................................................................1

II.     JURISDICTION AND VENUE.................................................................................11

III.    PARTIES AND RELEVANT NON-PARTIES.............................................................11

IV.     BACKGROUND .........................................................................................................22

      A.      Bear Stearns Emerges As a Major Issuer and
             Underwriter of Mortgage-Backed Securities .........................................................22

      B.      Bear Stearns' Securitization and Underwriting Operations..................................26

             1.      Bear Stearns' Bulk-Loan Purchases from Third-Party Originators...........26

             2.      The Ratings Agencies' Roles in Bear Stearns'
                  Bid on Loans Purchased at Auction...........................................................27

             3.      Bear Stearns' Loan File "Due Diligence" Between
                  Acceptance of Bid at Auction and Settlement Date...................................29

             4.      Flow Loans from Bear Stearns Subsidiary and Correspondent Lenders ...30

             5.      Bear Stearns Securitizes MBS into Separate
                  "Shelves": BSABS, BSMF and SAMI  .....................................................31

      C.      Bear Stearns' "Ratings Shopping" Practices ........................................................32

V.      DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM
        THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT......................33

      A.      Exponential Increases in Borrower Delinquencies
             Shortly After Certificate Issuances Reflect
             Defective Collateral and Faulty Origination.........................................................33

      B.      The Collapse of the Certificates' Ratings Shortly After Issuances
             Reflects Defective Loan Collateral and Faulty Origination ..................................35

      C.      Investigations and Disclosures Subsequent to Issuance
             Evidence EMC, BSRM and Encore Disregarded
             Stated Mortgage Loan Underwriting Guidelines...................................................36

             1.      EMC And BSRM Systematically Disregarded
                  Stated Mortgage Loan Underwriting Guidelines ......................................36

  2. Encore Systematically Disregarded Stated
   Mortgage Loan Underwriting Guidelines...................................................42

D. Subsequent Disclosures Evidence That Third-Party Originators
 Disregarded Stated Mortgage Loan Underwriting Guidelines ............................44

  1. Countrywide Systematically Disregarded
   Stated Mortgage Loan Underwriting Guidelines.......................................44

  2. American Home Systematically Disregarded Stated
   Mortgage Loan Underwriting Guidelines...................................................50

  3. Ameriquest Loan Sellers Systematically Disregarded
   Stated Mortgage Loan Underwriting Guidelines.......................................53

  4. GreenPoint Systematically Disregarded Stated
   Mortgage Loan Underwriting Guidelines...................................................58

  5. Aegis Systematically Disregarded Stated
   Mortgage Loan Underwriting Guidelines...................................................61

  6. FMC Systematically Disregarded Stated
   Mortgage Loan Underwriting Guidelines...................................................62

E. The FTC Action Reveals that EMC and Bear Stearns Engaged in
 Systemic Improper Mortgage Collection and Servicing Practices .......................64

F. Bear Stearns' Inadequate Due Diligence with Respect to Compliance
 with Stated Underwriting Guidelines and EMC Servicing Activities ..................68

G. The Offering Documents Failed to Disclose that Bear Stearns
 Relied on S&P's and Moody's Outdated Models
 to Determine Levels of Credit Enhancement And Ratings...................................72

H. The Ratings Agencies Relaxed the Ratings Criteria Which
 Led to Artificially Inflated Ratings for the Certificates........................................77

I. The Prospectus Supplements Did Not
 Reflect the True Risk of the Certificates...............................................................79

J. The Offering Documents Failed to Disclose
 Bear Stearns' Ratings Shopping Practices............................................................81

K. The Offering Documents Failed to Disclose the True
 Roles of Ratings Agencies in Forming and Structuring
 the Certificates for Sale as Primarily AAA Securities..........................................82

L.      The Offering Documents Failed to Disclose Material Financial
        Conflicts of Interest Between Bear Stearns and the Ratings Agencies ................84

M.      Federal District Court Rules Non-Independence of
        Moody's in MBS and CDO Ratings Is a Material
        Misrepresentation in Moody's Securities Fraud Case ...........................................87

VI.   **MATERIAL MISSTATEMENTS AND
      OMISSIONS IN THE OFFERING DOCUMENTS** ....................................................89

A.      Material Misstatements and Omissions
        Regarding Mortgage Loan Underwriting Guidelines ............................................89

        1.      The Registration Statements ......................................................................89

        2.      The Prospectus Supplements ......................................................................92

                i.       EMC's Mortgage Loan Underwriting Guidelines .........................92

                ii.      BSRM's Mortgage Loan Underwriting Guidelines ......................95

                iii.     Countrywide's Mortgage Loan Underwriting Guidelines ............98

                iv.      American Home's Mortgage Loan Underwriting Guidelines .....102

                v.       Ameriquest Loan Sellers' Mortgage
                         Loan Underwriting Guidelines ...................................................105

                vi.      GreenPoint's Mortgage Loan Underwriting Guidelines ..............108

                vii.     Aegis' Mortgage Loan Underwriting Guidelines .......................112

                viii.    FMC's Mortgage Loan Underwriting Guidelines.......................114

C.      The Registration Statements Included Material
        Misstatements and Omissions Regarding Credit Support ...................................115

D.      The Prospectus Supplements Misstated the True Loan-to-
        Value Ratios Associated with the Underlying Mortgages...................................118

E.      The Prospectus Supplements Misstated the
        Certificates' True Investment Rating..................................................................121

F.      Misstatements and Omissions in the Registration
        Statements Regarding EMC Servicing Practices................................................123

G.    Misstatements and Omissions in the Prospectus
      Supplements Regarding EMC Servicing Practices.............................................125

VII.   **CLASS ACTION ALLEGATIONS** ...........................................................................126

VIII.  **PRAYER FOR RELIEF**..........................................................................................135

# I.

# SUMMARY OF THE ACTION

1.    This Amended Complaint (the "Complaint") is alleged upon personal knowledge with respect to Plaintiffs, and upon information and belief with respect to all other matters. This action is brought pursuant to the Securities Act of 1933 (the "Securities Act") by (i) Court-Appointed Lead Plaintiff New Jersey Carpenters Health Fund ("Carpenters Health Fund" or "Lead Plaintiff") and (ii) Plaintiff Boilermaker Blacksmith National Pension Trust ("Boilermaker Pension Trust;" with the Carpenters Health Fund, collectively referred to herein as "Plaintiffs"), on their own behalf and as a class action on behalf of all persons and entities who purchased or otherwise acquired interests in the Issuing Trusts (as set forth in ¶¶ 43-33, *infra*) (the "Issuing Trusts") pursuant or traceable to two (2) separate Registration Statements and accompanying Prospectuses filed with the Securities and Exchange Commission (the "SEC") by (i) Structured Asset Mortgage Investments II, Inc. ("SAMI") on March 10, 2006 (No. 333-132232) (the "SAMI Registration Statement")   and (ii) Bear Stearns Asset Backed Securities I, LLC ("BSABSI") on March 31, 2006 (No. 333-131374) (the "BSABSI Registration Statement;" with the SAMI[1] Registration Statement, collectively referred to herein as the "Registration Statements")(the "Class").

2.    Pursuant to the Registration Statements and Prospectus Supplements incorporated therein (collectively, the "Offering Documents"), Bear Stearns & Company, Inc. ("BSC") and its subsidiaries underwrote and sold $31.61 billion of mortgage backed securities ("MBS"), designated as Mortgage Pass-Through Certificates ("MPTC") and Asset-Backed Certificates ("ABS") (collectively, the "Certificates") to Plaintiffs and the Class. The Certificates were sold

---

[1]    SAMI and BSABSI were entities formed and controlled by Bear Stearns & Company, Inc. for the purpose of issuing mortgage backed securities.

in forty-four (44) Offerings completed in just sixteen months between May 23, 2006 and September 18, 2007 (collectively, the "Offerings").

3.     As set forth below, the Offering Documents contained material misstatements and omitted material information in violation of Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Defendants are strictly or negligently liable for the material misstatements and omissions under the Securities Act.  The Complaint asserts no allegations or claims sounding in fraud.

4.     Plaintiffs seek redress against Defendants SAMI and BSABSI, who prepared and filed the Registration Statements; Defendants Jeffrey L. Verschleiser ("Verschleiser"), Michael B. Nierenberg ("Nierenberg"), Jeffrey Mayer ("Mayer"), Thomas F. Marano ("Marano"), Mathew E. Perkins ("Perkins"), Samuel L. Molinaro, Jr. ("Molinaro"), Kim Lutthans ("Lutthans"), Katherine Garniewski ("Garniewski") and Joseph T. Jurkowski, Jr. ("Jurkowski") (collectively, the "Individual Defendants") who individually signed the Registration Statements; Defendant EMC Mortgage Corporation ("EMC"), who was the Sponsor and Seller on each Offering responsible for acquiring the underlying mortgage loan collateral as well as a Servicer responsible for collection of the mortgage debt and distributions to Certificate investors according to the terms of the Offerings; Defendant BSC, who was the sole underwriter of the Offerings;[2] and Defendant Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services ("S&P"), a division of Defendant the McGraw-Hill Companies, Inc. (S&P and Moody's are collectively referred to herein as the "Ratings Agencies," "Ratings Agency Defendants" or the "Ratings Agency Underwriters") who, with BSC, structured the Certificates for sale to investors as primarily the highest investment grade securities ("AAA").  (BSABSI,

---

[2]     JPMorgan Chase, Inc. ("JPM") is named as a Defendant in the within action as BSC's successor-in-interest. JPM purchased BSC on March 16, 2008 for $236 million, or $2 per share in a "fire-sale" acquisition orchestrated by the Federal Reserve and Treasury Department.  (¶¶ 43-44, *infra*).

SAMI, EMC and BSC along with their affiliates, subsidiaries and successors-in-interest are referred to collectively herein as "Bear Stearns").

5.      This action arises from the conversion by Bear Stearns and the Ratings Agencies of 111,426 largely subprime mortgage loans into $31.61 billion of purportedly "investment grade" securities. The value of the Certificates was directly tied to repayment of the underlying mortgage loans since the principal and interest payments due to investors were secured and derived from cash flows from those loans.[3]

6.      By the end of 2005, Bear Stearns had become the single largest underwriter of MBS in the world. According to *Inside Mortgage Finance*, in 2005 alone Bear Stearns underwrote over $130 billion of MBS.[4] Bear Stearns was capable of generating such massive quantities of MBS because it created and operated what was essentially a high speed assembly line for the securitization of mortgage loans. Bear Stearns had sufficient "product" in the form of mortgage loans because it owned and operated subsidiaries – EMC Mortgage Corporation ("EMC"), Bear Stearns Residential Mortgage Corporation ("BSRM") and Encore Credit Corp. ("Encore") – engaged in the business of residential mortgage loan origination. The loans from these companies were purchased on a continuous basis for the sole purpose of securitization. Bear also purchased "bulk" quantities of loans from third party subprime lenders at auction.

---

[3]      As the original borrowers on each of the underlying mortgage loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates. If borrowers failed to pay back their mortgages, defaulted, or were forced into foreclosure, the resulting losses flowed to the Certificate investors. As set forth in the Prospectus Supplements, the Certificates were divided into a structure of classes, or "tranches," reflecting different priorities of seniority, payment, exposure to risk and default, and interest payments.

[4]      As set forth in the securities fraud complaint filed on February 27, 2009 in the United States District Court for the Southern District of New York by purchasers of BSC common stock, *In re The Bear Stearns Companies, Inc Securities, Derivative, and ERISA Litigation*, No. 08-MDL-1963(RWS) (¶ 98), BSC's concentration on the generation and sale of MBS and other "toxic" structured finance products ultimately resulted in the collapse of BSC's common stock price from $148.50 per share on March 15, 2007 to $2.00 per share on March 1, 2008 and the government-imposed sale of BSC to JP Morgan that was announced on March 17, 2008.

7.    The underlying mortgage loans for the Certificates were acquired from EMC, BSRM and Encore[5] or at auctions principally from subprime loan originators Countrywide Home Loans, Inc. ("Countrywide"), American Home Mortgage ("American Home"), Ameriquest Mortgage Company ("Ameriquest"), Town & Country Credit Corporation ("T&C"), Argent Mortgage Company, LLC ("Argent"),[6] GreenPoint Mortgage Funding, Inc. ("GreenPoint"), Aegis Mortgage Corporation ("Aegis") and Fieldstone Mortgage Corporation ("FMC") (collectively referred to herein as the "Originators").[7]

8.    For BSC, the Certificates could not be sold unless they had been assigned the highest investment grade rating from the Ratings Agencies. The reason was simple. Without such ratings, they could not be purchased by Bear Stearns' principal potential investors – pension funds and insurance companies.[8]    Bear Stearns did not leave the assignment of these highest AAA ratings to chance. The Rating Agencies were made integral to the MBS assembly line. Bear Stearns ensured the highest ratings were assigned to the Certificates by engaging Moody's and S&P not merely to "rate" the Certificates after they were issued, but, more importantly, to directly participate in the creation and structuring of the Certificates - activities typically within the duties of the investment banking underwriter.  (¶¶ 58-78).  Although not disclosed to

---

[5]    Encore was strictly a subprime lender; it specialized in providing loans to borrowers with compromised credit. Encore has operated as a wholly-owned subsidiary of BSRM since February, 2006. As of October 29, 2007, Encore was merged into, and began operating under the name Bear Stearns Residential Mortgage Company. BSRM and Encore are, at times, collectively referred to herein as the "EMC Originators" or the "EMC Loan Sellers."

[6]    T&C and Argent have operated as wholly-owned subsidiaries of Ameriquest since January 2003. Ameriquest, T&C and Argent are, at times, collectively referred to herein as the "Ameriquest Originators" or the "Ameriquest Loan Sellers."

[7]    SAMI and BSABSI served as "Depositor" for their respective Offerings (¶¶ 43-44, *infra*), acquiring the loans from EMC and "depositing" them to the Issuing Trusts where SAMI or BSABSI securitized the cash-flows from the mortgage loans into the Certificates which were sold to investors.

[8]    As former head of MBS at Moody's, Brian Clarkson stated in an October 17, 2008 article in the *Financial Times*, in structured finance, including mortgage backed securities "[y]ou start with a rating and build a deal around a rating."  (¶ 200).

Plaintiffs and the Class, well before the formation of the Certificates, the Ratings Agencies participated in the determination of which mortgage loans Bear Stearns would purchase at auction and at what price, the loans that should be included in the underlying Certificate mortgage pools and the structure of the Certificates themselves – *i.e.,* the number and kind of classes or tranches and the amount and kind of investment protections or "credit enhancement" built into the Certificates' structure.  Also undisclosed to investors was the fact that the Ratings Agencies were engaged by "rating shopping," *i.e.*, the Ratings Agency's "ratings" were submitted as part of  the  competitive bid submitted to Bear Stearns to obtain the Certificate engagements - before they were actually hired to rate the securities.

9.      As a result, regardless of the creditworthiness of the borrower or the terms of the underlying mortgages,[9] the Certificates were substantially assigned the highest investment grade ratings by the Ratings Agencies.  Moody's assigned its highest rating of "Aaa" to over 87.0% or $27.44 billion of the Certificates, while S&P assigned its highest rating of "AAA" to over 89.0%

---

[9]      As alleged herein, the Certificate collateral was composed of significant non-traditional adjustable mortgages, interest only and negative amortization loans ("Neg Am").  (¶¶ 14, 50-57).  These types of loans presented the greatest potential for **"payment shock"** to the borrower since they provided for initially small monthly payments based on low fixed rates which then reset thereafter to significantly higher monthly payment amounts based on adjustable interest rates.  In particular, Bear Stearns securitized - and the Rating Agencies rated as AAA securities - Certificates largely composed of negative amortization loans. (¶ 50-57).  Specifically, these loans permitted the borrower to pay less than even the full monthly interest payment with the unpaid interest and principal being added back on top of the outstanding principal balance.  These small payments were permitted only until the loan's Loan-To-Value ("LTV") ratio (which initially around 80%) reached approximately 110%. At that point, the loan "reset" requiring the borrower to make monthly payments based on significantly higher adjustable rates and outstanding principal. While this type of loan was designed for high net worth investors who were capable of earning higher returns through investment than in making interest and principal payments upfront, Bear Stearns and the Originators routinely sold these loans to unsophisticated borrowers who were unable to make the required payments after the loan reset.

All 44 Offerings included some degree of these negative amortization loans.  However, the underlying mortgage loan collateral of the following 23 Certificate was  substantially composed of negative amortization loans: BSMF Series 2006-AC1, BSMF Series 2006-AR1, BSMF Series 2006-AR2, BSMF Series 2006-AR3, BSMF Series 2006-AR4, BSMF Series 2006-AR5, BSMF Series 2006-SL1, BSMF Series 2006-SL2, BSMF Series 2006-SL3, BSMF Series 2006-SL4, BSMF Series 2006-SL5, BSMF Series 2006-SL6, BSMF Series 2007-AR1, BSMF Series 2007-AR3, BSMF Series 2007-SL1, BSMF Series 2007-SL2, SAMI Series 2006-AR4, SAMI Series 2006-AR5, SAMI Series 2006-AR6, SAMI Series 2006-AR7, SAMI Series 2006-AR8, SAMI Series 2007-AR1, SAMI Series 2007-AR2.

or $26.71 billion of the total $31.61 billion of issued Certificates.  The ratings purported to reflect the risk or probability of default by the borrower according to the Offering Documents. (¶¶ 269-272).  None of the Certificates were initially rated by either S&P or Moody's as below "investment grade" ("Ba1" and below for Moody's and "BB+" and below for S&P).

10.    Soon after issuance, the value of the Certificates collapsed.  Plaintiffs' holdings have lost over 56% of their initial value.  (¶¶ 21-22).  Further, the likelihood of these securities ever recovering their value is severely diminished by the fact that approximately *42%* of the mortgage loans underlying the Certificates – the source of Certificate investors' financial return – are in delinquency, default, foreclosure or repossession.  Moreover, approximately *93%* of the Certificates have now been downgraded by Moody's to "junk bond" investments.  (¶ 84).

11.    Since Certificate Investors were dependent on the quality of the mortgage collateral for receipt of a return on their investment, the descriptions of the loan origination guidelines in the Offering Documents were highly material disclosures to Certificate purchasers. The loan origination guidelines contained in Offering Documents generally required an examination of borrower creditworthiness (¶¶ 209-261) and the performance of standard appraisals of the mortgage properties (¶¶ 209-261).  These portions of the Offering Documents contained misstatements and omissions since, as emerged only well after issuance of the Certificates, BSRM, Encore, EMC and the Originators systematically disregarded the stated underwriting guidelines set forth in the Offering Documents.  (¶¶ 209-278).  These misstatements and omissions were further reflected in the fact that the Ratings Agencies themselves, in downgrading the Certificates from the highest investment grade to junk bond investments, specifically attributed the downgrades to "aggressive underwriting" in the origination of the loans (¶ 84); the utter collapse of the AAA ratings originally assigned the

Certificates – down multiple levels to junk bond status (¶ 84); and the uniform pattern of exponential increases in delinquency, default and foreclosure rates almost immediately after the Offerings (regardless of when the Offering occurred). (¶¶ 79-80, 85-86, 99, 106, 121, 130, 143, 152, 157).

12.    While compliance with those loan underwriting guidelines was highly material to Certificate investors, who were dependent on the creditworthiness of the borrowers for interest and principal payments, Bear Stearns had no such similar financial interest.   Bear Stearns conducted inadequate due diligence with respect to whether the loans were originated in conformity with the underwriting guidelines stated in the Offering Documents.   Bear Stearns' "due diligence" principally occurred not during the underwriting phase of the Offering, but while Bear Stearns was inspecting smaller bulk loans for possible purchase from third-party loan originators after successfully bidding on the loans at auction.  (¶¶ 63-70).  At that stage, there was a disincentive for Bear Stearns to reject, or "kick-back," loans as non-compliant with stated guidelines since the Originator would be less likely to select Bear Stearns as the winning bidder in future auctions.  Bear Stearns generally used non-conforming loans as a rationale to negotiate a lower price for the loans, not to reject them.  Bear Stearns' "due diligence" was limited, inadequate and defective.  (¶¶ 58-78, 167-185).  Bear Stearns was forced to review loans on an expedited basis and unable to commit to a full review of the loan pools.  Moreover, Bear Stearns did not have a mechanism in place to prevent previously "kicked-back" loans from being resubmitted as part of later pools by an Originator.

13.    Bear Stearns contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors'

activities.  As disclosed as part of an ongoing investigation of investment banking misconduct in underwriting MBS being conducted by the New York Attorney General (the "NYAG"), Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks routinely overrode exclusion of those loans from purchase and securitization.  (¶¶ 70-78, 144).  Further, the President of The Bohan Group stated that, by the time the Offerings of the Certificates took place, investment banks were requiring a review of only 5% to 7% of the entire loan pools.  (¶ 68).

14.    The Offering Documents failed to disclose that, given the systematic disregard for the underwriting guidelines by Bear and the Originators and the servicing guidelines by EMC, the amount of credit enhancement was insufficient for the Certificates to be assigned AAA and investment grade ratings; and that the Ratings Agencies caused this understatement by failing to timely and adequately update the models employed to make those assessments.  As was only disclosed well after issuance of the Certificates, S&P's models had not been materially updated since 1999; while Moody's models had not been materially updated since 2002.  Since these models used statistical assumptions based on the performance of mortgage loans issued in or before 2002, they failed to accurately reflect the performance of the Certificate collateral, which included substantial portions of the type of loans which only began to be originated en masse after 2002 – *i.e.,* subprime and Alt-A loans, non-traditional adjustable mortgages; interest only and negative amortization loans as well as loans issued with limited borrower documentation or employment verification.  (¶¶ 54, 61-67, 173-183, 190-192).

15.    The Offering Documents also failed to disclose material financial conflicts of interest between the Ratings Agencies and Bear Stearns, including Bear Stearns' engagement of the Ratings Agencies through "ratings shopping."  (¶¶ 56-58, 73-76).  These conflicts of interest

were detailed in a report released by the SEC in July 2008 (the "SEC Report"), after a year-long investigation into the Ratings Agencies' activities relating to the issuance of RMBS in the period spanning 2005 through 2007.  The SEC Report disclosed that the Ratings Agencies were typically engaged by way of "ratings shopping" whereby the Ratings Agency that was ultimately engaged was the one which provided the most profitable rating to the investment bank in "bidding" for the engagement.  The SEC Report also explained that the Ratings Agencies were incentivized, due to the highly profitable nature of these MBS engagements and the concentration of business in the hands of a relatively small group of investment banks, to not update their models lest they become unable to provide to the investment bank the most profitable credit enhancement and rating structure for the mortgage backed securities transaction.  (¶¶ 78, 197, 203-208).

16.    Finally, given that repayment of the Certificates to investors was dependent on the proper collection by the Servicer of borrower mortgage payments, the description of the Servicer's duties and obligations in the Offering Documents was also highly material to Certificate investors.   The Offering Documents contained descriptions of EMC's role as "servicer."  (¶¶ 275-280).  These descriptions contained material misstatements and omissions since, as set forth in an action commenced by the Federal Trade Commission in 2008, EMC and BSC engaged in systematic violations of the laws governing mortgage and debt collection including the Federal Trade Commission Act ("FTCA"); the Fair Debt Collection Practices Act ("FDCPA"), the Fair Credit Reporting Act ("FCRA") and the Truth in Lending Act ("TILA").  (¶¶ 163-168).  Ultimately, in September 2008, BSC and EMC were forced to pay over $28 million in fines in settlement of the FTC action as well as to agree to engage in wide-ranging corrective and remedial actions.  *Id*.

17.    As set forth herein, the Offering Documents contained material misstatements and omissions of material facts in violation of Section 11 and 12 of the Securities Act, including the failure to disclose that: (i) the Certificate mortgage loan collateral was not originated in accordance with the loan underwriting guidelines set forth in the Registration Statements or the Prospectus Supplements, since the Originators failed to conduct meaningful assessment of the borrower's creditworthiness and/or standard appraisals of the mortgaged properties sufficient to assess their fair value (¶¶ 85-168); (ii) BSC failed to conduct adequate due diligence with respect to the Originators' compliance with the loan underwriting guidelines stated in the Offering Documents (¶¶ 61-78, 169-176); (iii) the stated Credit Enhancement did not support the investment grade ratings assigned to the Certificates in light of the true undisclosed and impaired quality of the mortgage collateral (¶¶ 50-78, 177-187, 201-208, 264-266); (iv) there were material undisclosed conflicts of interest between Bear Stearns and the Ratings Agencies, including as reflected in the undisclosed ratings shopping practices, which incentivized the Ratings Agencies to understate the appropriate Certificate Credit Enhancement and inflate the Certificate ratings (¶¶ 50-78, 177-187, 201-208, 264-266); (v) the amount of credit enhancement provided to the Certificates was inadequate to support the AAA and investment grade ratings because those amounts were determined primarily by Ratings Agencies' models which had not been updated in a timely manner (¶¶ 177-187); and (vi) EMC and Bear Stearns did not service the mortgage loan collateral as stated in the Offering Documents, but engaged in collection practices violative of the FTCA; the FDCPA, the FCPA, and the TILA (¶¶ 163-168).

18.    As a result of these material misstatements and omissions of material fact Plaintiffs and the Class have suffered damages for which Defendants are liable pursuant to Sections 11, 12 and 15 of the Securities Act.

## II.

## JURISDICTION AND VENUE

19.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by Section 22 of the Securities Act, and venue is proper pursuant to Section 22 of the Securities Act.

20.     The violations of law complained of herein occurred in this County, including the dissemination of misstatements and omission statements complained of herein into this County. BSC, JPM, EMC, SAMI, BSABSI and their affiliates and subsidiaries conduct or conducted business in this County.

## III.

## PARTIES AND RELEVANT NON-PARTIES

21.     Court Appointed Lead Plaintiff Carpenters Health Fund is a Taft-Hartley Pension Fund.  As reflected in the certification filed herein, the Carpenters Health Fund purchased the following Certificates pursuant and traceable to the 2006 Registration Statement and Prospectus Supplement and has been damaged thereby.

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Value as of the Date of Filing of Complaint (Per Unit) |
|---|---|---|---|
| Bear Stearns Mortgage Funding, Series 2006-AR1 Trust, Class 1B3 | 145,000.00 | $ 0.9997 | $ 0.0010 |

22.     Plaintiff Boilermaker Pension Trust is a Taft-Hartley Pension Fund.  As reflected in the attached Certification of Securities Class Action, Boilermaker Pension Trust purchased the

11

following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged by the following amounts as of the date of filing:[10]

| Certificates Purchased | Amount of Units Purchased | Amount Paid (Per Unit) | Value as of Filing of Complaint (Per Unit) |
|---|---|---|---|
| Structured Asset Mortgage Investments II, Series 2006-AR5 Trust, Class 1A1 | 269,114.44 | $ 0.9581 | $ 0.9350 |
| Structured Asset Mortgage Investments II, Series 2006-AR5 Trust, Class 2A1 | 235,696.47 | $ 0.9575 | $ 0.3602 |
| Structured Asset Mortgage Investments II, Series 2006-AR6 Trust, Class 1A1 | 2,423,365.66 | $ 0.9578 | $ 0.3314 |
| Bear Stearns Asset Backed Securities, Series 2007-HE1 Trust, Class 1A1 | 2,600,000 | $ 0.5506 | $ 0.3194 |

23.    Defendant SAMI is the Depositor for a certain number of the Offerings which are the subject of the within action, and, during the relevant time period, was a wholly-owned subsidiary of BSC.  According to its SEC filings, SAMI maintained its principal offices at 383 Madison Avenue, New York, New York 10179 until mid-2008.  Pursuant to a Merger Agreement effective May 30, 2008, The Bear Stearns Companies, Inc. ("BSI") merged with BSC Merger Corporation, a wholly-owned subsidiary of Defendant JPMorgan Chase, Inc. ("JPM"), making BSI a wholly-owned subsidiary of JPM.  As such, as of the date of the filing of this Complaint, SAMI's principal offices are now located at 270 Park Avenue, New York, New York 10017.

---

[10]    An executed Certification of Securities Class Action on behalf of the Boilermaker Pension Trust is annexed hereto.

24.     Defendant BSABSI is the Depositor for a certain number of the Offerings which are the subject of the within action, and, during the relevant time period, was a wholly-owned subsidiary of BSC.  According to its SEC filings, BSABSI maintained its principal offices at 383 Madison Avenue, New York, New York 10179 until mid-2008.  Pursuant to the Merger Agreement effective May 30, 2008, as set forth above, BSABSI's principal offices are now located at 270 Park Avenue, New York, New York 10017.

25.     BSI, a Delaware Corporation with its principal place of business at 383 Madison Avenue, New York, New York, 10017, served as the holding company for the entire family of Bear Stearns Entities.  BSI rose to become one of the largest investment banking and securities-trading-and-brokerage firms.  In 2007, BSI was the largest underwriter of U.S. residential MBS ("RMBS") and the second largest underwriter of U.S MBS.  In March 2008, as the result of BSI's concentration on the generation and sale to investors of toxic debt securities including MBS and collateralized debt obligations, the Federal Reserve Bank of New York instituted an emergency lending action and brokered a "fire-sale" acquisition of BSI by JPM.  The "merger" agreement was executed on March 16, 2008 with JPM agreeing to acquire the struggling investment bank for two dollars per share.  Pursuant to a Merger Agreement effective May 30, 2008, BSI merged with BSC Merger Corporation, a wholly owned subsidiary of JPM, and BSI, along with its subsidiaries and affiliates, all became wholly-owned subsidiaries of JPM.

26.     Defendant JPM is an investment banking holding company incorporated in Delaware, and principally located at 270 Park Avenue, New York, New York 10017.  Pursuant to the Merger between BSI and the wholly-owned subsidiary of JPM, Defendants BSC, SAMI and BSABSI along with their affiliates and subsidiaries, became wholly-owned subsidiaries of JPM.

27.    Defendant EMC acted as the Sponsor for the Certificates issued pursuant to the Registration Statements.  Bear Stearns originated or acquired all underlying mortgage collateral for the various Offerings via the Sponsor, EMC.  (¶¶ 43-44).  EMC made certain representations and warranties in connection with the loan pools collateralizing the Certificates.  (*Id*).  As set forth in the Registration Statements, EMC then conveyed the mortgages to Special Purpose Entities ("SPE"), including the Depositors, Defendants SAMI and BSABSI, which were created for the sole purpose of creating, and thereafter depositing the collateral into, the Issuing Trusts. The Issuing Trusts then issued the Certificates supported by the cash flows from the assets and were secured by those assets.  EMC's principal office is located at 2780 Lake Vista Drive, Lewisville, Texas 75067-3884.

28.    Defendant SAMI filed the following Registration Statement and accompanying Prospectus with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| March 6, 2006 | S-3 | $ 50,000,000,000 |
| March 10, 2006 | S-3/A | $ 50,000,000,000 |

29.    Defendant BSABSI, filed the following Registration Statement and accompanying Prospectus with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| January 30, 2006 | S-3 | $ 1,000,000 |
| March 31, 2006 | S-3/A | $ 50,000,000,000 |

30.    Defendant Jeffrey L. Verschleiser ("Verscheleiser") was, at all relevant times, President (Principal Executive Officer) of SAMI.  Verscheleiser signed the SAMI Registration Statement as President (Principal Executive Officer) of SAMI.

31.    Defendant Michael B. Nierenberg ("Nierenberg") was the Treasurer (Principal Financial Officer and Principal Accounting Officer) of SAMI at all relevant times.  Nierenberg signed the SAMI Registration Statement.

32.    Defendant Jeffrey Mayer ("Mayer") was a Director of SAMI during the relevant time period.  Mayer signed the SAMI Registration Statement.

33.    Defendant Thomas F. Marano ("Marano") was a Director of both SAMI and BSABSI during the relevant time period.  Marano signed both the SAMI and BSABSI Registration Statements.

34.    Defendant Matthew E. Perkins ("Perkins") was, at all relevant times, President (Principal Executive Officer) and a Director of BSABSI.  Perkins signed the BSABSI Registration Statement as President (Principal Executive Officer) and a Director of BSABSI.

35.    Defendant Joseph T. Jurkowski, Jr. ("Jurkowski") was, at all relevant times, Vice President of BSABSI.  Jurkowski signed the BSABSI Registration Statement as Vice President of BSABSI.

36.    Defendant Samuel L. Molinaro, Jr. ("Molinaro") was the Treasurer (Principal Financial and Accounting Officer) and a Director of BSABSI during the relevant time period.  Molinaro signed the BSABSI Registration Statement.

37.    Defendant Kim Lutthans ("Lutthans") was an Independent Director of BSABSI during the relevant time period.  Lutthans signed the BSABSI Registration Statement.

38.    Defendant Katherine Garniewski ("Garniewski") was an Independent Director of BSABSI during the relevant time period.  Garniewski signed the BSABSI Registration Statement.

39.    The Defendants identified in ¶¶ 30-38 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Issuing Trusts as they were officers and/or directors of SAMI and/or BSABSI and signed either one or both of the Registration Statements for the registration of the securities thereafter issued by the Issuing Trusts.

40.    The Individual Defendants participated with and/or conspired with the remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

41.    Defendant BSC, a former wholly-owned subsidiary of BSI, is an SEC-registered broker-dealer.  BSC was located at 383 Madison Avenue, New York, New York 10179, until it was sold to JPM in March 2008.  Defendants BSC and JPM, as BSC's successor-in-interest, are collectively referred to herein as "BSC."

42.    Defendant BSC served as the Underwriter for all of the Certificate Offerings complained of herein.  After incurring substantial losses due to their exposure to the U.S. sub-prime housing markets, BSC was purchased by and merged into a wholly-owned subsidiary of Defendant JPM, in order to avoid imminent bankruptcy in 2008.[11]  Defendant BSC was intimately involved in the Certificate Offerings.  BSC failed to perform the requisite level of due diligence in connection with the Certificate Offerings. The Offering Documents disseminated in connection with the Certificate Offerings contained material misstatements and omissions of material fact relating to the "Underwriting Practices" employed in originating the underlying

---

[11]    Defendant JPM is a investment banking holding company incorporated in Delaware, and principally located at 270 Park Avenue, New York, New York 10017.  Pursuant to the Merger between Bear Stearns Companies Inc. and the wholly owned subsidiary of JPM, Defendant BSC became a non-bank operating wholly owned subsidiary of JPM, in May 2008.

mortgage loans and issuing the Certificates.   BSC was one of the leading underwriters in mortgage-backed securities in the United States prior to its downfall.   BSC, and JPM as its successor-in-interest, as an essential part of their investment banking businesses, have substantial contacts within this County and during the relevant time period transacted business in New York – specifically New York County (*i.e*., Wall Street and the financial markets) including through the Offerings.   BSC actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

43.     BSC served as underwriter for the following Offerings issued pursuant to the BSABSI Registration Statement:

| Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| Bear Stearns Asset Backed Securities, Series 2006-HE5 | $ 396,674,000 | May 23, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2006-AC4 | $ 357,522,000 | June 28, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-AC1 | $ 241,704,000 | July 27, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-SL1 | $ 477,761,000 | July 27, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-SL2 | $ 323,515,000 | August 25, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-SL3 | $ 290,743,000 | September 28, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-SL4 | $ 296,247,000 | November 8, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, | $ 260,663,000 | November 28, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |

Series 2006-AC5

| | | | | | |
|---|---|---|---|---|---|
| Bear Stearns Asset Backed Securities, Series 2006-AQ1 | $ 593,225,000 | November 29, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2006-HE9 | $ 1,007,791,000 | November 29, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-SL5 | $ 334,186,000 | November 29, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2006-HE10 | $ 1,096,352,000 | December 28, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-SL6 | $ 4,243,000 | December 29, 2006 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2007-SL1 | $ 328,924,000 | January 24, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-AQ1 | $ 333,732,000 | January 26, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-AC1 | $ 448,027,000 | January 29, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-HE1 | $ 676,171,000 | January 29, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-AC2 | $ 381,278,000 | February 23, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-AQ2 | $ 193,460,000 | February 26, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-FS1 | $ 364,767,000 | February 27, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-HE2 | $ 685,929,000 | February 27, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2007-SL2 | $ 280,632,000 | February 27, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-AC3 | $ 368,568,000 | March 29, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |

| Bear Stearns Asset Backed Securities, Series 2007-HE3 | $ 916,696,000 | March 29, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-HE4 | $ 821,614,000 | April 26, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-AC4 | $ 401,056,000 | April 27, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-HE5 | $ 634,345,000 | May 29, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-AC5 | $ 439,552,424 | June 28, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-HE6 | $ 648,390,000 | August 29, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |
| Bear Stearns Asset Backed Securities, Series 2007-AC6 | $ 252,208,997 | September 18, 2007 | Bear Stearns & Co., Inc. | BSABS I, LLC | EMC Mortgage Corporation |

44.    Furthermore, BSC served as underwriter for the following Offerings issued pursuant to the SAMI Registration Statement:

| Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
| --- | --- | --- | --- | --- | --- |
| Structured Asset Mortgage Investments II, Series 2006-AR5 | $ 951,921,000 | May 30, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Structured Asset Mortgage Investments II, Series 2006-AR4 | $ 1,564,950,000 | June 29, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-AR1 | $ 973,112,000 | July 28, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Structured Asset Mortgage Investments II, Series 2006-AR6 | $ 1,524,376,000 | August 3, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Structured Asset Mortgage Investments II, | $ 2,867,019,000 | August 31, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |

Series 2006-AR7

| | | | | | |
|---|---|---|---|---|---|
| Bear Stearns Mortgage Funding, Series 2006-AR2 | $ 1,097,323,000 | September 27, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Structured Asset Mortgage Investments II, Series 2006-AR8 | $ 1,718,595,000 | October 27, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-AR3 | $ 795,165,000 | October 30, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-AR4 | $ 496,614,000 | November 28, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2006-AR5 | $ 1,831,882,000 | December 28, 2006 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2007-AR1 | $ 1,078,030,000 | January 29, 2007 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Structured Asset Mortgage Investments II, Series 2007-AR1 | $ 680,345,000 | January 29, 2007 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Structured Asset Mortgage Investments II, Series 2007-AR2 | $ 510,918,000 | February 26, 2007 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |
| Bear Stearns Mortgage Funding, Series 2007-AR3 | $ 1,294,229,000 | March 29, 2007 | Bear Stearns & Co., Inc. | SAMI II, Inc. | EMC Mortgage Corporation |

45.     Each of the Issuing Trusts for the various Certificates was a New York common law trust.  Each of the Issuing Trusts issued hundreds of millions of dollars worth of Certificates pursuant to a Prospectus Supplement, incorporated by reference into the corresponding Registration Statement, which listed numerous classes of offered Certificates.

46.     Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020.   S&P, a division of Defendant McGraw-Hill, is a Nationally Recognized Statistical Ratings Organization ("NRSRO") which provides credit ratings, risk

evaluation, investment research and data to investors.  S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.  In addition, S&P worked with EMC, SAMI, BSABSI, loan sellers and servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

47.    Defendant Moody's Investors Service, Inc. (defined herein as "Moody's") is an NRSRO principally located at 250 Greenwich Street, New York, New York 10007. Defendant Moody's, a division of Moody's Corporation, provides credit ratings, risk evaluation, investment research and data to investors.  Defendant Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members.  In addition, Moody's worked with EMC, SAMI, BSABSI, loan sellers and servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

48.    Defendants McGraw-Hill, inclusive of S&P, and Moody's, are collectively referred to hereinafter as the "Ratings Agencies," the "Ratings Agency Defendants" or the "Ratings Agency Underwriters").

49.    The Ratings Agency Underwriters are not being sued herein pursuant to Section 11(a)(4) as persons who prepared or certified the ratings portion of the Registration Statements since, pursuant to Securities Act Rule 436(g), the ratings assigned to a class of debt securities shall not be considered part of the Registration Statement "prepared or certified by a person within the meaning of Section 11 of the Securities Act."  Instead, they are being sued on the

basis of their roles, as alleged in detail, *infra*, as underwriters and control persons within the meaning of Sections 11 and 15 of the Securities Act, including their underwriting activities both before and after their engagement to "rate" the Certificates in determining which mortgage loans to be included and excluded from the underlying Certificate collateral and the composition of the Certificate credit enhancement.

## IV.

## BACKGROUND

A.  **Bear Stearns Emerges As a Major Issuer and Underwriter of Mortgage-Backed Securities**

50.     As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



51.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is

also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage. Of course, because the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

52. The securitization of loans fundamentally shifts the risk of loss from the mortgage loan originator to the investor who purchased an interest in the securitized pool of loans. When the originator holds the mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan. As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans. In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

53. In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators. Investors in these early GSE securitizations were provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

54. Between 2001 and 2006, however, there was dramatic growth in both non-GSE loan originations and securitizations, for which there were no such underwriting limitations. That growth resulted in a commensurate increase in subprime securitizations. According to

*Inside Mortgage Finance* (2007), in 2001, agency originations were $1.433 trillion and securitizations were $1.087 trillion – far outpacing non-agency originations of $680 billion and securitizations of $240 billion.  In 2006, agency originations grew to $1.040 trillion while securitizations declined to $904 million.  However, in that same period, non-agency originations had grown by 100% to $1.480 trillion, and non-agency securitizations had grown by 330% to $1.033 trillion in 2006.  Further, non-agency origination of subprime loans grew by 315% – from $190 billion in 2001 to $600 billion in 2006; and non-agency Alt-A origination grew by 566% – from $60 billion in 2001 to $400 billion in 2006.  Non-agency securitizations of subprime loans had also grown exponentially by 415% – from $87.1 billion in 2001 to $448 billion in 2006.

55.     The market for adjustable rate mortgages ("ARMs"), including interest only and negative amortization loans, grew concurrently with the boom in subprime and Alt-A loan originations and securitizations.  Issuance of ARMs increased from $355 billion in 2001 to $1.3 trillion in 2006.  (*Mortgage Market Statistical Annual*, 2007, Vol. 1, p.4).  Such growth coincided with the increase in popularity of so called "exotic" or non-traditional ARMs which had fixed interest rates for a limited period before "resetting" during the life of the loan to significantly higher adjustable rates.  These non-traditional ARMs included "2/28 or 3/27 ARMs" (many with below-market teaser rates for two or three years and then conversion to the fully-indexed rate); interest-only ARMs (permitting interest only payments for a set period of time during which the rate may fluctuate, resulting in negative amortization and rising principal); option payment ARMs (offering up to four payment options, including minimum and interest only payments, which, if chosen, result in negative amortization and rising principal); and 40-year ARMs (in which payments are calculated based on a 40-year payment term but where the

loan terminates in 30 years, resulting in a final balloon payment).[12]  Origination of non-traditional ARMs increased by 278% between 2004 and 2006 – from $205 billion in 2004 to $775 billion in 2006.[13]

56.    These adjustable ARM loans and particularly negative amortization loans ("Neg Am loans") represented a significant portion of the Certificate collateral. As set forth below, however, the models the Ratings Agencies used to determine the requisite credit enhancement required for the Certificates to be substantially rated AAA had not been sufficiently updated by S&P since 1999 or by Moody's since 2002.  This led to an understatement of required credit enhancement since the models did not include sufficient quantities of loans reflective of the Certificate collateral – no documentation Alt-A or subprime loans; adjustable interest only or Neg Am loans – and tested pursuant to economic stresses attendant to such loans.

57.    BSC became a significant underwriter in the non-agency MBS securitizations market.  According to *Inside Mortgage Finance*, in 2005 and 2006 BSC, having issued $64.58 and $64.299 billion of MBS in 2005 and 2006, respectively, was the fourth and fifth largest issuer of non-agency MBS in those years.  In 2005 and 2006 Bear Stearns,, having underwritten $130.82 and $103.38 billion of MBS in 2005 and 2006, respectively, was the first and third largest underwriter of non-agency MBS in those years.

---

[12]    McCoy, Patricia, The Legal Infrastructure of Subprime and Nontraditional Home Mortgages, The Institutional Center for Housing Studies, Harvard University, p. 17 (February 2008) (the "Harvard Study").  These nontraditional ARMs were included in some of the Certificate pools and were viewed by one commentator to be "so complex that even savvy borrowers have difficulty understanding the risks that they present.  Worse yet, subprime lenders peddled many of these loans to borrowers who not only did not understand them, but had little chance of avoiding default."  These nontraditional mortgages were offered "by more lenders to a wider spectrum of borrowers who [might] not otherwise qualify for more traditional mortgage loans and [might] not fully understand the associated risks."  Many of these products were underwritten with less stringent income and asset verification requirements ("reduced documentation") and often were combined with simultaneous second-lien loans, leaving borrowers with little or no equity, these controversial 'exotic' ARMs exploded in the last three years, with dollar volume rising."  Harvard Study at 17.

[13]    Mortgage Market Statistical Annual (2007, Vol. I, p. 6).

**B.**    **Bear Stearns' Securitization and Underwriting Operations**

58.    In 2005 and 2006, Bear Stearns' RMBS operations were run primarily out of its offices at 383 Madison Avenue, New York, New York.  Defendant Thomas Morano was the head of Bear Stearn's RMBS operations.  The RMBS trading floor was divided by the type of mortgage loans being securitized and sold to investors.  Defendant Michael Nierenberg was responsible for the ARM/Alternative-A ("Alt-A") Trading Desk (the "ARM/Alt-A Desk") which controlled the securitization of ARMs and Alt-A loans.  Alt-A loans are loans to borrowers with compromised credit but not to the extent of subprime borrowers.

59.    Defendant Jeffrey Meyer oversaw the Fixed Rate/Subprime Mortgage Trading Desk ("Subprime Desk").  Defendant Jeffrey Verschlaiser ran the Asset-Backed Securities Trading Desk and reported to Defendant Mathew Perkins who was the head of ABS at Bear Stearns.

60.    Bear Stearns also engaged former Ratings Agency employees to conduct "ratings shopping" to ensure it obtained the highest rating for the Certificates.

**1.**    **Bear Stearns' Bulk-Loan Purchases from Third-Party Originators**

61.    Before securitization could begin, Bear Stearns had to acquire the underlying mortgage loans.  This was accomplished in two ways.  Throughout the course of a month, BSC made substantial bulk loan purchases from third-party originators through silent auctions.  BSC had a specific sales team assigned to bulk loan purchases from third-party originators.  Originators set a date and time for bids to be submitted by competing investment banks to purchase a block of mortgage loans.  In advance of the auction, the Originator would send to each bidding investment bank a "Loan Level File" in the form of a spreadsheet, which contained numerous fields of non-borrower sensitive information regarding the loans to be auctioned.  The

spreadsheet would include information such as borrower FICO scores, LTV, property location and the level of documentation supporting the loan, and many other loan characteristics. Bear Stearns' Mortgage Finance Group would scrub the loan data for errors and then analyze the underlying loan characteristics.

62.    At the same time, the originator would provide Bear Stearns with a Bid Stipulation Sheet (the "Bid Sheet"). The Bid Sheet would describe the general characteristics of the loan pool being auctioned, the variance rate of the pool and most importantly the *maximum* size of the pool sample which the investments banks were permitted conduct due diligence on and the number of loans which the banks could "kick-back" to the originator due to borrower deficiencies, payment delinquencies or first/early payment defaults on the loan.

### 2.    The Ratings Agencies' Roles in Bear Stearns' Bid on Loans Purchased at Auction

63.    Bear Stearns traders had, on their desktop computers, S&P's LEVELS Model and Moody's M-3 Model, which they used to determine the amount of credit enhancement needed for certain Certificates, based upon a specific pool of loans, to be rated AAA. Nevertheless, Bear Stearns would also send the "Loan Level File" to the Ratings Agencies in advance of the auction in order for them to participate and advise on Bear Stearns' determination of the appropriate price to pay for the loans at auction. S&P would run the loan tape through both its "LEVELS" and "SPIRE" Models. Moody's would run the loan tape through its M-3 Model. The LEVELS and M-3 Models analyzed and indicated if there were loans that failed to have necessary information or support so that they should be excluded from Bear Stearns' purchase. Further, these Models analyzed 50-80 loan characteristics (*e.g.,* borrower FICO score, LTV, property location, etc)., in order to estimate the number of loans that were likely to default and the corresponding dollar amount of the loss which would result from such default. The estimates

were based on the performance of undisclosed data based on loans tested under undisclosed economic stresses.  By determining these two factors, the LEVELS Model calculated the amount of "credit enhancement" required to offer a specific pool of loans with ratings of "AAA."  The LEVELS Model might show a certain pool of loans required 20% credit enhancement in order for 80% of the loan pool to be rated AAA.  Credit enhancement was a highly material issue for investors.  It represented the amount of "cushion" or protection the Certificate structure provided to the senior classes of the Certificates.  There were multiple forms of credit enhancement, including subordination; overcollateralization and excess spread.  (¶¶ 15-18, *supra*).

64.    Bear Stearns attempted to obtain as many classes of AAA-rated Certificates as possible since they were more easily sold and significantly more profitable to Bear Stearns than lower-rated Certificates.  At the same time, Bear Stearns also attempted to limit the number of subordinate classes because they were more difficult to sell and more costly to Bear Stearns in general.  This was a constant point of negotiation, with Bear Stearns pressing the Ratings Agencies for more AAA-rated classes and less credit enhancement.  It was the level of credit enhancement described in the Offering Documents which provided the justification to investors of an award of an AAA rating to mortgage loans comprised in part of subprime and Alt-A borrowers.  The Offering Documents described the credit enhancement in the form of subordination or overcollateralization, or even limited bond insurance, which appeared to justify the ratings.

65.    The materially omitted fact that was not disclosed until well after the Certificates were issued was that the Ratings Agencies' models fundamentally rested on the performance of a specific data set of loans, and as the market for MBS evolved, those models were never materially expanded or adjusted to test the new economic stresses.  The S&P model was not

updated since 1999, and Moody's was not updated since 2002. (¶¶ 177-187). However, it was after these dates that there had been a substantial expansion in subprime Alt-A, no documentation, non-traditional ARMS, interest only and Neg Am loans.

66.    S&P would also run the loan data through its "SPIRE" Model, which would apply timing assumptions to the specific loan pool. The SPIRE Model considered default curves, prepayment and interest rate stresses which occur over time. The end result of the Spire Model would be an assessment of specific subordination structure for the MBS deal, specifically the excess spread and over-collateralization required.

67.    The information derived from the LEVELS Model was then provided to BSC, and was a critical factor in determining the price Bear Stearns would bid for the loans at auction.

68.    All of this work by S&P and Moody's, referred to at S&P as "bid package" work, was performed without any compensation from Bear Stearns in an effort to engender goodwill so that Bear Stearns would ultimately engage either Ratings Agency to rate the loans at the underwriting stage.

69.    If Bear Stearns' bid was accepted by the Originator, Bear Stearns would have a short period before the Originator was paid in cash for Bear Stearns to examine the loans more closely.

**3.    Bear Stearns' Loan File "Due Diligence" Between
Acceptance of Bid at Auction and Settlement Date**

70.    Between the date of the auction where Bear Stearns' bid was accepted and the settlement date when Bear Stearns paid the Originator in cash for the loans purchased, a limited review was conducted. The ostensible purpose of this review was to determine principally whether the loans contained the requisite legal documentation as reflected in the loan tape provided before the auction and whether the loans were originated in accordance with the

Originators loan underwriting guidelines. Bear Stearns contracted this "due diligence" work to outside firms, principally Bohan and Clayton, who, in turn, hired outside contractors to review the loan files of 5% to 10% of the total amount of loans included in the pool. Bear Stearns' Due Diligence Team (defined herein as the "DDT"), which was made up of approximately two to three individuals (for all of the numerous ongoing Offerings), was responsible for overseeing the work performed by Clayton and Bohan. These workers were supposed to be looking to see if the loans conformed to the Originators' underwriting guidelines and if the loan files contained the requisite legal documentation. Each loan reviewed would be rated either category "1," "2" or "3". The loans rated category "3" loans were found to be defective or fraudulent and recommended by the reviewer to be excluded while those rated category "2" were deemed to be questionable. The rating of the audit loans was provided to Bear Stearns' DDT on a Microsoft Excel spreadsheet, and they determined whether the loans should be "kicked" out of the loan pool or rejected. Bear Stearns' DDT exercised its discretion to rarely exclude either category "2" or "3" rated loans. Bear Stearns was incentivized not to "kick-out" loans even if they were designated category "3," since if Bear Stearns rejected any significant portion of the loans, the originator from which those loans were purchased would likely not sell Bear Stearns loans at auction in the future, for fear of too many "kicked-out" loans. In addition, Bear Stearns knew it was able to securitize even loans designated category "3" and so at most, Bear Stearns would generally use the evidence of non conforming loans to negotiate a cheaper price.

### 4.     Flow Loans from Bear Stearns Subsidiary and Correspondent Lenders

71.     Before the loans reached these trading desks they had to be acquired from originators. Loans purchased from Bear subsidiaries EMC, ECC and BSRM and other correspondent lenders were acquired through "flow agreements". The flow basis loans

immediately became part of Bear Stearns' RMBS database or "loan warehouse" and were serviced by EMC. Traders at Bear Stearns' Trading Desk ("BSTD") would price these loans on a loan-by-loan basis with the assistance of computer pricing models.

72.    Once the flow loan was approved and finalized, the loan file would be sent directly by the lender or mortgage broker to EMC's servicing division. Simultaneously, an electronic record would be sent to Bear Stearns at which point it became part of Bear Stearns' loan warehouse and recorded in the ledger of the specific Bear Stearns Desk responsible for that type of loan - be it subprime, Alt-A, etc. While the flow of loans occurred daily, and the BSTD would price the loans on a loan-by-loan the flow agreements themselves would set a weekly or monthly settlement date with the underlying lender.

73.    Minimal due diligence was performed on the loans which flowed directly into the Bear Stearns loan warehouse from correspondent lenders at point of purchase. Computer models would price the loans, and they were rarely rejected.

### 5.    Bear Stearns Securitizes MBS into Separate "Shelves": BSABS, BSMF and SAMI

74.    With the securitization structure in place, the Certificates were then issued through Bear Stearns Trusts or "Shelf" names. The different shelf names reflected the different types of loans included in the specific Offerings. The underlying mortgages in the Bear Stearns Mortgage Funding ("BSMF") Trusts were 30-year and 40-year conventional, adjustable rate or fixed rate, Neg Am mortgage loans secured by first or second liens on one- to four-family residential properties; the underlying mortgages in Bear Stearns Asset Backed Securities ("BSABS") Trusts were fixed rate, adjustable rate and hybrid mortgage loans, substantially all of which are fully or negatively amortizing and secured by first liens on one- to four-family residential properties; the underlying mortgages in the Structured Asset Mortgage Investments

Shelf ("SAMI") were fixed rate and adjustable rate negative amortization mortgage loans secured by first liens on one-to-four-family residential properties. Taking into account only those Offerings which are the subject of the within action, Bear Stearns completed twenty-one (21) BSABS, sixteen (16) BSMF and seven (7) SAMI Shelf Offerings between May 23, 2006 and September 18, 2007 - averaging 1 every 10 days.[14]

### C.    Bear Stearns' "Ratings Shopping" Practices

75.    Bear Stearns derived its profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans. For the Certificates to sell profitably, approximately 80% of the securitization had to be assigned the highest AAA rating by the Ratings Agencies.

76.    Bear Stearns ultimately engaged the Defendant Ratings Agencies through a "ratings shopping" process. Initially, the Collateral Analyst would send the preliminarily structured deal to the Ratings Agencies for feedback. Bear Stearns' in-house ratings agency personnel, as part of the MFT, would oversee the communications with the Ratings Agencies. At which point S&P, for example, would run the loan tape through both its LEVELS and SPIRE Models again and provide Bear Stearns with the results in an effort to obtain the ratings engagement. Through the LEVELS Model, S&P would advise Bear Stearns, for example, that 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates were subordinate. This 5.75% was the amount of loss coverage required. Bear Stearns would then again "negotiate" with the Ratings Agencies before they were hired, in order to get them to agree to the least amount of loss coverage and credit enhancement, and the highest percentage of AAA designated Certificates.

---

[14]    The BSMF and SAMI shelves contained substantial negative amortization loans (¶ 9, fn. 9).

77.     S&P would also again run the Deal File through its SPIRE Model in order to provide a deal structure that was within its acceptable levels of subordination or overcollateralization in order to obtain class sizes with the appropriate ratings.

78.     Bear Stearns relied on this "ratings shopping" process to obtain the most profitable structure on the Offerings.  As set forth below, ratings shopping was disclosed in detail in the SEC Report released in July 2008 (¶ 197) and in testimony by former Moody's and S&P managers in October 2008 (¶¶ 200).  The practice was effectively ended by way of an agreement entered into between the Ratings Agencies and NYAG in 2008.  (¶ 198).

## V.

## DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT

### A.    Exponential Increases in Borrower Delinquencies Shortly After Certificate Issuances Reflect Defective Collateral and Faulty Origination

79.     The defective nature of the Certificates and Certificate mortgage loan collateral was reflected in the recurring pattern of exponential increases in borrower delinquencies only months after issuance of the Certificates across all 44 Certificate Offerings.

80.     At the time of issuance the average delinquency rate of the outstanding loan balance was 1.14%.  Four months later, delinquencies skyrocketed by over 432% to an average of just over 6.0% of the outstanding loan balance.  Broken down by Shelf, average Certificate delinquencies at four months from issuance rose by 258% to 7.6% for Bear's BSABS Shelf, by 491% to approximately 4.0% for the BSMF Shelf and by 592% to 7.0% for the SAMI Shelf. Within six months after the Certificates were issued delinquencies continued to dramatically worsen by over 56% within just two months to 10.0% of the outstanding mortgage loan balance - in excess of 12.0% for the BSABS offerings, 7.0%, approximately 7% for BSMF offerings, and

approximately 10.0% for SAMI offerings.  As of the filing of the Complaint, the collateral has largely failed with a startling 42.0% of the total mortgage loan balance now delinquent or in default.

81.    The meteoric increase in delinquencies rates following issuance of the Certificates is reflective of early payment default and disregard for underwriting guidelines.  (¶¶ 79-80, 85-86, 99, 106, 121, 130, 143, 152, 157).  As reported by the Federal Bureau of Investigation (the "FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics, found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more, fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Insurance, found that the same top states for mortgage fraud – including the states where the BSMBS collateral was principally originated – were also the same top states with the highest percentage of early payment defaults.

82.    This pattern of borrower default shortly after the completion of the Offerings evidences early payment default and borrower misrepresentations.  The origination of such fundamentally impaired loan collateral could only have occurred as a result of systematic failures to abide by the underwriting guidelines in the Offering documents and as a result of inadequate due diligence by Bear Stearns in monitoring compliance with those guidelines.

**B.    The Collapse of the Certificates' Ratings Shortly After Issuances
Reflects Defective Loan Collateral and Faulty Origination**

83.    The Ratings Agencies rated the Certificates pursuant to the following twenty three

(23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| **Color code** | **Number** | **Definition** | **Moodys** | **S & P** | **Fitch** |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

84.    As noted above, over 87.5% (or $26.71 billion out of $31.33 billion) and 89.0%

(or $26.71 billion out of $29.99 billion) of the Certificates issued were assigned the highest

ratings of AA by Moody's and S&P.  As a general matter, a rating downgrade of even one level,

*e.g.*, from AAA to AA or from Aaa to Aa, is considered material to the financial condition of the

rated entity or securities.  Here, the magnitude of the Certificate downgrades is unprecedented. The Certificates were downgraded as many as 22 levels - with, for example, $25.63 billion of the total $26.71 billion in Certificates initially rated Aaa, now having been downgraded from Aaa to "Ba1" or below, meaning these Certificates were not only designated "junk bonds," but were assessed to be in danger of "imminent default."  The remaining Certificate tranches have fared no better since currently over 93% or $29.24 billion of the total $31.33 billion of Moody's rated Certificates has been downgraded to speculative "junk" status.  Furthermore, Certificates rated in the AA and A range by Moody's at issuance have been downgraded to CC and below by S&P – from "very high grade" and "upper medium" securities to "extremely speculative" junk bonds. This historic and dramatic reversal in the financial assessment of the Certificates by the Rating Agencies underscores that these securities were impaired from the outset.

**C.    Investigations and Disclosures Subsequent to Issuance
Evidence EMC, BSRM and Encore Disregarded
Stated Mortgage Loan Underwriting Guidelines**

**1.    EMC And BSRM Systematically Disregarded
Stated Mortgage Loan Underwriting Guidelines**

85.    EMC was a principal originator for twenty-eight (28) of the Bear Stearns Certificate Offerings complained of herein.[15]  The total value of the 28 Offerings for which EMC was a principal originator was $16.99 billion, of which 88.26%, or $14.74 billion, was awarded an initial rating of Aaa.  Following issuance of the Certificates, disclosures began to emerge which reflected that EMC systematically disregarded the underwriting guidelines set forth in the

---

[15]    EMC was a principal originator of the mortgage collateral underlying the BSABS Series 2006-AC4, BSABS Series 2006-AC5, BSABS Series 2006-HE10, BSABS Series 2007-AC1, BSABS Series 2007-AC2, BSABS Series 2007-AC3, BSABS Series 2007-AC4, BSABS Series 2007-AC5, BSABS Series 2007-AC6, BSABS Series 2007-HE1 , BSABS Series 2007-HE2 , BSABS Series 2007-HE4, BSMF Series 2006-AC1, BSMF Series 2006-AR1, BSMF Series 2006-AR2, BSMF Series 2006-AR3, BSMF Series 2006-AR4, BSMF Series 2006-AR5, BSMF Series 2006-SL1, BSMF Series 2006-SL2, BSMF Series 2006-SL3, BSMF Series 2006-SL4, BSMF Series 2006-SL5, BSMF Series 2006-SL6, BSMF Series 2007-AR1, BSMF Series 2007-AR3, BSMF Series 2007-SL1, BSMF Series 2007-SL2 and SAMI Series 2007-AR2 Certificate Offerings.

Offering Documents.  As a result, 95.68%, or $14.10 billion, of the initially Aaa rated Certificates have been downgraded to speculative "junk" status and below.  Moreover, current delinquency and default rates on the EMC originated collateral has risen exponentially since issuance of the Certificates – from 0.91% as of the cut-off dates to approximately 38.00% as of May 1, 2009.

86.    BSRM was a principal originator for twenty-one (21) of the Bear Stearns Certificate Offerings.[16]  The total value of the 21 Offerings for which BSRM was a principal originator in was $14.96 billion, of which 88.32%, or $12.99 billion, was awarded an initial rating of Aaa.  Following issuance of the Certificates, approximately 97.04%, or $12.61 billion, of the initially rated Aaa Certificates have been downgraded to speculative "junk" status and below.  Moreover, current delinquency and default rates on the BRSM originated collateral has risen exponentially since issuance of the Certificates – from 0.89% as of the cut-off dates to 39.20% as of May 1, 2009.

87.    After the issuance of the Certificates, disclosures and governmental investigations began to emerge which reflected EMC's, inclusive of BSRM, systematic disregard for the underwriting guidelines set forth in the Offering Documents.

88.    EMC, a wholly owned subsidiary of BSC and now a wholly owned subsidiary of JPMorgan Chase (defined herein as "JPM"), BSC's *successor-in-interest*, is a mortgage banking company that specializes in the acquisition, servicing and disposition of residential mortgage loans.  According to the Company's website, "since its inception in 1990, EMC has purchased over $50 billion in residential whole loans. This includes the purchase of Scratch & Dent, sub-

---

[16]      BSABS Series 2006-HE10, BSABS Series 2007-AC5, BSABS Series 2007-AC6, BSABS Series 2007-HE1, BSABS Series 2007-HE2, BSMF Series 2006-AR1, BSMF Series 2006-AR2, BSMF Series 2006-AR3, BSMF Series 2006-AR4, BSMF Series 2006-AR5, BSMF Series 2006-SL1, BSMF Series 2006-SL2, BSMF Series 2006-SL3, BSMF Series 2006-SL4, BSMF Series 2006-SL5, BSMF Series 2006-SL6, BSMF Series 2007-AR1, BSMF Series 2007-AR3, BSMF Series 2007-SL1, BSMF Series 2007-SL2 and SAMI Series 2006-AR4.

performing and non-performing loans through the EMC Trade Desk and the purchase of newly originated non-agency loans through the EMC Production Conduit."

89.     In late 2008 an action was commenced by Ambac Assurance Corp. ("Ambac") against EMC alleging rampant fraud in the origination of mortgage loans used in securitizations. On November 6, 2008, the *Associated Press* reported that Ambac Assurance Corp, which had insured EMC mortgage loans intended for securitization, had filed suit in the United States District Court for the Southern District of New York against EMC and BSC alleging that the companies had built a "house of cards" through fraud and misrepresentations. *Ambac Assurance Corp., v. EMC Mortgage Corp.*, 08-cv-9464 (S.D.N.Y. Nov. 5, 2008) (the "Ambac Complaint" or the "Ambac Compl."). With respect to the Ambac Complaint, the *Associated Press* stated:

> Bear Stearns leveraged its reputation and dominance in mortgage finance to entice companies such as Ambac to insure loans plagued by rampant fraud … Bear Stearns promised that its mortgage loans originated through proper means and didn't result from fraud, misrepresentation or gross negligence. Yet … Ambac discovered widespread breaches of representations in almost 80 percent of the documents supporting 695 defaulted loans studied all of which EMC refused to cure, repurchase or provide substitutes for damaged loans.

Larry Neumeister, NY Lawsuit: Bear Stearns Built A 'House of Cards,' *Associated Press*, November 6, 2008.

90.     Ambac insured the loans underlying four separate mortgage-backed securities transactions. When the loans began to default, incurring more than $640 million in losses to Ambac alone, Ambac sought to have the loans repurchased or replaced pursuant to their agreement. Ambac Compl. at ¶ 7.

91.     According to the Ambac Complaint, after incurring these substantial losses, Ambac conducted a study of 1,486 loans with an aggregate principal of approximately $86.9 million. The results of that review found:

> [o]f these 1486 loans, 1,332, over 89% breached one or more of the

representations and warranties made to Ambac. The most prevalent and troubling of the breaches identified by Ambac across all four Transactions involve (1) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties, and (2) the loan originators' abject failures to adhere to proper and prudent mortgage lending practices, including their own underwriting guidelines.

Ambac Compl., at ¶ 6.

92.    The Ambac Complaint lays out, in detail, the Bear Stearns "securitizations machine" and EMC's crucial, and damaging, role within that machine:

EMC acted as both an originator and an aggregator of an enormous volume of residential mortgage loans, 'with the ultimate strategy of securitization into an array of Bear Stearns' securitizations.' EMC repeatedly executed on that strategy, in many cases retaining the rights to act as servicer of the mortgage loans that it securitized. In its role as aggregator, EMC prescribed loan origination standards and approved the underwriting guidelines of a large number of mortgage lenders.

Id., at ¶ 18.

93.    As alleged, Bear Stearns and EMC expanded its loan generation to fuel its securitizations and, at the same time, reassured the market that it would maintain the quality of its securitizations. Ambac Compl. at ¶ 26. But, in fact, they did not take steps to ensure the "quality of the product." Instead, Bear Stearns pushed for increased loan volumes at the expense of underwriting standards. "As a consequence, EMC's inventory of mortgage loans was replete with loans (i) originated by fraud, material misrepresentations, or omissions and (ii) underwritten without regard to prudent standards or the fundamental principles of mortgage lending, which require good-faith assessment of the borrower's ability and willingness to repay the loan." Ambac Compl., at ¶ 27.

94.    EMC generated demand for the MBS it was helping to create by "convincing investors that the securities it sold were safe and profitable investment, despite the fact that,

unbeknownst to Ambac and the market at large, those securities were backed by unjustifiably risky loans." Ambac Compl., at ¶ 25.

95.    According to the Ambac Complaint, EMC and its parent, Bear Stearns did this by:

First, Bear Stearns touted its experience, expertise, analytic prowess, and sales and distribution channels. Second, EMC represented that it had conducted due diligence of the mortgage-loan pools it securitized to ensure the integrity of their origination and to confirm the accuracy of their terms [(i.e., by representing it had conducted due diligence of these loans)]. Third, EMC made numerous express representations and warranties about the risk attributes of the loans it was securitizing to the investors and insurers of those transactions, and agreed to repurchase those loans if the representations and warranties proved untrue. Bear Stearns thus assured purchasers and insurers of these securities that EMC would stand behind the securities it marketed. Finally, EMC obtained financial guaranty insurance policies to provide investors with greater comfort and to enhance the marketability of the securities.

*Id.,* at ¶ 25.

96.    The Ambac Complaint further makes clear that in order to feed the growing demand for mortgage backed securities, EMC and Bear Stearns expanded acceptance and financing of "no doc" and "low doc" loan products with a marked and dangerous decline in the rigor and discipline with which [the companies] approached loan origination and underwriting." Ambac Compl. at ¶ 28.

97.     Thus, as alleged in the complaint, EMC's inventory of mortgage loans was rifled with loans "originated by fraud and underwritten pursuant to imprudent or non-existent standards," all of which were turned around and "knowingly or recklessly" sold into securitization trusts regardless of the alarming percentage of which that are now defaulted. Ambac Compl., at ¶¶ 29-30.

98.    On February 27, 2009, investors filed suit against Bear Stearns alleging securities fraud in violation of the Securities and Exchange Act *In re The Bear Stearns Companies, Inc. Securities, Derivative, and Erisa Litigation*, No. 08-MDL-1963(RWS) (the "Bear Stearns Fraud

Action").  The complaint sets forth detailed evidence of pervasive improper lending practices at

EMC based on interviews with former EMC employees as follows:

> As a result of Bear Stearns' hunger for loans to securitize, it also purchased huge numbers of risky loans originated by other companies through its EMC Mortgage Corporation ("EMC") subsidiary. From 1990 until 2007, EMC purchased over $200 billion in mortgages.

> The loans the Company purchased by this means were often as suspect as the loans it originated.  Confidential Witness Number 2 ("CW 2"), a Quality Control and Reporting Analyst at EMC from April 2006 through August 2007, reviewed and examined loan origination and loan portfolio statistics on subprime loans purchased by EMC, and also created reports for upper management at EMC.  CW 2 confirmed that EMC would buy almost everything, including extremely risky loans where the borrower's income and ability to pay could not be verified.

> According to Confidential Witness Number 3 ("CW 3"), a former Collateral Analyst with the Company who worked for Bear Stearns in the first half of 2007, the Company understood that the loans it was purchasing through EMC were unusually risky.  CW 3 reported that during the latter part of 2006 and the beginning of 2007 EMC was "buying everything" without regard for the riskiness of the loan.  CW 3 explained that because of the potential for profits from securitizing these loans Bear Stearns managers looked the other way and did not enforce basic underwriting standards.

> Confidential Witness Number 4 ("CW 4"), an Underwriting Supervisor and Compliance Analyst for EMC from September 2004 until February 2007, reported that the Bear Stearns traders responsible for buying the loans were fully aware of the weakness of the underlying loans.  According to CW 4, the traders ignored CW 4's due diligence findings that borrowers would be unable to pay.

> Bear Stearns also began funding and purchasing even riskier closed-end second-lien ("CES") loans and home-equity lines of credit ("HELOCs").  Most of these loans were made to borrowers with poor credit. Moreover, they were secured by secondary liens on the home, meaning that, should the home go into foreclosure, Bear Stearns would only be paid after the first mortgage was satisfied and was more likely not to be paid in full if the value of the home dropped.  By the end of 2006, EMC had purchased $1.2 billion of HELOC and $6.7 billion of second-lien loans.   Once these loans were purchased, they would go directly into the securitization process.

> Finally, through EMC, Bear Stearns aggressively purchased exceptionally risky mortgages that were already in default in the hopes of bringing the borrower back into compliance and securitizing the loan along with other acquired and originated

mortgages-so-called "scratch and dent" loans.  A special desk at Bear Stearns was designated to securitize the "scratch and dent" loans and sell them to investors.

### 2. Encore Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

99.    Encore was Bear Stearns' sub-prime loan origination subsidiary. Encore was the principle originator for the BSABS Series 2006-HE9, BSABS Series 2006-HE10, BSABS Series 2007-HE1, BSABS Series 2007-HE4, BSABS Series 2007-HE5 and BSABS Series 2007-HE6 Certificate Offerings. The total value of the six (6) Offerings for which BSRM was a principal originator in was $4.88 billion, of which over 79.00%, or $3.83 billion, was awarded an initial rating of AAA.  Following issuance of the Certificates, disclosures began to emerge which reflected Encore's systematic disregard for the underwriting guidelines set forth in the Offering Documents.  As a result, 71.50%, or $2.74 billion, of the initially rated AAA Certificates have been downgraded to speculative "junk" status and below.  Moreover, current delinquency and default rates on the Encore originated collateral have risen exponentially since issuance of the Certificates – from 4.10% as of the cut-off dates to 51.00% as of May 1, 2009.

100.    The Bear Stearns Fraud Action, filed on February 27, 2009, also set forth detailed evidence of widespread improper lending practices at BSC's Encore subsidiary including as follows:

> … the Company actively encouraged its loan originator subsidiaries to offer loans even to borrowers with poor credit scores and troubled credit histories. According to Confidential Witness Number 1 ("CW 1"), an Area Sales Manager who began work for Encore in January of 2006 and continued working at BSRM until February of 2008, CW 1's office was under great pressure to "dig deeper" and originate riskier loans that "cut corners" with respect to credit scores or Loan-to-Value Ratios ("LTV Ratios").

> As a result of these lax standards, the Company approved the great majority of all loan applications it received.  While the national rejection rate was 29% in 2006, BSRM rejected only 13% of applications in the same period.

In 2006 alone, using these questionable lending practices, BSRM and Encore originated 19,715 mortgages worth $4.37 billion.  Because these were "captive" originations, the mortgages originated by BSRM and ECC were sent directly into the securitization process at Bear Stearns.

101.    As reported in a February 7, 2007 article in *Thomson Financial*, in February 2007, Encore was acquired by BSRM, a unit of BSI, and one of biggest packagers and underwriters of residential U.S. RMBS.

102.    Not long after Encore was acquired by BSRM, the N.A.A.C.P. brought suit against Encore and several other subprime lenders alleging discriminatory and deceptive lending practices in violation of The Fair Housing Act, the Equal Credit Opportunity Act, and the Civil Rights Act (the "N.A.A.C.P. Action").  According to a September 23, 2007 *New York Times* article, the N.A.A.C.P. Action alleges that Encore targeted 30% more African American borrowers than Caucasians with the same credit qualifications.  Encore then improperly disclosed fees and omitted disclosures including excessive prepayment penalties which effectively prohibit borrowers from refinancing  at a fairer rate. (*Id.*)

103.    During that same time, *Bloomberg* reported that Encore's parent company, Bear Stearns, was under investigation by the Federal Trade Commission ("FTC") for predatory lending practices including deceptively convincing borrowers to agree to unfair and abusive loan terms. (*Bloomberg.com*, Bear Stearns gets FTC Demand for Data on Mortgages, Dec. 30, 2005).

104.    But the truth was soon revealed as FTC disclosures emerged showing that, from November 2007 to February 2008, Bear Stearns had been severely hurt by the mortgage crisis and that profits plunged by almost 80%.  In addition, on April 15, 2008, *Reuters* reported that in February 2008, Bear Stearns acknowledged that net income had dropped from $554 million to $115 million and net revenues were down 40% to $1.48 billion.  These figures included about $600 million of write-downs tied to mortgages and leveraged finance.

105.    By March of 2008, on the backs of mounting mortgage losses and entanglements in the subprime market, Bear Stearns was liquidated at $2 per share in a fire sale to J.P. Morgan.

**D.    Subsequent Disclosures Evidence That Third-Party Originators
        Disregarded Stated Mortgage Loan Underwriting Guidelines**

**1.    Countrywide Systematically Disregarded
        Stated Mortgage Loan Underwriting Guidelines**

106.    Countrywide was a principal originator for the BSABS Series 2007-AC4, SAMI Series 2006-AR4, SAMI Series 2006-AR6, SAMI Series 2006-AR7, SAMI Series 2006-AR8 and SAMI Series 2007-AR1 Certificate Offerings. The total value of the six (6) Offerings for which Countrywide was a principal originator in was $8.77 billion, of which 92.30%, or $8.08 billion, was awarded an initial rating of Aaa. Following issuance of the Certificates, disclosures began to emerge which reflected Countrywide's systematic disregard for the underwriting guidelines set forth in the Offering Documents. As a result, 97.58%, or $7.89 billion, of the initially rated AAA Certificates have been downgraded to speculative "junk" status and below. Moreover, current delinquency and default rates on the Countrywide originated collateral has risen exponentially since issuance of the Certificates from 0.72% as of the cut-off dates to over 44.30% as of May 1, 2009.

107.    Countrywide is currently under investigation by a panel of the United States Senate for predatory lending – a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest and fees that are unreasonably high. Countrywide's increased risk of not being able to collect on these predatory mortgage loans puts the Certificates underlying mortgage collateral at risk, thereby further increasing the risk to Plaintiffs and the Class.

108.    During an August 29, 2007 press conference reported in *The Wall Street Journal*, Senator Charles Schumer, chairman of the Senate panel investigating Countrywide's predatory lending practices, stated:

> Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower …. [Countrywide's] brokers can earn an extra 1 percent of the loan value in commission by adding a three-year prepayment penalty to loans.

109.    On or about March 10, 2008, the FBI disclosed that it had initiated a probe into the fraudulent mortgage practices engaged in by Countrywide, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and specific instructions to underwriters by Countrywide not to scrutinize certain types of loans it issued.    Subsequently, on April 2, 2008, a Federal Bankruptcy Judge overseeing the proceedings of more than 300 Countrywide-related bankruptcies ordered a further inquiry into the misconduct, and specifically, the illegal inflation of fees throughout the loan process that had been occurring at Countrywide.

110.    On April 11, 2008, a detailed amended complaint for violations of the federal securities laws was filed in federal court in the Central District of California against Countrywide.    In a decision dated December 1, 2008 (the "Countrywide Decision" or "Countrywide Dec."), Judge Mariana Pfaelzer of the U.S. District Court of the Central District of California upheld the bulk of that 416-page securities class action complaint, which detailed a massive fraud involving Countrywide.    Highlights of the Countrywide Decision include the following:

> "From mid-2003 onward, Countrywide continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006."  (Countrywide Dec., p. 7).

In December 2007, Countrywide revealed that 89% ($64 bn). of it's 2006 pay-option ARMs would not have been approved under its original underwriting guidelines, nor would 83% ($74 bn). of its 2005 pay-option ARMs. (Countrywide Dec., p. 8).

During the Class Period,[17] Countrywide "employed an internal, misleading definition of 'subprime,'" using a FICO score of 620 to delineate between prime and sub-prime instead of an industry-wide standard of 660. (Countrywide Dec., p. 10).

"Countrywide often waived its weakened standards, routinely approving loans that fell well outside its guidelines … It's goal was to [a]pprove virtually every borrower and loan profile…" (Countrywide Dec., p. 11).

Throughout the Class Period, appraisals were inflated (Countrywide Dec., pp. 13-14), salaries for no-doc loan applications were inflated (Countrywide Dec., pp. 14-15), and loan-to-value ratios were understated (Countrywide Dec., p. 16), all unbeknownst to the public.

Citing a "Price Any Loan system" of underwriting and "Countrywide's internal documents that systematically encouraged approving virtually any loan with additional 'add-on' fees," the court rejected motions to dismiss the fraud claims against senior Countrywide officers. (Countrywide Dec., p. 89).

"Plaintiffs describe a unified course of abandoning sound [loan] underwriting practices." (Countrywide Dec., p.38).

Plaintiffs persuasively alleged a pattern of "systematically lowering, avoiding and undermining guidelines while approving low-quality mortgages as 'prime'". (Countrywide Dec. p. 85).

111.   Summarizing the complaint's allegations regarding Countrywide's core mortgage-related operations, the court observed:

Plaintiffs have created a cogent and compelling inference of a company obsessed with loan production and market share with little regard for the attendant risks, despite the company's **repeated assurances to the market**. With respect to loan origination practices, they raise strong inferences that (1) borrower requirements were progressively loosened over the Class Period; (2) in many instances, the actual loan quality was lower than the borrower's FICO score and LTV ratio suggested because Countrywide misrepresented how lax its verification practices became; and (3) Countrywide management routinely circumvented the normal underwriting process by approving highly risky loans for sale into the secondary market.

---

[17]     The Class Period in the Countrywide action is March 12, 2004 through March 7, 2008.

Countrywide Dec., at 78 (emphasis added).

112.    The Countrywide securities fraud complaint identified specific deviations for Countrywide's stated underwriting guidelines.  For example, in connection with the "No Income/No Asset Documentation Program," Countrywide represented that "[t]his program is limited to borrowers with excellent credit histories."  However, Countrywide routinely extended these loans to borrowers with weak credit, and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like ARMs, were highly likely to contain misinformation from the borrower, such as overstated incomes, that might result in increased defaults.  Because borrowers were advised that their representations on loan applications would not be verified, Countrywide employees referred to these products as "liar loans."

113.    On April 30, 2008, *The Wall Street Journal* reported on a federal probe of Countrywide that uncovered evidence of executives deliberately overlooking inflated income figures for many borrowers.  Indeed, Countrywide's "Fast and Easy" mortgage program, in which borrowers were asked to provide little or no documentation of their finances, was particularly prone to abuse by loan offices and outside mortgage brokers.

114.    On May 7, 2008, *The New York Times* published a tongue-in-cheek article entitled "A Little Pity, Please, for Lenders," that shifted the onus to borrowers for the current residential mortgage crisis.  In particular, the article noted that low documentation and stated documentation loans – *e.g.*, Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program – have "became known within the mortgage industry as "liar loans" because many of the borrowers falsified their income."  However, these relaxed loan programs were created and promoted by aggressive lenders looking to amass volume loans for securitizations.

115.    In addition to ongoing SEC, FBI and FTC investigations, the Attorneys General of California, Florida and Illinois all launched investigations of Countrywide for deceptive business practices relating to its mortgage lending, and more recently, both California and Illinois have commenced lawsuits against Countrywide.

116.    *The New York Times* reported that the Illinois Attorney General initiated a lawsuit against Countrywide and Angelo Mozilo, Chairman of the Board and Chief Executive Officer through July 1, 2008, contending that the company and its executives defrauded borrowers in the state by selling them costly and defective loans that quickly went into foreclosure.  The lawsuit accuses Countrywide and Mozilo of relaxing underwriting standards, structuring loans with risky features, misleading consumers with hidden fees and marketing claims, and creating incentives for its employees and brokers to sell questionable loans.  As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy.  It is all from the greed of people like Mozilo."

117.    *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality."  (*See* Gretchen Morgenson, "Illinois to Sue Countrywide," *The New York Times,* June 25, 2008).

118.    As reported in the June 26, 2008 edition of *The New York Times*, California filed a similar lawsuit against Countrywide and Mozilo, accusing defendants of engaging in unfair trade practices that encouraged homeowners to take out risky loans, regardless of whether they could repay them.  Jerry Brown, California's Attorney General, stated: "Countrywide exploited the American dream of homeownership and then sold its mortgages for huge profits on the secondary market."

119.    On July 24, 2008, *The Los Angeles Times* reported that "three big Southland lenders (are) under federal investigation; Sources say IndyMac, Countrywide and New Century [have been] subpoenaed." *The Los Angeles Times* further reported that officials have begun to investigate whether investors were defrauded by the value of mortgage-backed securities:

> A federal grand jury in Los Angeles has begun probing three of the nation's largest subprime mortgage lenders in the clearest sign yet that prosecutors are investigating whether fraud and other crimes contributed to the mortgage debacle.
>
> ***Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp., New Century Financial Corp. and IndyMac*** Federal Bank seeking a wide range of information, according to sources with direct knowledge of the subpoenas.
>
> People familiar with the situation told The Times that the subpoenas seek e-mails, phone bills and bank records and follow interviews that federal investigators have conducted with employees and others knowledgeable about the lending operations of the three Southern California institutions, which all collapsed under the weight of bad loans.
>
> ***In the case of Countrywide, the sources said, investigators have also begun looking into news reports that the firm and its former chairman, Angelo Mozilo, gave mortgage breaks to members of Congress and other influential "friends of Angelo," including Richard Aldrich, an associate justice of the California Court of Appeal.***
>
> The investigations are part of a coordinated Justice Department effort that until now has focused primarily on smaller operators suspected of defrauding homeowners and mortgage lenders.
>
> The subpoenas, while indicating that the effort is still at an early stage, show that the government is starting to take aim at the largest lenders and their executives to determine whether they were complicit in the multibillion-dollar mortgage crisis. The sources familiar with the subpoenas spoke on condition of anonymity because they were not allowed to discuss them publicly.
>
> The mortgage losses have regulators and law enforcement personnel gearing up for what experts say could prove to be the biggest financial fraud case since the savings and loan crisis of the 1980s.
>
> ***Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased, as well***

> *as other possible crimes such as insider trading by corporate officials who sold*
> *stock knowing their holdings were about to deflate in value.*

(Emphasis added.)

120.    As reported in the October 6, 2008 edition of *The New York Times*, Countrywide agreed to commit $8.4 billion in loan aid as part of a settlement with the Attorneys General of eleven states, including Illinois and California, which brought suit against Countrywide alleging that the bank engaged in predatory lending practices.   The settlement provides a program by which existing loans would be modified:

> [B]orrowers were placed in the riskiest loans, including adjustable-rate mortgages whose interest rates reset significantly several years after the loans were made. Pay-option mortgages, under which a borrower must pay only a small fraction of the interest and principal, thereby allowing the loan balance to increase, also are included in the modification.

### 2.    American Home Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

121.    American Home was a principal originator for the SAMI Series 2006-AR5 Certificate Offering. The total value of the Offering for which American Home was a principal originator in was $951.92 million, of which 94.13%, or $896.07 million, was awarded an initial rating of Aaa.   Following issuance of the Certificates, disclosures began to emerge which reflected American Home's systematic disregard for the underwriting guidelines set forth in the Offering Documents.   As a result, 100.00%, or $869.07 million, of the initially rated AAA Certificates have been downgraded to speculative "junk" status and below.   Moreover, current delinquency and default rates on the American Home originated collateral has risen exponentially since issuance of the Certificates from 0.00% as of the cut-off date to 39.00% as of May 1, 2009.

122.    In the course of one week, American Home went from being one of the ten largest mortgage lenders in the country, servicing about $50 billion in loans, to insolvency, as a result of shortage of cash and demands for more collateral from its lenders, and as a result was forced to file for bankruptcy protection on August 6, 2007.

123.    In fact, American Home had been originating fraudulent and defective loans as early as 2006.  Specifically, in 2006, American Home instituted several law suits to compel smaller lenders to repurchase bad loans that had all suffered early payment defaults.  The purchase contract defined "early-payment default" as "any mortgage loan in which one or more 30-day delinquency occurred in the three months following the purchase of the loan."  *See American Home Mortgage Corp. v. Federal Guaranty Mortgage Corp.,* 2:06-cv-05465, (E.D.N.Y. Oct. 2006); *see also, American Home Mortgage Corp. v. Solutions Funding, Inc.,* 2:06-cv-05506, (E.D.N.Y. Oct. 2006); *American Home Mortgage Corp. v. USA Funding Corp.,* 2:06-cv-05956 (E.D.N.Y. Nov. 2006); *American Home Mortgage Corp. v. Home Loan Mortgage Corporation*, 2:06-cv-05993, (E.D.N.Y Nov. 2006).

124.    By 2007, American Home's dubious underwriting practices caught up to it.  On August 2, 2007, the New Jersey Department of Banking and Insurance issued legal documents ordering American Home to stop doing business in the state and started the paper work to revoke American Home's mortgage lender license.  American Home could no longer maintain the fraud and filed for bankruptcy several days later.

125.    On September 12, 2007 *Newsday* reported that Fitch downgraded $16.2 million of American Home's loans to "scratch and dent" bonds.  Unlike other mortgage-related securities, which enjoy an assumption of industry-standard performance, "scratch and dent" bonds are scrutinized for actual performance from the day they are bundled and sold as securities.

126.     American Home's egregious conduct was further revealed when on February 11, 2008, the *Wall Street Journal* reported that American Home had 490,000 home loan files in storage with no idea who owned the loans.  This evidenced that American Home was signing off on loans without any attention to the contents of the documents.  Moreover, rather than taking responsibility, American Home's solution was to destroy all the loans because it cost $45,000 a month to warehouse.  Only after facing fierce opposition did American Home finally offer to hand over the loans to investors who say they can prove that they are the rightful owner of the loans.

127.     In addition to its civil woes, American Home is involved in several criminal probes and investigations.  According to a May 5, 2008 article in *The Globe and News,* prosecutors from the Eastern District of New York were investigating American Home for criminal activity including reporting misrepresentations in securities filings about the company's financial position and quality of its mortgage loans, failing to disclose a rising number of loan defaults and engaging in questionable accounting to hide losses.

128.     As early as March 2008, federal prosecutors had already convicted one American Home sales executive, Kourash Partow, of mortgage fraud.  According to a March 11, 2008 *Wall Street Journal* article, after conviction, Partow, who worked for Countrywide before joining American Home, sought a lighter sentence on the grounds that his former employers, (Countrywide and American Home) not only had knowledge of the loan document inaccuracies but in fact encouraged manipulation by intentionally misrepresenting the performance of loans and the adequacy of how the loans were underwritten.  Partow's attorney argued that Countrywide and American Home had competitive cultures that encouraged a blind eye mentality.  In fact, American Home immediately hired Partow and appointed him as branch

manager and loan officer even though he had been fired from Countrywide in June 2006 after

FBI scrutiny of his loans provoked an internal audit. Patrow admitted that that he would falsify

accurate information given by clients by inflating income or assets in order to get loans

approved. Most of the loans did not require documentary verification of such figures.

129.    Presently all that remains of American Home is the servicing unit which was

purchased by Wilbur Ross of WL Ross & Co., on October 5, 2007 for $500 million. In March

2008, the *Globe and Mail* reported that Ross, who has a reputation for buying distressed

companies at rock-bottom prices, bought Option One, H&R Block's mortgage servicing division,

to merge with American Home. Together, the two units comprise the second largest servicing

business for subprime loans.

### 3.    Ameriquest Loan Sellers Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

130.    The Ameriquest Loan Sellers[18] were principal originators for the BSABS Series

2006-AQ1, BSABS Series 2007-AQ1, BSABS Series 2007-AQ2 and BSABS Series 2006-HE5

Certificate Offerings. The total value of the four (4) Offerings for which Ameriquest Loan

Sellers was a principal originator in was $1.52 billion, of which 70.58%, or $1.07 billion, was

awarded an initial rating of Aaa. Following issuance of the Certificates, disclosures began to

emerge which reflected Ameriquest Loan Sellers' systematic disregard for the underwriting

---

[18]    ACC Capital Holdings ("ACC Capital"), headquartered in Orange, California, was the nation's largest subprime lender and considered an industry model. ACC Capital was privately owned by Roland Arnall until his death in March 2008. Argent Mortgage Capital ("Argent") was the wholly-owned wholesale mortgage subsidiary of ACC Capital. Argent was purchased from ACC Capital by Citigroup on August 31, 2007. Citigroup re-branded Argent as Citi Residential Lending, which operated for several months before it was shut down. Ameriquest was ACC Capital's wholly owned retail lending subsidiary. On August 1, 2007, Ameriquest announced that it will no longer be accepting loans. On August 31, 2007 Ameriquest was purchased from Citigroup.

Town & Country Credit Corp. (TCCC) was ACC Capital's wholly owned retail lender and sister to Ameriquest. TCCC was a Delaware corporation with a primary place of business in Santa Ana, California. TCCC abruptly closed in May 2006 as part of a broader reorganization that closed 229 offices and concentrated operations in southern California.

guidelines set forth in the Offering Documents.  As a result, 82.46%, or $882.99 million, of the initially rated AAA Certificates have been downgraded to speculative "junk" status and below. Moreover, current delinquency and default rates on the Ameriquest Loan Sellers originated collateral has risen exponentially since issuance of the Certificates from 1.08% as of the cut-off dates to 55.91% as of May 1, 2009.

131.    On January 24, 2006, the *Washington Post* reported in an article titled "Mortgage Lender Settles Law Suit," that ACC Capital and its affiliates, including Argent, Ameriquest and TCCC settled a class action lawsuit with the attorney generals of 49 states over allegations of predatory lending practices.  In addition to paying $295 million in consumer redress and $30 million in legal fees, the company agreed to change some of its business practices and accept outside monitors who will observe the company's operations to make sure it is living up to the agreement.

132.    The underlying complaint provides allegations of misconduct regarding deceptive acts and practices by failing to provide timely and adequate information concerning loan fees, misrepresentation of loan costs, falsely promising "the best-possible rate available," misrepresenting the presence of adjustable rate features, misrepresenting the cost and ability to refinance at a later date and misleading borrowers about the presence and significance of prepayment penalties.  *State of Washington v. ACC Capital Holdings*, Civ. No. 06-2-09702, Complaint (the "ACC Capital Compl.").

133.    The complaint also provides that ACC Capital and its subsidiaries violated their own "Best Practice" Policies by soliciting borrowers to refinance within the first twenty-four months of their loan term, thereby causing some borrowers to incur a prepayment penalty.  It also provides that the ACC Capital parties pressured appraisers by providing them with explicit

and implicit monetary incentives to inflate real estate appraisals in excess of the market value. *Id.*

134.    In addition to legal battles ACC Capital has simultaneously been battling consumer protection legislation.  Consumer activists say that the company has been lobbying against state legislation aimed at countering alleged abuses by sub-prime lenders.  According to an August 12, 2005 *San Francisco Chronicle* article, billionaire owner of ACC Capital, Roland Arnall, was a heavy donor to both Democrats and Republicans.  In 2003, Arnall, his wife Dawn, and Ameriquest donated $1.5 million to California Governor Arnold Scwarzenneger and another $1.5 million to the California Republican Party.  In 2004 and 2005, Arnall contributed $400,000 to the Democratic party and all the expenses for several California Assemblyman to attend his fundraisers in Honolulu.  (*San Francisco Chronicle*, "Embattled Home Lender Gives Heavily to Politicians," August 12, 2005).

135.    On February 4, 2005, Norma Garcia, a California lobbyist for Consumers Union told the *Los Angeles Times*, "they try to paint themselves as the good guys – that they've adopted best practices and they're kind of the gold standard for the industry, but really when you look at what they're doing to try to fight predatory lending legislation, it shows exactly where they're coming from."  (*Los Angeles Times*, "Workers Say Lender Ran 'Boiler Rooms,' "February 4, 2005).

136.    A former employee of Ameriquest, Mark Bomchill, described the year he spent hustling mortgages for Ameriquest in suburban Minneapolis to the *Los Angeles Times*:

> Slugging down Red Bull caffeine drinks, sales agents would work the phones hour after hour, trying to turn cold calls into lucrative "sub-prime" mortgages - high-cost loans made to people with spotty credit.
>
> The demands were relentless: One manager prowled the aisles between desks like "a little Hitler," Bomchill said, hounding agents to make more calls and push

more loans, bragging that he hired and fired people so fast that one worker would be cleaning out his desk as his replacement came through the door.

"It was like a boiler room," said Bomchill, 37.  "You produce, you make a lot of money.  Or you move on.  There's no real compassion or understanding of the position they're putting their customers in."

*        *        *

"Whatever you had to do to close a loan, that's what was done.  If you had to state somebody's income at $8,000 a month and they were a day care provider, who's to say it wasn't?"

*Los Angeles Times*, "Workers Say Lender Ran 'Boiler Rooms,'" February 4, 2005.

137.    According to information gathered by the *Los Angeles Times* from public records, interviews and dozens of consumer lawsuits:

A.    Ameriquest customers filed more complaints with the Federal Trade Commission from 2000 through 2004 than did those of  two of its biggest competitors combined, the agency said – 466 compared with 101 for Full Spectrum Lending (Calabasas- based Countrywide Financial Corp.'s sub-prime until) and 51 for Irvine based New Century Financial Corp.  (*Id.*)

B.    From 2000 through 2004, 134 complaints (including allegations of fraud and unfair business practices) were registered against Ameriquest with the California Department of Corporations, compared with 39 for New Century and 21 for Full Spectrum.  (*Id.*)

C.    Recent lawsuits filed by consumers in California and at least 20 other states allege a pattern of fraud, falsification of documents, bait-and-switch sales tactics and other violations.  In a sworn declaration in one case, a former loan officer named Kenneth Kendall said Ameriquest managers encouraged employees to "promise certain interest rates and fees, only to change those rates at the time of closing."  (*Id.*)

D.    In court documents and interviews, 32 former employees across the country say they witnessed or participated in improper practices, mostly in 2003 and 2004.  This behavior was said to have included deceiving borrowers about the terms of their loans, forging documents, falsifying appraisals and fabricating borrowers income to qualify them for loans they couldn't afford.  (*Id.*)

138.    In a suit filed January 14, 2005 in U.S. District Court in San Francisco, borrower Nona Knox claims that Ameriquest qualified her and her late husband, who at the time was 79

years old and suffering from terminal cancer, for a loan by fabricating documents showing that he earned $6,800 a month as a proprietor of Knox Music Academy. The music school in reality never existed but was made up by the loan officers without the knowledge, consent or any suggestion from the Knox. (*Id.*)

139.    In another suit filed in Sacramento County Superior Court, a former loan agent, Lisa Taylor, alleges that she was fired from ACM for complaining about sexual harassment and widespread falsification of documents. (*Id.*). She states that she witnessed co-workers using a brightly lighted Coke Machine as a tracing board, copying borrowers' signatures on an unsigned piece of paper. (*Id.*)

140.    On January 24, 2006, the *Washington Post* reported that at a news conference in California, state law enforcement officials said that AMC grew and profited by giving loan officers financial incentives to sign unsuitable loans. In many cases, people with a strong credit history who qualified for lower rates were signing off on higher rates. In other cases promised rates started low but leaped to unsustainable levels. In addition, borrowers were encouraged to misrepresent their income to qualify for larger loans than they could afford. According to Iowa Attorney General Tom Miller, "the culture was to sell, sell, sell, and do whatever it takes to sell, sell, sell." (*Washington Post*, "Mortgage Lender Settles Lawsuit," January 24, 2006).

141.    On August 20, 2007, *BusinessWeek* reported in an article titled "Did Big Lenders Cross the Line" that lawsuits are increasingly blaming lenders' lax underwriting standards and outright fraud for loan delinquency. In one lawsuit against Ameriquest, plaintiff, Mary Overton alleges that loan officers at a Brooklyn (NY) branch of Ameriquest coerced Overton into signing a loan. Unbeknownst to Ms. Overton, Ameriquest created fake tax returns, employment records, and a 401(k) to make it appear that the loan was affordable. According to other court filings, at

least 40 other borrowers allege Ameriquest doctored loan documents or increased borrowers' income. According to *Businessweek* the motive for a large lender such as Ameriquest to engage in such fraud is to keep up loan volume and generate sales.

142. On October 22, 2007 *MortgageDaily* reported that Wachovia filed a lawsuit against Ameriquest alleging that Ameriquest has not complied with repurchase requests on loans with fraudulent files. According to the complaint, the 135 nonperforming loans sold to Wachovia on Dec 29, 2005 contained incorrect credit scores, false employment status and misstatements of the kind of home being *financed*. In addition, the complaint states that the loans had not been underwritten pursuant to the underwriting procedures that Ameriquest agreed to apply and thus Ameriquest's representations and warranties regarding the loans were false and breached by Ameriquest. (*Mortgage Daily*, "Wachovia v. Ameriquest," October 22, 2007.)

### 4. GreenPoint Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

143. GreenPoint was a principal originator for the BSABS Series 2006-AC5 and BSABS Series 2007-AC3 Certificate Offerings. The total value of the two (2) Offerings for which GreenPoint was a principal originator in was $808.12 million, of which 93.07%, or $752.09 million, was awarded an initial rating of Aaa. Following issuance of the Certificates, disclosures began to emerge which reflected GreenPoint's systematic disregard for the underwriting guidelines set forth in the Offering Documents. As a result, 100.00%, or $752.09 million, of the initially rated AAA Certificates have been downgraded to speculative "junk" status and below. Moreover, current delinquency and default rates on the GreenPoint originated collateral has risen exponentially since issuance of the Certificates – from 0.99% as of the cut-off dates to 24.23% as of May 1, 2009.

144.    GreenPoint, which once originated $25 billion in mortgages a year nationwide, was one of the nation's largest originators of Alt-A loans, according to an interview with S.A. Ibrahim, the CEO of GreenPoint Mortgage Funding, a subsidiary of GreenPoint Financial Corp, published in *Mortgage Banking* on February 1, 2004.

145.    The Prospectuses issued by the Issuing Trusts, as set forth in ¶¶ 43-44, each stated with respect to GreenPoint's origination standards that that the loans originated by GreenPoint were issued based on borrower creditworthiness, value of the collateral underlying the mortgage loan and that no documentation or limited documentation loans were limited to individuals with good credit history.

146.    According to the *Washington Business Journal,* as of August 200, GreenPoint specialized in non-conforming and Alt-A mortgages which generated higher origination fees than standard loans.    Furthermore, as stated in *Business Week Magazine* in November 2008, GreenPoint's employees and independent mortgage brokers, accordingly, targeted more and more borrowers who were less able to afford the loan payments they were required to make, and many had no realistic ability to pay off the loans.    According to a wrongful termination suit filed by a former GreenPoint employee in September 2005, if underwriters denied an application for creditworthiness, managers would override their decisions and approve the loans anyway.

147.    Greenpoint's employees used this system to increase their own commissions at the expense of their underwriting guidelines.    The practice of quantity over quality continued until December 2008 when Capital One Financial Corp. ("Capital One"), which had purchased GreenPoint less than a year earlier, shut down the mortgage wholesaler's operations, according to a *Washington Business Journal* dated August 21, 2007.

148.    Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in 2006.  However, according to GreenPoint's website, the company ceased accepting new loan applications in October 2007 and was eventually liquidated by Capital One in December 2008.  As a result, Capital One took an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

149.    In 2008, the NYAG announced that it was investigating GreenPoint for potential predatory and discriminatory lending practices occurring between 2004 and 2006.  The investigation resulted in a July 2008 settlement between GreenPoint and the NYAG for $1 million – after the NYAG's investigation revealed that GreenPoint had been charging African American and Latino borrowers more than Caucasians for mortgage loans.

150.    "Stated income" or "no doc" loans were based on borrowers' bare representations about their ability to repay, with little or no documentation to substantiate those representations. In these loans, the lender typically agreed not to inquire behind the borrower's represented income or assets, or simply loaned the money without making such an inquiry.  These loans generally required the highest level credit scores and low loan-to-value ratios.  GreenPoint, however, routinely extended these loans to borrowers with weak credit, and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products, such as ARMs, were highly likely to contain misinformation from the borrower, such as overstated incomes, that would result in increased defaults in the loan application.

151.    GreenPoint's CEO, S.A. Ibrahim, maintained that these no-doc loans were the preferred instrument in their arsenal including minimal to no losses even in times of economic slowdown, and that, although GreenPoint's guidelines claim that they do not calculate the

borrowers Loan-to-value ratio, Ibrahim, has said that Loan-to-value ratios of 70% or 80% are not uncommon.

### 5.   Aegis Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

152.   Aegis was a principal originator for the BSABS Series 2007-HE4 and BSABS Series 2007-HE5 Certificate Offerings. The total value of the two (2) Offerings for which Aegis was a principal originator in was $1.46 billion, of which 78.54%, or $1.14 billion, was awarded an initial rating of Aaa.  Following issuance of the Certificates, disclosures began to emerge which reflected Aegis' systematic disregard for the underwriting guidelines set forth in the Offering Documents.  As a result, 66.62%, or $761.81 million, of the initially rated Aaa Certificates have been downgraded to speculative "junk" status and below.  Moreover, current delinquency and default rates on the Aegis originated collateral has risen exponentially since issuance of the Certificates from 0.99% as of the cut-off dates to 25.99% as of May 1, 2009.

153.   According to a complaint filed by one of the founders of Aegis in District Court of Harris County, Texas captioned *D. Richard Thompson v. Aegis Mortgage Corp.*, Case No 07-33593 (the "Thompson Compl."), Aegis was founded in 1993 with a $500,000 investment. Aegis began life as a privately held mortgage banking company owned by three individuals.  By 1998, the company was generating $1 billion in annual loan volume. In 1998 and 1999, Cerberus Capital Management, LP ("Cerberus) made a $45 million investment in Aegis, enabling the company to delve further into the murky depths of the subprime mortgage industry.  (Thompson Compl., at 5).

154.   With this substantial cash infusion, Aegis acquired two extremely distressed mortgage production operations, UC Lending and New America.  These and subsequent acquisitions enabled Aegis to grow from 150 employees in nine locations in 1999 to 3,800

employees in over 100 locations in 2005.  By 2006, Aegis was ranked as the 13th largest subprime lender in the country, generating close to $20 billion in annual originations. In eight years, the company's subprime originations grew by an incredible 1,750%.  (Thompson Compl., at 6-9).

155.    Aegis' astronomic growth was fueled by an insatiable appetite for high fee, high-risk mortgages. As the need for these mortgages increased, loan underwriting standards were loosened to the point of nearly abandoning them by 2006.  A large portion of the loans Aegis originated during this time were purchased from unlicensed mortgage brokers. Because Aegis was feeding all the loans it originated to the hungry investment banks like Bear Stearns, underwriting standards were thrown by the wayside. Quantity became more important than quality.  The small underwriting department for Aegis' East Coast operations, located in Jacksonville Florida, was understaffed and bullied by the Divisional head of underwriting, Helen Spavile, to approve whatever loans were sent there for approval.  With no choice in the matter, the guidelines were ignored and the loans approved. (Thompson Compl., at 10).

156.    But the bad loans finally caught up with Aegis, and on August 13, 2007, the company was forced to file for bankruptcy protection.

### 6.    FMC Systematically Disregarded Stated Mortgage Loan Underwriting Guidelines

157.    FMC was a principal originator for the BSABS Series 2006-HE5, BSABS Series 2006-HE9, BSABS Series 2007-FS1 and BSABS Series 2007-HE3 Certificate Offerings.  The total value of the four (4) Offerings for which FMC was a principal originator in was $2.69 billion, of which 78.45%, or $2.11 billion, was awarded an initial rating of Aaa.  Following issuance of the Certificates, disclosures began to emerge which reflected FMC's systematic disregard for the underwriting guidelines set forth in the Offering Documents.  As a result,

73.24%, or $1.54 billion, of the initially rated Aaa Certificates have been downgraded to speculative "junk" status and below. Moreover, current delinquency and default rates on the FMC originated collateral has risen exponentially since issuance of the Certificates from 1.65% as of the cut-off dates to over 53.0% as of May 1, 2009.

158.    On March 17, 2006, according to *PR Newswire*, the National Community Reinvestment Coalition filed a civil rights complaint against Fieldstone and its parent, Fieldstone Investment Company exposing Fieldstone's underwriting practice of using minimum loan values to "redline low to moderate income communities and/or exclude row houses that are situated in African American or Latino communities." As alleged, Fieldstone had employed the practice of denying loans to applicants whose homes are valued at less than $100,000.

159.    On September 13, 2007, *The Daily Record* reported that Morgan Stanley had filed a federal lawsuit seeking to recover millions from defaulted mortgages that the company had purchased over a three year period. The lawsuit alleges that Fieldstone failed to follow through on its obligations to keep accounts current and to buy back any defaulted loans. Morgan Stanley sought to have 72 mortgages with no, or late payments with a total outstanding balance of $26.5 million repurchased.

160.    On July 17, 2007, Fieldstone announced that it had been acquired by Credit-Based Asset Servicing and Securitization, LLC ("C-BASS"), an issuer, servicer and investor specializing in credit-sensitive residential mortgage assets. But, by the following month, Fieldstone stopped accepting new loan applications.

161.    In November 2007, just four months after its acquisition by C-BASS, *Yahoo Business* reported that Fieldstone was forced to seek bankruptcy protection due to mounting losses caused by delinquencies and foreclosures. At the same time, C-BASS itself went through

a $3.8 billion out-of-court restructuring as a result of what the *Daily Deal* described on November 27, 2007 as "unprecedented margin calls caused by the weakened mortgage industry"

162.    On March 27, 2009, *US Fed News* reported that an undercover operation had resulted in fraud charges against 24 defendants, including brokers, business owners and appraisers who dealt regularly with Fieldstone.  The indictment in *United States v. Ruwaida Dabbouseh and Khalil Quandil*, Civ. No. 09-CR-231, whereby an undercover agent posed as a prospective buyer, alleges that brokers, in April 2007 prepared and submitted loan applications containing false statements pertaining to the agent's employment and identity to Fieldstone.  A business owner working with the brokers then submitted verification of employment falsely representing that his company employed the agent.  Based on these representations, Fieldstone fraudulently loaned the agent $153,000.

### E.    The FTC Action Reveals that EMC and Bear Stearns Engaged in Systemic Improper Mortgage Collection and Servicing Practices

163.    As set forth below, the Offering Documents contained statements regarding Bear Stearns and EMC's servicing practices.  (¶¶ 167-168).  These statements included descriptions of EMCs collection disclosure obligations with regard to the borrower and underlying mortgage loans.  On September 9, 2008 the FTC filed a detailed complaint (the "FTC Complaint") setting forth EMC's improper mortgage loan servicing practices in violation of the FDCPA, the FCRA and the TILA (the "FTC Action").  The FTC Complaint was filed in the United States District Court for the Eastern District of Texas after a lengthy FTC investigation.  *FTC v. EMC Mortgage Corporation and The Bear Stearns Companies, LLC*, Civ. No. 4:08-cv-338.

164.    On September 9, 2008, the Court entered a Stipulated Final Judgment and Order in settlement of the FTC Action (the "FTC Judgment").  Pursuant to the FTC Judgment, EMC and The Bear Stearns Companies, LLC agreed to pay $28 million in fines; abide by specific

"Injunctive Relief" prohibiting them from engaging in prohibited servicing practices; and comply with certain "Data Integrity Requirements" regarding the maintenance of mortgage borrower data.

165. The FTC Complaint described that, "in recent years, during the explosive growth of the mortgage industry, [EMC] acquired and securitized loans at a rapid pace, paying inadequate attention to the integrity of consumers' loan information and to sound servicing practices.

166. According to the FTC Complaint, in servicing loans, EMC neglected to obtain timely and accurate information on consumers' loans, made inaccurate claims to consumers and engaged in unlawful collection and servicing practices.

167. Among other things, the FTC Investigation, as recounted in the FTC Complaint, found that:

> As a mortgage servicer, EMC makes various representations to borrowers, including on loans newly acquired by defendants. Specifically, in collection calls and notices, monthly statements, payoff statements, foreclosure notices, bankruptcy filings, and otherwise, EMC routinely makes representations to borrowers about their loans, including: (1) the unpaid principal balance; (2) the due date; (3) the interest rate; (4) the monthly payment amount; (5) the delinquency status; and (6) fees and corporate advances assessed by prior loan servicers. In many instances, EMC makes these representations to borrowers within days of the transfer of the loans for servicing to EMC. For example, EMC begins making collection calls on those transferred loans that are purportedly past due. In many instances, however, EMC makes these early collection calls and sends collection notices to consumers before it has obtained complete loan information from the seller and before it has conducted quality control and other data integrity checks to ensure the accuracy of the representations it makes to borrowers…

> In numerous instances, EMC has lacked a reasonable basis for its representations to borrowers, because it failed to obtain accurate and complete information about the consumer's loan account before making the representation. Despite indications that loan data obtained from prior loan servicers and loaded onto its servicing system was likely inaccurate or unverified, EMC nonetheless used that data to make representations to borrowers about their loans. As a result,

defendants have made inaccurate claims to consumers and engaged in unwarranted collection practices…

As a mortgage servicer, EMC receives consumers' disputes regarding the status and handling of their loans.  In numerous instances, EMC has failed to investigate and resolve consumers' disputes in a timely manner.  In addition, in numerous instances, EMC has failed to report consumers' loan accounts as disputed when furnishing information to consumer reporting agencies…

In connection with loans that were in default when obtained by defendants, EMC has failed to disclose in initial communications with consumers that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose.  In addition, EMC has failed to send consumers a written notice, or has sent untimely or defective notices, containing the amount of the debt, the creditor's name, and the consumer's rights to dispute the debt and obtain verification of the debt…

As a mortgage servicer, EMC "advances" money to a borrower to pay for items, such as property inspections, that it deems necessary to protect the note holder's rights in the property.  Pursuant to the mortgage contract, EMC adds these "corporate advances" to the consumer's loan balance.  In many instances, however, EMC has charged borrowers for property inspections that were not authorized by the mortgage contract.  For example, EMC has charged borrowers for alleged property inspection fees, where the purpose of the inspector's visit to the consumer's home was to attempt to collect on the loan. In addition, EMC has charged borrowers for property inspections on newly acquired loans notwithstanding that EMC lacked a reasonable basis for the need for a property inspection…

In numerous instances, including in connection with newly-acquired loans, EMC has made collection calls to borrowers repeatedly and with excessive frequency under the circumstances.  In addition, in numerous instances, EMC has made collection calls using cell phones that display only the borrower's local area code on the borrower's caller identification display ("caller ID"), and without identifying its name on the caller ID. EMC has used cell phones and caller ID in this fashion notwithstanding that EMC was not calling from the borrower's local area code…

As a mortgage servicer, EMC also charges borrowers other fees, such as late fees in connection with alleged defaults and prepayment penalties in connection with loan payoffs.  In numerous instances, defendants have charged borrowers for fees, including late fees and prepayment penalties, in violation of state law…

When borrowers request the amount of money necessary to reinstate or payoff their loan, and in other instances where EMC seeks payment, EMC's demands often contain fees that have been assessed by EMC, including fees for property

inspections, late fees, prepayment penalties, and loan modifications. In many instances, these demands include unauthorized fees.

FTC Compl., at 4-7.

168. The *Originator Times* reported that the FTC Judgment, besides requiring EMC and Bear Stearns to pay $28 million to settle the charges against them, also required them to redress consumers who had been injured by the illegal practices. In addition, the FTC Judgment permanently enjoined and restrained EMC and The Bear Stearns Companies, LLC from, among other things:

a) Misrepresenting, expressly or by implication, the amount of any payment or fee due on a loan; b) Misrepresenting, expressly or by implication, that any payment or fee due on a loan is allowed under the loan instruments or permitted by law; c) Misrepresenting, expressly or by implication, the amount, nature, or terms of any fee or other condition or requirement of any loan; and d) Making any representation, expressly or by implication, about the amount of any payment or fee, the date that any payment or fee is due, or any other information regarding the terms, conditions, or status of a loan, unless, at the time of making such representation, such persons possess and rely on competent and reliable evidence that substantiates the representation. (FTC Judgment at 5-6).

assessing and/or collecting any fee unless it is for services actually rendered and is a) expressly authorized, and clearly and prominently disclosed, by the loan instruments and not prohibited by law; b) expressly permitted by law and not prohibited by the loan instruments; or c) a reasonable fee for a specific service requested by a consumer that is assessed and/or collected only after clear and prominent disclosure of the fee is provided to the consumer and explicit consent is obtained from the consumer to pay the fee in exchange for the service, and such fee is not otherwise prohibited by law or the loan instruments. (FTC Judgment at 6-7).

assessing and/or collecting fees for property inspections, provided that defendants may impose reasonable fees for property inspections actually performed if: (I) the consumer's loan payment has not been received within forty-five (45) calendar days of the due date; and (2) the inspections are limited to the initial inspection and to additional inspections during the period of continued delinquency not more frequent than every thirty (30) calendar days. Provided, however, that defendants may charge fees for property inspections actually performed if those inspections are otherwise required by law or regulation, or required by written handbook requirements issued by the Department of Housing and Urban Development ("HUD"). (FTC Judgment at 7).

**F.    Bear Stearns' Inadequate Due Diligence with Respect to Compliance
with Stated Underwriting Guidelines and EMC Servicing Activities**

169.    The Registration Statements provided that the loan underwriting guidelines used
to originate the loan collateral is as specifically set forth in each of the Prospectus Supplements.
(¶ 211).    The Prospectus Supplements provide that the Mortgage Loans underlying the
Certificates were originated pursuant to stated underwriting guidelines of the principal loan
Originators as set forth in the Prospectus Supplements.  (*Id.*).

170.    As underwriter of the Certificates Offerings, Bear Stearns conducted inadequate
due diligence with respect to whether the various Originators complied with the loan
underwriting guidelines described in the Prospectus Supplements.

171.    Bear Stearns and other investment banks contracted with external firms to review
whether the loans included in MBS that they underwrote were in compliance with the loan
originators' represented standards.  Bear Stearns was a noted client of Bohan and Clayton.  In
June of 2007, the New York Attorney General subpoenaed documents from Clayton and Bohan,
seeking information regarding whether the investment banks withheld information that should
have been disclosed to investors.    Similar subpoenas were issued by the SEC and by
Massachusetts and Connecticut regulators.

172.    In June 2007, the New York Attorney General, subpoenaed documents from
Bohan and Clayton related to their due diligence efforts on behalf of the investment banks, such
as Bear Stearns, that underwrote mortgage backed securities.  The NYAG, along with the
Attorneys General of Massachusetts and Connecticut and the SEC (all of which also subpoenaed
documents) are investigating whether investment banks held back information they should have
provided in the disclosure documents related to the sale of mortgage backed securities to
investors.

173.    In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on Loans", *The New York Times* reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.
>
> Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms.  But the banks did not disclose the details of these reports to credit-rating agencies or investors.
>
> The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter.  Charges could be filed in coming weeks.
>
> *          *          *
>
> The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures.  The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.
>
> As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans.  In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.
>
> It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans.  Some industry officials say such loans made up a quarter to a half of the portfolios they saw.  In some cases, the loans accounted for as much as 80 percent.  While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.
>
> Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.
>
> *          *          *

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco.  Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

*       *       *

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said lenders and investment banks routinely ignored concerns raised by these consultants,

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said, "We stopped checking."

174.    On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  On the same day, both the *New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," Jan. 27, 2008), and the *Wall Street Journal* ran articles describing the nature of the NYAG's investigation and Clayton's testimony.  The *Wall Street Journal* reported that the NYAG's investigation is focused on "the broad language written in prospectuses about the risky nature of these securities changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising."  According to the *New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

175.    A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.
>
> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.
>
> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous.  And it didn't get filtered."
>
> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.
>
> The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

*The Los Angeles Times*, "Subprime Watchdogs Ignored," March 23, 2008.

176.    Moreover, while underwriters would have sought to have Clayton review 25% to 40% of loans in a pool that was going to be securitized earlier in the decade, by 2006 the typical percentage of loans reviewed for due diligence purposes was just 10%.  Bohan's President, Mark Bohan, stated that "[b]y contrast [to investment banks in RMBS deals], buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

71

**G.    The Offering Documents Failed to Disclose that Bear Stearns
 Relied on S&P's and Moody's Outdated Models
 to Determine Levels of Credit Enhancement And Ratings**

177.    The Prospectus Supplements describe the varying forms of credit enhancement, including by way of subordination and over-collateralization.  The Supplements contain material misstatements and omissions of fact, including that the amount and form of credit enhancement were insufficient and understated because they were largely determined by Ratings Agencies' models that had not been materially updated since 1999 (for S&P) and 2002 (for Moody's).  As a result, these outdated models were based primarily on the performance of fixed interest loans and not subprime, Alt-A, no or limited documentation loans, or loans with interest only, option ARM and negative amortization provisions – which were the kinds of loans substantially included in the Certificate collateralizations.  As a result, the models failed both to provide sufficient, appropriate credit enhancement and to disclose the deficiencies in the manner in which credit enhancement was determined.

178.    The Ratings Agencies' determinations of the amount and kind of credit enhancement to be included in the Certificates were faulty.  These same faulty determinations were then used later by the same firms to assign inflated and faulty AAA ratings to a substantial portion of the total Certificate value of the Offerings ($27.44 billion out of $31.33 billion Moody's rated Certificates, or 88.0%, and $26.71 billion out of $29.99 billion S&P rated Certificates, or just over 89.0%).  These ratings were inflated and unjustifiably high because they were determined pursuant to the same models used to determine credit enhancement – models that had not adequately been updated at the time the Certificates were issued.

179.    The truth about the Ratings Agencies' undisclosed use of outdated models in rating RMBS deals only began to emerge in 2008.  The inadequacy of the models used to rate

72

(and determine the amount of credit enhancement needed to support the rating) was discussed in the April 2008 issue of *Mortgage Banking* which explained that the Ratings Agencies' models used statistical assumptions that were too heavily based on the performance of 30-year fixed mortgages – which were not the kinds of mortgages that had been securitized in the prior four years:

> S & P's Coughlin admits that "assumptions that went into decision-making [on credit ratings] were informed by what had happened in the past," and yet in this instance "previous loss data proved to be much less of a guide to future performance."

> But why?  Drexel University's Mason believes it's because the CRAs relied on statistical models that were misleading, at best.  "I think their [credit-rating] methodologies were demonstrably insufficient," he says.

> "Unlike the traditional rating processes for single-named issuers, which rely on empirical analysis at their core, structured-finance rating analysis is essentially driven by statistical models," write Mason and Rosner in their paper.  And the data that the rating agencies used when evaluating mortgage-backed securities--including those backed by subprime mortgages--were heavily biased by over-reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan, as Mason explains during an interview, is a very different animal.

> "This is not your historical mortgage loan," he says.  "This is more like a credit-card loan."  Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

180.    In an article appearing in *The New York Times* on April 8, 2008, entitled "Triple A Failure," *The New York Times* took note of Moody's April 2007 disclosure that it was "revising" its model which had not been revised since 2002:

> In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages.  It noted that the model "was first introduced in 2002.  Since then, the mortgage market has evolved considerably."  This was a rather stunning admission; its model had been based on a world that no longer existed.

181.    The article explained that when Moody's had analyzed subprime delinquency data in 2007 it had found trends that its 2002 model never accounted for:

> Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined. This was rather intuitive; Moody's simply hadn't reckoned on it. Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time. Translation: even people with good credit scores were defaulting. Amy Tobey, leader of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets." Indeed. And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them. Homeowners' equity had never been as high as believed because appraisals had been inflated.

182.    On October 22, 2008, the United States House of Representatives Committee on Oversight and Government Reform (the "House Oversight Committee") heard testimony from Frank Raiter (the "Raiter Testimony"), the former Managing Director and head of Residential Mortgage-Backed Securities at S&P from March 1995 through April 2005. Raiter testified that the ratings on S&P deals turn in part on the credit rating of the individual mortgages. It was from this credit analysis that S&P determined *(1) the expected default probability* of a loan and *(2) the loss that would occur in the event of a default* which, in turn, was used to establish the amount of AAA bonds that could be issued against the pool and amount of equity or "credit enhancement" needed to protect the AAA bonds from experiencing losses:

> A mortgages backed security consists of a pool of individual mortgage loans. Depending on the type of mortgage product (i.e., prime-jumbo, subprime, Alt-A or HEL) underlying a given security, the pool could consist of 1,000 to 25,000 loans. The ratings process consists of two distinct operations – the credit analysis of individual mortgages and a review of the documents governing the servicing of loans and the payments to investors in the securities.
>
> *The credit analysis is focused on determining the expected default probabilities on each loan and the loss that would occur in the event of a default.* These, in turn, establish the expected loss for the entire pool and determine the amount of AAA bonds that can be issued against the pool. It is analogous to your equity

> position in your home and the underlying mortgage.
>
> The loss estimate determines the equity needed to support the bond – it is
> intended to protect the AAA bonds from experiencing any losses, much the same
> as the homeowners' equity stake in a house protects the lender from loss in the
> mortgage loan.

Raiter Testimony at 3 (emphasis added).

183.    Raiter testified that in 1995, S&P developed a sophisticated model to estimate the

default and loss of individual loans and pools – a model based on approximately 500,000 loans

with performance data going back five or more years.  This "LEVELS" Model was updated in

early 1999 based on a database of 900,000 loans.  Raiter testified further that ***"it was critical to***

***maintain the best models as they were the linchpins of the rating process."*** (Raiter Testimony

at 4 (emphasis added)).  After the housing boom took off in 2001, S&P developed a far better

model in 2001, with updated data in 2003 and 2004, based on approximately 9.5 million loans

***"covering the full spectrum of new mortgage products, particularly in AAA and fixed/floating***

***payment type categories."*** (*Id.*)

184.    Nevertheless, S&P failed to implement this updated model, which, in Raiter's

view, would have forewarned on the loan-losses from the new loan products, in particular:

> [T]he analysts at S&P had developed better methods for determining default
> which did capture some of the variations among products that were to become
> evident at the advent of the crisis.  It is my opinion that had these models been
> implemented we would have had an earlier warning about the performance of
> many of the new products that subsequently lead to such substantial losses.  That,
> in turn, should have caused the loss estimates mentioned above to increase and
> could have thus caused some of these products to be withdrawn from the market
> as they would have been too expensive to put into bonds.

*Id.*, at 4.

185.    As Raiter explained, the unfortunate consequences of continuing to use outdated

versions of the rating model included "the failure to capture changes in performance of the new

non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."  S&P's current President, Deven Sharma, agreed with Raiter's explanation in his own testimony in front of the House Oversight Committee on October 22, 2008, noting: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work … [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

186.    Executives at Moody's also acknowledged a lack of investment in Moody's ratings models and the failure of Moody's ratings models to capture the decrease in lending standards.  In a confidential presentation to Moody's Board of Directors from October 2007, released by the House Oversight Committee on October 22, 2008 during the Committee's "Hearing on the Credit Agencies and the Financial Crisis" (the "House Oversight Committee Hearing"),[19] Raymond McDaniel, the current Chairman and CEO of Moody's, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment."  McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape. (*Id.*)  Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized during a Moody's Town Hall on September 10, 2007, the transcript of which was released during the House Oversight Committee Hearing on October 22, 2008, Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decrease in underwriting standards]."

187.    Not only were Moody's and S&P's models based on outmoded data but they were often constructed by people who were not familiar with the housing markets in the areas that

---

[19]    All exhibits released by the House Oversight Committee from the Committee's "Hearing on Credit Agencies and the Financial Crisis" can be found on the Committee's website at www.oversight.house.gov.

they were rating.  And, in some instances, real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor ratings agency.

**H.     The Ratings Agencies Relaxed the Ratings Criteria Which
        Led to Artificially Inflated Ratings for the Certificates**

188.    Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  In a September 25, 2008 article published by *Bloomberg*, titled "Race to Bottom at Moody's, S&P Secured Sub-prime's Boom, Bust," a former S&P Managing Director – Richard Gugliada – explained the easing of standards as a "'*market-share war where criteria were relaxed*'" and admitted, "'*I knew it was wrong at the time … [i]t was either that or skip the business*.  That wasn't my mandate.  My mandate was to find a way.  Find the way.'" According to Gugliada, when the subject of tightening S&P's ratings criteria came up, the co-director of CDO ratings, David Tesher, said: "Don't kill the golden goose." *Id*.

189.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney"), two S&P analysts, from April 5, 2007, that described S&P's rating of an investment similar to the Trusts and that was submitted during the House Oversight Committee Hearing:

> **Shah:** btw – that deal is ridiculous
>
> **Mooney:** i know right ... model def does not capture half of the rish [sic]
>
> **Mooney:** *risk*
>
> **Shah:** we should not be rating it
>
> **Mooney:** we rate every deal
>
> **Mooney:** it could be structured by cows and we would rate it
>
> **Shah:** but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

190.    In an email sent on December 5, 2006, released during the House Oversight Committee Hearing, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] *even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters.*"

191.    On October 28, 2008, former Moody's Managing Director Jerome S. Fons ("Fons") testified before the House Oversight Committee (hereinafter "Fons Testimony").  Fons had been an Executive at Moody's for 17 years, in various positions including Managing Director of Credit Policy.  Fons testified that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

192.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality." (Fons Testimony, at 3).  Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  (*Id.*)  Fons said it was this business model that "*prevented analysts from putting investor interests first*."  (*Id.*)

193.    Raymond McDaniel, the current CEO of Moody's, also acknowledged the degradation of ratings standards.  In the same confidential presentation to Moody's Board of Directors in October 2007, cited *supra*, McDaniel told the Board: "The real problem is not that the market ... underweights ratings quality but rather that in some sectors, it actually penalizes

78

quality ... It turns out that *ratings quality has surprisingly few friends*." He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'" In fact, *The Wall Street Journal,* in an article published on April 24, 2007, found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage after its client complained and said it might go with a different ratings firm.

## I.    The Prospectus Supplements Did Not Reflect the True Risk of the Certificates

194.    The Ratings Agencies rated the Certificates based in large part on data about each mortgage loan that Bear Stearns provided to them – including appraisal values, LTV ratios, and borrower creditworthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels. As discussed above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting addressed in this Complaint. Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities). Nor did they seek representations from sponsors that due diligence had been performed. During Moody's September 2007 "Town Hall Meeting," hosted by Moody's Managing Director, Raymond McDaniel, executives at Moody's acknowledged that the Ratings Agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true... [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law. We know that's a lie.

*        *        *

> There's a lot of fraud that's involved there, things that we didn't see ... We're sort

of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis.

\*        \*        \*

[W]e're being asked to figure out how much everyone lied. ... [I]f all of the information was truthful and comprehensive and complete, we wouldn't have an issue here ...

What we're really being asked to do is figure out how much lying is going on and bake that into a credit ... which is a pretty challenging thing to do. I'm not sure how you tackle that from a modeling standpoint.

Moody's Town Hall Meeting Transcript, at 16, 58.

195.    In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's sub prime ratings leading to massive leading to massive downgrades and potential more downgrades to come? We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets. As for #1, it seems to me that *we had blinders on and never questioned the information we were given*. Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan? As for #2, *it is our job to think of the worst case scenarios and model them ... Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both*.

Moody's Town Hall Meeting Transcript, at 79 (emphasis added).

196.    Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk, and the Certificates were given investment grade ratings when in reality they were not of investment grade quality. These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

**J.      The Offering Documents Failed to Disclose
        Bear Stearns' Ratings Shopping Practices**

197.    The Registration Statements disclosed the engagement of Ratings Agencies but omitted disclosure of the manner in which the Ratings Agencies were engaged – so-called Rating Shopping.  As noted, the SEC Report set forth that S&P and Moody's engaged in the practice of "ratings shopping," as indicative of one of the practices which may have pressured Ratings Agencies to issue faulty ratings for MBS.  (¶¶ 203-206).

198.    In June, 2008, the NYAG's Office announced that after an investigation of the Ratings Agencies in the context of mortgage-backed securities, it had reached an agreement with S&P, Moody's and Fitch which contemplated a complete overhaul of the then-current ratings procedures and guidelines and to put an end to what had been termed "ratings shopping." Instead of investment banks looking to issue mortgage-backed bonds going to all three agencies for a review, but only use, and pay for, the most optimistic rating, the agencies now will get paid up front regardless if they are hired to assign a rating, a move expected to remove any potential for conflicts of interest.

199.    As set forth above, in Fons' Testimony before the House Oversight Committee, he explained that Moody's provided inadequate ratings on RMBS because of conflicts of interest and being forced to "bid" or "shop" its ratings to obtain engagements:

> Why did it take so long for the rating agencies to recognize the problem?  Why were standards so low in the first place?  And what should be done to see that this does not happen again?
>
> ***My view is that a large part of the blame can be placed on the inherent conflicts of interest found in the issuer-pays business model and rating shopping by issuers of structured securities.***  A drive to maintain or expand market share made the rating agencies willing participants in this shopping spree.  It was also relatively easy for the major banks to play the agencies off one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency.  Originators of structured securities typically chose the agency

with the lowest standards, engendering a race to the bottom in terms of rating quality. While the methods used to rate structured securities have rightly come under fire, in my opinion, the business model prevented analysts from putting investor interests first.

Fons Testimony, at 3 (emphasis added).

200.    In further testimony at the October 22, 2008 House Oversight Committee Hearing, Managing Director of Egan-Jones Rating Co., Sean J. Egan ("Egan"), stated, in part:

Assigning ratings on structured finance bonds differs from the process for corporate and municipal bonds. In the unsecured corporate and municipal markets, debt issuers are subject to being rated by all of the rating agencies because financial information is publicly available to all parties. The structured finance market has been a "rating by request" market where the debt issuers invite some or all of the major rating agencies to preview the collateral pools so the rating agencies can provide preliminary rating indications that can be used to size the bond classes and structure the bond transactions.

*Historically, all of the rating agencies have agreed to bow out of the rating process if they are not actually selected by the debt issuer to rate a securities transaction. This has encouraged the debt issuers to shop for the best ratings so they can optimize their securitization proceeds.*

Testimony of Sean J. Egan, House Oversight Committee Hearing, October 22, 2008, at 9 (emphasis added).

**K.    The Offering Documents Failed to Disclose the True Roles of Ratings Agencies in Forming and Structuring the Certificates for Sale as Primarily AAA Securities**

201.    In the April 2008 issue of *Mortgage Banking*, critics began to note the role of the Ratings Agencies in providing "structuring advice:"

But serious concerns have also been voiced by members of Congress about whether the CRAs' business model--where the large investment banks that underwrite mortgage-backed securities (MBS) and collateralized debt offerings actually pay to have their deals rated by the agencies, and the agencies in turn provide feedback to the underwriters on how to boost their deals' credit rating to the highly coveted triple-A status – may have prejudiced their objectivity and integrity.

"It seems to me that the credit-rating agencies are playing both coach and referee," said Sen. Robert Menendez (D-New Jersey), during a September 2007

hearing by the Senate Banking Committee on the collapse of the subprime market.

Critics also argue that the CRAs are actively involved in the structuring of RMBS and CDO deals, and thus can hardly claim that their ratings are merely "opinions" on the likelihood that a debt security might go into default – or, as one agency official has called them, "the world's shortest editorials."

Joseph Mason, an associate professor of finance at Drexel University in Philadelphia and a former economist at the Office of the Comptroller of the Currency (OCC), says *it is indisputable that the CRAs provide underwriters with "active structuring advice" on how to get a triple-A credit rating for their deals. While the CRAs insist they're merely providing information to the investment bankers during the underwriting process, Mason says they're trying to draw "an artificial line between advice and communication."*

(Emphasis added.)

202.    An article appearing in *The Financial Times* on October 17, 2008 entitled "When Junk Was Gold," addressed the unique role of the Ratings Agencies in structured finance deals such as mortgage backed securities:

The first mortgage-backed bonds were created in the late 1980's, well before Clarkson's time, by a trader called "Lewie" Ranieri. Ranieri, the head of the mortgage trading desk at the former investment bank Salomon Brothers, was famous for the huge sums of money he netted for his employer and for the quantity of cheeseburgers he ate. What he struck upon in structured finance was a process of pure alchemy: a way of turning myriad messy mortgage loans into standardized, regimented and easy-to-assess bonds.

Ranieri knew that the magic of structuring was in the packaging. Packaged in the right way, mortgages could come to create a huge, new tradable bond market. And this is where the rating agencies came in. Structured bonds, like any other bond, needed ratings in order to be sold. *But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating. This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them. "The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined. In some cases, the ratings are known before the bonds have even been inked. "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.*

(Emphasis added.)

203.    The Ratings Agencies' unique role in influencing the structure of the securitization was more fully discussed in the July 2008 SEC Report.  The SEC Report confirmed that S&P and Moody's provided "feed back" to the Sponsor of the Offerings as to the structure, which would result in the highest rating:

> The three examined rating agencies generally followed similar procedures to develop ratings for subprime RMBS and CDOs.  ***The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence),*** the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS trance issued by the trust.  Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger.  ***The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating.  Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche – as the highest rated tranche – pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.***

(Emphasis added.)

## L.    The Offering Documents Failed to Disclose Material Financial Conflicts of Interest Between Bear Stearns and the Ratings Agencies

204.    The Offering Documents make no mention of the material financial conflicts of interest between Bear Stearns and the Ratings Agencies, including the fact that the analysts involved in rating were also involved in the rating fees or the Ratings Agencies' business interests.  The SEC Report confirmed significant undisclosed conflicts of interest which incented Ratings Agencies to issue inflated ratings.  The SEC Report found, in violation of SEC Rules, "key participants" in the securitization process negotiated fees the rating agency would receive in exchange for their high ratings.  (SEC Report at 23-24).

205.    The SEC noted, *inter alia*, that analysts are "aware" of the rating firm's "business interests when securing the rating of the deal" as follows:

- ***While each rating agency has policies and procedures restricting analysts from participating in fee discussions with issuers,*** these policies still allowed key participants in the ratings process to participate in fee discussions.

- Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal.  The Staff notes multiple communications that indicated that some analysts were aware of the firm's fee schedules, and actual (negotiated) fees.  There does not appear to be any internal effort to shield analysts from emails and other communications that discuss fees and revenue from individual issuers.

- ***"Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."***

(SEC Report at 24-25 (emphasis added).)

206.    The July 2008 SEC Report found that a number of factors unique to the rating of RMBS may have "exacerbated" the effect of conflicts of interest inherent in the fact that the issuer or arranger pays for the ratings.  These factors include that the arranger of the deal has:

- ***"More flexibility to adjust the deal to obtain a desired credit rating as compared to arrangers of non-structured asset classes."***

- "Second, there is a high concentration in the firms conducting the underwriting function…    While 22 different arrangers underwrote subprime RMBS deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume."

- With a fast-changing market, rating processes are frequently and quickly changed.  The high concentration of arrangers with the influence to determine the ***choice of rating agency heightened the inherent conflicts in the "issuer pays" compensation model.***  Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Ratings Agencies may be pressured by arrangers to produce a more ***favorable outcome or reduce credit enhancement levels,*** thus reducing ***the cost of the debt for a given level of cash inflows from the asset pool.***  When the arranger also sponsors the RMBS or CDO trust, pressure can

influence an agency's decision to update a model when the update would lead to a less favorable outcome.

- ***High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.*** Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

SEC Report at 31-33 (emphasis added).

207.    As reported in *The Washington Post* on June 6, 2008, the New York State Attorney General's Office announced that it had reached an agreement with the credit-rating companies, S&P, Moody's and Fitch to:

… change the way they evaluate mortgage securities that have roiled financial markets for the past year.

The deal with Moody's Investors Service, Standard & Poor's and Fitch Ratings aims to restore confidence among investors -- who saw top-rated securities lose much of their worth in a matter of months -- by revising how the agencies are paid for issuing ratings. The agreement also requires credit-rating agencies to direct investment banks to provide them with more data on the pools of mortgages that make up the bonds.

The agencies have been under fire for the role they played in the subprime mortgage crisis by awarding top ratings to securities that soured. Regulators and investors have alleged that the agencies have a conflict of interest because they are paid by the investment banks issuing the securities, thus encouraging the credit agencies to give high ratings to win business.

The agreement seeks to end this practice by having the issuers pay the credit-rating agencies at four points during the rating process, not just at the end when the rating is given.

Credit-rating agencies will also be required to disclose information about all securities submitted for review, allowing investors to determine whether issuers sought, but subsequently decided not to use, ratings from a specific agency. This will allow investors to see whether investment banks shopped around for the agency that would give their securities the best rating, said Andrew M. Cuomo, New York's attorney general.

208.    The NYAG further stated that:

"The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities," Cuomo said in a statement. "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse."

*Id.*, at 2.

## M.    Federal District Court Rules Non-Independence of Moody's in MBS and CDO Ratings Is a Material Misrepresentation in Moody's Securities Fraud Case

209.    On February 19, 2009, in *In re Moody's Corporation Securities Litigation,* 2009 U.S. Dist. LEXIS 13894 (Civ. No. 07-CV-8375), Judge Kram of the United States District Court for the Southern District of New York denied Defendant Moody's Motion to Dismiss, finding that statements regarding the ratings agency's independence in issuing ratings constituted an actionable and material misrepresentation (the "Moody's Decision" or the "Moody's Dec."). In that case, investors filed a class action against Moody's claiming that the company had made material misrepresentations and omissions respecting, among other things, its business, the meaning and the method of its credit ratings and the manner in which it generated financial results and growth. In her decision, Judge Kram stated, in part:

- Plaintiff's core allegation is that Moody's falsely claimed that it was an independent body publishing ratings accurately and impartially. Defendants contend that the statements cited by plaintiffs are declarations of intent or vague pronouncements constituting "puffery." The Court disagrees with Defendants' characterizations. (Moody's Dec., at 28).

- The AC [Amended Complaint] adequately alleges that Moody's employees and clients attempted to raise questions about the Company's independence. In a confidential presentation, CEO McDaniel admits that ***analysts and managing directors sometimes succumb to the pressure placed upon them by issuers and ignore the strictures of the ratings system***. (Moody's Dec., at 29).

- Collectively, the facts belie Defendants' claims of independence and ratings integrity. The facts alleged by Plaintiffs challenge the Company's assertion

that it applies its "opinions consistently, fairly, and objectively." Similarly, the revelations that *it [Moody's] altered ratings at the request of issuers* called into question Moody's claim that it "maintains independence in its relationships with Issuers and other interested entities." (Moody's Dec., at 30).

- …Moody's statements regarding its own independence do not constitute inactionable puffery. They were neither "vague" nor "non-specific" pronouncements that were incapable of "objective verification." Moody's not only proclaimed its independence; it also listed verifiable actions it was taking to ensure its independence. Rather than being general statements, these were specific steps that Moody's was taking to ensure its independence and ratings integrity. (Moody's Dec., at 33).

- Plaintiffs have alleged sufficient facts to show that *Moody's rating methodologies were not "accurately disclosed"* by alleging that Moody's did not even start to assess originator practices until well after it claimed it had. (Id.)

(Emphasis added).

210.    In or about July 2008, both Moody's and S&P sought to make internal changes to reform the conflicts of interest problems identified by the SEC. In a *Reuters* article, S&P Draws Criticism as Sets Ratings Reform, published on July 2, 2008, it was reported that S&P had "unveiled an overhaul of its ratings process on Thursday, responding to widespread criticism of the quality and accuracy of credit ratings" and had:

> … [a]nnounced 27 steps that its aid would boost confidence in credit ratings. It came on the heels of planned reforms announced this week by its major rivals, [Moody's and Fitch].

> Ratings agencies have come under fire from regulators and investors who say they helped precipitate the U.S. subprime mortgage crisis and credit tightening that began in 2007.

> "The supposed reforms announced today by Standard & Poor's and by Moody's on Tuesday are too little, too late," New York State Attorney General Andrew Cuomo said in a statement. "Both S&P and Moody's are attempting to make piecemeal change that seem more like public relations window-dressing than systematic reform." He pledged to continue investigating their roles in the mortgage crisis.

Critics say the agencies at first assigned high ratings to hundreds of billions of dollars of securities linked to low-quality debt, only to exacerbate market turmoil by later rapidly downgrading many of those same securities.

This has contributed to write-downs piling up in the financial industry, hurting stock prices and causing losses in a variety of pension and mutual funds.

## VI.

## MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

A.    **Material Misstatements and Omissions
        Regarding Mortgage Loan Underwriting Guidelines**

1.    **The Registration Statements**

211.    The Registration Statements provide that underwriting was to include assessments of borrower or mortgagor creditworthiness and appraisals of the mortgaged properties, as follows:

> The underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan.
>
> *            *            *
>
> The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations. High LTV Loans are underwritten with an emphasis on the creditworthiness of the related mortgagor. High LTV Loans are underwritten with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property.

Structured Asset Mortgage Investments II, Inc., Form S-3/A Registration Statement, filed March 10, 2006, at 17.  *Cf.*, Bear Stearns Asset Backed Securities I, LLC, Form S-3/A Registration Statement, filed March 31, 2006, at S-42.

212.  *Omitted Information*:  These statements contain material misstatements and omissions, because, as stated herein, EMC, BSRM, ECC and the Originators materially disregarded reasonable assessments of borrower creditworthiness and relied on inflated appraisals.

213.  With respect to the importance of the appraisals of the mortgaged properties, the Registration Statements specifically provide:

> Mortgaged properties generally will be appraised by licensed appraisers or through an automated valuation system.  A licensed appraiser will generally address neighborhood conditions, site and zoning status and condition and valuation of improvements.  In the case of mortgaged properties secured by single family loans, the appraisal report will generally include a reproduction cost analysis (when appropriate) based on the current cost of constructing a similar home and a market value analysis based on recent sales of comparable homes in the area.  With respect to multifamily properties, commercial properties and mixed-use properties, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used.  An appraisal employing the income approach to value analyzes a property's projected net cash flow, capitalization and other operational information in determining the property's value.

Structured Asset Mortgage Investments II, Inc., Form S-3/A Registration Statement, filed March 10, 2006, at 18.

> Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, replacement cost analysis based on the current cost of constructing a similar home and, when deemed appropriate, market rent analysis based on the rental of comparable homes in the area.  All appraisals are required to conform to the Uniform Standard of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.

Bear Stearns Asset Backed Securities I, LLC, Form S-3/A Registration Statement, filed March 31, 2006, at S-42.

214.    **Omitted Information:**    These statements contain material misstatements and omissions because, as stated herein, appraisal standards were largely disregarded and the values of the underlying mortgaged properties were materially inflated in the loan underwriting process.

215.    The Registration Statements also provide for prudent underwriting for mortgages where less borrower documentation was required.    For example, the SAMI Registration Statement provides:

> The mortgage loans will be originated under "full/alternative", "stated income/verified assets", "stated income/stated assets", "no documentation" or "no ratio" programs.  The "full/alternative" documentation programs generally verify income and assets in accordance with Fannie Mae/Freddie Mac automated underwriting requirements.    The stated income/verified assets, stated income/stated assets, no documentation or no ratio programs generally require less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, under both "full/alternative" documentation programs, ***at least one month of income documentation is provided.  This documentation is also required to include year-to-date income or prior year income in case the former is not sufficient to establish consistent income.***  Generally under a "stated income verified assets" program no verification of a mortgagor's income is undertaken by the origination however, verification of the mortgagor's assets is obtained.  Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied.    Generally, under a "no documentation" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator.  ***The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.*** Generally, under a "no ratio" program, the mortgagor is not required to disclose their income although the nature of employment is disclosed.  Additionally, on a "no ratio" program assets are verified.

Structured Asset Mortgage Investments II, Inc., Form S-3/A Registration Statement, filed March 10, 2006, at 17 (emphasis added).  *Cf.*, Bear Stearns Asset Backed Securities I, Inc., Form S-3/A Registration Statement, filed March 31, 2006, at S-42.

216.  **Omitted Information**: These statements contain material misstatements and omissions because, as stated herein, the Originators (including EMC, Encore and BSRM) materially disregarded underwriting requirements for mortgages requiring lesser borrower documentation.

### 2.    The Prospectus Supplements

### i.    EMC's Mortgage Loan Underwriting Guidelines

217.  The underlying loan collateral for certain of the Issuing Trusts (¶¶ 43-44) was originated by EMC.  The Prospectus Supplements describe the underwriting guidelines used by EMC in originating Certificate Collateral.  For example, the July 6, 2006 Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering states:

> … **underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.** …  Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.

*    *    *

> Generally, each mortgagor will have been required to complete an application designed to provide to the lender pertinent credit information concerning the mortgagor.  The mortgagor will have given information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and will have furnished the lender with authorization to obtain a credit report which summarizes the mortgagor's credit history.

*    *    *

> In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.  Such ratios vary depending on a number of underwriting criteria, including loan-to-value ratios, and are determined on a loan-by-loan basis.

92

\*      \*      \*

>    ***Each lender also examines a prospective borrower's credit report.***  Generally, each credit report provides a credit score for the borrower. Credit scores generally range from 350 to 840 and are available from three major credit bureaus: Experian (formerly TRW Information Systems and Services), Equifax and Trans Union.  If three credit scores are obtained, the originator applies the middle score of the primary wage earner.  If a primary wage earner cannot be determined because of the documentation type, the lowest middle score of all borrowers is used.

BSMF Series 2006-AR1 Trust Prospectus Supplement, filed July 6, 2006, at S-31-32 (emphasis added).

218.    ***Omitted Information***:   These statements contain material misstatements and omissions because, as stated herein, EMC systematically disregarded these underwriting procedures and pushed for loan volumes at the expense of underwriting standards, thereby failing to take the steps necessary to safeguard the quality of the product.

219.    The Prospectus Supplements describe the importance of the appraisals of the mortgaged properties.  For example, the July 6, 2006 Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering specifically provides:

>    Each mortgaged property relating to an EMC mortgage loan has been appraised by a qualified independent appraiser who is approved by each lender.   All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation.   Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed.   The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines.   In certain cases an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used.

*Id.*, at S-32.

220.  **Omitted Information:**  These statements contain material misstatements and omissions because, as stated herein, EMC largely disregarded appraisal standards and bought loans without regard to the riskiness of the loan, and because and the values of the underlying mortgage properties were materially inflated in the loan underwriting process.

221.  The Prospectus Supplements also provide for prudent underwriting for mortgages where less borrower documentation was required.  For example, the July 6, 2006 Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering provide:

> The mortgage loans have been underwritten under one of the following documentation programs: full/alternative documentation ("Full/Alt Doc"), stated income/verified asset documentation ("SIVA"), no ratio documentation ("No Ratio"), and stated income/stated assets ("SISA") documentation.
>
> Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower.  *Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified.*
>
> Under the no ratio documentation program the borrower's income is not stated and no ratios are calculated.  *Although the income is not stated nor verified, lenders obtain a telephonic verification of the borrower's employment without reference to income.  Borrower's assets are verified.*
>
> Under the stated income/stated asset documentation program, the borrower's income and assets are stated but not verified.  The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower.
>
> Under the no income/no asset documentation program, the borrower's income and assets are neither stated nor verified.  The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower.

*Id.,* at S-32.

222.  **Omitted Information:**  These statements contain material misstatements and omissions because, as stated herein, EMC materially disregarded underwriting requirements for

and expanded acceptance and financing of mortgages requiring lesser borrower documentation with a marked and dangerous decline in the rigor and discipline with which it approached underwriting.

### ii.    BSRM's Mortgage Loan Underwriting Guidelines

223.    The underlying loan collateral for certain of the Issuing Trusts (*see* ¶¶ 43-44, *supra*) was originated by BSRM.    The Prospectus Supplements describe the underwriting guidelines used by BSRM in originating Certificate Collateral.    For example, the July 6, 2006 Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering provides:

> The BSRM Alt–A Underwriting Guidelines are intended to ensure that (i) the loan terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability of the property are acceptable.
>
> \*        \*        \*
>
> All of the Alt-A mortgage loans originated by BSRM are based on loan application packages submitted through the wholesale or correspondent channel. Based on the documentation type each loan application package has an application completed by the prospective borrower that includes information with respect to the applicant's assets, liabilities, income, credit and employment history, as well as certain other personal information.    During the underwriting process, BSRM calculates and verifies the loan applicant's sources of income (except documentation types, which do not require such information to be stated or independently verified), reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the BSRM Underwriting Guidelines.

*Id.,* at S-32-33.

224.    ***Omitted Information***:    These statements contain material misstatements and omissions because, as stated herein, BSRM disregarded these underwriting procedures.

225.    The Prospectus Supplements describe the importance of the appraisals of the mortgaged properties.    For example, the July 6, 2006 Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering specifically provides:

Properties that secure BSRM mortgage loans have a valuation appraisal performed by a qualified and licensed appraiser. All appraisers providing services must comply with the respective state and federal laws. An appraisal must not be more than 120 days old at the closing date or a re-certification of value is required. The original appraiser must perform re-certification. As an alternative, a field review with comparable properties that sold in the last three months and support the value is also acceptable, in lieu of the re-certification of value. After 180 days, a new appraisal is required regardless of whether an existing or new construction property. All combined loan amounts greater than $650,000 and less than or equal to $1,000,000 require two original appraisals. The second appraisal must be from a BSRM nationally approved appraiser. The value used to determine the LTV/CLTV will be the lesser of the two values. BSRM combined loans amounts greater that $1,500,000 in the state of California will require two appraisals; the second appraisal must be from a BSRM nationally approved appraiser. The value used to determine the LTV/CLTV will be the lesser of the two values.

Each appraisal is reviewed by a representative of BSRM, who has the right to request a second appraisal, additional information or explanations, lower the approved loan amount, reduce the maximum allowable loan-to-value ratio or deny the loan based on the appraisal.

*Id.,* at S-36.

226. ***Omitted Information***: These statements contain material misstatements and omissions because, as stated herein, BSRM largely disregarded appraisal standards and the values of the underlying mortgage properties were materially inflated in the loan underwriting process.

227. The Prospectus Supplements also provide for prudent underwriting for mortgages where less borrower documentation was required. For example, the July 6, 2006 Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering provides:

The BSRM mortgage loans were originated in accordance with guidelines established by BSRM with one of the following documentation types: "Full Documentation"; "Limited Documentation"; "Lite Documentation"; "Stated Income/Verified Assets"; "No Ratio/Verified Assets"; "Stated Income/Stated Assets"; "No Income/No Assets (NINA)"; "No Doc"; and "No Doc with Assets"….

\*      \*      \*

96

*Limited Documentation:* ….  Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*Lite Documentation:* ….  Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*Stated Income*: ….  Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*No Ratio:* ….  Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*Stated Income/Stated Assets:* ….  The applicant's income as stated must be reasonable for the related occupation, borrowers' credit profile and stated asset, in the loan underwriter's discretion.  ….  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*No Income/No Assets (NINA):* ….  Borrower's ability to repay the loan is based upon past credit history and FICO score.

*No Doc:* ….  Borrower's ability to repay the loan is based upon past credit history and FICO score.

*No Doc with Assets:* ….  Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or *securities* statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal,

> interest, taxes and insurance.  Borrower's ability to repay the loan is based upon
> past credit history; FICO score and verified assets.

*Id.,* at S-34-35.

228.  ***Omitted Information:***    These statements contain material misstatements and
omissions because, as stated herein, BSRM materially disregarded underwriting requirements for
mortgages requiring lesser borrower documentation.

### iii.    Countrywide's Mortgage Loan Underwriting Guidelines

229.  The underlying loan collateral for certain of the Issuing Trusts (¶¶ 43-44) was
originated by Countrywide.  The Prospectus Supplements describe the underwriting guidelines
used by Countrywide in originating Certificate Collateral.  Countrywide generally required a
description of the borrower's income, employment documentation, FICO scores and a credit
report.  For example, the Prospectus Supplement for the April 27, 2007 BSABS Series 2007-
AC4 Certificate Offering stated:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of
> Countrywide Home Loans to evaluate the prospective borrower's credit standing
> and repayment ability and the value and adequacy of the mortgaged property as
> collateral.
>
> \*      \*      \*
>
> As part of its evaluation of potential borrowers, Countrywide Home Loans
> generally requires a description of income.  If required by its underwriting
> guidelines, Countrywide Home Loans obtains employment verification providing
> current and historical income information and/or a telephonic employment
> confirmation.  Such employment verification may be obtained, either through
> analysis of the prospective borrower's recent pay stub and/or W-2 forms for the
> most recent two years, relevant portions of the most recent two years' tax returns,
> or from the prospective borrower's employer, wherein the employer reports the
> length of employment and current salary with that organization.
>
> \*      \*      \*
>
> In assessing a prospective borrower's creditworthiness, Countrywide Home
> Loans may use FICO Credit Scores.  "FICO Credit Scores" are statistical credit

scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. .... Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years, may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program").

\*        \*        \*

**For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.**

BSABS Series 2007-AC4 Trust Prospectus Supplement, filed April 27, 2007, at 40 (emphasis added).

230.    **Omitted Information:** In fact, Countrywide lending officers regularly ignored adverse information in a borrower's credit report. Consumer credit rating agencies must remove non-confirmable adverse information within a certain time period from consumer credit reports. Lending officers and originators knew that borrowers frequently complained to consumer credit rating agencies about accurate adverse information in an effort to increase their credit scores.

231.    The Prospectus Supplements describe the importance of the appraisals of the mortgaged properties. For example, the April 27, 2007 Prospectus Supplement for the BSABS Series 2007-AC4 Prospectus Supplement provides:

Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. **The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition.** Following each appraisal, the appraiser prepares a report which includes a market

data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. ***All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect***.

*Id.,* at 34 (emphasis added).

232. ***Omitted Information:*** In fact, Countrywide's home loan appraisals were not obtained from independent appraisers or appraisal services, but rather from appraisers who understood that their appraisals must conform to predetermined levels at which a loan could be approved, or risk their association and employment with Countrywide or brokers working with Countrywide. The effect was that purportedly independent appraisals were not prepared in conformance with Fannie Mae or Freddie Mac appraisal standards. Countrywide failed to confirm that appraisers were following the guidelines described, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than suggested by the Offering Documents. This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004 to 2005. Thus, the aggressive lending practices introduced during those years where, for example, borrowers with mortgages in excess of their ability to pay were assured that by the promise of refinancing to a lower rate, were unavailable.

233. The Prospectus Supplement for the BSABS 2007-AC4 Certificate Offering details Countrywide's programs for issuing mortgage loans where less than full documentation was required. But, even those programs were subject to underwriting procedures and required appraisals (as set forth in ¶ 231, above). The Prospectus Supplement states, in part:

The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

*     *     *

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. ***This program is limited to borrowers with excellent credit histories***. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, ***the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.*** ….

*Id.,* at 43 (emphasis added).

234. ***Omitted Information***: These statements contain material misstatements and omissions because, as stated herein, Countrywide materially disregarded underwriting requirements for mortgages requiring lesser borrower documentation and inflated fees throughout the loan process. Despite assurances that lesser loans were limited to borrowers with excellent credit histories, Countrywide routinely extended these loans to borrowers with weak credit histories.

### iv.      **American Home's Mortgage Loan Underwriting Guidelines**

235.      The underlying loan collateral for certain of the Issuing Trusts (¶¶ 43-44) was originated by American Home.   The Prospectus Supplements describe the underwriting guidelines used by American Home in originating Certificate Collateral. American Home purported to have rigorous underwriting standards designed to evaluate borrower creditworthiness.   For example, the Prospectus Supplement for the SAMI Series 2006-AR5 Certificate Offering provides:

> American Home's underwriting philosophy is to **weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.**

> \*          \*          \*

> American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

> \*          \*          \*

> In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months. In general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.

> \*          \*          \*

> American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to

manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

SAMI Series 2006-AR5 Trust Prospectus Supplement, filed May 30, 2006, at S-45 (emphasis added).

236.    ***Omitted Information***:    These statements contain material misstatements and omissions because, as stated herein, American Home disregarded its stated underwriting standards in order to obtain larger fees and profits by increasing loan origination volume.  As such, American Home disregarded crucial risk factors in making determinations on loan applications specifically approving loan applications for Option-Arm and loans with Negative Amortization features to borrowers with bad credit history or insufficient income to repay the loan once the rates adjusted upwards.   Moreover, American Home's controls were inadequate to prevent it from originating suspect loans which were sure to default absent rapid, significant price appreciation of the underlying property.

237.    In fact, lending officers were regularly satisfied about adverse information in a borrower's credit report by ignoring such adverse information.  Rating agencies must remove non-confirmable adverse information within a certain time period from consumer credit reports. Lending officers and originators knew that borrowers frequently complained to credit ratings agencies about accurate adverse information in an effort to increase their credit scores.

238.    American Home purported to require and rely upon standard appraisals.  For example, the Prospectus Supplement for the SAMI Series 2006-AR5 Certificate Offering specifically provides:

Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.

*     *     *

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

*Id.,* at S-45 (emphasis added).

239. ***Omitted Information***: These statements contain material misstatements and omissions because, as stated herein, American Home largely disregarded its appraisal standards and the values of the underlying mortgage properties were materially inflated in the loan underwriting process.

240.    The Prospectus Supplements also provide for prudent underwriting for mortgages where less borrower documentation was required.  For example, the May 30, 2006 Prospectus Supplement for the SAMI Series 2006-AR5 Certificate Offering provides:

> Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require.  Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require.  For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both. For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both.  Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

*        *        *

> American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation.  Therefore each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

*Id.,* at S-45, S-48 (emphasis added).

241.    ***Omitted Information:*** These statements contain material misstatements and omissions because, as stated herein, American Home materially disregarded underwriting requirements for mortgages requiring lesser borrower documentation and regularly made exceptions to the underwriting guidelines in the absence of sufficient compensating factors to offset the additional risk.

### v.    Ameriquest Loan Sellers' Mortgage Loan Underwriting Guidelines

242.    The underlying loan collateral for certain of the Issuing Trusts (¶¶ 43-44) was originated by the Ameriquest Loan Sellers, or Ameriquest.  The Prospectus Supplements describe the underwriting guidelines used by Ameriquest in originating Certificate Collateral.

Ameriquest purported to follow guidelines assessing borrower creditworthiness and requiring standard appraisals which were then reviewed by Ameriquest.  For example, the Prospectus Supplement for the BSABS Series 2006-AQ1 Certificate Offering provides

> All of the mortgage loans originated by the Ameriquest Loan Sellers are based on loan application packages submitted directly or indirectly by a loan applicant to the Ameriquest Loan Sellers.  Each loan application package has an application completed by the applicant that includes information with respect to the applicant's liabilities, income, credit history and employment history, as well as certain other personal information.  The Ameriquest Loan Sellers also obtain (or the broker submits) a credit report on each applicant from a credit reporting company.  The credit report typically contains the reported information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and reported records of default, bankruptcy, repossession and judgments.  If applicable, the loan application package must also generally include a letter from the applicant explaining all late payments on mortgage debt and, generally, consumer (i.e. non-mortgage) debt.

> During the underwriting process, each Ameriquest Loan Seller reviews and verifies the loan applicant's sources of income (except under the Stated Income and Limited Documentation types, under which programs such information may not be independently verified), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Ameriquest Underwriting Guidelines.  The Ameriquest Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires (i) an appraisal of the mortgaged property which conforms to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a representative of the Ameriquest Loan Sellers or a fee appraiser and may include a desk review of the original appraisal or a drive-by review appraisal of the mortgaged property.

> *      *      *

> Properties that are to secure mortgage loans have a valuation obtained by an appraisal performed by a qualified and licensed appraiser who is a staff appraiser or an independent appraiser who is in good standing with the related Ameriquest Loan Seller's in-house appraisal department.  Generally, properties below average standards in condition and repair are not acceptable as security for mortgage loans under the Ameriquest Underwriting Guidelines. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where

> deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  Every independent appraisal is reviewed by a representative of the applicable Ameriquest Loan Seller or a fee appraiser before the mortgage loan is funded.

BSABS Series 2007-AQ1 Trust Prospectus Supplement, filed January 26, 2007, at 32.

243.    **Omitted Information:**  These statements contain material misstatements and omissions because, as stated herein, Ameriquest disregarded these underwriting procedures.

244.    Ameriquest purported to require and rely upon standard appraisals.  For example, the Prospectus Supplement for the BSABS Series 2007-AQ1 Certificate Offering specifically provides:

> Properties that are to secure mortgage loans have a valuation obtained by an appraisal performed by a qualified and licensed appraiser who is a staff appraiser or an independent appraiser who is in good standing with the related Ameriquest Loan Seller's in-house appraisal department.  Generally, properties below average standards in condition and repair are not acceptable as security for mortgage loans under the Ameriquest Underwriting Guidelines.  Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  Every independent appraisal is reviewed by a representative of the applicable Ameriquest Loan Seller or a fee appraiser before the mortgage loan is funded.

*Id.,* at 32.

245.    **Omitted Information:** These statements contain material misstatements and omissions because, as stated herein, Ameriquest largely disregarded appraisal standards and falsified appraisals; in addition the values of the underlying mortgage properties were materially inflated in the loan underwriting process.

246.    The Prospectus Supplements also provide for prudent underwriting for mortgages where less borrower documentation was required.  For example, the Prospectus Supplement for the BSABS Series 2006-AQ1 Certificate Offering provides:

*Full Documentation.* The Full Documentation residential loan program is generally based upon current year to date income documentation as well as the previous year's income documentation (i.e., tax returns and/or W-2 forms and/or written verification of employment) for the previous 12 months (with respect to mortgage loans originated by Argent) or 24 months (with respect to mortgage loans originated by Ameriquest) or bank statements for the previous 12 months (with respect to mortgage loans originated by Argent) or 24 months (with respect to mortgage loans originated Ameriquest).    The documentation required is specific to the applicant's sources of income.  The applicant's employment and/or business licenses are generally verified.

*Limited Documentation.* The Limited Documentation residential loan program is generally based on bank statements from the past 6 months (with respect to mortgage loans originated by Argent) or 12 months (with respect to mortgage loans originated by Ameriquest) supported by additional documentation provided by the applicant or current year to date documentation.   The applicant's employment and/or business licenses are generally verified.

*Stated Income.* The Stated Income residential loan program requires the applicant's employment and income sources to be stated on the application.  The applicant's income as stated must be reasonable for the related occupation in the loan underwriter's discretion. However, the applicant's income as stated on the application is not independently verified.

*Id.,* at 32.

247.    ***Omitted Information:*** These statements contain material misstatements and omissions because, as stated herein, Ameriquest materially disregarded underwriting requirements for mortgages requiring lesser borrower documentation.

### vi.    GreenPoint's Mortgage Loan Underwriting Guidelines

248.    The underlying loan collateral for certain of the Issuing Trusts (¶¶ 43-44) was originated by GreenPoint.   The Prospectus Supplements describe the underwriting guidelines used by GreenPoint in originating Certificate Collateral.   For Example, the Prospectus Supplement for the BSABS Series 2006-AC5 Certificate Offering states:

Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Exceptions to the guidelines are permitted where compensating factors are present.

\*       \*       \*

In assessing a prospective borrower's creditworthiness, GreenPoint may use FICO® credit scores. FICO credit scores are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO credit scores were not developed to predict the likelihood of default on mortgage loans and, accordingly, may not be indicative of the ability of a borrower to repay its mortgage loan. FICO credit scores range from approximately 300 to approximately 850, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score.

In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income. These ratios vary depending on a number of underwriting criteria, including loan-to-value ratios ("LTV"), and are determined on a loan-by-loan basis. The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's.

\*       \*       \*

As part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. If required by its underwriting guidelines, GreenPoint obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Employment verification may be obtained through analysis of the prospective borrower's recent pay stubs and/or W-2 forms for the most recent two years or relevant portions of the borrower's most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the borrower's length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

BSABS Series 2006-AC5 Trust Prospectus Supplement, filed November 28, 2006, at S-34.

249. **Omitted Information:** Exceptions to guidelines were granted in many circumstances – not just where compensating factors existed. The exceptions were granted when the borrower could not qualify. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not

exercise any degree of realistic control.  Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. In addition, GreenPoint did not verify the income of borrowers as represented.  Many of GreenPoint's Alt-A loans were actually subprime loans, an innovation later copied by others. GreenPoint was very liberal with terms even to borrowers with low credit scores.  As a result of GreenPoint's poor underwriting practices, GreenPoint's parent, Capital One, recently took an $850 million charge as a result of the company's decision to close GreenPoint's doors.

250.    GreenPoint purported to require and rely upon standard appraisals, as set forth in the Prospectus Supplement for the BSABS Series 2006-AC5 as follows:

> Periodically, the data used by GreenPoint to underwrite mortgage loans may be obtained by an approved loan correspondent.  In those instances, the initial determination as to whether a mortgage loan complies with GreenPoint's underwriting guidelines may be made by such loan correspondent.  In addition, GreenPoint may acquire mortgage loans from approved correspondent lenders under a program pursuant to which GreenPoint delegates to the correspondent the obligation to underwrite the mortgage loans to GreenPoint's standards.  Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by GreenPoint before acquisition of the mortgage loan, and the correspondent represents to GreenPoint that its underwriting standards have been met.  After purchasing mortgage loans under those circumstances, GreenPoint conducts a quality control review of a sample of the mortgage loans.  The number of loans reviewed in the quality control process varies based on a variety of factors, including GreenPoint's prior experience with the correspondent lender and the results of the quality control review process itself.

> In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing.  All appraisals are required to conform the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed.  The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases, an analysis based on income generated by the

property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used. GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

*Id.,* at S-34.

251.    ***Omitted Information:*** These deficiencies in income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property.  However, appraisers were in fact pressured to appraise to certain levels.  Appraisers knew if they appraised under certain levels they would not be hired again.  Thus, the appraisals were inherently unreliable and there was little to support the value and adequacy of the mortgaged property.

252.    The Prospectus Supplements also provide for prudent underwriting for mortgages where less borrower documentation was required, as set forth below taken from the Prospectus Supplement for the BSABS Series 2006-AC5 Certificate Offering:

GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs.  Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. ***Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion***, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived.  Mortgage loans originated and acquired with limited documentation programs include cash-out refinance loans, super-jumbo mortgage loans and mortgage loans secured by investor-owned properties.  Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation requirements.  Under no documentation programs, income ratios for the prospective borrower are not calculated. Emphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective borrower, rather than on verified income and assets of the borrower.  Documentation concerning income, employment verification and asset verification is not required and income

> ratios are not calculated. Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

*Id.,* at S-34 (emphasis added).

253. ***Omitted Information:*** These statements contain material misstatements and omissions because, as stated herein, GreenPoint materially disregarded underwriting requirements for mortgages requiring lesser borrower documentation, and did not limit no or limited documentation loans to individuals with good credit histories.

### vii.    Aegis' Stated Mortgage Loan Underwriting Guidelines

254. The underlying loan collateral for certain of the Issuing Trusts (¶¶ 43-44) was originated by Aegis. The Prospectus Supplements describe the underwriting guidelines used by Aegis in originating Certificate Collateral. For example, with regard to Aegis's stated underwriting guidelines, the Prospectus Supplement for the BSABS Series 2007-HE5 Certificate Offering provides:

> The underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans: the creditworthiness of a borrower based on both a credit score and mortgage history; the income sufficiency of a borrower's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property; and the adequacy of the mortgaged property, expressed in terms of loan-to-value ratio, to serve as the collateral for a mortgage loan.

BSABS Series 2007-HE5 Trust Prospectus Supplement, filed May 29, 2007, at 38.

255. ***Omitted Information*:** As set forth herein, Aegis employees often relaxed these documentation requirements allowing applicants who did not qualify to obtain mortgages. This allowed the company to increase its loan volume, but ultimately served as its demise once the mortgage bubble burst.

256.    Aegis purported to require and rely upon standard appraisals of the underlying mortgaged property in making loan application determinations, stating, in part:

> In determining the adequacy of the property as collateral, an appraisal is generally made of each property considered for financing …. In the case of an appraisal, the appraiser is required to verify that the property is in good condition and that construction, if new, has been completed.  The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements.  Additionally, a risk analysis is ordered on each appraisal from a third party vendor and all high risk appraisals are reviewed by staff appraisers.

*Id.,* at 40.

257.    **Omitted Information:** These statements contain material misstatements and omissions because, as stated herein, Aegis largely disregarded appraisal standards and the values of the underlying mortgage properties were materially inflated in the loan underwriting process.

258.    The Prospectus Supplements also provide for prudent underwriting for mortgages where less borrower documentation was required.  For example, the March 29, 2007 Prospectus Supplement for the BSABS Series 2007-HE3 Certificate Offering provides:

> Some of the mortgage loans have been originated under "stated income," "limited documentation" or "no documentation" programs that require less documentation and verification than do traditional "full documentation" programs.  Under a "stated income" program, some borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income, except verification of employment, will be undertaken.  Under a "limited documentation" program, applicants usually are required to submit verification of stable income for at least 12 months, such as 12 consecutive months of complete personal checking account bank statements.  Generally, in order for a borrower to be eligible for a "stated income" or "limited documentation" program, the loan-to-value ratio must meet applicable guidelines, the borrower must have a good credit history and the borrower's eligibility for this type of program may be determined by use of a credit-scoring model.  Under a "no documentation" program, no information is obtained regarding the borrower's income and there is no verification of the borrower's assets.  The "No Documentation" program guidelines require stronger credit profiles than the other programs, and have substantially more restrictive requirements for loan-to-value ratios, occupancy requirements and credit scores.

*            *            *

113

Generally, credit-scoring models provide a means for evaluating the information about a prospective borrower that is available from a credit reporting agency. Credit scores are obtained from credit reports provided by various credit reporting organizations, each of which may employ differing computer models and methodologies.

\* \* \*

**In addition, it should be noted that credit scores were developed to indicate a level of default probability over a two-year period, which does not correspond to the life of a mortgage loan.**

*Id.,* at S-33-34 (emphasis added).

259.    **Omitted Information:** These statements contain material misstatements and omissions because, as stated herein, Aegis' small underwriting department was easily bullied both by managers within the Company and by the larger investment banks to disregard their underwriting guidelines and approve loans that should not have been considered.  Credit scores became more of a suggestion than a requirement or guideline and many loans were approved for applicants who had no business receiving one.

### viii.    FMC's Mortgage Loan Underwriting Guidelines

260.    The underlying loan collateral for certain of the Issuing Trusts (¶¶ 43-44) was originated by FMC.  The Prospectus Supplements describe the underwriting guidelines used by FMC in originating Certificate Collateral.   For example, with regard to FMC's stated underwriting guidelines, the Prospectus Supplement for BSABS Series 2007-HE3 Certificate Offering provides:

FMC originates both conforming and non-conforming loans…  Non-conforming borrowers typically have good credit backgrounds, but tend to have higher LTV ratios, higher debt ratios than conforming borrowers or less income documentation.

\* \* \*

FMC offers a variety of fixed-rate mortgage loans and ARMs to non-conforming borrowers. FMC considers a combination of factors in deciding whether to

approve these loans, including the borrower's income documentation, the loan-to-value, or LTV, the borrower's mortgage and consumer credit payment history, the property type and the credit score necessary to qualify under a particular program. Nevertheless, each program relies upon the analysis of each borrower's ability to repay the loan according to its terms, the risk that the borrower will not repay, the fees and rates FMC charges, the value of the collateral, the benefit FMC believes it is providing to the borrower and the loan amounts relative to the risk FMC believes it is taking.

*    *    *

All of FMC's non-conforming loans are underwritten by its on-staff underwriting personnel. FMC does not delegate underwriting authority to any broker or third party. The underwriters review each non-conforming loan in one of FMC's regional funding centers. FMC believes that this regionalized underwriting process provides them with the ability to fund loans faster than many of its competitors, and the experience of their loan originators and branch managers, information systems and rigorous quality control process ensure the continued high quality of their loans.

BSABS Series 2007-HE3 Trust Prospectus Supplement, filed March 29, 2007, at S-47.

261.    **Omitted Information:**    In fact, FMC's "underwriting personnel" consistently modified mortgage loan applications in order to increase the volume of loans and fees derived from such mortgage loans.  As such, the underwriting was generally not monitored by FMC's supposed rigorous quality control process and only came to light after a federal undercover investigation revealed the true practices at FMC.

## B.    The Registration Statements Omitted Information Regarding Delinquencies as of the Cut-Off Date

262.    The Registration Statements contained a section which described the percentage of delinquencies at a cut-off date just prior to the Offering date.  The precise figures were left blank.  Each of the Prospectus Supplements contained the same language indicating that as of the "cut-off date" (defined differently in each Prospectus Supplement either none or a very small percentage, but always less than .02% of the mortgage collateral, of the initial loans were considered delinquent for any reason:

(3)    ***As of the Closing Date, there is no monetary default existing under any mortgage or the related mortgage note and there is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach or event of acceleration;*** and neither the Sponsor nor any of its respective affiliates has taken any action to waive any default, breach or event of acceleration; and no foreclosure action is threatened o has been commenced with respect to the mortgage loan.

BSMF Series 2006-AR1 Trust Prospectus Supplement, filed July 28, 2006, at S-81 (emphasis added).

263.    ***Omitted Information:*** These statements masked the true impaired nature of the collateral since the delinquency rates for these loan pools followed the same pattern of skyrocketing delinquencies immediately following the Offering dates. Specifically, In the four months after the BSMF 2006-AR1 Offering, the borrower delinquency and default rate increased from 0.00% at issuance of the Certificates, to over 1.00% within four months of the Offering date.

**C.    The Registration Statements Included Material Misstatements and Omissions Regarding Credit Support**

264.    With respect to Credit Support, the SAMI Registration Statement provided as follows:

As set forth below and in the applicable prospectus supplement, credit enhancement may be provided by one or more of a financial guaranty insurance policy, a special hazard insurance policy, a mortgage pool insurance policy or a letter of credit. In addition, if provided in the applicable prospectus supplement, in lieu of or in addition to any or all of the foregoing arrangements, credit enhancement may be in the form of a reserve fund to cover the losses, subordination of one or more classes of subordinate securities for the benefit of one or more classes of senior securities, of cross-collateralization or overcollateralization, or a combination of the foregoing. The credit support may be provided by an assignment of the right to receive specified cash amounts, a deposit of cash into a reserve fund or other pledged assets, or by guarantees provided by a third-party or any combination thereof identified in the applicable prospectus supplement. Each component will have limitations and will provide coverage with respect to Realized Losses on the related mortgage loans. Credit support will cover Defaulted Mortgage Losses, but coverage may be limited or unavailable with respect to Special Hazard Losses, Fraud Losses, Bankruptcy

Losses and Extraordinary Losses. To the extent that the credit support for the offered securities of any series is exhausted, the holders thereof will bear all further risk of loss.

Structured Asset Mortgage Investments II, Inc., Form S-3/A Registration Statement, filed March 10, 2006, at 49; *cf.*, Bear Stearns Asset Backed Securities I, LLC, Form S-3/A Registration Statement, filed March 31, 2006, at 46.

265.    Furthermore, the Prospectus Supplement for the BSMF Series 2006-AR1 Trust

provided that Credit Enhancement would include:

> **Credit enhancement** provides limited protection to holders of specified certificates against shortfalls in payments received on the mortgage loans. This transaction employs the following forms of credit enhancement.
>
> *Excess Spread and Overcollateralization.* The mortgage loans are expected to generate more interest than is needed to pay interest on the related offered certificates because we expect the weighted average net interest rate of the mortgage loans to be higher than the weighted average pass-through rate on the related offered certificates. In addition, such higher interest rate is paid on a principal balance of mortgage loans that is larger than the principal balance of the related certificates. Interest payments received in respect of the mortgage loans in excess of the amount that is needed to pay interest on the offered certificates, related trust expenses and, with respect to the group I mortgage loans, on and after the distribution date occurring in July 2016, any amounts paid into the final maturity reserve account, will be used to reduce the total current principal amount of the related certificates until a required level of overcollateralization has been achieved.
>
> *Subordination; Allocation of Losses.* By issuing senior certificates and subordinate certificates, the trust has increased the likelihood that senior certificateholders will receive regular payments of interest and principal.

BSMF Series 2006-AR1 Trust Prospectus Supplement, filed July 28, 2006, at S-9-10.

266.    **Omitted Information:** The above statements failed to disclose that the Ratings

Agencies largely determined the amount and kind of Credit Support or Credit Enhancement to be

provided for each Certificate, both before and after Ratings Agencies were formally "engaged"

by Bear Stearns, in order for the Certificates to be assigned predetermined ratings.  The above

statements also failed to disclose that the amounts and kind of Credit Support the Ratings

Agencies determined was appropriate for the Certificates, as specifically set forth in each Prospectus Supplement, were faulty, erroneous and inaccurate since the Ratings Agency models had not been updated and failed to accurately or adequately reflect the performance of the Certificate mortgage loans.

### D. The Prospectus Supplements Misstated the True Loan-to-Value Ratios Associated with the Underlying Mortgages

267. Each of the Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts. In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range. The following chart, taken from the Prospectus Supplement for BSMF Series 2006-AR1 makes clear that the majority of mortgage loans had LTV's of 75% or above.

**Original Loan-to-Value Ratios\* of the Mortgage Loans as of the Cut Off Date in Group I**

| Original Loan-to-Value Ratios(%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of Cut-off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.00 - 30.00 | 2 | $ 249,863 | 0.05 % |
| 30.01 - 40.00 | 6 | 2,648,627 | 0.55 |
| 40.01 - 50.00 | 5 | 1,201,450 | 0.25 |
| 50.01 - 55.00 | 3 | 3,878,500 | 0.81 |
| 55.01 - 60.00 | 9 | 3,736,575 | 0.78 |
| 60.01 - 65.00 | 20 | 9,456,495 | 1.97 |
| 65.01 - 70.00 | 33 | 16,868,491 | 3.51 |
| 70.01 - 75.00 | 126 | 59,514,711 | 12.39 |
| 75.01 - 80.00 | 971 | 376,875,521 | 78.47 |
| 80.01 - 85.00 | 6 | 1,551,921 | 0.32 |
| 85.01 - 90.00 | 12 | 3,583,328 | 0.75 |
| 90.01 - 95.00 | 3 | 732,841 | 0.15 |
| Total | 1,196 | $ 480,298,324 | 100.00 % |

Weighted Average Original Loan-to-Value:    77.78%

**Original Loan-to-Value Ratios\* of the Mortgage Loans as of the Cut Off Date in Group II**

| Original Loan-to-Value Ratios(%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of Cut-off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.00  -  30.00 | 2 | $ 234,000 | 0.05 % |
| 30.01  -  40.00 | 9 | 2,963,260 | 0.58 |
| 40.01  -  50.00 | 11 | 3,414,765 | 0.66 |
| 50.01  -  55.00 | 9 | 1,988,336 | 0.39 |
| 55.01  -  60.00 | 19 | 6,326,091 | 1.23 |
| 60.01  -  65.00 | 24 | 7,898,068 | 1.54 |
| 65.01  -  70.00 | 39 | 14,068,467 | 2.74 |
| 70.01  -  75.00 | 81 | 30,945,457 | 6.02 |
| 75.01  -  80.00 | 1,356 | 446,370,786 | 86.81 |
| Total | 1,550 | $ 514,209,230 | 100.00 % |

Weighted Average Original Loan-to-Value:                    78.11%

BSMF Series 2006-AR1 Trust Prospectus Supplement, filed July 28, 2006, at Schedule A-9.

268.    ***Omitted Information***: As explained above, the appraisals of the properties underlying the mortgage loans were inaccurate and inflated. Furthermore, due to hidden incentives, the stated sales price of properties underlying the mortgage loans did not accurately reflect the true value of the properties.  These inflated appraisals and misleading sales price figures were used to form the LTV ratios listed in the prospectus supplements. Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio for a given loan.  For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000). Due to the inflated appraisals, the LTV ratios listed in the prospectus supplements were artificially low, making it appear that the loans underlying the trusts were less risky than they really were.

269.    The Prospectus Supplement for the BSMF Series 2006-AR1 Certificates also stated that:

> Generally, each mortgage with an LTV at origination of greater than 80% is covered by a primary mortgage insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac. The policy provides coverage in the amount equal to a specified percentage multiplied by the sum of the remaining principal balance of the related mortgage loan, the accrued interest on it and the related foreclosure expenses.

BSMF Series 2006-AR1 Trust Prospectus Supplement, filed July 28, 2006, at S-36.

270. **Omitted Information:** Due to the artificially inflated appraisals (as detailed above) mortgages were extended to borrowers whose true LTV ratio did not support the amount of the mortgage loan. Further, contrary to the statement that these many of the mortgages were in fact "limited documentation," or not "full documentation" loans, they were not extended to borrowers who have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion. In fact, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the originators' underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs.

- Steering borrowers to more expensive loans that exceeded their borrowing capacity.

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes.

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted.

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the originators' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

- Incentivizing their employees to approve borrowers under exceptions to the originators' underwriting policies.

- Failing to determine whether stated income or stated assets were reasonable.

E. **The Prospectus Supplements Misstated the Certificates' True Investment Rating**

271. The Registration Statements and Prospectus Supplements contained statements regarding the ratings of the Certificates that were supported by the mortgage loans. The Registration Statements referred the investor to the Prospectus Supplements for specific information as to the ratings for each of the Certificates.

272. Each of the Prospectus Supplements provided: (1) both S&P's and Moody's actual rating for each class of Certificate within a Trust; or (2) stated that the Certificates in each class would not be offered unless they received ratings from both Moody's and S&P that were at least as high as those set forth in the Prospectus Supplement. All of the ratings set forth in all of the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3) and S&P (AAA through BBB) and the majority of Certificate classes received the highest rating of Aaa/AAA.

273. The following chart, taken from the Prospectus Supplement for BSMF Series 2006-AR1 is an example of the first type of representation:

**Group I**

**Offered Certificates**

| Class | Pass-Through Rate | Initial Current Principal Amount | Initial Rating (S&P/Moody's) | Designation |
|---|---|---|---|---|
| I-A-1 | Variable Rate | $257,200,000 | AAA/Aaa | Group I Super Senior |
| I-A-2 | Variable Rate | $128,600,000 | AAA/Aaa | Group I Senior Support |
| I-A-3 | Variable Rate | $42,866,000 | AAA/Aaa | Group I Senior Support |
| I-X | Fixed Rate | Notional | AAA/Aaa | Group I Senior Interest Only |
| I-B-1 | Variable Rate | $13,689,000 | AA+/Aaa | Group I Subordinate |
| I-B-2 | Variable Rate | $9,126,000 | AA/Aa1 | Group I Subordinate |
| I-B-3 | Variable Rate | $3,362,000 | AA–/Aa2 | Group I Subordinate |
| I-B-4 | Variable Rate | $6,484,000 | A+/Aa3 | Group I Subordinate |
| I-B-5 | Variable Rate | $3,362,000 | A/A2 | Group I Subordinate |
| I-B-6 | Variable Rate | $6,724,000 | BBB/Baa2 | Group I Subordinate |
| I-B-7 | Variable Rate | $2,401,000 | BBB–/Baa3 | Group I Subordinate |
| **Total Group I Offered Certificates:** | | $473,814,000 | | |

**Group I**

**Non-Offered Certificates**

| Class | Pass-Through Rate | Initial Current Principal Amount | Initial Rating (S&P/Moody's) | Designation |
|---|---|---|---|---|
| I-XP | N/A | N/A | NR | Group I Subordinate |
| I-R | Variable Rate | $0 | NR | Group I Residual |
| I-R-X | Variable Rate | $0 | NR | Group I Residual |
| I-B-IO | N/A | $0 | N/A | Group I Subordinate |
| **Total Group I Non-Offered Certificates:** | | $0 | | |

**Group II**

**Offered Certificates**

| Class | Pass-Through Rate | Initial Current Principal Amount | Initial Rating (S&P/Moody's) | Designation |
|---|---|---|---|---|
| II-A-1 | Variable Rate | $275,205,000 | AAA/Aaa | Group II Super Senior |
| II-A-2 | Variable Rate | $137,603,000 | AAA/Aaa | Group II Senior Support |
| II-A-3 | Variable Rate | $45,867,000 | AAA/Aaa | Group II Senior Support |
| II-B-1 | Variable Rate | $18,769,000 | AA/Aa1 | Group II Subordinate |
| II-B-2 | Variable Rate | $11,570,000 | A/Aa2 | Group II Subordinate |
| II-B-3 | Variable Rate | $7,456,000 | BBB/A1 | Group II Subordinate |
| II-B-4 | Variable Rate | $2,828,000 | BBB–/A3 | Group II Subordinate |
| **Total Group II Offered Certificates:** | | $499,298,000 | | |

274.    ***Omitted Information***: The ratings stated in the Prospectus Supplements were based on outdated models, lowered ratings criteria, and inaccurate loan information.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.

**F.    Misstatements and Omissions in the Registration
        Statements Regarding EMC Servicing Practices**

275.    The Registration Statements purported to describe EMC activities as servicer or

Master Servicer in connection with the Certificate mortgage loan collateral.  The Registration

Statements provide EMC to serve as servicer or master servicer in connection with Certificate

Offerings:[20]

> With respect to any series of securities, if so specified in the related prospectus
> supplement, EMC will also act as servicer [or master servicer] for the mortgage
> pool. If so, EMC will service the mortgage loans in accordance with the
> description of the applicable servicing procedures contained in this prospectus
> under "Servicing of Mortgage Loans" and "Description of the Securities."

Structured Asset Mortgage Investments II, Inc., Form S-3/A Registration Statement, filed March
10, 2006, at 61.

> EMC has been servicing residential mortgage loans since 1990. From year end
> 2004 to year end 2005 EMC's servicing portfolio grew by 113%.  As of August
> 31, 2005, EMC was acting as servicer for approximately 213 series of residential
> mortgage-backed securities with an aggregate outstanding principal balance of
> approximately $45.4 billion.

*Id.; Cf.* Bear Stearns Asset Backed Securities I, LLC, Form S-3/A Registration Statement, filed
March 31, 2006, at S-47.

> EMC will service the mortgage loans in accordance with the description of the
> applicable servicing procedures contained in this section in the prospectus
> supplement.

Bear Stearns Asset Backed Securities I, LLC, Form S-3/A Registration Statement, filed March
31, 2006, at S-47.

---

[20]    EMC served as Master Servicer or Servicer in connection with 42 of the 44 Offerings as follows: BSMF
Series 2006-AC1, BSMF Series 2006-AR1, BSMF Series 2006-AR2, BSMF Series 2006-AR3, BSMF Series 2006-
AR4, BSMF Series 2006-AR5, BSMF Series 2006-SL1 BSMF Series 2006-SL2, BSMF Series 2006-SL3, BSMF
Series 2006-SL4, BSMF Series 2006-SL5, BSMF Series 2006-SL6, BSMF Series 2007-AR1, BSMF Series 2007-
AR3, BSMF Series 2007-SL1, BSMF Series 2007-SL2, BSABS 2006-AC4, BSABS 2006-AC5, BSABS Series
2007-AC1, BSABS Series 2007-AC2, BSABS Series 2007-AC3, BSABS Series 2007-AC4, BSABS Series 2007-
AC5, BSABS Series 2007-AC6, BSABS Series 2007-AQ1, BSABS Series 2007-AQ2, BSABS Series 2007-FS1,
BSABS Series 2007-HE1, BSABS Series 2007-HE2, BSABS Series 2007-HE3, BSABS Series 2007-HE4, BSABS
Series 2007-HE5, BSABS Series 2007-HE6, BSABS Series 2006-HE9, BSABS Series 2006-AQ1, BSABS Series
2006-HE10, BSABS Series 2006-HE5, SAMI Series 2006-AR4, SAMI Series 2006-AR6, SAMI Series 2006-AR8,
SAMI Series 2007-AR1 and SAMI Series 2007-AR2.

276.    **Omitted Information**: The above statements failed to disclose that EMC had disregarded debt and lending laws in its servicing practices.  As alleged in the FTC Complaint, rather than servicing loans in line with standard agreements, EMC neglected to obtain timely and accurate information on consumers' loans, made inaccurate claims to consumers and engaged in unlawful collection and servicing practices.

277.    The Registration Statements set forth EMC's servicer activities to be as follows:

> As part of its servicing duties, the master servicer will be required to, and to cause each of the servicers to, make reasonable efforts to collect all payments called for under the terms and provisions of the mortgage loans that it services. The master servicer and each servicer will be obligated to follow the same collection procedures as it would follow for comparable mortgage loans held for its own account, so long as these procedures are consistent with the servicing standard of and the terms of the related pooling and servicing agreement or servicing agreement and the servicing standard generally described in the preceding paragraph, and do not impair recovery under any instrument of credit enhancement included in the related trust fund.

Structured Asset Mortgage Investments II, Inc., Form S-3/A Registration Statement, filed March 10, 2006, at 24.

> The master servicer will use reasonable efforts to ensure that all payments required under the terms and provisions of the mortgage loans are collected, and will follow collection procedures comparable to the collection procedures of prudent mortgage lenders servicing mortgage loans for their own account, to the extent such procedures will be consistent with the Pooling and Servicing Agreement.

Bear Stearns Asset Backed Securities I, LLC, Form S-3/A Registration Statement, filed March 31, 2006, at S-48.

> In instances in which a loan is in default, or if default is reasonably foreseeable, and if determined by the master servicer to be in the best interests of the related security-holders, the master servicer may engage, either directly or through subservicers, in a wide variety of loss mitigation practices including waivers, modifications, payment forbearances, partial forgiveness, entering into repayment schedule arrangements, and capitalization of arrearages rather than proceeding with foreclosure or repossession, if applicable.

Bear Stearns Asset Backed Securities I, LLC, Form S-3/A Registration Statement, filed March 31, 2006, at S-48.

278.    **_Omitted Information_**: These statements from the Registration Statements failed to disclose that because EMC had acquired and securitized loans at a rapid pace, EMC had paid inadequate attention to the integrity of consumers' loan information and to sound servicing practices.  Further, EMC made unwarranted collection calls to borrowers representing that their loans were past due before it had obtained complete loan information from the seller and before it has conducted quality control and other data integrity checks to ensure the accuracy of the representations it makes to borrowers.  As the FTC Complaint uncovered, in numerous instances, EMC lacked a reasonable basis for these representations to borrowers.

**G.    Misstatements and Omissions in the Prospectus
       Supplements Regarding EMC Servicing Practices**

279.    The Prospectus Supplements also described EMC's responsibilities as master servicer of the Certificate collateral.  For example, the Prospectus Supplement for BSMF Series 2006-AR4 states:

> The master servicer for any mortgage pool will be obligated under the pooling and servicing agreement or servicing agreement to supervise, monitor and oversee the obligations of the servicers to service and administer their respective mortgage loans in the mortgage pool for the benefit of the related security-holders, in accordance with applicable law, the terms of the pooling and servicing agreement or servicing agreement, the mortgage loans and any instrument of credit enhancement included in the related trust fund, and, to the extent consistent with the foregoing, the customs and standards of prudent institutional mortgage lenders servicing comparable mortgage loans for their own account in the jurisdictions where the related mortgaged properties are located.  Subject to the foregoing, the master servicer will have full power and authority to do any and all things in connection with servicing and administration that it may deem necessary and desirable.

BSMF Series 2006-AR4 Trust Prospectus Supplement, filed November 28, 2006, at 24-25.

> As part of its servicing duties, the master servicer will be required to, and to cause each of the servicers to, make reasonable efforts to collect all payments called for under the terms and provisions of the mortgage loans that it services.  The master servicer and each servicer will be obligated to follow the same collection procedures as it would follow for comparable mortgage loans held for its own

account, so long as these procedures are consistent with the servicing standard of and the terms of the related pooling and servicing agreement or servicing agreement and the servicing standard generally described in the preceding paragraph, and do not impair recovery under any instrument of credit enhancement included in the related trust fund. Consistent with the foregoing, the master servicer or any servicer will be permitted, to the extent provided in the related prospectus supplement, to waive any prepayment premium, late payment charge or other charge in connection with any mortgage loan.

*Id.*

280.    ***Omitted Information***: The representations above failed to disclose EMC's total disregarded for several mortgage lending and debt collection laws in its servicing duties, including the FDCPA, the FCRA and the TILA as it aimed to further increase the fees that it earned. As the FTC investigation found, EMC often assessed and collected fees from borrowers for services that it had not actually rendered. Further, the statements failed to disclose that EMC did not investigate or resolve consumers' disputes in a timely manner as required of the Servicer nor did it inform defaulted borrowers of impending debt collections also in violation of both law and their obligations as Servicer.

## VII.

## <u>CLASS ACTION ALLEGATIONS</u>

281.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Issuing Trusts, as set forth in ¶¶ 43-44, pursuant and/or traceable to the false and misleading Registration Statements and who were damaged thereby (the "Class").

282.    Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

283.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Bear Stearns, SAMI, BSABSI, EMC or their transfer agents and maybe notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Billions of dollars worth of Certificates were issued pursuant to the Registration Statements.

284.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

285.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

286.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Registration Statements issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

287.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of § 11 of the Securities Act
### (Against BSC, SAMI, BSABSI, the Individual Defendants and the Ratings Agency Underwriters)

288.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

289.    This Cause of Action is brought pursuant to § 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Issuers of the Registration Statements, the Individual Defendants, the Underwriter and the Ratings Agency Underwriters.  This Cause of Action is predicated upon Defendants' strict liability for making material misleading statements and omitting material information from and in the Offering Documents.

290.    The Offering Documents were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

291.    The Individual Defendants, the Ratings Agency Underwriters, BSC, SAMI and BSABSI are strictly liable to Plaintiffs and the Class for making the misstatements and omissions in issuing the Certificates.

292.    The Individual Defendants each signed one or both of the Registration Statements.

293.    BSC acted as underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, directly and indirectly

solicited offers to purchase the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates. BSC was an underwriter for the respective Issuing Trusts.

294. The Ratings Agency Underwriters also directly and indirectly participated in the sale and distribution of the Certificates and in the drafting and disseminating the Offering Documents for the Certificates through the structuring of the Certificates for sale as AAA securities, establishing the mortgage loan collateral underlying the Certificates and determining the nature and kind of credit enhancement or credit support for the Certificates.

295. SAMI, BSABSI, BSC the Individual Defendants and the Ratings Agency Underwriters owed the Plaintiffs and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

296. SAMI, BSABSI, the Individual Defendants, BSC and the Ratings Agency Underwriters knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

297. SAMI, BSABSI, each of the Individual Defendants, BSC and the Ratings Agency Underwriters failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

298.    SAMI, BSABSI, the Individual Defendants, BSC and the Ratings Agency Underwriters issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

299.    By reason of the conduct alleged herein, each of the SAMI, BSABSI, the Individual Defendants, BSC and the Ratings Agency Underwriters violated § 11 of the Securities Act, and are liable to Plaintiffs and the Class.

300.    Plaintiffs and other Class members acquired the Certificates pursuant and/or traceable to the Registration Statements.  At the time Plaintiffs and Class members obtained their Certificates they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

301.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of SAMI, BSABSI, the Individual Defendants, BSC and the Ratings Agency Underwriters.

302.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, SAMI, BSABSI, BSC and the Rating Agency Underwriters, as set forth in § 11 of the Securities Act.

303.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### (Against BSC)

304.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

305.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against the underwriters of the Offerings, BSC .

306.    BSC sold the Certificates pursuant to the defective Prospectus Supplements for their own financial gain.  The Prospectus Supplements contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

307.    BSC owed to Plaintiffs and the other Class members who purchased Certificates pursuant to the Offering Documents, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.  BSC knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth herein.

308.    Plaintiffs and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Offering Documents.  Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Documents.

309.    By reason of the conduct alleged herein, BSC violated § 12(a)(2) of the Securities Act, and is liable to Plaintiffs and other Class members who purchased Certificates pursuant to and/or traceable to the Offering Documents.

310.    Plaintiffs and other Class members were damaged by BSC's wrongful conduct. Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in § 12(a)(2) of the Securities Act. Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in § 12(a)(2) of the Securities Act.

311.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## THIRD CAUSE OF ACTION

### Violations of § 15 of the Securities Act
### (Against the Individual Defendants, Defendant BSC and the Ratings Agency Underwriters)

312.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

313.    This Cause of Action is brought pursuant to § 15 of the Securities Act against the Individual Defendants, BSC and the Ratings Agency Underwriters.

314.    Each of the Individual Defendants, by virtue of his or her control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of EMC, SAMI, BSABSI and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  Each of the Individual Defendants had the power to influence, and exercised that power and influence, to cause EMC, SAMI, BSABSI, the Ratings

Agency Underwriters the Issuing Trusts to engage in violations of the Securities Act, as described above.

315.    BSC, by virtue of its control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, a controlling person of EMC, SAMI, BSABSI and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  BSC had the power to influence, and exercised that power and influence, to cause EMC, SAMI, BSABSI and the Issuing Trusts to engage in violations of the Securities Act, as described above.

316.    Each of the Ratings Agency Underwriters, by virtue of its control, influence, participation and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of EMC, SAMI, BASABSI and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  Each of the Defendant Ratings Agency Underwriter had the power to influence, and exercised that power, to cause EMC, SAMI, BSABSI and the Issuing Trusts to engaged in violations of the Securities Act, as described above.

317.    The Individual Defendants', BSC's and the Ratings Agency Underwriters' control, position and influence made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class members.

318.    Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statements and having otherwise participated in the consummation of the Offerings detailed herein.  The Defendants named herein were responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from the borrowers to investors.

319.    Individual Defendants prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated.

320.    Since the Defendants named herein controlled the ultimate decision of which mortgage loans would be included and excluded from the securitized pools of loans as well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors, they controlled all material aspects relating to the acquisition, structure and sale of the Certificates and thus, the activities of the Issuing Trusts and Individual Defendants within the meaning Section 15 of the Securities Act.

321.    By virtue of the wrongful conduct alleged herein, the Individual Defendants, BSC and the Ratings Agency Underwriters are liable to Plaintiffs and the other Class members for the damages sustained.

## VIII.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

322.    Determining that this action is a proper class action and certifying Plaintiffs as Class representatives;

323.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

324.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

325.    Awarding rescission or a rescissory measure of damages; and

326.    Awarding such additional equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
       May 15, 2009

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: _____
    Joel P. Laitman (JL-8177)
    Christopher Lometti (CL-9124)
    Daniel B. Rehns (DR-5506)
    Kenneth M. Rehns (KR-9822)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstain.com*
*drehns@cohenmilstein.com*
*krehns@cohenmilstein.com*


Avi Garbow
S. Douglas Bunch
1100 New York Avenue, NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*agarbow@cohenmilstein.com*
*dbunch@cohenmilstein.com*

*Counsel for Plaintiffs and the Proposed Class*

CERTIFICATION OF BEAR STEARNS MORTGAGE FUNDING
TRUST SECURITIES CLASS ACTION COMPLAINT

I, Richard L. Calcara, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the Executive Administrator of Boilermaker Blacksmith National Pension Trust (the "Trust").

2.    I have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

3.    The Trust is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.    During the Class Period (as defined in the Complaint), the Trust purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

5.    The Trust did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.    During the three-year period preceding the date of my signing this Certification, the Trust has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act except *In re Societe Generale Sec Litig, SDNY Docket No 08-CV-2495; Boilermaker Blacksmith National Pension Trust v. Wells Fargo Mortgage-Backed Securities 2006 AR-1 Trust, et al.,* S.D.N.Y. Docket No. 09-CV-833; *In re Lehman Brothers Mortgage-Backed Securities Litigation:* S.D.N.Y., Docket No. 09-MD-2017; and *New Jersey Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4, et al.,* S.D.N.Y. Docket No. 08-CV-5093.

7.     The Trust will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to their representation of the Class.

Signed under the penalties of perjury, this 12th day of May 2009.

Richard L. Calcara, on behalf of Boilermaker
Blacksmith National Pension Trust

## SCHEDULE A

| DATE | TRANSACTION | PRICE PER UNIT |
|------|-------------|----------------|
| 11/29/2007 | Purchased 269,114.44 units Structured Asset Mortgage Investments II Trust Mortgage Pass-Through Certificates, Series 2006-AR5, Class 1A1 | $.9581 |
| 11/29/2007 | Purchased 235,696.47 units Structured Asset Mortgage Investments II Trust Mortgage Pass-Through Certificates, Series 2006-AR5, Class 2A1 | $.9575 |
| 11/29/2007 | Purchased 2,423,365.66 units Structured Asset Mortgage Investments II, Mortgage Pass-Through Certificates, Series 2006-AR6, Class 1A1 | $.9578 |
| 08/22/2008 | Purchased 2,600,000 units Bear Stearns Asset-Backed Securities 2007-HE1, Class 1A1 | $.5506 |

## CERTIFICATE OF SERVICE

I, Daniel B. Rehns, counsel for the Plaintiffs, hereby certify that on May 15, 2009, I filed an original of the foregoing by hand with the Clerk of the Court and delivered a copy to all parties named herein and/or counsel of record in the within action by hand or first-class mail.

Daniel B. Rehns