**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**



RECEIVED
OCT 2 9 2010
U.S.D.C. S.D. N.Y.
COMPLETED

IN RE BEAR STEARNS MORTGAGE
PASS-THROUGH CERTIFICATES
LITIGATION

**This Document Relates To:**

All Actions

MASTER FILE NO.:

08 Civ. 8093 (LTS) (KNF)

<u>ECF CASE</u>

**THIRD AMENDED CLASS
ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     SUMMARY OF THE ACTION ................................................................................ 1

II.    JURISDICTION AND VENUE ............................................................................... 6

III.   PARTIES .................................................................................................................. 6

IV.   BACKGROUND ....................................................................................................... 15

       A.     Bear Stearns Emerges As A Major Issuer And Underwriter Of Mortgage-Backed Securities ................................................................. 15

       B.     Bear Stearns' Securitization And Underwriting Operations ............................... 19

              1.     "Flow Loans" From Bear Stearns' Subsidiary And Correspondent Lenders ................................................................ 19

              2.     Bear Stearns' Bulk Loan Purchases From Third-Party Originators ............................................................................. 20

V.     EVIDENCE OF SYSTEMATIC DISREGARD FOR STATED UNDERWRITING STANDARDS ................................................................ 25

       A.     Exponential Increase In Delinquency And Default Rates ................... 25

       B.     Collapse Of Certificate Ratings To "Junk Bond" Levels ................... 26

       C.     Numerous Government Investigations Reveal The Falsity Of The Offering Documents ............................................................. 29

VI.   THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS ................................ 30

       A.     EMC Mortgage Corporation ................................................. 32

       B.     Bear Stearns Residential Mortgage Corporation ................................. 37

       C.     Countrywide Home Loans ..................................................... 41

       D.     American Home Mortgage ..................................................... 52

       E.     Wells Fargo Mortgage Corporation ................................................. 58

       F.     Fieldstone Mortgage Corporation ................................................. 64

       G.     Additional Originators ......................................................... 67

VII.  THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS REGARDING VALUING THE COLLATERAL ......................... 70

i

VIII.   THE OFFERING DOCUMENTS CONTAINED MATERIAL
MISSTATEMENTS AND OMISSIONS REGARDING CREDIT
SUPPORT .................................................................................................... 72

IX.   THE OFFERING DOCUMENTS CONTAINED MATERIAL
MISSTATEMENTS AND OMISSIONS REGARDING THE
CERTIFICATES' RATINGS ......................................................................... 73

X.   THE CLAIMS IN THE AMENDED COMPLAINT ARE TIMELY .............................. 80

XI.   CLASS ACTION ALLEGATIONS ................................................................ 82

FIRST CAUSE OF ACTION For Violation Of § 11 Of The Securities Act
(Against Bear Stearns, J.P. Morgan Securities, The Depositors And The
Individual Defendants).......................................................................................... 84

SECOND CAUSE OF ACTION For Violation Of § 12(a)(2) Of The Securities
Act  (Against Bear Stearns And J.P. Morgan Securities) .................................... 86

THIRD CAUSE OF ACTION Violations Of § 15 Of The Securities Act (Against
The Individual Defendants, Bear Stearns And J.P. Morgan Securities).......................... 88

RELIEF REQUESTED........................................................................................... 89

JURY DEMAND ................................................................................................... 90

Plaintiffs, as defined in paragraph 1 below, allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their counsel. The investigation included, for example: (i) review and analysis of the offering materials for the Certificates; (ii) examination of the SEC filings, press releases and other public statements of Bear Stearns & Co., Inc. ("Bear Stearns"); (iii) review and analysis of court filings cited herein; (iv) review and analysis of media reports and congressional testimony; (v) review and analysis of testimony and exhibits presented to the Financial Crisis Inquiry Commission ("FCIC"); and (vi) review and analysis of performance, downgrade and pricing data related to the offerings at issue. Many of the facts related to Plaintiffs' allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

I.      SUMMARY OF THE ACTION

1.      Court-appointed Co-Lead Plaintiffs Public Employees' Retirement System of Mississippi ("Mississippi PERS") and New Jersey Carpenters Health Fund ("New Jersey Carpenters"), along with plaintiffs Boilermaker Blacksmith National Pension Trust ("Boilermakers"), the Police and Fire Retirement System of the City of Detroit ("Detroit"), the State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board on behalf of the Oregon Public Employee Retirement Fund ("OPERS"), the Iowa Public Employees' Retirement System ("IPERS"), the City of Fort Lauderdale Police & Fire Retirement System ("Fort Lauderdale") and the San Antonio Fire and Police Pension Fund, ("San Antonio") (collectively "Plaintiffs"), bring this securities class action individually, and on

1

behalf of a class consisting of all persons or entities who purchased or otherwise acquired beneficial interests in the Certificates that are identified in ¶38 below, each of which was issued pursuant and/or traceable to Structured Asset Mortgage Investments II, Inc.'s (the "SAMI Depositor") March 10, 2006 Registration Statement and/or Bear Stearns Asset Backed Securities I, LLC's (the "Bear Stearns Depositor") March 31, 2006 Registration Statement (the "Class").

2.      Plaintiffs assert claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Accordingly, this action involves solely strict liability and negligence claims brought pursuant to the Securities Act.  The Complaint does not allege fraud on the part of any Defendant.

3.      This action arises from the sale of $17.58 billion of mortgage-backed certificates ("Certificates") to Plaintiffs and the Class pursuant to the Registration Statements.  The Certificates are securities entitling the holder to income payments from pools of mortgage loans and/or mortgage-backed securities ("MBS").  To facilitate the Certificates' sale, Bear Stearns formed the Depositors for the sole purpose of issuing mortgage-backed securities.  The Certificates, which were based on 47,178 largely subprime and Alt-A mortgages, were sold in 14 Offerings completed between May 30, 2006 and April 26, 2007.

4.      On March 10, 2006, the SAMI Depositor filed a Registration Statement (No. 333-132232) with the Securities and Exchange Commission ("SEC") indicating its intention to sell $50 billion in mortgage-backed certificates (the "SAMI Registration Statement").  On March 31, 2006, the Bear Stearns Depositor filed a Registration Statement (No. 333-131374) with the SEC indicating its intention to sell $50 billion in mortgage-backed certificates (the "Bear Stearns Registration Statement").  The SAMI Registration Statement and Bear Stearns Registration Statement are collectively referred to herein as the "Registration Statements."  The Registration

Statements, along with their accompanying Prospectus and Prospectus Supplements, are collectively referred to herein as the "Offering Documents."

5.     The Certificates were supported by pools of mortgage loans that Bear Stearns originated or purchased from third-party originators.  Bear Stearns owned and operated three residential mortgage loan origination subsidiaries – EMC Mortgage Corporation ("EMC"), Bear Stearns Residential Mortgage Corporation ("Bear Stearns Mortgage Corp.") and Encore Credit Corp. ("Encore").  In addition to securitizing loans originated through its subsidiaries, Bear Stearns purchased and securitized "bulk" quantities of loans from third-party subprime lenders at auction, including Countrywide Home Loans, Inc. ("Countrywide"), Wells Fargo Mortgage Corporation ("Wells Fargo"), American Home Mortgage ("American Home"), Fieldstone Mortgage Corporation ("Fieldstone") and Aegis Mortgage Corporation ("Aegis") (collectively, the "Originators").

6.     Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default.  In this regard, ratings played an important role in the sale of such securities to investors.  Credit ratings were supposed to reflect the risk associated with investment alternatives.  The Certificates here received high ratings, including "triple-A," categorizing them as investment-grade securities.  As alleged below, however, Defendants misrepresented the quality of the loans in the loan pools and the ratings were unjustifiably high.

7.     Moody's Investors Services, Inc. ("Moody's") and McGraw-Hill Companies, Inc. through its division, Standard & Poor's ("S&P") (collectively, the "Rating Agencies"), provided ratings for the Certificates.  These ratings, which were expressly included in each of the Prospectus Supplements, determined, in part, the price at which these Certificates were offered to

Plaintiffs and the Class.  Moody's highest investment rating is "Aaa."  S&P's highest rating is "AAA."  These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk.  Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.  These ratings are considered "investment-grade ratings."  Any instrument rated lower than BBB is considered below investment-grade.  As alleged below, Defendants misrepresented the quality of the process purportedly used to originate the mortgage loans within the pools causing the Certificates to be assigned unjustifiably high ratings.

8.     The Offering Documents stated that "[t]he depositor anticipates that the securities will be sold primarily to institutional investors … "  Structured Asset Mortgage Investments II, Inc. Prospectus, dated March 28, 2006, at 125.  Many institutional investors – public pension funds, banks, insurance companies, and mutual funds – were prohibited by regulation from purchasing securities not rated "investment-grade."  Accordingly, the sale of the Certificates was expressly conditioned on the assignment of the highest investment-grade rating.  Moody's and S&P originally assigned their highest rating of "AAA"/maximum safety to over 92%, or $16.2 billion, of the Certificates.

9.     The Offering Documents contained untrue statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading, regarding: (1) the underwriting and appraisal standards purportedly used in connection with the origination of the underlying mortgages; (2) the true value of the collateral; (3) the amount of credit support for each Offering; and (4) the ratings of the Certificates.

10.     The true facts that were omitted from the Offering Documents were:

- The EMC Originators and third-party Originators systematically disregarded the stated underwriting standards when issuing loans to borrowers;

- The underlying mortgages were based on collateral appraisals that overstated the value of the underlying properties;

- The ratings stated in the Prospectus Supplements were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information - S&P's models had not been materially updated since 1999 and Moody's models had not been materially updated since 2002; and

- Due diligence firms that Bear Stearns and EMC hired to review pools of loans from third-party originators identified a material number of underwriting exceptions, many of which Bear Stearns and EMC ultimately waived.

11.     As a result of the untrue statements and omissions, Plaintiffs and the Class purchased Certificates that were far riskier than represented, not of the "best quality" and not equivalent to other investments with the same credit ratings.  Plaintiffs and the class were injured when virtually all the Certificates were downgraded to below investment-grade and the value of the Certificates plummeted.  Specifically, 99%, or $17.4 billion, of the Certificates have been downgraded.  Of those that have been downgraded, 97.8%, or $16.96 billion, have been downgraded to below investment-grade.  ¶74.  Moreover, 95%, or $15.3 billion, of the $16.2 billion of Certificates initially awarded AAA/maximum safety ratings have been downgraded to "junk bond" investments.  ¶75.

12.     Contrary to representations in the Offering Documents, the Certificates exposed purchasers to increased risk with respect to absolute cash flow and the timing of payments.  The value of the Certificates has collapsed, and, as set forth below, at the time of the lawsuit, they were worth only a fraction of their initial original value.

13.     This action was brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of when the Certificates were sold to the public.  Plaintiffs lacked actual knowledge of the violations and a reasonably diligent investor would not have discovered the violation within one year of when the applicable complaint was filed.

## II.   JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct complained of herein occurred in substantial part in this District, including the dissemination of the materially false and misleading statements complained of herein.  In addition, Defendants conduct business in this District.

16.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## III.   PARTIES

17.     Co-Lead Plaintiff the Public Employees' Retirement System of Mississippi ("Mississippi PERS") is a governmental defined benefit pension plan qualified under Section 401(a) of the Internal Revenue Code, and is the retirement system for nearly all non-federal public employees in the State of Mississippi.  As reflected in its Certification filed November 10, 2009, Mississippi PERS purchased Certificates in various Bear Stearns and SAMI offerings and was damaged as a result.  Mississippi PERS purchased Certificates in the Bear Stearns Alt-A Trust, Series 2006-6 ("BALTA 2006-6"), at a price of $0.9949 and later disposed of them in the market at a price of $0.9905.  Mississippi PERS purchased its BALTA 2006-6 Certificates directly from Bear Stearns in the initial offering.  Mississippi PERS purchased Certificates in the Bear Stearns ARM Trust, Series 2006-4 ("BSARM 2006-4"), at a price of $0.9476 and later disposed of them in the market at a price of $0.4275.  Mississippi PERS purchased Certificates in

the 2A1 tranche of Bear Stearns ARM Trust, Series 2007-3 ("BSARM 2007-3"), at a price of $0.9707 and later disposed of them in the market at a price of $0.6382.  Mississippi PERS purchased Certificates in the 1A1 tranche of BSARM 2007-3 at a price of $0.6122.  At the time a suit including the BSARM 2007-3 Certificates was brought, the value of Mississippi PERS' BSARM 2007-3 Certificates was below $0.6122.  Mississippi PERS purchased Certificates from the Structured Assert Mortgage Investment II Trust 2006-AR6 ("SAMI 2006-AR6"), at a price of $0.6073.  At the time a suit including the SAMI 2006-AR6 Certificates was brought, the value of Mississippi PERS' SAMI 2006-AR6 Certificates was below $0.6073.

18.    Co-Lead Plaintiff the New Jersey Carpenters Health Fund ("New Jersey Carpenters") is a Taft-Hartley Pension Fund.  New Jersey Carpenters purchased the Bear Stearns Mortgage Funding Trust, Series 2006-AR1 ("BSMF 2006-AR1") Certificates, directly from the Underwriter, Bear Stearns, in the Offering and has been damaged thereby.  As detailed herein as well as in its Amended Certification, annexed hereto, New Jersey Carpenters was injured as a result of its Certificate investments.  As of the date of the filing of the operative complaint, the value of the Certificates had diminished considerably, such that its custodian bank valued these Certificates at the time of the August 2008 lawsuit at less than $0.4000 per unit.  To date, the New Jersey Carpenters has incurred a total loss on its investment in the Certificates due to realized losses incurred by the pool collateral.  As of December 2009, the New Jersey Carpenters had an outstanding principal investment of $144,954.69.  In January 2009, the New Jersey Carpenters received no principal or interest payments on its investment.  In February 2009, as a result of substantial losses incurred by the pool collateral, Bear Stearns was forced to write down $960,382.36 of the principal value on the 1B3 Class.  The New Jersey Carpenters incurred realized losses of principal value on its investment as a direct result in the amount of $53,333.39.

Thereafter, in March and April 2009, Bear Stearns was again forced to realize losses of the remaining balance of the 1B3 Class, writing down $1,643,460.31 in March 2009 and $4,481,159.49 in April 2009.  This caused the New Jersey Carpenters to realize losses of principal value in those months in the amounts of $70,859.96 and $20,761.34, respectively.

19.     Plaintiff Boilermaker Blacksmith National Pension Trust ("Boilermakers") is a Taft-Hartley Pension Fund.  Boilermakers purchased the Structured Asset Mortgage Investments II Trust, Series 2006-AR5 ("SAMI 2006-AR5") and SAMI 2006-AR6 Certificates, pursuant and traceable to the Offering Documents and has been damaged thereby.  As detailed herein as well as in its Amended Certification, annexed hereto, Boilermakers was injured as a result of its Certificate investments.  For example, Boilermakers purchased Certificates from the SAMI 2006-AR5 Trust at a price of $0.9581 and later sold at a price of $0.9350.  With respect to Certificates which Boilermakers purchased and held – which include Certificates issued by the SAMI 2006-AR5 and SAMI 2006-AR6 Trusts – as of the date of the filing of the operative complaint, their value had diminished considerably to $0.3586 and $0.3287, respectively, according to Boilermakers' custodial statements.

20.     Plaintiff the Police and Fire Retirement System of the City of Detroit ("Detroit") is a public pension fund for the benefit of the active and retired police officers and firefighters of the City of Detroit, Michigan.  Detroit purchased Certificates in the Bear Stearns Alt-A Trust, Series 2006-8 ("BALTA 2006-8"), and sustained damage as the result.  As detailed in its Certification, Detroit purchased Certificates in BALTA 2006-8 on May 8, 2008 at a price of $0.6131 and later disposed of the Certificates in the market on April 8, 2009 at a price of $0.2189.

8

21.    Plaintiff, the State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board on behalf of the Oregon Public Employee Retirement Fund ("OPERS"), is a public pension fund for employees of the State of Oregon. OPERS purchased the Bear Stearns Alt-A Trust, Series 2007-1 ("BALTA 2007-1") and Structured Asset Mortgage Investments II Trust, Series 2006-AR7 ("SAMI 2006-AR7") Certificates, directly from the Underwriter, Bear Stearns, in the Offerings and has been damaged thereby.    Furthermore, OPERS purchased the BALTA 2006-8 Certificates, pursuant and traceable to the Offering Documents, and has also been damaged as a result.  As detailed herein as well as in its Certification, annexed hereto, OPERS sustained injury as a result of its Certificate investments.  For example, OPERS purchased Certificates from the BALTA 2006-8, at a price of $0.9998 and later sold at a price of $0.6500.  Additionally, OPERS purchased Certificates from the SAMI 2006-AR7 Trust, at a price of $0.9997 and later sold at a price of $0.5875.  With respect to Certificates which OPERS purchased and held – which include Certificates issued by the BALTA 2007-1, BALTA 2006-8 and SAMI 2006-AR7 Trusts – as of the date of the filing of the operative complaint, their value had diminished considerably and were $0.3817, $0.2277 and $0.4597, respectively, according to OPERS' custodial statements.

22.    Plaintiff the Iowa Public Employees' Retirement System ("IPERS") is a public pension fund for employees of the State of Iowa.  IPERS purchased the BSMF 2006-AR1 Certificates, Bear Stearns Asset Backed Securities Trust, Series 2007-HE4 ("BSABS 2007-HE4") Certificates and BALTA 2006-6 Certificates, directly from the Underwriter, Bear Stearns, on the Offering.  Furthermore, IPERS purchased the Bear Stearns Asset Backed Securities Trust, Series 2007-HE3 ("BSABS 2007-HE3") Certificates, SAMI 2006-AR7 and BALTA 2007-1 Certificates, pursuant and traceable to the Offering Documents and has been damaged thereby.

As detailed herein as well as in its Certification, annexed hereto, IPERS has sustained injury as a result of its Certificate investments.  For example, IPERS purchased Certificates from the BSABS 2007-HE3 Trust, at a price of $1.000 and later sold at a price of $0.9969.  Additionally, IPERS purchased Certificates from the BSABS 2007-HE4 Trust, at a price of $1.0000 and later sold at a price of $0.8700.  Furthermore, IPERS purchased BALTA 2006-6 Certificates and SAMI 2006-AR7 Certificates, at prices of $1.0000 and $0.9788, respectively, and later sold at prices of $0.4708 and $0.9162, respectively.  With respect to Certificates which IPERS purchased and held – which include Certificates issued by the BALTA 2007-1 and BSMF 2006-AR1 Trusts – as of the date of the filing of the operative complaint, their value had diminished considerably and were valued at $0.3993 and $0.6249, respectively.

23.     Plaintiff the City of Fort Lauderdale Police & Fire Retirement System ("Fort Lauderdale") is a public pension fund for the benefit of the active and retired police officers and firefighters of the City of Fort Lauderdale, Florida.  Fort Lauderdale purchased Certificates in the Bear Stearns ARM Trust 2007-1 ("BSARM 2007-1") and sustained damage as the result.  As detailed in its Certification, Fort Lauderdale purchased its Certificates on April 26, 2007 at a price of $1.003 and on May 16, 2007 at a price of $0.9984, and later disposed of the Certificates in the market on November 3, 2009 at a price of $0.6237.

24.     Plaintiff the San Antonio Fire and Police Pension Fund ("San Antonio") provides comprehensive retirement, death and disability benefits for the police officers, fire fighters, retirees and their beneficiaries of the City of San Antonio, Texas.  San Antonio purchased Certificates in the Bear Stearns Mortgage Funding Trusts 2006-AR4 ("BSMF 2006-AR4") and 2006-AR5 ("BSMF 2006-AR5") Trusts, and sustained damage as the result.  As detailed in its Certification, San Antonio purchased Certificates in BSMF 2006-AR4 on October 27, 2006 at a

price of $1.00 and later disposed of the Certificates in the market on January 28, 2010 at a price of $0.5045.  San Antonio purchased its BSMF 2006-AR5 Certificates on December 15, 2006 at a price of $1.00 and later disposed of the Certificates in the market on May 18, 2010 at a price of $0.5300.

25.     Defendant Bear Stearns & Co., Inc. (previously defined as "Bear Stearns") was an SEC-registered broker-dealer and a wholly-owned subsidiary of The Bear Stearns Companies, Inc. ("BSI").  By the end of 2005, Bear Stearns was the single largest underwriter of mortgage-backed securities in the world.  Bear Stearns served as the underwriter for all of the Certificates here, and assisted in drafting and disseminating the Offering Documents.  Bear Stearns was located at 383 Madison Avenue, New York, New York 10179.  Pursuant to a Merger Agreement effective May 30, 2008, BSI merged with Bear Stearns Merger Corporation, a wholly-owned subsidiary of JPMorgan Chase, Inc. ("J.P. Morgan"), making BSI a wholly-owned subsidiary of J.P. Morgan.  J.P. Morgan is an investment banking holding company incorporated in Delaware, and principally located at 270 Park Avenue, New York, New York 10017.  Defendant J.P. Morgan Securities, Inc. ("J.P. Morgan Securities") is a wholly owned subsidiary of J.P. Morgan, and is the successor-in-interest to Bear Stearns.

26.     Defendant Structured Asset Mortgage Investments II, Inc. (previously defined as the "SAMI Depositor") was the Depositor for certain Offerings as detailed in ¶38, and was a wholly-owned subsidiary of Bear Stearns.  The SAMI Depositor maintained its principal offices at 383 Madison Avenue, New York, New York 10179, until mid-2008.  The SAMI Depositor's principal offices are now located at 270 Park Avenue, New York, New York 10017.  The SAMI Depositor filed the following Registration Statement and accompanying Prospectus with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

11

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| March 6, 2006 | S-3 | $50,000,000,000 |
| March 10, 2006 | S-3/A | $50,000,000,000 |

27.     Defendant Bear Stearns Asset Backed Securities I, LLC (previously defined as the "Bear Stearns Depositor") was the Depositor for certain Offerings as detailed in ¶38, and was a wholly-owned subsidiary of Bear Stearns.  The Bear Stearns Depositor maintained its principal offices at 383 Madison Avenue, New York, New York 10179, until mid-2008.  The Bear Stearns Depositor's principal offices are now located at 270 Park Avenue, New York, New York 10017.  The Bear Stearns Depositor filed the following Registration Statement and accompanying Prospectus with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| January 30, 2006 | S-3 | $1,000,000 |
| March 31, 2006 | S-3/A | $50,000,000,000 |

28.     Defendant EMC was the Sponsor for each of the Offerings identified in ¶38.  As set forth in the Registration Statements, EMC conveyed the mortgages to special purpose entities, including the Depositors, which were created for the sole purpose of creating, and thereafter depositing the collateral into, the issuing trusts.  EMC's principal office is located at 2780 Lake Vista Drive, Lewisville, Texas 75067-3884.

29.     Defendant Jeffrey L. Verschleiser ("Verschleiser") was, at all relevant times, President (Principal Executive Officer) of the SAMI Depositor.  Verschleiser signed the SAMI Registration Statement.  Verschleiser ran the Asset-Backed Securities Trading Desk and reported to Defendant Matthew E. Perkins who was the head of asset-backed securities at Bear Stearns.

30.     Defendant Michael B. Nierenberg ("Nierenberg") was the Treasurer (Principal Financial Officer and Principal Accounting Officer) of the SAMI Depositor at all relevant times.  Nierenberg was responsible for the ARM/Alternative-A ("Alt-A") Trading Desk which

controlled the securitization of ARMs and Alt-A loans. Nierenberg signed the SAMI Registration Statement.

31.     Defendant Jeffrey Mayer ("Mayer") was a Director of the SAMI Depositor at all relevant times. Defendant Mayer oversaw the Fixed Rate/Subprime Mortgage Trading Desk ("Subprime Desk"). Mayer signed the SAMI Registration Statement.

32.     Defendant Thomas F. Marano ("Marano") was a Director of both the SAMI Depositor and the Bear Stearns Depositor at all relevant times. Marano was the head of Bear Stearns' residential mortgage-backed securities operations. Marano signed both the SAMI and Bear Stearns Registration Statements.

33.     Defendant Matthew E. Perkins ("Perkins") was, at all relevant times, President (Principal Executive Officer) and a Director of the Bear Stearns Depositor. Perkins signed the Bear Stearns Registration Statement.

34.     Defendant Joseph T. Jurkowski, Jr. ("Jurkowski") was, at all relevant times, Vice President of the Bear Stearns Depositor. Jurkowski signed the Bear Stearns Registration Statement.

35.     Defendant Samuel L. Molinaro, Jr. ("Molinaro") was the Treasurer (Principal Financial and Accounting Officer) and a Director of the Bear Stearns Depositor at all relevant times. Molinaro signed the Bear Stearns Registration Statement.

36.     Defendant Kim Lutthans ("Lutthans") was an Independent Director of the Bear Stearns Depositor at all relevant times. Lutthans signed the Bear Stearns Registration Statement.

37.     Defendant Katherine Garniewski ("Garniewski") was an Independent Director of the Bear Stearns Depositor at all relevant times. Garniewski signed the Bear Stearns Registration Statement.

13

38.     For each offering, the following chart identifies: (1) the issuing trust; (2) the principal amount of Certificates issued; (3) the offering date; (4) the registration statement; and (5) the Depositor/Issuer:

| Trust | Approximate Principal Amount | Offering Date | Registration Statement | Depositor/Issuer |
|-------|------------------------------|---------------|------------------------|------------------|
| Bear Stearns Asset Backed Securities, Series 2007-HE3 | $916,696,000 | March 29, 2007 | 333-131374 | Bear Stearns Depositor |
| Bear Stearns Asset Backed Securities, Series 2007-HE4 | $821,614,000 | April 26, 2007 | 333-131374 | Bear Stearns Depositor |
| Structured Asset Mortgage Investments II, Series 2006-AR5 | $951,921,000 | May 30, 2006 | 333-132232 | SAMI Depositor |
| Bear Stearns Mortgage Funding, Series 2006-AR1 | $973,112,000 | July 28, 2006 | 333-132232 | SAMI Depositor |
| Structured Asset Mortgage Investments II, Series 2006-AR6 | $1,524,376,000 | August 3, 2006 | 333-132232 | SAMI Depositor |
| Structured Asset Mortgage Investments II, Series 2006-AR7 | $2,867,019,000 | August 31, 2006 | 333-132232 | SAMI Depositor |
| Bear Stearns ARM Trust, Series 2006-4 | $1,306,358,150 | September 28, 2006 | 333-132232 | SAMI Depositor |
| Bear Stearns Alt-A Trust, Series 2006-6 | $1,893,943,000 | September 29, 2006 | 333-132232 | SAMI Depositor |
| Bear Stearns Mortgage Funding, Series 2006-AR4 | $496,614,000 | November 28, 2006 | 333-132232 | SAMI Depositor |
| Bear Stearns Mortgage Funding, Series 2006-AR5 | $1,831,882,000 | December 28, 2006 | 333-132232 | SAMI Depositor |
| Bear Stearns Alt-A Trust, Series 2006-8 | $1,353,897,000 | December 28, 2006 | 333-132232 | SAMI Depositor |
| Bear Stearns Alt-A Trust, Series 2007-1 | $849,807,000 | January 29, 2007 | 333-132232 | SAMI Depositor |
| Bear Stearns ARM Trust, Series 2007-1 | $992,996,150 | February 27, 2007 | 333-132232 | SAMI Depositor |
| Bear Stearns ARM Trust, Series 2007-3 | $807,120,150 | April 26, 2007 | 333-132232 | SAMI Depositor |

14

IV.     BACKGROUND

   A.     Bear Stearns Emerges As A Major Issuer And
          Underwriter Of Mortgage-Backed Securities

39.     As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



40.     A "depositor" acquires an inventory of loans from a "sponsor"/"seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity.  The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

41.     The depositor then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches."  Tranches are related MBS offered as part of the same pass-through certificate offering, each with a different

level of risk and reward.  Any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority. As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA."  Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.  Of course, because the lower tranches are designed to provide a cushion, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

42.     If the risk profile of the underlying security changes, or the original ratings were inaccurate or based on inaccurate data, Rating Agencies upgrade or downgrade a credit rating. Rating Agencies also assign positive and negative "watches" and positive and negative "outlooks" to a security's rating.  Rating Agencies do not classify ratings outlooks and negative watches as "downgrades."  Moody's website states that "[t]he assignment of, or a change in, an outlook is not a credit rating action if there is no change to the credit rating."[1] Likewise, S&P's website states that "[a] CreditWatch listing, however, does not mean a rating change is inevitable, and when appropriate, a range of potential alternative ratings will be shown."[2]

43.     By working with the Rating Agencies, the underwriters and the depositor are able to ensure that each particular mortgage pass-through certificate will receive a pre-determined rating.  Once the tranches are established, the issuing trust passes the certificates back to the depositor, who then passes the certificates to one or more underwriters.  The underwriters offer the various certificates to investors, in exchange for cash that will be passed back to the depositor, minus any fees owed to the underwriters.

---

[1] Available at http://v3.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_79004.

[2] Available at http://www.standardandpoors.com/ratings/articles/en/us/?assetID=1245219 848760.

44.     The securitization of loans fundamentally shifts the risk of loss from the mortgage loan originator to the investor who purchased an interest in the securitized pool of loans.  When the originator holds the mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.  As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

45.     In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators.  Investors in these early GSE securitizations were provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

46.     Between 2001 and 2006, however, there was dramatic growth in non-GSE loan originations and securitizations.  According to *Inside Mortgage Finance* (2007), in 2001, GSE originations were $1.433 trillion and securitizations were $1.087 trillion – far outpacing non-GSE originations of $680 billion and securitizations of $240 billion.  In 2006, GSE originations grew to $1.040 trillion while securitizations declined to $904 million.  However, in that same period, non-GSE originations had grown 100% to $1.480 trillion, and non-GSE securitizations had grown 330% to $1.033 trillion in 2006.  Further, non-GSE origination of subprime loans

17

grew 315% – from $190 billion in 2001 to $600 billion in 2006; and non-GSE Alt-A origination grew 566% – from $60 billion in 2001 to $400 billion in 2006.  Non-GSE securitizations of subprime loans had also grown 415% – from $87.1 billion in 2001 to $448 billion in 2006.

47.    The market for adjustable rate mortgages ("ARMs"), including interest-only and negative amortization loans, grew concurrently with the boom in subprime and Alt-A loan originations and securitizations.  ARMs increased from $355 billion in 2001 to $1.3 trillion in 2006.  *Mortgage Market Statistical Annual* (2007, Vol. 1, p. 4).  Such growth coincided with the increase in popularity of so called "exotic" or non-traditional ARMs which had fixed interest rates for a limited period before "resetting" during the life of the loan to significantly higher adjustable rates.  These non-traditional ARMs included "2/28 or 3/27 ARMs" (many with below-market teaser rates for two or three years and then conversion to the fully-indexed rate); interest-only ARMs (permitting interest-only payments for a set period of time during which the rate may fluctuate, resulting in negative amortization and rising principal); option payment ARMs (offering up to four payment options, including minimum and interest-only payments, which, if chosen, result in negative amortization and rising principal); and 40-year ARMs (in which payments are calculated based on a 40-year payment term but where the loan terminates in 30 years, resulting in a final balloon payment).  Origination of non-traditional ARMs increased 278% between 2004 and 2006 – from $205 billion to $775 billion.  *Mortgage Market Statistical Annual* (2007, Vol. 1, p. 6).

48.    The Certificate collateral was largely composed of non-traditional adjustable mortgages, interest-only and negative amortization loans.  These types of loans presented the greatest potential for "payment shock" to the borrower since they provided for initially small monthly payments based on low fixed rates which then reset thereafter to significantly higher

monthly payment amounts based on adjustable interest rates.  In particular, the Bear Stearns Certificates securitized – 92% of which were assigned AAA ratings – were largely composed of negative amortization loans.  Specifically, these loans permitted the borrower to pay less than even the full monthly interest payment with the unpaid interest and principal being added back on top of the outstanding principal balance.  These small payments were permitted only until the loan's Loan-To-Value ("LTV") ratio (which initially was around 80%) reached approximately 110%.  At that point, the loan "reset," requiring the borrower to make monthly payments based on significantly higher adjustable rates and outstanding principal. While this type of loan was designed for high net worth investors who were capable of earning higher returns through investment than in making interest and principal payments upfront, Bear Stearns and the Originators routinely sold these loans to unsophisticated borrowers who were unable to make the required payments after the loan reset.

49.    As set forth below, the models used to determine the requisite credit enhancement required for the AAA ratings on the Certificates did not include sufficient quantities of loans reflective of the loans underlying the Certificates, *e.g.,* no documentation, Alt-A, adjustable rate, interest-only and Neg. Am. Loans.  Thus the Certificates' credit enhancement was insufficient.

B.    Bear Stearns' Securitization
        And Underwriting Operations

1.    "Flow Loans" From Bear Stearns'
         Subsidiary And Correspondent Lenders

50.    Loans purchased from the EMC Originators were acquired through "flow agreements."  The flow basis loans immediately became part of Bear Stearns' database or "loan warehouse" and EMC serviced these flow basis loans.  Traders at Bear Stearns' trading desk priced these loans on a loan-by-loan basis with the assistance of computer pricing models.

51.     Once the flow loan was approved and finalized, the lender or mortgage broker would send the loan file directly to EMC's servicing division.  Simultaneously, an electronic record would be sent to Bear Stearns at which point it became part of Bear Stearns' loan warehouse and recorded in the ledger of the specific Bear Stearns desk responsible for that type of loan, *i.e.*, subprime, Alt-A, etc.  While the flow of loans occurred daily, and the Bear Stearns' trading desk would price the loans on a loan-by-loan basis, the flow agreements themselves set a weekly or monthly settlement date with the underlying lender.

        2.      Bear Stearns' Bulk Loan
                 Purchases From Third-Party Originators

52.     Bear Stearns made substantial bulk loan purchases from third-party originators through silent auctions.  Originators set a date and time for competing investment banks to submit bids to purchase a block of mortgage loans.  In advance of the auction, the Originator would send each bidding investment bank a "Loan Level File" in the form of a spreadsheet, which contained numerous fields of non-borrower sensitive information regarding the loans to be auctioned.  The spreadsheet would include information such as FICO score, LTV ratio, property location and the level of documentation supporting the loan, and many other loan characteristics.

53.      At the same time, the originator provided Bear Stearns with a Bid Stipulation Sheet (the "Bid Sheet").  The Bid Sheet described the general characteristics of the loan pool being auctioned, the variance rate of the pool and, most importantly, the maximum size of the pool sample on which the investment banks were permitted to conduct due diligence and the number of loans which the banks could "kick-back" to the originator due to borrower deficiencies, payment delinquencies or first/early payment defaults on the loan.

54.     Prior to auction, Bear Stearns sent the "Loan Level File" to the Rating Agencies to enable them to advise Bear Stearns as to the appropriate price to pay for the loans.  Indeed,

Bear Stearns traders had S&P's and Moody's (outdated) models on their desktop computers. Upon receipt of the "Loan Level File," S&P would run the loan tape through both its "LEVELS" and "SPIRE" Models.  Moody's would run the loan tape through its M-3 Model.  These models analyzed 50-80 loan characteristics (*e.g.,* FICO score, LTV ratio, property location, etc.), in order to estimate the number of loans that were likely to default and the corresponding amount of the dollar loss resulting from such default.  Despite a substantial expansion in subprime Alt-A, no documentation, non-traditional ARMS, interest-only and negative amortization loans, S&P and Moody's did not update their models after 1999 and 2002, respectively.  Therefore, the models' estimate of the number of loans that were likely to default and the corresponding amount of the dollar loss from such default lacked any reasonable basis and were materially inaccurate.

55.     Once the Rating Agencies' analysis was complete, Bear Stearns submitted its bids.  If the mortgage originator accepted a bid, Bear Stearns typically had a short period of time prior to the settlement date (when cash was paid to the mortgage originator for the loans) to conduct due diligence on the loans.  Bear Stearns often hired third-party due diligence firms such as Clayton Holdings, Inc. ("Clayton") or the Bohan Group ("Bohan") to conduct this review.

56.     Although the ostensible purpose of the review was to eliminate from the pools loans that did not meet the stated underwriting standards, executives at Clayton and Bohan stated that during the time which the offerings here were issued, banks such as Bear Stearns were performing increasingly cursory due diligence on smaller and smaller percentages of loans. Frank P. Filipps, Clayton's chairman and CEO, stated that "[e]arly in the decade, a securities firm might have asked Clayton to review 25% to 40% of the sub-prime loans in a pool, compared with typically 10% in 2006."  Bohan President Mark Hughes stated, "[b]y contrast, loan buyers

who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined." E. Scott Reckard, *Sub-Prime Mortgage Watchdogs Kept On Leash*, Los Angeles Times, March 17, 2008.

57.     From January 2006 to June 2007, Clayton reviewed roughly 911,000 loans, but that only represented 10% of the loans from the pools it was contracted to review. For each pool, Clayton and Bohan reviewed the percentage of loans designated in the Bid Sheet for: (1) adherence to seller credit underwriting guidelines and client risk tolerances; (2) compliance with federal, state and local regulatory laws; and (3) the integrity of electronic loan data provided by the seller to the prospective buyer. This review was commonly referred to as a "credit and compliance review." Contract underwriters reviewed the loan files, compared tape data with hard copy or scanned file data to verify loan information, identified discrepancies of key data points, and graded loans based on seller guidelines and client tolerances.

58.     Each day, Clayton generated reports for Bear Stearns and the loan seller that summarized Clayton's findings, including summaries of the loan files that suffered from exceptions to the relevant underwriting standards. Some exceptions were benign, such as a credit score that is slightly below acceptable range (i.e., 680 score required, 670 actual). Others, such as lack of an appraisal, stated income not being reasonable for the job stated or missing critical documents in a HUD-1 filed, were more severe. Once Clayton identified exceptions, the seller has the option to attempt to cure them by providing missing documentation or otherwise explaining to Clayton why a loan complied with underwriting standards. If additional information was provided, Clayton re-graded the loan. Once this process was complete, Clayton provided Bear Stearns with final reports.

59.     Clayton's final reports categorized loans into one of three categories.  First, loans that complied with the underwriting standards were categorized as "Accept."  Second, loans that did not comply with underwriting standards were categorized as "Reject."  Finally, loans that were initially categorized as "Reject," but were waived by the client were categorized as "Waiver."

60.     The Offering Documents failed to disclose that, between January 2006 and June 2007:

- Clayton rejected a material number of third-party loans it reviewed for Bear Stearns and EMC as the result of exceptions to underwriting standards;

- Bear Stearns and EMC waived the underwriting exceptions related to a material number of those rejections;

- A large percentage of the loans ultimately included in each loan pool at issue were not reviewed for compliance with the stated underwriting guidelines; and

- Bear Stearns included in its pools loans with exceptions, but no compensating factors, and used the Clayton reports to negotiate lower prices for the pools.

61.     In June 2007, New York Attorney General Andrew Cuomo ("NYAG") subpoenaed documents from Clayton and Bohan related to their due diligence efforts.  The NYAG's investigation focused on whether Wall Street banks including Bear Stearns failed to adequately disclose the warnings they received regarding the number of loans that failed to meet lending guidelines.  Clayton also received an information request from the SEC and information subpoenas from the Massachusetts and Connecticut Attorneys General.

62.     On January 12, 2008, in an article entitled "Inquiry Focuses on Withholding of Data on Loans," the *New York Times* reported:

An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.  Reports commissioned by

the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. ***But the banks did not disclose the details of these reports to credit-rating agencies or investors.*** The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments (emphasis added).

63.    On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in New York in exchange for providing documents and testimony regarding its due diligence reports. That same day, in an article entitled "Loan Reviewer Aiding Inquiry Into Big Banks," the *New York Times* reported that a person familiar with the NYAG's investigation stated that as demand for loans surged, mortgage originators were in a superior bargaining position and required that Wall Street banks have Clayton and other consultants review fewer loans. Incredibly, "investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

64.    On March 17, 2008, the *Los Angeles Times* reported that Clayton and Bohan employees (including eight former loan reviewers who were interviewed for the article) "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports."

65.    On September 23, 2010, the Financial Crisis Inquiry Commission ("FCIC"), a bipartisan commission created to "examine the causes, domestic and global, of the current financial and economic crisis in the United States," held a hearing which explored the role of due diligence firms in the securitization process. According to documents filed with the FCIC, between January 2006 and June 2007, Clayton reviewed 19,248 Bear Stearns loans, and initially rejected 4,494 (23%). Bear Stearns waived the exceptions related to 1,295 (29%) of those loans.

24

During that same period, Clayton reviewed 53,131 EMC loans, and initially rejected 7,277 (13.7%).  EMC waived the exceptions related to 3,628 (50%) of those loans.

66.     Additionally, as Clayton only reviewed a small cross-section of the loans in each pool – often between 10% and 20% – there were many loans which were never reviewed for compliance with applicable underwriting standards.  During sworn testimony before the FCIC, the following exchange occurred between the Chairman of the FCIC, Phil Angelides, and Senior Vice President at Clayton, Vicki Beal:

> Mr. Angelides: Secondly, it appears as though you did a sample of 5 to 10 percent, but it looks like the other 90 percent were never fixed.  So I am thinking if I am a securitizer … [I] got a sample of 10 percent.  I know 11 percent of those fail.  I kick those out.  But as to the other 90 percent, I [] do nothing?
>
> MS. BEAL: Right.

67.     Bear Stearns was incentivized to "kick-out" as few loans as possible because (1) mortgage originators would not invite a bank that consistently kicked out large numbers of loans to future auctions; and (2) the securitization became smaller as loans were kicked out, thus decreasing the underwriting fee.  In many instances, instead of kicking loans with underwriting exceptions out of the pools, Bear Stearns and other banks simply included the loans and used the reports which Clayton and other due diligence firms generated to negotiate a lower purchase price for the loan pool.

## V.     EVIDENCE OF SYSTEMATIC DISREGARD FOR STATED UNDERWRITING STANDARDS

### A.     Exponential Increase In Delinquency And Default Rates

68.     As set forth above, it is now apparent that the Bear Stearns and third-party mortgage originators routinely allowed misstatements in loan applications and systematically ignored stated underwriting standards.  Unsurprisingly, this has resulted in dismal performance

of the loans.  As of the filing of the First Consolidated Amended Complaint in May 2009, borrower delinquency and default rates on the underlying mortgage collateral had increased over 37,000% from issuance to 60.5% of the mortgage loan balance.  These skyrocketing delinquency and default rates forced the Rating Agencies to downgrade substantially all of the Certificates to at or near junk bond status (as set forth below).   As of the date of the filing of the Second Consolidated Amended Complaint in this Action in February 2010, **_over 68%_** of mortgage collateral was considered to be in some form of delinquency or default.

       B.      <u>Collapse Of Certificate Ratings To "Junk Bond" Levels</u>

       69.     Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default.  In this regard, the Rating Agencies played an important role in the sale of such securities to investors.

       70.     The Rating Agencies rated the Certificates pursuant to the following twenty-three (23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

71.     As noted above, the Rating Agencies initially assigned the highest ratings of AAA/maximum safety to 92%, or $16.2 billion, of the Certificates, as reflected in the chart below:

| Series | Offering Amount | AAA | % |
|---|---|---|---|
| BSABS 2007-HE3 | $916,696,000 | $715,790,000 | 78.08% |
| BSABS 2007-HE4 | $821,614,000 | $641,737,000 | 78.11% |
| SAMI 2006-AR5 | $951,921,000 | $896,069,000 | 94.13% |
| BSMF 2006-AR1 | $973,112,000 | $901,030,222 | 92.59% |
| SAMI 2006-AR6 | $1,524,376,000 | $1,422,131,000 | 93.29% |

| Series | Offering Amount | AAA | % |
|---|---|---|---|
| SAMI 2006-AR7 | $2,867,019,000 | $2,672,201,000 | 93.20% |
| BSARM 2006-4 | $1,306,358,150 | $1,247,757,150 | 95.51% |
| BALTA 2006-6 | $1,863,943,000 | $1,672,819,000 | 89.75% |
| BSMF 2006-AR4 | $496,614,000 | $477,465,000 | 96.14% |
| BSMF 2006-AR5 | $1,831,882,000 | $1,733,778,000 | 94.64% |
| BALTA 2006-8 | $1,353,897,000 | $1,270,327,000 | 93.83% |
| BALTA 2007-1 | $849,807,000 | $755,991,000 | 88.96% |
| BSARM 2007-1 | $992,996,150 | $951,915,150 | 95.86% |
| BSARM 2007-3 | $807,120,150 | $777,483,150 | 96.33% |
| **TOTAL** | **$17,557,355,450** | **$16,136,493,672** | **91.90%** |

72.     As of the filing of the Complaint in February 2010, as set forth directly above, the underlying collateral had largely failed, with over 68% of the total mortgage loan balance severely delinquent, in default, repossessed, in bankruptcy or in foreclosure.

73.     S&P revised the methodologies used to rate mortgage-backed securities because the performance of the underlying collateral "called into question" the accuracy of the loan data. Specifically, S&P increased "credit protection" for rated transactions.  S&P stated that it would also seek to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."  Moody's also revised its ratings methodology, citing "aggressive underwriting" used in the origination of the collateral.

74.     The Certificates were downgraded as many as 22 levels with, for example, 95%, or $15.3 billion, of the total $16.2 billion of Certificates initially rated AAA/maximum safety now having been downgraded from AAA to "Ba1" or below, meaning these Certificates were not only designated "junk bonds," but were assessed to be in danger of "imminent default."

Over 99%, or $17.4 billion, of the remaining Certificate tranches have now been downgraded, with 97.8%, or $16.96 billion, of the total Certificates having been downgraded to speculative "junk" status.

75.     Bear Stearns' systematic disregard for the stated underwriting guidelines led to dramatic downgrades of the Certificates as set forth directly above.  Currently, 94.95% ($15.3 billion) of the $16.2 billion of Certificates initially rated AAA/maximum safety have been downgraded to speculative "junk" status or below.  Current delinquency and default rates on the mortgage loans underlying the Certificates have risen exponentially by over 37,000% from issuance of the Certificates – from 0.16% as of the respective Offering dates to **_over 68%_** as of February 2010.

76.     Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to the loan originators which further evidenced that they had engaged in underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statements and Prospectus Supplements.

C.     Numerous Government Investigations
        Reveal The Falsity Of The Offering Documents

77.     Although the poor performance of the MBS alone strongly suggests that Bear Stearns and its correspondent lenders' lending practices were far from what was disclosed in the Prospectus Supplements, there is substantial additional evidence that also demonstrates that the statements in the Prospectus Supplements about loan quality and loan underwriting practices were materially inaccurate.  Among this evidence are statements by former Bear Stearns as well as Originators' employees, facts which have emerged in ongoing litigation involving the SEC and other federal agencies, facts set out in complaints filed by state attorneys general, facts set out in filings by private litigants and information from press reports and other sources.

78.     Taken together, these facts demonstrate that, while the Offering Documents represented that underwriting was designed to ensure the borrower's ability to repay the mortgage and the adequacy of the collateral supporting the mortgage, in reality, underwriting practices were designed to originate as many mortgage loans as possible without regard to the ability of borrowers to afford such mortgages.  Indeed, contrary to the representations in the Registration Statements and Prospectus Supplements, it has now been revealed that Bear Stearns' loan originators systemically disregarded the income, assets and employment status of borrowers seeking mortgage loans in order to qualify these borrowers for mortgages that were then pooled and used as collateral for the MBS sold to Plaintiffs.  In many instances, this was done by allowing borrowers to inflate stated income, or facilitating income inflation by allowing ineligible borrowers to resort to "no documentation loans" and "stated income loans."

## VI.   THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS

79.     The Registration Statements provided that underwriting was to include assessments of borrower or mortgagor creditworthiness and appraisals of the mortgaged properties, as follows:

> ***The underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan.***
>
> *     *     *
>
> The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses.  However, the Loan-to-Value Ratio of the mortgage loan is another critical factor.  In addition, a

mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations.

*       *       *

High LTV Loans are underwritten with an emphasis on the creditworthiness of the related mortgagor. High LTV Loans are underwritten with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property.

SAMI Registration Statement at 17; *see also* Bear Stearns Registration Statement at S-42.

80.     With respect to the importance of the appraisals of the mortgaged properties, the

Registration Statements specifically provided:

Mortgaged properties generally will be appraised by licensed appraisers or through an automated valuation system. A licensed appraiser will generally address neighborhood conditions, site and zoning status and condition and valuation of improvements. In the case of mortgaged properties secured by single family loans, the appraisal report will generally include a reproduction cost analysis (when appropriate) based on the current cost of constructing a similar home and a market value analysis based on recent sales of comparable homes in the area. With respect to multifamily properties, commercial properties and mixed-use properties, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used. An appraisal employing the income approach to value analyzes a property's projected net cash flow, capitalization and other operational information in determining the property's value.

SAMI Registration Statement at 18.

Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition.

*       *       *

All appraisals are required to conform to the Uniform Standard of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.

Bear Stearns Registration Statement at S-42.

81.    The statements regarding underwriting and appraisal standards were materially untrue and contained omissions.  As detailed below, the originators systematically disregarded their stated underwriting and appraisal standards.

A.    <u>EMC Mortgage Corporation</u>

82.    EMC originated loans which were included in the following offerings: BSABS 2007-HE4, BSMF 2006-AR1, BSMF 2006-AR4, BSMF 2006-AR5, BALTA 2006-6, BALTA 2006-8 and BALTA 2007-1.  The total value of these seven (7) Offerings for which EMC originated loans was $8.19 billion, of which the Rating Agencies assigned initial ratings of AAA/maximum safety to 91%, or $8.05 billion.  EMC, which, at all relevant times, was a wholly-owned subsidiary of Bear Stearns, specialized in the acquisition, servicing and disposition of residential mortgage loans.

83.    The Prospectus Supplements described EMC's underwriting standards in originating the underlying mortgages.  For example, the July 28, 2006 Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering stated:

> … ***underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral***. . .Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process.
>
> \*       \*       \*
>
> In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.  Such ratios vary depending on a number of underwriting criteria, including loan-to-value ratios, and are determined on a loan-by-loan basis.

*Id.* at S-31-32 (emphasis added); *see also* Appendix To Third Amended Complaint ("Appendix"), Chart A.

84.     The Prospectus Supplements also described the importance of the appraisals of the mortgaged properties:

> Each mortgaged property relating to an EMC mortgage loan has been appraised by a qualified independent appraiser who is approved by each lender.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed.  The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines.  In certain cases an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used.

*Id.* at S-32; *see also* Appendix, Chart B.

85.     The Prospectus Supplements also provided for prudent underwriting for mortgages where less borrower documentation was required:

> The mortgage loans have been underwritten under one of the following documentation programs: full/alternative documentation ("Full/Alt Doc"), stated income/verified asset documentation ("SIVA"), no ratio documentation ("No Ratio"), and stated income/stated assets ("SISA") documentation.
>
> Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower.  ***Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified.***
>
> Under the no ratio documentation program the borrower's income is not stated and no ratios are calculated.  ***Although the income is not stated nor verified, lenders obtain a telephonic verification of the borrower's employment without reference to income.  Borrower's assets are verified.***

> Under the stated income/stated asset documentation program, the borrower's income and assets are stated but not verified. The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower.

*Id.* at S-32 (emphasis added); *see also* Appendix, Chart C.

86.     ***Misstated and Omitted Information:*** The statements in the Offering Documents related to EMC's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein, EMC (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting standards in the absence of sufficient compensating factors; (2) pursued loan volume at the expense of underwriting standards, thereby failing to take the steps necessary to safeguard the quality of the product; and (3) largely disregarded appraisal standards and bought loans without regard to the riskiness of the loan because the values of the underlying mortgage properties were materially inflated in the loan underwriting process.

87.     In late 2008, Ambac Assurance Corp. ("Ambac") commenced an action against EMC and Bear Stearns in the United States District Court for the Southern District of New York alleging that the companies had built a "house of cards" through rampant misrepresentation in the origination of mortgage loans used in securitizations. *Ambac Assurance Corp., v. EMC Mortgage Corp.*, No. 08-cv-9464 (S.D.N.Y.) (the "Ambac Complaint"). On November 6, 2008, an article in the *Associated Press* reported the following with respect to the Ambac Complaint:

> Bear Stearns leveraged its reputation and dominance in mortgage finance to entice companies such as Ambac to insure loans plagued by rampant fraud … Bear Stearns promised that its mortgage loans originated through proper means and didn't result from fraud, misrepresentation or gross negligence. Yet … Ambac discovered widespread breaches of representations in almost 80 percent of the documents supporting 695 defaulted loans it studied.

Larry Neumeister, NY Lawsuit: Bear Stearns Built A 'House of Cards,' *Associated Press*, November 6, 2008.

34

88.     According to the Ambac Complaint, after incurring more than $640 million in losses, Ambac conducted a study of 1,486 loans with an aggregate principal of approximately $86.9 million.  The results of that review found:

> [o]f these 1486 loans, 1332, over 89%, breached one or more of the representations and warranties that EMC had made to Ambac.  The most prevalent and troubling of the breaches identified by Ambac across all four Transactions involve (1) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties, and (2) the loan originators' abject failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting guidelines.

Ambac Complaint at ¶6.

89.     The Ambac Complaint lays out, in detail, the Bear Stearns "securitization machine" and EMC's crucial, and damaging, role within that machine:

> [EMC] acted both as an "originator" and an "aggregator" of an enormous volume of residential mortgage loans, "with the ultimate strategy of securitization into an array of Bear Stearns's securitizations."  EMC repeatedly executed on that strategy, in many cases retaining the rights to act as servicer of the mortgage loans that it securitized.  In its role as aggregator, EMC prescribed loan origination standards and approved the underwriting guidelines of a large number of mortgage lenders…

Id. at ¶18.

90.     EMC expanded its loan generation to supply its securitizations and, at the same time, reassured the market that it would maintain the quality of its securitizations.  Id. at ¶26.  But, in fact, "EMC's inventory of mortgage loans was replete with loans (i) originated by fraud, material misrepresentations, or omissions and (ii) underwritten without regard to prudent standards or the fundamental principles of mortgage lending, which require a good-faith assessment of the borrower's ability and willingness to repay the loan."  Id. at ¶27.  EMC "convince[ed] investors that the securities it sold were a safe and profitable investment, despite the fact that, unbeknownst to Ambac and the market at large, those securities were backed by unjustifiably risky loans."  Id. at ¶25.

91.    The Ambac Complaint further makes clear that EMC and Bear Stearns expanded acceptance and financing of "no doc" and "low doc" loan products "with a marked and dangerous decline in the rigor and discipline with which [the companies] approached loan origination and underwriting."  *Id.* at ¶28.  Thus, EMC's inventory of mortgage loans "was replete with loans originated by fraud or underwritten pursuant to imprudent or non-existent standards."  *Id.* at ¶¶29-30.

92.    Matt Van Leeuwen, a mortgage analyst with EMC between 2004 and 2006, has also confirmed that EMC disregarded its underwriting standards.  Van Leeuwen revealed that: (a) Bear Stearns pushed EMC analysts to perform their loan analyses of the underlying mortgages in only one to three days so that Bear Stearns would not have to hold the loans on its books; (b) EMC analysts were allowed to falsify loan data if that information was missing from the loan data and the mortgage originators did not respond to requests for that information; (c) the documentation level of the loans was often incorrectly identified; and (d) rather than going back to the mortgage originator for clarification, Bear Stearns would avoid investigating and make the loan "fit."  Teri Buhl, "More Corruption: Bear Stearns Falsified Information as Raters Shrugged," *The Atlantic*, May 14, 2010.

93.    EMC's systematic disregard for underwriting and appraisal standards affected a material number of loans in the BSABS 2007-HE4, BSMF 2006-AR1, BSMF 2006-AR4, BSMF 2006-AR5, BALTA 2006-6, BALTA 2006-8 and BALTA 2007-1 Offerings and resulted in increased delinquencies, defaults and dramatic downgrades to the Certificates' ratings. Currently, 98% ($7.3 billion) of the $7.45 billion of Certificates that were initially rated AAA have been downgraded to speculative "junk" status or below.  Current delinquency and default

rates on the EMC-originated collateral have risen exponentially since issuance of the Certificates – from 0.32% as of the cut-off dates, to approximately 73% as of February 2010.

        B.     <u>Bear Stearns Residential Mortgage Corporation</u>

94.     In February 2007, Bear Stearns Mortgage Corp. acquired the subprime origination platform of Performance Credit Corp. (formerly known as Encore Credit Corp.).  Thereafter, Bear Stearns Mortgage Corp. originated loans through two different divisions, "Bear Res" located in Scottsdale, Arizona, and "Encore Credit" located in Irvine, California.  Bear Stearns Mortgage Corp. and Encore originated loans which were included in the following offerings: BSMF 2006-AR1, BSMF 2006-AR4, BSMF 2006-AR5, and BSABS 2007-HE4.  The total value of these Offerings was $4.12 billion, of which over 91%, or $3.75 billion, had an initial rating of AAA/maximum safety.

95.     The Prospectus Supplements described Bear Stearns Mortgage Corp.'s underwriting standards.  For example, the July 28, 2006 Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering stated:

> ***The BSRM Alt-A Underwriting Guidelines are intended to ensure that (i) the loan terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability of the property are acceptable.***
>
> *      *      *
>
> All of the Alt-A mortgage loans originated by BSRM are based on loan application packages submitted through the wholesale or correspondent channel. Based on the documentation type each loan application package has an application completed by the prospective borrower that includes information with respect to the applicant's assets, liabilities, income, credit and employment history, as well as certain other personal information.  During the underwriting process, BSRM calculates and verifies the loan applicant's sources of income (except documentation types, which do not require such information to be stated or independently verified), reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the BSRM Underwriting Guidelines.

\*      \*      \*

>   Exceptions to the BSRM Underwriting Guidelines are considered with reasonable
>   compensating factors on a case-by-case basis and at the sole discretion of senior
>   management…. Compensating factors may include, but are not limited to,
>   validated or sourced/seasoned liquid reserves in excess of the program
>   requirements, borrower's demonstrated ability to accumulate savings or devote a
>   greater portion of income to housing expense and borrowers' potential for
>   increased earnings based on education, job training, etc. Loan characteristics such
>   as refinance transactions where borrowers are reducing mortgage payments and
>   lowering debt ratios may become compensating factors as well.

*Id.* at S-33 (emphasis added); *see also* Appendix, Chart D.

96.    The Prospectus Supplements described the importance of the appraisals of the

mortgaged properties:

>   Properties that secure BSRM mortgage loans have a valuation appraisal
>   performed by a qualified and licensed appraiser. All appraisers providing services
>   must comply with the respective state and federal laws. An appraisal must not be
>   more than 120 days old at the closing date or a re-certification of value is
>   required. The original appraiser must perform re-certification. As an alternative,
>   a field review with comparable properties that sold in the last three months and
>   support the value is also acceptable, in lieu of the re-certification of value. After
>   180 days, a new appraisal is required regardless of whether an existing or new
>   construction property. All combined loan amounts greater than $650,000 and less
>   than or equal to $1,000,000 require two original appraisals. The second appraisal
>   must be from a BSRM nationally approved appraiser. The value used to
>   determine the LTV/CLTV will be the lesser of the two values. BSRM combined
>   loans amounts greater than $1,500,000 in the state of California will require two
>   appraisals; the second appraisal must be from a BSRM nationally approved
>   appraiser. The value used to determine the LTV/CLTV will be the lesser of the
>   two values.
>
>   Each appraisal is reviewed by a representative of BSRM, who has the right to
>   request a second appraisal, additional information or explanations, lower the
>   approved loan amount, reduce the maximum allowable loan-to-value ratio or deny
>   the loan based on the appraisal.

*Id.* at S-36; *see also* Appendix, Chart E.

97.    The Prospectus Supplements also provided for prudent underwriting for

mortgages where less borrower documentation was required. For example, the July 28, 2006

Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering provided:

The BSRM mortgage loans were originated in accordance with guidelines established by BSRM with one of the following documentation types: "Full Documentation"; "Limited Documentation"; "Lite Documentation"; "Stated Income/Verified Assets"; "No Ratio/Verified Assets"; "Stated Income/Stated Assets"; "No Income/No Assets (NINA)"; "No Doc"; and "No Doc with Assets"....

\*     \*     \*

*Limited Documentation:* ….   Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*Lite Documentation:* ….   Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*Stated Income*: ….   Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*No Ratio:* ….   Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*Stated Income/Stated Assets:* ….   The applicant's income as stated must be reasonable for the related occupation, borrowers' credit profile and stated asset, in the loan underwriter's discretion.  ….   The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.

*No Income/No Assets (NINA):* ….   Borrower's ability to repay the loan is based upon past credit history and FICO score.

*No Doc:* ….   Borrower's ability to repay the loan is based upon past credit history and FICO score.

> *No Doc with Assets:* ….  Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or *securities* statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.  Borrower's ability to repay the loan is based upon past credit history; FICO score and verified assets.

*Id.* at S-34-35; *see also* Appendix, Chart F.

98.    ***Misstated and Omitted Information:*** The statements in the Offering Documents related to Bear Stearns Mortgage Corp. and Encore's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein, Bear Stearns Mortgage Corp. and Encore: (1) systematically disregarded their stated underwriting standards and regularly made exceptions to their underwriting standards in the absence of sufficient compensating factors; (2) pursued loan volume at the expense of underwriting standards, thereby failing to take the steps necessary to safeguard the quality of the product; and (3) largely disregarded appraisal standards leading to the values of the underlying mortgage properties being materially inflated in the loan underwriting process.

99.    Bear Stearns Mortgage Corp.'s systematic disregard for underwriting and appraisal standards affected a material number of loans in the BSMF 2006-AR1, BSMF 2006-AR4, BSMF 2006-AR5, and BSABS 2007-HE4 Offerings and resulted in increased delinquencies, defaults and dramatic downgrades to the Certificates' ratings.   Currently, almost 100% ($3.74 billion) of the $3.75 billion of Certificates that were initially rated AAA have been downgraded to speculative "junk" status or below.   Current delinquency and default rates on the Bear Stearns Mortgage Corp and/or Encore-originated collateral have risen exponentially since issuance of the Certificates – from 0.01% as of the cut-off dates, to over 71% as of February 2010.

C.   Countrywide Home Loans

100.   Countrywide originated loans which were included in the following offerings: SAMI 2006-AR6, SAMI 2006-AR7, BALTA 2006-6, BALTA 2007-1, BSARM 2006-4, BSARM 2007-3 and BSARM 2007-1.  The total value of these Offerings was $10.21 billion, of which 93%, or $9.5 billion, was initially rated AAA/maximum safety.

101.   The Prospectus Supplements described Countrywide's underwriting standards. Countrywide generally required a description of the borrower's income, employment documentation, FICO scores and a credit report.  For example, the Prospectus Supplement for the SAMI 2006-AR6 Certificate Offering stated:

> ***Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.***
>
> *         *         *
>
> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income.  If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization.  Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.
>
> *         *         *
>
> Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

*Id.* at S-43 (emphasis added); *see also* Appendix, Chart G.

102.   The Prospectus Supplements described the importance of the appraisals of the mortgaged properties:

Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. *The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition*. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. *All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect*.

*Id.* at S-44 (emphasis added); *see also* Appendix, Chart H.

103.    The Prospectus Supplement for the SAMI 2006-AR6 Certificate Offering details Countrywide's programs for issuing mortgage loans where less than full documentation was required.   But, even those programs were subject to underwriting procedures and required appraisals.  The Prospectus Supplement stated, in part:

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%.

\*      \*      \*

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. ***This program is limited to borrowers with excellent credit histories.***

Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%.  Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.  Under the Stated Income/Stated Asset Documentation Program, ***the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income …***

*Id.* at S-45-47 (emphasis added); *see also* Appendix, Chart I.

104.   ***Misstated and Omitted Information:*** The statements in the Offering Documents related to Countrywide's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein, Countrywide: (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting standards in the absence of sufficient compensating factors.  Despite assurances that lesser loans were limited to borrowers with excellent credit histories, Countrywide routinely extended these loans to borrowers with weak credit histories; and (2) largely disregarded appraisal standards and did not prepare appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards.

105.   Confidential Witness ("CW") 1, a Senior Underwriter in Roseville, California, from September 2002 to September 2006, stated that Countrywide would regularly label loans as "prime" even if made to unqualified borrowers (including those who had recently gone through a bankruptcy and were still having credit problems).  According to CW1, Countrywide's lending

practices got riskier in 2006 and Countrywide was more lax in enforcing its underwriting policies during that year.

106.     According to CW2, an Executive Vice President of Production Operations and later an Executive Vice President of Process Improvement, who worked at Countrywide for 17 years before leaving in October 2005, Countrywide created a computer system (or "rules engine") that routed highly risky loans out of the normal loan approval process to a central underwriting group for evaluation.  The system was called the Exception Processing System.  According to CW2, the Exception Processing System identified loans that violated Countrywide's underwriting requirements.  However, according to CW2, loans identified by the Exception Processing System as violating underwriting standards were ***not*** rejected.  Rather, according to CW2, Countrywide executives wanted the Company's Central Underwriting group to review such loans to evaluate whether these loans should require a higher price (up-front points) or a higher interest rate in light of the violation at issue.  Central Underwriting entered information into the Exception Processing System about its decisions to approve such loans and charge additional fees to the borrower.

107.     According to CW3, an Underwriter from Long Island, New York, between March 2000 and January 2007, Countrywide extended loans to individuals with increasing debt-to-income ratios.  Initially, Countrywide limited debt-to-income ratios to 38%, but this rose to 50%.  According to CW3, Countrywide branch managers' compensation was tied to loan origination volume and not the quality of the loans.  Thus, according to CW3, branch managers pushed originators to sell more loans despite the riskiness of these loans.

108.     According to CW4, an underwriter for Countrywide in the Jacksonville, Florida, processing center between June 2006 and April 2007, as much as 80% of the loans originated

involved significant variations from the underwriting standards that necessitated a signoff by management.  CW4 stated that Countrywide was very lax when it came to underwriting standards.  Management pressured underwriters to approve loans and this came from "up top" because management was paid based, at least in part, on the volume of loans originated.  CW4's manager told CW4 to approve as many loans as possible and push loans through.  According to CW4, most loans declined by underwriters would "come back to life" when new information would "miraculously appear" – which indicated to CW4 that Countrywide was not enforcing its underwriting standards.

109.     Moreover, according to Mark Zachary, a former Regional Vice President of Countrywide Mortgage Ventures, LLC, Countrywide blatantly ignored its underwriting policies and procedures.  Mr. Zachary stated that there was a problem with appraisals performed on homes being purchased with Countrywide loans.  According to Mr. Zachary, the appraiser was being strongly encouraged to inflate appraisal values by as much as 6% to allow the homeowner to "roll up" all closing costs.  According to Mr. Zachary, this inflated value put the buyer "upside down" on the home immediately after purchasing it, *i.e.*, the borrower owed more than the home's worth.  Thus, the borrower was more susceptible to default.  It also put the lender and secondary market investor at risk because they were unaware of the true value of their asset.  According to Mr. Zachary, Countrywide performed an audit in January 2007 into these matters which corroborates his story.

110.     Appraisals for properties that Countrywide originated were not obtained from independent appraisers because the appraisal amounts had to conform to pre-determined levels, or the appraiser's association or employment with Countrywide might be at risk.  Countrywide failed to confirm that appraisers were following the standards described by Fannie Mae and

Freddie Mac.  Combined with the implied or express pressures placed on appraisers to appraise to the desired value, there was enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than suggested by the Offering Documents.  This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004 to 2005.

111.    On or about March 10, 2008, the FBI disclosed that it had initiated a probe into Countrywide's mortgage practices, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and Countrywide's specific instructions to underwriters not to scrutinize certain types of loans it issued.  Subsequently, on April 2, 2008, a Federal Bankruptcy Judge overseeing the proceedings of more than 300 Countrywide-related bankruptcies ordered a further inquiry into the misconduct, and specifically, the illegal inflation of fees throughout the loan process that had been occurring at Countrywide.

112.    On April 11, 2008, an amended complaint for violations of the federal securities laws was filed in federal court in the Central District of California against Countrywide.  *See Argent Classic Convertible Arbitrage Fund LP, et al. v. Countrywide Financial Corp., et al.*, No. 07-7097 (C.D. Cal.).  The complaint identified specific deviations for Countrywide's stated underwriting standards.  For example, in connection with the "No Income/No Asset Documentation Program," Countrywide represented that "[t]his program is limited to borrowers with excellent credit histories."  However, Countrywide routinely extended these loans to borrowers with weak credit and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like ARMs, likely contained misinformation from the

46

borrower, such as overstated incomes, that increased the likelihood of defaults.   Because borrowers were advised that their representations on loan applications would not be verified, Countrywide employees referred to these products as "liar loans."

113.   In addition, numerous Attorneys General have initiated investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from the underwriting standards it professed using for originating residential loans.

114.   The Illinois Attorney General initiated a lawsuit against Countrywide and Angelo Mozilo, Chairman of the Board and Chief Executive Officer through July 1, 2008, contending that the company and its executives sold borrowers costly and defective loans that quickly went into foreclosure.   *See The People of the State of Illinois v. Countrywide Financial Corporation, et al.*, No. 08CH22994 (Cook County Ch. Ct.), (the "Illinois AG Complaint").   Additionally, the Illinois AG Complaint alleges that Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrower was able to repay the loan.   Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income.   For example, according to the Illinois AG Complaint: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.   Furthermore, to supplement an employee's judgment as to whether a potential borrower's income was "reasonable," Countrywide required its employees to utilize a website, www.salary.com.   Even if the stated salary was outside of the

range provided by the website, Countrywide employees could still approve the loan.  The Illinois AG alleged that the "reasonableness" test contravened proper underwriting practices.

115.    As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy.  It is all from the greed of people like Mozilo."  *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality."  (*See* Gretchen Morgenson, "Illinois to Sue Countrywide," *The New York Times,* June 25, 2008.)

116.    California's Attorney General also commenced an investigation into Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *The People of the State of California v. Countrywide Financial Corporation, et al*., No. LC081846 (Los Angeles Super. Ct.) (the "California AG Complaint").  The California AG Complaint also alleged that Countrywide departed from its stated underwriting standards.  For example, the Complaint alleged that employees were incentivized to make exceptions to underwriting standards and failed to verify borrower documentation and information.  According to the California AG Complaint, Countrywide used a system called CLUES (Countrywide Loan Underwriting Expert System), to provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting standards.  CLUES reports indicating a loan was not within Countrywide's underwriting standards often were ignored in order to effectuate the loan.

117.    Jerry Brown, California's Attorney General, stated: "Countrywide exploited the American dream of homeownership and then sold its mortgages for huge profits on the secondary market."

118.    Likewise, the Connecticut Attorney General (the "Connecticut AG") filed a complaint in Superior Court, Judicial District of Hartford, entitled *State of Connecticut v. Countrywide Financial Corporation, et al.*, No. CV08-40390945 (Hartford Super. Ct.), alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for loans they otherwise would not have received.

119.    Investigations in other states such as Washington, West Virginia, Indiana and Florida confirmed many of the allegations in the Illinois, California and Connecticut complaints.

120.    On July 24, 2008, *The Los Angeles Times* reported that "three big Southland lenders (are) under federal investigation; Sources say IndyMac, Countrywide and New Century [have been] subpoenaed." *The Los Angeles Times* further reported that officials have begun to investigate the value of mortgage-backed securities:

> A federal grand jury in Los Angeles has begun probing three of the nation's largest subprime mortgage lenders in the clearest sign yet that prosecutors are investigating whether fraud and other crimes contributed to the mortgage debacle.
>
> ***Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp., New Century Financial Corp. and IndyMac Federal Bank*** seeking a wide range of information, according to sources with direct knowledge of the subpoenas.
>
> ***Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased,*** as well as other possible crimes such as insider trading by corporate officials who sold stock knowing their holdings were about to deflate in value.

(Emphasis added.)

121.    On September 30, 2008, MBIA Insurance Corp. ("MBIA") filed a complaint against Countrywide in New York state court, entitled *MBIA Insurance Corp. v. Countrywide, et*

*al.*, No. 08/602825 (N.Y. Sup. Ct.).  The MBIA complaint alleges that Countrywide fraudulently induced it to provide insurance for certain investment certificates.  MBIA was able to obtain approximately 19,000 loan files for the Certificates it insured as a result of its contractual agreements with Countrywide.  After reviewing the portfolios and re-underwriting each loan provided by Countrywide, MBIA discovered that there was "an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow."  MBIA Complaint at ¶78.  MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)."  *Id.* at ¶79.  Significantly, "MBIA's re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies."

122.    On October 6, 2008, Countrywide settled lawsuits brought by eleven Attorneys General, for $8.4 billion.  The settlement provided a program by which existing loans would be modified:

> [B]orrowers were placed in the riskiest loans, including adjustable-rate mortgages whose interest rates reset significantly several years after the loans were made.  Pay-option mortgages, under which a borrower must pay only a small fraction of the interest and principal, thereby allowing the loan balance to increase, also are included in the modification.

123.    On June 4, 2009, the Securities and Exchange Commission filed a complaint against Mozilo, David Sambol, and Eric Sieracki alleging, *inter alia*, that a high percentage of Countrywide's loans violated its own weak underwriting standards.  The SEC complaint was based on an extensive investigation, and set forth numerous emails from Mozilo stating that: (1) large portions of Countrywide's portfolio consisted of "the most dangerous product in

50

existence and there can be nothing more toxic"; (2) Mozilo had "personally observed a serious lack of [underwriting] compliance within our origination system"; and (3) "it is just a matter of time that we will be faced with … much higher delinquencies."

124.    On September 16, 2010, the Honorable John F. Walter of the United States District Court for the Central District of California issued an order denying defendants' motion for summary judgment, citing extensive evidence indicating that Countrywide routinely ignored its underwriting standards and "would underwrite ***any*** loan it could sell into the secondary mortgage market."  *Id.* at 12.  *See SEC v. Angelo Mozilo, et al.*, 09-cv-03994-JFW-MAN (Sept. 16, 2010) ("SEC Order") (emphasis in original).  Further, the SEC Order noted that "[a]s a consequence of Countrywide's 'matching strategy,' Countrywide's underwriting 'guidelines' would end up as a composite of the most aggressive guidelines in the market."  *Id.* (quotations in original).  On October 15, 2010, the SEC settled its case with the three Countrywide executives for a total of $73 million.  According to the SEC, Mozilo was fined $22.5 million, the largest penalty ever on a senior executive of a public company.  Further, he forfeited $45 million in "ill-gotten gains."

125.    Countrywide's systematic disregard for underwriting and appraisal standards affected a material number of loans in the SAMI 2006-AR6, SAMI 2006-AR7, BALTA 2006-6, BALTA 2007-1, BSARM 2006-4, BSARM 2007-3 and BSARM 2007-1  Offerings and resulted in increased delinquencies, defaults and dramatic downgrades to the Certificates' ratings. Currently, 98% ($9.31 billion) of the Certificates that were initially rated AAA have been downgraded to speculative "junk" status or below.  Current delinquency and default rates on the Countrywide originated collateral have risen exponentially since issuance of the Certificates – from .01% as of the cut-off dates to over 65% as of February 2010.

D.     <u>American Home Mortgage</u>

126.     American Home originated loans included in the SAMI Series 2006-AR5 Certificate Offering.  The total value of the Offering for which American Home originated loans was $951.92 million, of which 94.13%, or $896.07 million, was initially rated AAA/maximum safety.

127.     The Prospectus Supplements described American Home's underwriting standards. American Home purported to have rigorous underwriting standards designed to evaluate borrower creditworthiness.  For example, the Prospectus Supplement for the SAMI Series 2006-AR5 Certificate Offering, filed May 30, 2006, provided:

> American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.
>
> *          *          *
>
> American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is ***indicative of the applicant's willingness and ability to pay the debt they would be incurring.***
>
> *          *          *
>
> In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months. In general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.
>
> *          *          *
>
> American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters

may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

*Id.* at S-47-49 (emphasis added).

128.    American Home purported to require and rely upon standard appraisals.  For example, the Prospectus Supplement for the SAMI Series 2006-AR5 Certificate Offering, specifically provided:

Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.  The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms.  Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment.  In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.

*       *       *

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value.  American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan.  In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan.  In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac.

> Loans with higher loan-to-value ratios require higher coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

*Id.* at S-49.

129.    The Prospectus Supplements also provided for prudent underwriting for mortgages where less borrower documentation was required:

> Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both. For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both. Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

*        *        *

> American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

*Id.* at S-48-49.

130.    ***Misstated and Omitted Information:*** The statements in the Offering Documents related to American Home's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein, American Home: (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting standards in the absence of sufficient compensating factors. As

such, American Home disregarded crucial risk factors in making determinations on loan applications, specifically approving loan applications for Option-Arm and loans with Negative Amortization features to borrowers with bad credit history or insufficient income to repay the loan once the rates adjusted upwards.   Moreover, American Home's controls were inadequate to prevent it from originating loans which were sure to default absent rapid, significant price appreciation of the underlying property; and (2) largely disregarded appraisal standards and did not prepare appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards.

131.    American Home greatly reduced and/or eliminated its underwriting standards in order to approve as many mortgages as possible.   For example, an internal American Home "Credit Update" presentation dated from October 2005 set forth revised credit factors which made clear that American Home's underwriting standards were to be either relaxed substantially or essentially rendered meaningless, in order to allow American Home to make loans to high-risk borrowers.   Specifically, the Credit Update sets forth the previous "interpretation" of the underwriting standards under a heading entitled "What we observed in [our] prior history" alongside the new "interpretation" under a heading entitled "Where We Are Now."   These new "guideline interpretations" included:

- Not requiring verification of income sources on stated income loans;
- Reducing the time that need have passed since the borrower was in bankruptcy or credit counseling;
- Reducing the required documentation for self-employed borrowers; and
- Broadening the acceptable use of second and third loans to cover the full property value.

132.    Indeed, an internal American Home e-mail sent on November 2, 2006, from Steve Somerman, an American Home Senior Vice President of Product and Sales Support in California and co-creator of the American Home's "Choice Point Loans" program, to loan officers

nationwide, stated that American Home would make a loan to virtually any borrower, regardless of the borrower's ability to verify income, assets or even employment.  That e-mail specifically encouraged loan officers to make a variety of loans that were inherently risky and extremely susceptible to delinquencies and default, including (1) stated income loans, where both the income and assets of the borrower were taken as stated on the credit application without verification; (2) "NINA" or No Income, No Asset loans, which allowed for loans to be made without any disclosure of the borrower's income or assets; and (3) "No Doc" loans, which allowed loans to be made to borrowers who did not disclose their income, assets or employment history.

133.   American Home also did not have appropriate controls in place to monitor and enforce compliance with underwriting standards.  According to CW5, a staff member in American Home's repurchase department between November 2004 and August 2007, "[T]he underwriters didn't do their jobs. They were lax, very lax."

134.   Moreover, American Home permitted numerous "exceptions" to its underwriting standards.  CW6, an Assistant Vice President for Direct Consumer Lending in American Home's loan origination business segment between July 2006 and August 2007, explained that exceptions were always being made to the underwriting standards.  When CW6's staff raised concern with the sales department about loans that did not meet the underwriting standards, the sales department would contact the Melville, New York headquarters to approve an exception to those standards so that the loan could be completed.  Examples of such exceptions included reducing the required credit score or increasing the loan-to-value ratio.  CW6 stated that, when the exception at issue involved accepting a reduced credit score, it was commonplace to overrule the objections of the underwriters in order to complete the loan.

135.    According to CW7, whose job at American Home from July 2005 through April 2007 was to review the underwriting of loans before they were sold to secondary market investors, exceptions to underwriting standards were made "all the time."  For example, borrowers who claimed to be self-employed were not required to prove that they had been in business for a specified period of time, as the stated underwriting standards required.

136.    According to CW8, a former Senior Underwriter at American Home from 2002 to 2007, underwriters' objections to loans were frequently vetoed.  CW8 stated that underwriters would "say[] 'no way' on a lot of things, 'I would never give a borrower a loan like this,'" but the loans would be approved nonetheless.  According to CW8, loans would be approved over the underwriter's objection if he refused to put his name on a loan, "[I]t happened more than it should have."

137.    On August 2, 2007, the New Jersey Department of Banking and Insurance issued legal documents ordering American Home to stop doing business in the state and started the paperwork to revoke American Home's mortgage lender license.  On August 6, 2007, American Home was forced to file for bankruptcy protection.

138.    In addition to civil lawsuits, American Home is involved in several criminal probes and investigations.  As early as March 2008, federal prosecutors had already convicted one American Home sales executive, Kourash Partow, of mortgage fraud.  According to a March 11, 2008 *Wall Street Journal* article, after conviction, Partow, who worked for Countrywide before joining American Home, sought a lighter sentence on the grounds that his former employers (Countrywide and American Home) not only had knowledge of the loan document inaccuracies but in fact encouraged manipulation by intentionally misrepresenting the performance of loans and the adequacy of how the loans were underwritten.  Partow's attorney

argued that Countrywide and American Home had competitive cultures that encouraged a blind eye mentality.  In fact, American Home immediately hired Partow and appointed him as branch manager and loan officer even though he had been fired from Countrywide in June 2006 after FBI scrutiny of his loans provoked an internal audit.  Partow admitted that he would falsify clients' income or assets in order to get loans approved.  Most of the loans did not require documentary verification of such figures.

139.     Further, according to a May 5, 2008 article in *The Globe and News,* prosecutors from the Eastern District of New York were investigating American Home for criminal activity including reporting misrepresentations in securities filings about the company's financial position and quality of its mortgage loans, failing to disclose a rising number of loan defaults and engaging in questionable accounting to hide losses.

140.     American Home's systematic disregard for underwriting and appraisal standards affected a material number of loans in the SAMI Series 2006-AR5 Offering and resulted in increased delinquencies, defaults and dramatic downgrades to the Certificates' ratings. Currently, 77% ($687 million) of the Certificates that were initially rated AAA have been downgraded to speculative "junk" status or below.  Current delinquency and default rates on the American Home originated collateral have risen exponentially since issuance of the Certificates – from 0.0% as of the cut-off dates to over 75% as of February 2010.

E.     Wells Fargo Mortgage Corporation

141.     Wells Fargo Mortgage Corporation ("Wells Fargo") originated loans which were included in the following offerings: BALTA 2006-8 and BSARM 2007-1.  The total value of these offerings was $2.35 billion, of which 94.7%, or $2.22 billion, was initially rated AAA/maximum safety.

142.    The Prospectus Supplements described Wells Fargo's underwriting standards. For example, the Prospectus Supplement for the BSARM 2007-1 Certificate Offering stated that Wells Fargo's mortgage loans included in the BSARM 2007-1 pool were

> underwritten in accordance with one or more of the following: (i) Wells Fargo Bank's 'general' underwriting standards, (ii) Wells Fargo Bank's modified underwriting standards that have been applied in the underwriting of mortgage loans under Wells Fargo Bank's 'alternative' mortgage loan underwriting program, and (iii) the underwriting standards of participants in Wells Fargo Bank's non-agency conduit program.

143.    The BSARM 2007-1 Prospectus Supplement stated that Wells Fargo's "general" underwriting standards were

> applied by or on behalf of Wells Fargo Bank *to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral.* The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk.
>
> *       *       *
>
> Wells Fargo Bank permits debt-to-income ratios to exceed guidelines *when the applicant has documented compensating factors* …

144.    As to Wells Fargo's "modified" underwriting standards, the BSARM 2007-1 Prospectus Supplement stated that:

> In comparison to Wells Fargo Bank's "general" underwriting standards described above, the underwriting standards applicable to mortgage loans under Wells Fargo Bank's 'alternative' mortgage loan underwriting program permit different underwriting criteria, additional types of mortgaged properties or categories of borrowers … and include certain other less restrictive parameters.

145.    The BSARM 2007-1 Prospectus Supplement also stated that:

Wells Fargo Bank's underwriting of every Mortgage Loan submitted (as to which underwriting authority has not been delegated) consists of a credit review. In addition, Wells Fargo Bank's underwriting of every Mortgage Loan submitted consists of a separate appraisal conducted by (i) a third-party appraiser, (ii) an appraiser approved by RELS, or (iii) RELS itself. Appraisals generally conform to current Fannie Mae and Freddie Mac secondary market requirements for residential property appraisals. All appraisals are subject to an internal appraisal review by the loan underwriter irrespective of the loan-to-value ratio, the amount of the Mortgage Loan or the identity of the appraiser

146.     The BSARM 2007-1 Prospectus Supplement stated that in order to qualify for participation in Wells Fargo's mortgage loan purchase program:

lending institutions must (i) meet and maintain certain net worth and other financial standards, (ii) demonstrate experience in originating residential mortgage loans, (iii) meet and maintain certain operational standards, (iv) *evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines and represent that each loan was underwritten in accordance with Wells Fargo Bank standards* and (v) utilize the services of qualified appraisers.

147.     ***Misstated and Omitted Information:*** The statements in the Offering Documents related to Wells Fargo's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein, Wells Fargo: (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting standards in the absence of sufficient compensating factors; and (2) largely disregarded appraisal standards and did not prepare appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards.

148.     Upon CW9's arrival at Wells Fargo Home Mortgage, CW9 was "shocked" that Wells Fargo Home Mortgage was doing "the same things" as Argent.  CW9 noted that the "pressure from loan officers" to close loans was "intense."   Individuals that were "high producers" were treated favorably:  "Anything they said went.  Anytime an underwriter would overturn one of their loans, it would come back approved by a manager."  "The high producers

that everyone wanted to make happy, caused a lot of bad loans to go through."  CW9 added, "[t]here was a lot of coercion between loan officers and underwriters."

149.    According to CW9, Wells Fargo was approving so many stated income loans that it felt the same as CW9's previous subprime lending job.  CW9 remarked that "[t]he loan officers were stretching the truth.  They would say [to the borrower], 'You need to make this much.'  So of course, the borrower would say, 'Ok, I make that much.'"

150.    According to CW10, a former employee at Wells Fargo Home Mortgage in San Bernardino, California, Wells Fargo Home Mortgage made "tons" of exceptions to its underwriting standards.  CW10 was employed as an Underwriter from January 2002 through May 2005 and as a Senior Underwriter from May 2005 until April 2006.  CW10 estimated that 25-30% of the loans had exceptions, most commonly for LTV and the debt-to-income ratio of the borrower.  During CW10's tenure with Wells Fargo Home Mortgage, the frequency and type of exceptions "got more and more ridiculous."  For example, Wells Fargo Home Mortgage would loosen underwriting standards toward the end of the year in order to meet the origination goals.  CW10 stated that "if it got to be around December, they'd relax the guidelines to get more exceptions."  CW10 also noted that Wells Fargo Home Mortgage began to extend stated income loans to "everyone," including, in one instance, a landscaper claiming to have $15,000 in income per month.  CW10 added that "[w]e didn't always feel the [stated] income was reasonable for the stated job" and that "it got to the point where you could have a 620 FICO and get a stated loan."

151.    CW10 also described Wells Fargo Home Mortgage as a "loan-producing machine," and noted that there was pressure from management to close as many loans as possible, independent of their quality or lack thereof:  "[Managers] always said we didn't have to approve loans we didn't want to approve, but if you didn't do them you wouldn't be around very

long.  We knew what we had to do to keep our jobs."  CW10 remarked that "[s]ometimes it felt like I was in sales, because they wanted production, period."

152.    According to CW11, a former Mortgage Specialist and Pricing/Pipeline Administrator for Wells Fargo Home Mortgage in Frederick, Maryland, from February 2002 through November 2006, when CW11 left the Company, they had just begun implementing a program called "courageous underwriting," which CW11 described as "following the guidelines but also finagling the guidelines if it meant getting the loan approved."  "They wanted us to do anything we could to get loans closed.  That was the bottom line."  CW11's managers would "push [CW11] to push the loans through, especially if it was a time when our numbers weren't quite meeting our goals.  They they'd look at things with a little less scrutiny."  CW11 also noted that Wells Fargo relaxed the qualifying test for obtaining underwriting authority, which ensured that more loans would close.  CW11 stated that the test was "engineered" by Wells Fargo "so it was easy to pass."  According to CW11, if a test-taker answered any question incorrectly, he/she could simply log out and then log back in and start again an "unlimited" number of times.

153.    From 1995 through 2004, CW12, a former Wells Fargo Home Mortgage employee who was employed as a Quality Compliance Manager I in San Bernardino, California, from 1995 through 1998, Loss Mitigation Supervisor from 1999 through 2004, and an REO Supervisor from July 2006 through May 2008, worked with third-party originators, and noted that some of the information in the loans was "blatantly falsified."  CW12 noted that there were a lot of exceptions made to the underwriting standards and that some loan originators "said they verified employment and income, but after reverification we found out it was wrong, and they hadn't."  Exceptions were made for bank statements as well.  "I remember some bank statements were falsified."  CW12 said there was no indication these practices stopped after 2004.

154. CW13, a former Wells Fargo Home Mortgage employee who worked as a Senior Mortgage Loan Underwriter in Rancho Bernardo, California, from November 2001 through June 2003, and a Home Mortgage Consultant in Newport Coast, California, from June 2003 through March 2008, stated that exceptions to the underwriting standards were made for "loan amounts, LTV, income, pretty much anything and everything—anything you could find to get a loan approved."

155. CW14 is a former employee at Wells Fargo Home Mortgage in Denver, Colorado, and Springfield, Illinois. CW14 was employed as a Wholesale Alternative Lending Operations Manager from 2003 through 2005 and as a Site Manager in retail underwriting from 2005 through 2007. According to CW14, Wells Fargo Home Mortgage developed riskier products over the course of his employment. The company went "from ultra-conservative, to trying to keep up with the market." Around 2006, CW14 noted that Wells Fargo Home Mortgage began to offer "more and more types of products," including no-doc loans, which were the "most aggressive."

156. Wells Fargo's systematic disregard for underwriting and appraisal standards affected a material number of loans in the BALTA 2006-8 and BSARM 2007-1 Offerings and resulted in increased delinquencies, defaults and dramatic downgrades to the Certificates' ratings. Currently, 93.6% ($2.08 billion) of the Certificates that were initially rated AAA have been downgraded to speculative "junk" status or below. Current delinquency and default rates on the Wells Fargo-originated collateral have risen exponentially since issuance of the Certificates – from 0.0% as of the cut-off dates to 58% as of February 2010.

F.     Fieldstone Mortgage Corporation

157.    Fieldstone originated loans included in the BSABS 2007-HE3 Offering.  The total value of the Offering was $916 million, of which 78%, or $715.8 million, was initially rated AAA/maximum safety.

158.    The Prospectus Supplements described Fieldstone's underwriting standards.  For example, with regard to Fieldstone's stated underwriting standards, the Prospectus Supplement for BSABS Series 2007-HE3 Certificate Offering dated March 29, 2007, provided:

> FMC originates both conforming and non-conforming loans…Non-conforming borrowers typically have good credit backgrounds, but tend to have higher LTV ratios, higher debt ratios than conforming borrowers or less income documentation.

> *        *        *

> FMC offers a variety of fixed-rate mortgage loans and ARMs to non-conforming borrowers. FMC considers a combination of factors in deciding whether to approve these loans, including the borrower's income documentation, the loan-to-value, or LTV, the borrower's mortgage and consumer credit payment history, the property type and the credit score necessary to qualify under a particular program. Nevertheless, each program relies upon the analysis of each borrower's ability to repay the loan according to its terms, the risk that the borrower will not repay, the fees and rates FMC charges, the value of the collateral, the benefit FMC believes it is providing to the borrower and the loan amounts relative to the risk FMC believes it is taking.

> *        *        *

> FMC's underwriting policy is to analyze the overall situation of the borrower and to take into account compensating factors that may be used to offset areas of weakness.  These compensating factors include credit scores, proposed reductions in the borrower's debt service expense, employment stability, number of years in residence and net disposable income.

> *        *        *

> All of FMC's non-conforming loans are underwritten by its on-staff underwriting personnel. FMC does not delegate underwriting authority to any broker or third party. The underwriters review each non-conforming loan in one of FMC's regional funding centers. FMC believes that this regionalized underwriting

> process provides them with the ability to fund loans faster than many of its competitors, and the experience of their loan originators and branch managers, information systems and rigorous quality control process **ensure the continued high quality of their loans.**

*Id.* at S-47-48 (emphasis added).  *See also* Prospectus Supplement for BSABS 2007-HE3, at S-47-48.

159.    ***Misstated and Omitted Information:*** The statements in the Offering Documents related to Fieldstone's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein: Fieldstone's "underwriting personnel" consistently modified mortgage loan applications in order to increase the volume of loans and fees derived from such mortgage loans.  As such, the underwriting was generally not monitored by Fieldstone's supposed rigorous quality control process.

160.    On March 17, 2006, according to *PR Newswire*, the National Community Reinvestment Coalition filed a civil rights complaint against Fieldstone and its parent, Fieldstone Investment Company, exposing Fieldstone's underwriting practice of using minimum loan values to "redline low to moderate income communities and/or exclude row houses that are situated in African American or Latino communities." As alleged, Fieldstone had employed the practice of denying loans to applicants whose homes are valued at less than $100,000.

161.    On September 13, 2007, *The Daily Record* reported that Morgan Stanley had filed a federal lawsuit seeking to recover millions from defaulted mortgages that the company had purchased over a three-year period.  The lawsuit alleges that Fieldstone failed to follow through on its obligations to keep accounts current and to buy back any defaulted loans.  Morgan Stanley sought to have 72 mortgages with no, or late payments with a total outstanding balance of $26.5 million repurchased.

162.    On July 17, 2007, Fieldstone announced that Credit-Based Asset Servicing and Securitization, LLC ("C-BASS"), an issuer, servicer and investor specializing in credit-sensitive residential mortgage assets acquired it.  The following month, Fieldstone stopped accepting new loan applications.

163.    In November 2007, just four months after the C-BASS acquisition, *Yahoo Business* reported that Fieldstone was forced to seek bankruptcy protection due to mounting losses caused by delinquencies and foreclosures.   At the same time, C-BASS itself went through a $3.8 billion out-of-court restructuring as a result of what the *Daily Deal* described on November 27, 2007 as "unprecedented margin calls caused by the weakened mortgage industry."

164.    On March 27, 2009, *US Fed News* reported that an undercover operation had resulted in fraud charges against 24 defendants, including brokers, business owners and appraisers who dealt regularly with Fieldstone.  The indictment in *United States v. Ruwaida Dabbouseh and Khalil Qandil*, No. 09-CR-231 (N.D. Ill.), whereby an undercover agent posed as a prospective buyer, alleges that brokers, in March 2007, prepared and submitted loan applications containing false statements pertaining to the agent's employment and identity to Fieldstone.   A business owner working with the brokers then submitted verification of employment falsely representing that his company employed the agent.   Based on these representations, Fieldstone loaned the agent $153,000.

165.    Fieldstone's systematic disregard for underwriting and appraisal standards affected a material number of loans in the BSABS 2007-HE3 Offering and resulted in increased delinquencies, defaults and dramatic downgrades to the Certificates' ratings.   Currently, 64.4% ($461.1 million) of the Certificates that were initially rated AAA have been downgraded to speculative "junk" status or below.  Current delinquency and default rates on the Fieldstone-

originated collateral have risen exponentially since issuance of the Certificates – from 0.0% as of the cut-off dates to 75% as of October 1, 2010.

G.     Additional Originators

166.   The Prospectus Supplements stated that the following Additional Originators contributed loans to certain Offerings at issue:

| Additional Originators | |
|---|---|
| Aegis Mortgage Corporation | Synovus Mortgage Corporation |
| Mid America Bank | American Mortgage Express Corp. d/b/a |
| U.S. Bank, NA | American Residential Mortgage Corp. |
| Provident Funding Associates, L.P. | |

167.   The Prospectus Supplements set forth the underwriting standards for additional originators who originated 20% or more of the underlying mortgages in any one trust.  These statements were untrue and omitted material facts because many originators industry-wide systematically failed to follow their stated underwriting standards.

168.   As explained above in ¶¶44-47, the traditional mortgage model involved a bank originating a loan to the borrower/homeowner and retaining the credit (default) risk.  As such, under the traditional model, the loan originator had a financial incentive to ensure that (1) the borrower had the financial wherewithal and ability to repay the promissory note; and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

169.   With the advent of securitization, the traditional model gave way to the "originate to distribute" model, in which banks and originators sold the mortgages and transferred credit risk to investors through mortgage-backed securities.  Securitization meant that those originating mortgages were no longer required to hold them to maturity.  By selling the mortgages to investors, the originators obtained funds, enabling them to issue more loans and generate

transaction fees.  This increased the originators' focus on processing mortgage transactions rather than ensuring their credit quality.

170.    Loan fees and sales revenue became the originator's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan. To facilitate more loans, lenders began to offer more aggressive loan products such as subprime mortgages, hybrid loans and negative amortization "option ARM" loans, with little or no documentation.  As loan origination quantities increased, loan originators failed to follow their stated underwriting and appraisal standards, and other methods of risk assessment.

171.    Wall Street banks, including Bear Stearns, entered into the complex, high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass-through certificates.  By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as lending practices deteriorated and the dangers grew in the housing market.  At the center of the escalation was Wall Street's partnership with subprime lenders. This relationship was a driving force behind the once-soaring home prices and the spread of exotic loans that are now defaulting and foreclosing in record numbers.

172.    As is now evident, far too much of the lending during that time was neither responsible nor prudent.  According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 14, 2008 speech at the National Community Reinvestment Coalition Annual Meeting, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis.  A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios."  In its March 2008 Policy Statement on Financial Market Developments,

the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning* in late 2004 and extending into early 2007." (Emphasis in original).    As U.S. housing prices subsequently declined, the delinquency rate for such mortgages soared.

173.    For example, according to a complaint filed by one of the founders of Aegis Mortgage Corporation ("Aegis"), captioned *D. Richard Thompson v. Aegis Mortgage Corp.*, No. 07-33593 (Harris County Dist. Ct.) (the "Thompson Complaint"), Aegis was founded in 1993 with a $500,000 investment.    Initially, Aegis was a privately held mortgage banking company owned by three individuals.    By 1998, the company was generating $1 billion in annual loan volume. In 1998 and 1999, Cerberus Capital Management, LP made a $45 million investment in Aegis, enabling the company to increase its subprime business.    Thompson Complaint at 5.

174.    With this substantial cash infusion, Aegis acquired two extremely distressed mortgage production operations, UC Lending and New America.    These and subsequent acquisitions enabled Aegis to grow from 150 employees in nine locations in 1999 to 3,800 employees in over 100 locations in 2005.    By 2006, Aegis was ranked as the 13th-largest subprime lender in the country, generating close to $20 billion in annual originations.    In eight years, the company's subprime originations grew by an incredible 1,750%.    Thompson Complaint at 6-9.

175.    High-fee, high-risk mortgages fueled Aegis' astronomic growth.    As the need for these mortgages increased, loan underwriting standards were loosened to the point of near abandonment by 2006.    A large portion of the loans Aegis originated during this time were purchased from unlicensed mortgage brokers. Because investment banks like Bear Stearns

purchased Aegis' loans, underwriting standards were disregarded and quantity became more important than quality. Aegis' Divisional head of underwriting, Helen Spavile, bullied the understaffed East Coast underwriting department in Jacksonville, Florida, to approve whatever loans were sent there for approval, resulting in the guidelines being ignored and the loans approved. Thompson Complaint at 10. On August 13, 2007, the company was forced to file for bankruptcy.

176.    The additional originator's systematic disregard for underwriting and appraisal standards affected a material number of loans in each Offering to which they contributed loans and resulted in increased delinquencies, defaults and dramatic downgrades to the Certificates' ratings. Currently, 100% ($1.89 billion) of the Certificates that were initially rated AAA have been downgraded to speculative "junk" status or below. Current delinquency and default rates on the additional originator-originated collateral have risen exponentially since issuance of the Certificates – from 1.12% as of the cut-off dates to over 55% as of February 2010.

VII.    THE OFFERING DOCUMENTS
        CONTAINED MATERIAL MISSTATEMENTS
        REGARDING VALUING THE COLLATERAL

177.    In each Prospectus Supplement, Defendants provided purported LTV ratio information related to the loans underlying the trusts, including information about the number of loans containing LTV ratios within a given range. *See* Appendix, Charts J, K.

178.    As explained above, the appraisals for a material number of properties underlying the mortgage loans were not prepared in conformity with Fannie Mae, Freddie Mac or the Prospectus Supplements' stated appraisal standards, resulting in inaccurate and inflated appraisals. Incorporating an inflated appraisal into the LTV ratio calculation will result in a lower LTV ratio for a given loan. For instance, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%. If, however, the

70

appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).  Due to the inflated appraisals, Plaintiffs and the class paid more for the Certificates than they were worth at the time of suit.

179.  ***Misstated and Omitted Information***:  As explained above, the appraisals for a material number of the properties underlying the mortgage loans were not prepared in conformity with Fannie Mae or Freddie Mac appraisal standards and were inaccurate and inflated.  Furthermore, the stated sales prices of a material number of properties underlying the mortgage loans did not accurately reflect the true value of the properties.  These inflated appraisals and misleading sales prices were used to form the LTV ratios listed in the Prospectus Supplements.  Incorporating an inflated appraisal into the LTV ratio calculation will result in a lower LTV ratio for a given loan.  For instance, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).  Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the trusts had greater collateral and thus were less risky than they really were.

180.  The Offering Documents also stated that exceptions to underwriting standards could be granted if the borrower's loan application reflected "compensating factors" including "loan-to-value ratio."  As detailed above however, the LTV ratios were artificially low as a result of the inflated appraisals and sales price and therefore the use of this metric as a "compensating factor" further violated stated underwriting standards.

VIII.   THE OFFERING DOCUMENTS CONTAINED
        MATERIAL MISSTATEMENTS AND
        OMISSIONS REGARDING CREDIT SUPPORT

181.    Credit support or credit enhancement represented the amount of "cushion" or

protection the Certificate structure provided to the senior classes of the Certificates.   With

respect to Credit Support, the SAMI Registration Statement provided as follows:

> As set forth below and in the applicable prospectus supplement, credit
> enhancement may be provided by one or more of a financial guaranty insurance
> policy, a special hazard insurance policy, a mortgage pool insurance policy or a
> letter of credit. In addition, if provided in the applicable prospectus supplement, in
> lieu of or in addition to any or all of the foregoing arrangements, credit
> enhancement may be in the form of a reserve fund to cover the losses,
> subordination of one or more classes of subordinate securities for the benefit of
> one or more classes of senior securities, of cross-collateralization or
> overcollateralization, or a combination of the foregoing. The credit support may
> be provided by an assignment of the right to receive specified cash amounts, a
> deposit of cash into a reserve fund or other pledged assets, or by guarantees
> provided by a third-party or any combination thereof identified in the applicable
> prospectus supplement. Each component will have limitations and will provide
> coverage with respect to Realized Losses on the related mortgage loans. Credit
> support will cover Defaulted Mortgage Losses, but coverage may be limited or
> unavailable with respect to Special Hazard Losses, Fraud Losses, Bankruptcy
> Losses and Extraordinary Losses. To the extent that the credit support for the
> offered securities of any series is exhausted, the holders thereof will bear all
> further risk of loss.

SAMI Registration Statement at 49; *see also* Bear Stearns Registration Statement at 46.

182.    Furthermore, the Prospectus Supplement for the BSMF Series 2006-AR1 Trust

filed July 28, 2006, provided that:

> ***Credit enhancement*** provides limited protection to holders of specified
> certificates against shortfalls in payments received on the mortgage loans. This
> transaction employs the following forms of credit enhancement.

> *Excess Spread and Overcollateralization.* The mortgage loans are expected to
> generate more interest than is needed to pay interest on the related offered
> certificates because we expect the weighted average net interest rate of the
> mortgage loans to be higher than the weighted average pass-through rate on the
> related offered certificates. In addition, such higher interest rate is paid on a
> principal balance of mortgage loans that is larger than the principal balance of the
> related certificates. Interest payments received in respect of the mortgage loans in

excess of the amount that is needed to pay interest on the offered certificates, related trust expenses and, with respect to the group I mortgage loans, on and after the distribution date occurring in July 2016, any amounts paid into the final maturity reserve account, will be used to reduce the total current principal amount of the related certificates until a required level of overcollateralization has been achieved.

*Subordination; Allocation of Losses.* By issuing senior certificates and subordinate certificates, the trust has increased the likelihood that senior certificateholders will receive regular payments of interest and principal.

*Id.* at S-9-10; *see also* Appendix, Chart L.

183.     ***Misstated and Omitted Information:*** The above statements regarding credit enhancement failed to disclose that the Originators systematically disregarded their underwriting and appraisal standards and thus the supposed credit enhancement was deficient.  Further, they failed to disclose that the level of credit enhancement for each certificate lacked reasonable basis and was inaccurate since the Rating Agencies' models were based on inaccurate information and did not accurately reflect the performance of the underlying mortgage loans.

IX.     THE OFFERING DOCUMENTS CONTAINED
        MATERIAL  MISSTATEMENTS AND OMISSIONS
        REGARDING THE CERTIFICATES' RATINGS

184.     The Offering Documents stated that the Certificates' ratings "address the likelihood of the receipt by certificateholders of all distributions to which the certificateholders are entitled.  These ratings address the structural, legal and issuer-related aspects associated with the certificates and notes, the nature of the underlying mortgage assets and the credit quality of the guarantor, if any."   The Offering Documents also stated that "[i]t is a condition to the issuance of each class of Offered Certificates that it receives at least the ratings set forth below from S&P and Moody's."  *See* BSMF Series 2006-AR1 filed July 28, 2006, at S-2; *see also generally,* Appendix, Chart M.   As detailed below, the representations in the Offering

Documents about the Certificates' ratings were materially untrue and omitted facts necessary to make them not misleading.

185.    All of the ratings set forth in all of the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3) and S&P (AAA through BBB) and the vast majority of Certificate classes received the highest rating of AAA.  In fact, Moody's assigned AAA ratings to 91.1%, or $13.16 billion, of the $14.45 billion of Certificates it rated (91%).  S&P assigned AAA ratings to 91.4%, or $16.05 billion, out of the $17.56 billion of Certificates it rated (100%).  The ratings were based in large part on the representations in the Offering Documents regarding the originators' purported compliance with underwriting guidelines.  As discussed above, these representations were mischaracterized in light of the undisclosed systemic disregard for the stated underwriting standards.  Additionally, the Rating Agencies used models that were based primarily on the performance of fixed interest loans and failed to consider the performance of subprime, Alt-A, no- or limited documentation loans, or loans with interest only, option ARM and negative amortization provisions.

186.    As a result, the Certificates' ratings were unjustifiably high, lacked reasonable basis and did not accurately reflect the Certificates' true risk.  The Certificates were therefore secured by assets that had a much greater risk profile than represented.  Despite their investment-grade ratings, the Certificates were far riskier than other investments with the same ratings.  This caused Plaintiffs and the Class to pay more for the Certificates than they were worth at the time of the suit.

187.    During Moody's September 2007 "Town Hall Meeting," hosted by Moody's Managing Director, Raymond McDaniel, executives at Moody's acknowledged that the Rating Agencies used inaccurate data to form their ratings:

We're on notice that a lot of things that we relied on before just weren't true...
[W]e relied on reps and warrantees that no loans were originated in violation of
any state or federal law.  We know that's a lie.

*       *       *

There's a lot of fraud that's involved there, things that we didn't see ...  We're sort
of retooling those to make sure that we capture a lot of the things that we relied on
in the past that we can't rely on, on a going forward basis.

*       *       *

[W]e're being asked to figure out how much everybody lied. ... [I]f all of the
information was truthful and comprehensive and complete, we wouldn't have an
issue here ...

What we're really being asked to do is figure out how much lying is going on and
bake that into a credit ... which is a pretty challenging thing to do.  I'm not sure
how you tackle that from a modeling standpoint.

Moody's Town Hall Meeting Transcript, at 16, 58-59.

188.    An April 2008 issue of *Mortgage Banking* explained that the Rating Agencies'

models used statistical assumptions that were heavily based on the performance of 30-year fixed

prime mortgage loans – which were not the kinds of mortgages that were typically securitized

during the housing boom.  Indeed, as summarized above, the loans in the pools here are largely

subprime and Alt-A mortgages:

S & P's Coughlin admits that "assumptions that went into decision-making [on
credit ratings] were informed by what had happened in the past," and yet in this
instance "previous loss data proved to be much less of a guide to future
performance."

But why?  Drexel University's Mason believes it's because the CRAs relied on
statistical models that were misleading, at best.  "I think their [credit-rating]
methodologies were demonstrably insufficient," he says.

"Unlike the traditional rating processes for single-named issuers, which rely on
empirical analysis at their core, structured-finance rating analysis is essentially
driven by statistical models," write Mason and Rosner in their paper.  And the
data that the rating agencies used when evaluating mortgage-backed securities--
including those backed by subprime mortgages--were heavily biased by over-
reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a
subprime loan, as Mason explains during an interview, is a very different animal.

75

"This is not your historical mortgage loan," he says.  "This is more like a credit-card loan."  Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

189.    In an article appearing in *The New York Times* on April 8, 2008, entitled "Triple A Failure," *The New York Times* took note of Moody's April 2007 disclosure that it was "revising" its model which had not been revised since 2002:

In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages.  It noted that the model "was first introduced in 2002.  Since then, the mortgage market has evolved considerably."  This was a rather stunning admission; its model had been based on a world that no longer existed.

190.    The article explained that when Moody's had analyzed subprime delinquency data in 2007 it had found trends that its 2002 model never accounted for:

Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined.  This was rather intuitive; Moody's simply hadn't reckoned on it.  Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time.  Translation: even people with good credit scores were defaulting.  Amy Tobey, leader of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets."  Indeed.  And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them.  Homeowners' equity had never been as high as believed because appraisals had been inflated.

191.    On October 22, 2008, the United States House of Representatives Committee on Oversight and Government Reform (the "House Oversight Committee") heard testimony from Frank Raiter (the "Raiter Testimony"), the former Managing Director and head of Residential Mortgage-Backed Securities at S&P from March 1995 through April 2005.  Raiter testified that the ratings on S&P deals turn in part on the credit rating of the individual mortgages.  It was from this credit analysis that S&P determined (1) the expected default probability of a loan and (2) the loss that would occur in the event of a default which, in turn, was used to establish the

amount of AAA bonds that could be issued against the pool and the amount of equity or "credit enhancement" needed to protect the AAA bonds from experiencing losses:

> A mortgages backed security consists of a pool of individual mortgage loans. Depending on the type of mortgage product (i.e., prime-jumbo, subprime, Alt-A or HEL) underlying a given security, the pool could consist of 1,000 to 25,000 loans. The ratings process consists of two distinct operations – the credit analysis of individual mortgages and a review of the documents governing the servicing of loans and the payments to investors in the securities.

> ***The credit analysis is focused on determining the expected default probabilities on each loan and the loss that would occur in the event of a default.*** These, in turn, establish the expected loss for the entire pool and determine the amount of AAA bonds that can be issued against the pool. It is analogous to your equity position in your home and the underlying mortgage. The loss estimate determines the equity needed to support the bond – it is intended to protect the AAA bonds from experiencing any losses, much the same as the homeowner's equity stake in a house protects the lender from loss in the mortgage loan.

Raiter Testimony at 3 (emphasis added).

192.    Raiter testified that in 1995, S&P developed a sophisticated model to estimate the default and loss of individual loans and pools – a model based on approximately 500,000 loans with performance data going back five or more years. This "LEVELS" Model was updated in early 1999 based on a database of 900,000 loans. Raiter testified further that ***"[i]t was critical to maintain the best models as they were the linchpin of the rating process."*** Raiter Testimony at 4 (emphasis added). In 2003 and 2004, S&P updated its model based on approximately 9.5 million loans ***"cover[ing] the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories."*** *Id.* S&P did not implement this updated model in its ratings of the Certificates at issue here.

193.    As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market." S&P's current President, Deven Sharma, agreed with

Raiter's explanation in his own testimony in front of the House Oversight Committee on October 22, 2008, noting: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work … [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

194.     Executives at Moody's also acknowledged the failure of Moody's ratings models to capture the decrease in lending standards.  In a confidential presentation to Moody's Board of Directors from October 2007, released by the House Oversight Committee on October 22, 2008 during the Committee's "Hearing on the Credit Agencies and the Financial Crisis" (the "House Oversight Committee Hearing"),[3] Raymond McDaniel, the current Chairman and CEO of Moody's, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment."   McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape.  *Id.*   Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized that Moody's did not incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decrease in underwriting standards]."

195.     On October 28, 2008, former Moody's Managing Director Jerome S. Fons testified before the House Oversight Committee.  Fons testified that issuers of structured securities were free to shop around for the rating agency that would give them the highest rating and "typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality."   Fons noted that the rating agencies' "drive to maintain or expand

---

[3]  All exhibits released by the House Oversight Committee from the Committee's "Hearing on Credit Agencies and the Financial Crisis" can be found on the Committee's website at www.oversight.house.gov.

market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  Fons said it was this business model that "prevented analysts from putting investor interests first."

196.    On July 8, 2008, the SEC issued a Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies ("July 2008 Report").  The SEC's Summary Report found flaws in the rating agencies' procedures with respect to rating MBS products, including:

- Relevant ratings criteria were not disclosed;

- None of the rating agencies examined had specific written procedures for rating RMBS and CDOs;

- The rating agencies did not always document significant steps in the rating process – including the rationale for deviations from their models and for rating committee actions and decisions – and they did not always document significant participants in the ratings process;

- Rating agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies;

- The rationale for deviations from the model or out-of-model adjustments was not always documented in deal records.  As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating; and

- There was a lack of documentation of rating agency committee actions and decisions.

197.    The SEC further noted that there were only a limited number of investment banks who performed the underwriting function in many of the MBS which the rating agencies rated:

> there is a high concentration in the firms conducting the underwriting function.  Based on data provided by the three rating agencies examined, the Staff reviewed a sample of 642 deals.  While 22 different arrangers underwrote subprime RMBS deals, ***12 arrangers accounted for 80% of the deals, in both number and dollar volume***…In addition, 12 of the largest 13 RMBS underwriters were also the 12 largest CDO underwriters,

further concentrating the underwriting function, as well as the sources of the rating agencies' revenue stream.

X.     THE CLAIMS IN THE AMENDED COMPLAINT ARE TIMELY

198.     This action is brought within one year of the discovery of the untrue statements and omissions contained in the Offering Documents and within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Plaintiffs lacked actual knowledge of the violations, and a reasonably diligent investor would not have discovered the violation within one year of when the applicable complaint was filed.  Investors do not have access to loan files, and are not provided with the same loan-level information that Bear Stearns and the other Defendants had.

199.     The initial investment-grade rating and the dates of downgrade to below investment-grade are significant to when a reasonable investor even arguably may have discovered a Securities Act violation.  As summarized above, almost 95% – over $15.3 billion – of the Certificates in this case were assigned AAA ratings, indicating the highest quality and the smallest degree of investment risk.  ¶11.  The "AAA" rating indicated "maximum safety" because these Certificates were generally the first to receive payments and the last to incur losses.  ¶¶7, 8, 41.  Additionally, the Offering Documents represented that the AAA Certificates had "protection" in the form of subordination and credit enhancement.  ¶¶41, 181-83.

200.     Defendants structured the Certificates to obtain the greatest percentage of AAA-rated Certificates possible in order to market them to institutional investors, such as pension funds, which are often prohibited from purchasing and holding non-investment-grade securities.  ¶8.  The AAA ratings were critical to the Certificates' issuance because regulations required many institutional investors, such as banks, mutual funds, and public pension funds, to hold only "investment-grade" securities.  Indeed, the Offering Documents stated that "[t]he depositor

80

anticipates that the securities will be sold primarily to institutional investors … " *Id.* Plaintiffs – who are all institutional investors – only purchased Certificates initially rated AAA. ¶¶17-24.

201.   The original complaint in this action was filed August 20, 2008, and asserted claims on behalf of Certificate purchasers in the BSMF 2006-AR1 Offering.   No AAA Certificate in the BSMF 2006-AR1 Offering was downgraded to below investment-grade until, at the earliest, June 19, 2008.   The First Consolidated Amended Securities Class Action Complaint ("FAC") in this action was filed May 15, 2009, and asserted claims on behalf of Certificate purchasers in all Offerings "issued pursuant and/or traceable to" Registration Statements Nos. 333-131374 and 333-132232.   No AAA Certificates in these offerings were downgraded to below investment-grade until, at the earliest, June 19, 2008.   The Pension Trust Complaint ("PAC") in this action was filed July 9, 2009, and asserted claims on behalf of Certificate purchasers in all Offerings "issued pursuant and/or traceable to" Registration Statement No. 333-132232.   All claims related to these Certificates were previously asserted in the FAC.   No AAA Certificates in these offerings were downgraded to below investment-grade until, at the earliest, August 27, 2008.

202.   Moreover, the table below shows that none of the Certificates the Plaintiffs purchased were downgraded to below investment-grade more than a year before they were included in a complaint in this action:

| Plaintiff(s) | Offering | Date First Included In Complaint | First Downgrade To Below Investment-Grade |
|---|---|---|---|
| New Jersey IPERS | BSMF 2006-AR1 | August 2, 2008 | June 19, 2008 February 23, 2009 |
| Boilermakers | SAMI 2006-AR5 | May 15, 2009 | September 8, 2008 |
| Boilermakers Mississippi PERS | SAMI 2006-AR6 | May 15, 2009 | September 8, 2008 February 23, 2009 |

| Plaintiff(s) | Offering | Date First Included In Complaint | First Downgrade To Below Investment-Grade |
|---|---|---|---|
| Mississippi PERS IPERS | BALTA 2006-6 | July 9, 2009 | January 30, 2009 January 30, 2009 |
| Mississippi PERS | BSARM 2006-4 | July 9, 2009 | April 6, 2009 |
| Mississippi PERS | BSARM 2007-3-1A1 BSARM 2007-3-2A1 | July 9, 2009 | April 8, 2009 |
| Detroit OPERS | BALTA 2006-8 | July 9, 2009 | January 30, 2009 January 30, 2009 |
| IPERS OPERS | BALTA 2007-1 | July 9, 2009 | October 27, 2008 January 30, 2009 |
| IPERS OPERS | SAMI 2006-AR7 | May 15, 2009 | February 23, 2009 February 23, 2009 |
| IPERS | BSABS 2007-HE3 | May 15, 2009 | May 21, 2010 |
| IPERS | BSABS 2007-HE4 | May 15, 2009 | August 4, 2009 |
| Fort Lauderdale | BSARM 2007-1 | July 9, 2009 | April 7, 2009 |
| San Antonio | BSMF 2006-AR4 | May 15, 2009 | February 23, 2009 |
| San Antonio | BSMF 2006-AR5 | May 15, 2009 | February 23, 2009 |

203.    The pendency of the complaints described in ¶201 above tolled the statute of limitations on claims related to all Plaintiffs' certificates included in this Amended Complaint. Additionally, this complaint asserts the same Securities Act claims, names the same defendants, contains substantially similar allegations and relates to the same Registration Statements and Certificate purchasers as the FAC.  The claims here arise out of the same conduct, transactions, or occurrences set forth in the FAC.

XI.    CLASS ACTION ALLEGATIONS

204.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a) and (b)(3), individually, and on behalf of a class consisting of all persons or entities who purchased or otherwise acquired beneficial interests in the Certificates identified herein issued pursuant and traceable to Structured Asset Mortgage Investments II, Inc.'s March

10, 2006 Registration Statement and/or Bear Stearns Asset Backed Securities I, LLC's March 31, 2006 Registration Statement (the "Class").

205. This action is properly maintainable as a class action for the following reasons:

a) The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

b) Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class. Accordingly, Plaintiffs are adequately representative of the Class and will fairly and adequately protect the interests of the Class.

c) The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d) A class action is superior to all other methods for a fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as

a class action.  Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

206.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

      a)    Whether Defendants violated the Securities Act;

      b)    Whether statements made by Defendants to the investing public in the Registration Statements, Prospectuses and Prospectus Supplements both omitted and misrepresented material facts about the underlying mortgages; and

      c)    The extent and proper measure of the damages sustained by the members of the Class.

**FIRST CAUSE OF ACTION**
For Violation Of § 11 Of The Securities Act
(Against Bear Stearns, J.P. Morgan Securities,
The Depositors And The Individual Defendants)

207.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Cause Of Action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Cause Of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

208.    This Cause Of Action is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against Bear Stearns, J.P. Morgan Securities, as successor-in-interest to Bear Stearns, the Depositors and the Individual Defendants.  This Cause Of Action is predicated upon Defendants' strict liability for making materially false and misleading statements in the Offering Documents.

209.   The Registration Statements were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

210.   The Individual Defendants, Bear Stearns, and the Depositors are strictly liable to Plaintiffs and the Class for making the misstatements and omissions in issuing the Certificates.

211.   The Individual Defendants each signed one or both of the Registration Statements.

212.   Bear Stearns acted as an underwriter in the sale of Certificates, directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

213.   Bear Stearns, the Depositors and the Individual Defendants owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

214.   Bear Stearns, the Depositors and each of the Individual Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

215.   Bear Stearns, the Depositors and the Individual Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the

Registration Statements, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

216.    By reason of the conduct alleged herein, the Individual Defendants, Bear Stearns, J.P. Morgan Securities, as successor-in-interest to Bear Stearns and the Depositors violated Section 11 of the Securities Act, and are liable to Plaintiffs and the Class.

217.    Plaintiffs and other Class members acquired the Certificates, set forth herein at ¶¶17-24, 38, pursuant and traceable to the Offering Documents.  At the time Plaintiffs and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

218.    Plaintiffs and other Class members have been injured and have sustained damages as a result of the wrongful conduct alleged and the violations of Bear Stearns, J.P. Morgan Securities, the Depositors and the Individual Defendants.

219.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally, from the Individual Defendants, Bear Stearns, J.P. Morgan Securities and the Depositors, as set forth in Section 11 of the Securities Act.

220.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

SECOND CAUSE OF ACTION
For Violation Of § 12(a)(2) Of The Securities Act
(Against Bear Stearns And J.P. Morgan Securities)

221.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Cause Of Action, Plaintiffs expressly exclude and disclaim any

allegation that could be construed as alleging fraud or intentional misconduct.  This Cause Of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

222.    This Cause Of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against Bear Stearns and J.P. Morgan Securities, as successor-in-interest to Bear Stearns.

223.    The Prospectuses contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

224.    Bear Stearns owed to Plaintiffs, and the other Class members who purchased Certificates pursuant to the Prospectuses, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.

225.    Plaintiffs purchased the following Certificates in the below Offerings directly from Bear Stearns in the initial offering:

| Trust | Pro. Supp. Date | Plaintiff | Purchase Date | Purchased From |
|---|---|---|---|---|
| Bear Stearns Alt-A Trust, Series 2006-6 | 9/29/2006 | Mississippi PERS | 7/26/2006 | Bear Stearns |
| Bear Stearns Alt-A Trust, Series 2006-6 | 9/29/2006 | IPERS | 10/30/2006 | Bear Stearns |
| Bear Stearns Mortgage Funding, Series 2006-AR1 | 8/1/2006 | New Jersey Carpenters | 10/2/2006 | Bear Stearns |
| Bear Stearns Mortgage Funding, Series 2006-AR1 | 7/28/2006 | IPERS | 7/20/2006 | Bear Stearns |
| Bear Stearns Asset Backed Securities, Series 2007-HE4 | 4/26/2007 | IPERS | 4/13/2007 | Bear Stearns |
| Bear Stearns Alt-A Trust, Series 2007-1 | 1/29/2007 | OPERS | 1/24/2007 | Bear Stearns |
| Structured Asset Mortgage Investments II, Series 2006-AR7 | 8/31/2006 | OPERS | 7/10/2006 | Bear Stearns |

Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectuses.

226.    By reason of the conduct alleged herein, Bear Stearns and J.P. Morgan Securities, as successor-in-interest to Bear Stearns, violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiffs and other Class members who purchased Certificates pursuant to the Prospectuses.

227.    Plaintiffs and other Class members were damaged by Bear Stearns' wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

228.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements in the Offering Documents at an earlier time.

THIRD CAUSE OF ACTION
Violations Of § 15 Of The Securities Act (Against The Individual
Defendants, Bear Stearns And J.P. Morgan Securities)

229.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Cause of Action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Cause Of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

88

230.    This cause of action is brought against the Individual Defendants, Bear Stearns and J.P. Morgan Securities, as successor-in-interest to Bear Stearns as controlling persons, pursuant to Section 15 of the Securities Act.  The Individual Defendants and Bear Stearns, by virtue of his, her or its control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of the Depositors within the meaning of Section 15 of the Securities Act.  The Individual Defendants and Bear Stearns had the power to influence, and exercised that power and influence, to cause the Depositors to engage in violations of the Securities Act, as described above.   The Offering Documents explicitly stated that the Depositors were wholly-owned subsidiaries of Bear Stearns, and were "organized for the sole purpose of serving as a private secondary mortgage market conduit."  J.P. Morgan Securities is the successor-in-interest to Bear Stearns.  The Individual Defendants' and Bear Stearns' control, ownership and position made them privy to the material facts concealed from Plaintiffs and other Class members.

231.    By virtue of their wrongful conduct, the Individual Defendants, Bear Stearns and J.P. Morgan Securities, as successor-in-interest to Bear Stearns, are liable to Plaintiffs and other Class members for their sustained damages.

RELIEF REQUESTED

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a)    Declaring this action properly maintainable as a class action and certifying Plaintiffs as Class representative;

b)    Awarding compensatory and/or rescissory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

89

c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d)     Such other relief as the Court may deem just and proper.

<u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury.

Dated: October 29, 2010

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: _____
JOEL P. LAITMAN

Joel P. Laitman (JL-8177)
Christopher Lometti (CL-9124)
Daniel B. Rehns (DR-5506)
Kenneth M. Rehns (KR-9822)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstein.com*
*drehns@cohenmilstein.com*
*krehns@cohenmilstein.com*

Steven J. Toll *(admitted pro hac vice)*
Daniel S. Sommers *(admission pending)*
S. Douglas Bunch (SB-3028)
1100 New York Avenue, NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*stoll@cohenmilstein.com*
*dsommers@cohenmilstein.com*
*dbunch@cohenmilstein.com*

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**

By: _____
DAVID R. STICKNEY

90

DAVID R. STICKNEY *(admitted pro hac vice)*
TIMOTHY A. DeLANGE *(admitted pro hac vice)*
MATTHEW P. JUBENVILLE *(admitted pro hac vice)*
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:     (858) 793-0070
Fax:     (858) 793-0323
*davids@blbglaw.com*
*timothyd@blbglaw.com*
*matthewj@blbglaw.com*

-and-

DAVID WALES
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:     (212) 554-1400
Fax:     (212) 554-1444
*dwales@blbglaw.com*

*Counsel for Plaintiffs and the Proposed Class*


**KOHN, SWIFT & GRAF, P.C.**
JOSEPH C. KOHN
DENIS F. SHEILS
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel:     (215) 238-1700
Fax:     (215) 238-1968
*jkohn@kohnswift.com*
*dsheils@kohnswift.com*

*Additional Counsel for Plaintiff the Police and
Fire Retirement System of the City of Detroit*

## CERTIFICATION OF BEAR STEARNS MORTGAGE-BACKED
## SECURITIES CLASS ACTION COMPLAINT

I, George R. Laufenberg, Jr., hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Administrative Manager of the New Jersey Carpenters Health Fund (the "Fund").

2. I have reviewed the Third Consolidated Amended Securities Class Action Complaint in this case (the "Complaint"), and authorize the filing thereof.

3. The Fund is willing to continue to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4. During the Class Period (as defined in the Complaint), the Fund purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

5. The Fund did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6. During the three-year period preceding the date of my signing this Certification, the Fund has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act except *New Jersey Carpenters Health Fund v. Home Equity Mortgage Trust 2006-5, et al.,* S.D.N.Y. Docket No. 08-cv-05653, *New Jersey Carpenters Health Fund v. Lehman XS Trust Series 2005-5N, et al.,* S.D.N.Y. Docket No. 08-cv-06762, *New Jersey Carpenters Health Fund v. NovaStar Mortgage Funding Trust, Series 2006-3, et al.,* S.D.N.Y. Docket No. 08-cv-05310, and *New Jersey Carpenters Health Fund v. RALI Series 2006-QO1 Trust, et al.,* S.D.N.Y. Docket No. 08-cv-08781.

7.      The Fund will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to its representation of the Class.

Signed under the penalties of perjury, this _27_ day of October 2010.

George R. Laufenberg, Jr., on behalf of the
New Jersey Carpenters Health Fund

## SCHEDULE A

| Security Description | Transaction Date | Transaction Description | Price | Quantity |
|---|---|---|---|---|
| BSMF 2006-AR1 | 10/02/2006 | Buy | $0.9997 | 145,000.000 |

CERTIFICATION OF BEAR STEARNS MORTGAGE FUNDING
TRUST SECURITIES CLASS ACTION COMPLAINT

I, Mario Rodriguez, on behalf of the Boilermaker Blacksmith National Pension Trust (the "Trust"), hereby certify that the following, is true and correct to the best of my knowledge, information and belief:

1.     I have reviewed the Third Consolidated Amended Class Action Complaint (the "Complaint") and authorize the filing of this Certification on behalf of the Trust.

2.     The Trust is willing to continue to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

3.     During the Class Period (as defined in the Complaint), the Trust purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

4.     The Trust did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.     During the three-year period preceding the date of my signing this Certification, the Trust has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act except in *In re Societe Generale Securities Litigation*, S.D.N.Y. Docket No. 08-CV-2495; *Boilermaker Blacksmith National Pension Trust v. Wells Fargo Mortgage-Backed Securities 2006 AR-1 Trust, et al.*, S.D.N.Y. Docket No. 09-CV-833; *In re Lehman Brothers Mortgage-Backed Securities Litigation*: 08-CV-6762 and 08-CV-10686, consolidated Civ. No. 09-2017; *New Jersey Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4, et al.*, S.D.N.Y. Docket No. 08-CV-5093; *New Jersey Carpenters Health Fund v. RALI Series 2006-QO1 Trust, et al.*, S.D.N.Y. Docket No. 08-cv-08781; *and New Jersey Carpenters Vacation Fund v. Bear Stearns Mortgage Funding Trust 2006-AR1, et al.*, S.D.N.Y. Docket No. 08-CV-8093.

6.     The Trust will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to their representation of the Class.

Signed under the penalties of perjury, this 26th day of October 2010.

Mario Rodriguez, on behalf of Boilermaker Blacksmith
National Pension Trust

## SCHEDULE A

| Security Description | Transaction Date | Transaction Description | Price | Quantity |
|---|---|---|---|---|
| SAMI 2006-AR5 | 11/29/2007 | Buy | $0.9581 | 269,114.44 |
| SAMI 2006-AR5 | 01/09/2008 | Sell | $0.9350 | 250,808.69 |
| | | | | |
| SAMI 2006-AR5 | 11/29/2007 | Buy | $0.9575 | 235,696.47 |

| Security Description | Transaction Date | Transaction Description | Price | Quantity |
|---|---|---|---|---|
| SAMI 2006-AR6 | 11/29/2007 | Buy | $0.9578 | 2,423,365.66 |
| | | | | |
| BSABS 2007-HE1 | 08/28/2008 | Buy | $0.5506 | 2,600,000.00 |

## CERTIFICATION OF THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT

I, Ronald Zajac, General Counsel of the Police and Fire Retirement System of the City of Detroit, hereby declare that:

1.       I am authorized to make certification on behalf of the Police and Fire Retirement System of the City of Detroit ("PFRS").

2.       I have reviewed the complaint prepared by counsel and have authorized its filing.

3.       PFRS did not purchase the securities that are the subject of this action at the direction of the plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

4.       PFRS is willing to serve as representative party on behalf of a class, including providing testimony at deposition and trial if necessary.  PFRS fully understands the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act regarding its options as to selection and retention of counsel and overseeing the prosecution of the action for the class.

5.       During the proposed class period PFRS executed the following transactions in the Bear Stearns Alt-A Trust 2006-8 mortgage-backed securities that are the subject of this action:

Bear Stearns Zajac Cert  (00066872-2)

Transaction in Bear Stearns Alt-A Trust 2006-8

| CUSIP NO. | Transaction | Date | Quantity | Purchase Price |
|---|---|---|---|---|
| 07387QAM2 | Purchase | 5/8/2008 | $2,500,000.00 | $1,532,798.04 |

| CUSIP NO. | Transaction | Date | Quantity | Sale Price |
|---|---|---|---|---|
| 07387QAM2 | Sale | 4/8/2009 | $2,500,000.00 | $547,323.21 |

6.    PFRS has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

> In re WSB Financial Group Securities Litigation, Case No. 07-cv-1747 (W.D. Wash.)

> In re SiRF Technology Holdings, Inc. Securities Litigation, Case No. 08-cv-856 (N.D.Cal.)

> City of Roseville Employees' Retirement System v. Horizon Lines, Inc., et al., Case No. 08-969 (D.Del.).

7.    PFRS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

> In re Aetna, Inc. Securities Litigation, Case No. 07-cv-4451 (E.D. Pa.)

> In re Verifone Holdings, Inc. Securities Litigation, Case No. 07-cv-6140 (N.D.Cal.)

> In re UBS AG Securities Litigation, Case No. 07-cv-11225 (S.D.N.Y.)

> Washington Mutual Inc., Securities, Derivative & "ERISA" Litigation, Case No. 08-md-01919 (W.D. Wash.)

<u>In re Societe Generale Securities Litigation</u>, Case No. 08-cv-2495 (S.D.N.Y.)

<u>In re Gildan Active Wear Securities Litigation</u>, Case No. 08-cv-5048 (S.D.N.Y.)

<u>N.O. Employees Retirement System v. UBS AG, et. al.</u>, Case No. 09-cv-893 (S.D.N.Y.)

<u>In re IndyMac Mortgage-Backed Securities Litigation</u>, Case No. 09-cv-4583 (S.D.N.Y.)

In the foregoing cases, PFRS either withdrew its motion in deference to an institutional investor with a larger loss or an investor with a greater financial interest was chosen over PFRS to serve as lead plaintiff.

8.      PFRS has filed a complaint as a representative party in <u>Police and Fire Retirement System of the City of Detroit v. Goldman Sachs & Co. et al.</u>, Case No. 10-cv-04429 (S.D.N.Y.) and intends to file a motion for lead plaintiff in the future.

9.      PFRS sought to serve as lead plaintiff and representative party in <u>Southeastern Pennsylvania Transportation Authority v. Lehman Brothers Holdings, Inc. et al.</u>, Case No. 08-cv-2431 (N.D. Ill.), but withdrew its motion in favor of competing movants who were subsequently appointed Lead Plaintiff.  PFRS is now serving as a named plaintiff and proposed representative party in the amended complaint in <u>In re Lehman Brothers Equity/Debt Securities Litigation</u>, Case No. 08-cv-5523 (S.D.N.Y.).

10.      PFRS will not accept any payment for serving as a representative party on behalf of a class beyond its pro-rata share of any recovery, except as ordered or approved by the court, including any award to a representative plaintiff of reasonable costs and expenses, (including lost wages), directly related to representation of the class.

11.     I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8th day of October, 2010

Ronald Zajac
General Counsel
Police and Fire Retirement System
    of the City of Detroit

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, Frederick M. Boss, Chief Counsel, Civil Enforcement Division, for Oregon Public Employees' Retirement System ("OPERS" or "Plaintiff"), declare, on behalf of Plaintiff as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the Third Consolidated Amended Class Action Complaint asserting securities claims on behalf of purchasers of certain Certificates issued pursuant to Structured Asset Mortgage Investments II, Inc.'s March 10, 2006 Registration Statement and/or Bear Stearns Asset Backed Securities I, LLC's March 31, 2006 Registration Statement, and wish to join as a plaintiff retaining Cohen Milstein Sellers & Toll PLLC as my counsel.

2.    Plaintiff did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Based upon information and belief, Plaintiff's transactions in the securities that are the subject of this action were as indicated on Schedule A, attached hereto.

5.    In the three-year period preceding the date of this Certificate, Plaintiff sought to serve, and as a representative party on behalf of the class in *In re UBS AG Securities Litigation,* Master File No. 1:07-CV-11225-RJS (S.D.N.Y.), but the application was withdrawn prior to any decision because the action was deemed related to an earlier-filed case and was thus consolidated.    Plaintiff was thereafter named as an additional (not-lead) plaintiff in the consolidated action.    Similarly Plaintiff was named as an addition (not-lead) plaintiff in *Maine State Ret. Sys. v. Countrywide Financial Corporation et. al.,* No. 2:10-cv-00302-MRP-MAN (C.D. Cal.). During the three-year period preceding the date of this Certificate, Plaintiff has not served as a representative party for a class in any action under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of October 2010.

> The State of Oregon, by and through the
> Oregon State Treasurer and the Oregon
> Public Employee Retirement Board on
> behalf of the Oregon Public Employee
> Retirement Fund
>
> _____
> Frederick M. Boss
> Chief Counsel
> Civil Enforcement Division

## SCHEDULE A

| Security Description | Transaction Date | Transaction Description | Price | Quantity | Transaction Amount |
|---|---|---|---|---|---|
| BALTA 2007-1 | 1/24/2007 | Buy | 1.0000 | 21,265,000.00 | $21,265,000.00 |
| | | | | | |
| BALTA 2006-8 | 12/19/2006 | Buy | 0.9998 | 5,700,000.00 | $5,698,886.73 |
| | 12/19/2006 | Buy | 0.9998 | 3,000,000.00 | $2,999,414.07 |
| | 12/20/2006 | Buy | 0.9998 | 3,000,000.00 | $2,999,414.07 |
| | 3/24/2008 | Sell | 0.6500 | 5,350,599.00 | $3,477,889.64 |
| | | | | | |
| SAMI 2006-AR5 | 9/19/2007 | Buy | 0.9711 | 190,882.41 | $185,364.72 |
| | | | | | |
| SAMI 2006-AR5 | 9/19/2007 | Buy | 0.9720 | 252,149.00 | $245,096.71 |
| | 1/8/2008 | Sell | 0.9350 | 234,714.02 | $219,457.60 |
| | | | | | |
| SAMI 2006-AR6 | 9/19/2007 | Buy | 0.9714 | 374,542.92 | $363,833.34 |
| | 4/1/2009 | Sell | 0.3600 | 58,521.09 | $21,067.60 |
| | | | | | |
| SAMI 2006-AR6 | 9/5/2007 | Buy | 0.9714 | 94,907.58 | $72,766.67 |
| | | | | | |
| SAMI 2006-AR7 | 7/10/2006 | Buy | 0.9997 | 24,790,000.00 | $24,783,221.42 |
| | 1/11/2010 | Sell | 0.5875 | 10,034,019.00 | $5,894,986.19 |

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, Gregg A. Schochenmaier, on behalf of the Iowa Public Employees' Retirement System ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed a class action complaint asserting securities claims on behalf of purchasers of certain Certificates issued pursuant to Structured Asset Mortgage Investments II, Inc.'s March 10, 2006 Registration Statement and/or Bear Stearns Asset Backed Securities I, LLC's March 31, 2006 Registration Statement, and wish to join as a plaintiff retaining Cohen Milstein Sellers & Toll PLLC as my counsel.

2.      Plaintiff did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in the securities that are the subject of this action were as indicated on Schedule A, attached hereto.

5.      In the three-year period preceding the date of this Certification, IPERS is currently seeking to serve, has sought to serve and was not appointed and/or sought to serve and is currently serving, as a representative party on behalf of the class in *Rubin v. MF Global, Ltd.*, No. 08-cv-2233 (VM) (S.D.N.Y.) (filed Mar. 6, 2008); *Maine State Ret. Sys. v. Countrywide Financial Corporation, et al.*, No. 10-cv-302-MRP-MAN (C.D. Cal.) (filed Jan. 14, 2010); *In re The Mills Corp. Sec. Litig.*, No. 06-cv-77-LO-TRJ (E.D. Va.) (filed Jan. 20, 2006); *Monroe Ret. Sys. v. Bridgestone Corp.*, No. 01-cv-17 (M.D. Tenn.) (filed Jan. 4, 2001); *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group plc, et al.*, No. 08-cv-5093-HB (S.D.N.Y.) (filed May 14, 2008); *New Jersey Carpenters Health Fund v. RALI Series 2006-QO1 Trust, et al.*, No. 08-cv-8781-HB (S.D.N.Y.) (filed Sept. 22, 2008); *In re Lehman Brothers Mortgage-Backed Sec. Litig.*, No. 08-cv-6762-LAK, Master File No. 09-md-2017 (filed July 23, 2008); *In re IndyMac Mortgage-Backed Securities Litig.*, No. 09-cv-4583 (LAK).

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of  October 2010.

Gregg A. Schochenmaier

## SCHEDULE A

| Security Description | Transaction Date | Transaction Description | Price | Quantity | Transaction Amount |
|---|---|---|---|---|---|
| BSABS 2007-HE3 | 5/8/2007 | Buy | 1.0000 | 6,609,254.00 | $ 6,609,512.12 |
|  | 7/30/2007 | Sell | 0.9969 | 6,149,726.49 | $ 6,130,508.61 |
|  |  |  |  |  |  |
| BSABS 2007-HE4 | 4/13/2007 | Buy | 1.0000 | 5,719,000.00 | $ 5,719,000.00 |
|  | 10/10/2008 | Sell | 0.8700 | 3,677,114.84 | $ 3,199,053.14 |
|  |  |  |  |  |  |
| BALTA 2007-1 | 6/20/2008 | Buy | 0.6506 | 4,849,096.09 | $ 3,154,943.14 |
|  |  |  |  |  |  |
| SAMI 2006-AR7 | 8/10/2007 | Buy | 0.9788 | 5,222,344.00 | $ 5,111,369.19 |
|  | 1/29/2008 | Sell | 0.9162 | 4,652,379.33 | $ 4,262,742.51 |
|  |  |  |  |  |  |
| BSMF 2006-AR1 | 7/20/2006 | Buy | 1.0000 | 5,500,000.00 | $ 5,500,000.00 |
|  |  |  |  |  |  |
| BALTA 2006-6 | 10/31/2006 | Buy | 1.0000 | 2,964,309.00 | $ 2,964,309.00 |
|  | 10/30/2009 | Sell | 0.4708 | 1,259,017.38 | $ 592,721.80 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Michael Dew, on behalf of City of Fort Lauderdale Police & Fire Retirement System ("Fort Lauderdale"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Fort Lauderdale. Fort Lauderdale has retained Bernstein Litowitz Berger & Grossmann LLP in connection with this action. I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2. Fort Lauderdale did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Fort Lauderdale is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Fort Lauderdale's transactions in the Bear Stearns Pass-Through securities that are the subject of this action are set forth in the chart attached hereto.

5. Fort Lauderdale has not sought to serve as a lead plaintiff and representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Fort Lauderdale will not accept any payment for serving as a representative party on behalf of the Class beyond Fort Lauderdale's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of October, 2010.

Michael Dew
Chairman
*City of Fort Lauderdale*
*Police & Fire Retirement System*

City of Fort Lauderdale Police and Fire Retirement System
Transactions in Bear Stearns Pass-Through securities

**Bear Stearns ARM Trust 2007-1 2A1**
**CUSIP# 073880AD8**

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 4/26/2007 | 929,009.51 | 100.0312 |
| Purchase | 5/16/2007 | 485,946.78 | 99.8438 |
| Sale | 11/3/2009 | (955,190.52) | 62.3750 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Warren J. Schott, on behalf of the San Antonio Fire & Police Pension Fund ("San Antonio"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director and Chief Investment Officer of San Antonio. I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2. San Antonio did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. San Antonio is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. San Antonio's transactions in the Bear Stearns Pass-Through securities that are the subject of this action are set forth in the chart attached hereto.

5. San Antonio has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re Tronox, Inc., Securities Litigation,* Case No. 09-cv-6220 (S.D.N.Y.)

6. San Antonio has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

   *In re Sterling Financial Corporation Securities Litigation,* Case No. 07-cv-2171 (E.D. Pa.)
   *In re The Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation,*
   Case No. 08-cv-2793 (S.D.N.Y.)

7. San Antonio will not accept any payment for serving as a representative party on behalf of the Class beyond San Antonio's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this **28** day of October, 2010.

_Warren J. Schott_
Warren J. Schott
Executive Director and Chief Investment Officer
*San Antonio Fire & Police Pension Fund*

San Antonio Fire & Police Pension Fund
Transactions in Bear Stearns Pass-Through securities

**Bear Stearns Mortgage Funding Trust 2006-AR4 A1**
**CUSIP# 07401JAA6**

| Transaction | Date | Face Amount | Par Value |
|-------------|------|-------------|-----------|
| Purchase | 10/27/2006 | 1,000,000.00 | 100.0000 |
| Sale | 1/28/2010 | (679,789.85) | 50.4500 |

**Bear Stearns Mortgage Funding Trust 2006-AR5 2A1**
**CUSIP# 07401NAP4**

| Transaction | Date | Face Amount | Par Value |
|-------------|------|-------------|-----------|
| Purchase | 12/15/2006 | 500,000.00 | 100.0000 |
| Sale | 5/18/2010 | (344,778.00) | 53.0000 |

**IN RE BEAR STEARNS MORTGAGE
PASS-THROUGH CERTIFICATES LITIGATION**


**APPENDIX TO THIRD CONSOLIDATED
<u>AMENDED CLASS ACTION COMPLAINT</u>**

## CHART A

### EMC Underwriting Guidelines

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE4 | *See* "General" | BSMF 2006-AR5 | S-30-31 |
| BSMF 2006-AR1 | S-31-32 | BALTA 2006-6 | S-55-57 |
| BSMF 2006-AR4 | S-24-25 | BALTA 2006-8 | *37 |
| | | BALTA 2007-1 | S-43-45 |

## CHART B

### EMC Underwriting Guidelines

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE4 | *See* "General" | BSMF 2006-AR5 | S-32 |
| BSMF 2006-AR1 | S-32 | BALTA 2006-6 | S-55-57 |
| BSMF 2006-AR4 | S-25-26 | BALTA 2006-8 | *37 |
| | | BALTA 2007-1 | S-43-45 |

## CHART C

### EMC Underwriting Guidelines

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE4 | *See* "General" | BSMF 2006-AR5 | S-31 |
| BSMF 2006-AR1 | S-32 | BALTA 2006-6 | S-55-57 |
| BSMF 2006-AR4 | S-25-26 | BALTA 2006-8 | *37-38 |
| | | BALTA 2007-1 | S-43-45 |

## CHART D

### Bear Stearns Residential Mortgage Underwriting Guidelines

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE4 | *40 | BSMF 2006-AR4 | 25 |
| BSMF 2006-AR1 | S-33 | BSMF 2006-AR5 | S-32 |

## CHART E

### Bear Stearns Residential Mortgage Underwriting Guidelines

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE4 | *41 | BSMF 2006-AR4 | 27 |
| BSMF 2006-AR1 | S-36 | BSMF 2006-AR5 | S-35 |

## CHART F

### Bear Stearns Residential Mortgage Underwriting Guidelines

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE4 | *41 | BSMF 2006-AR4 | 26-27 |
| BSMF 2006-AR1 | S-34-35 | BSMF 2006-AR5 | S-33-35 |

## CHART G

### Countrywide Underwriting Guidelines

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| SAMI 2006-AR6 | S-42-44 | BALTA 2007-1 | 27-28 |
| SAMI 2006-AR7 | S-44-46 | BSARM 2006-4 | S-43 |
| BALTA 2006-6 | 35 | BSARM 2007-1 | S-41-43 |
|  |  | BSARM 2007-3 | 35-36 |

## CHART H

### Countrywide Underwriting Guidelines

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| SAMI 2006-AR6 | S-44 | BALTA 2006-7 | 29 |
| SAMI 2006-AR7 | S-46 | BSARM 2006-4 | S-47 |
| BALTA 2006-6 | 36 | BSARM 2007-1 | S-43 |
|  |  | BSARM 2007-3 | 36 |

## CHART I

### Countrywide Underwriting Guidelines

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| SAMI 2006-AR6 | S-45-47 | BALTA 2006-7 | 30-31 |
| SAMI 2006-AR7 | S-47-49 | BSARM 2006-4 | S-48 |
| BALTA 2006-6 | 37-38 | BSARM 2007-1 | S-44-46 |
|  |  | BSARM 2007-3 | 37-39 |

## CHART J

### Loan-To-Value Ratio Misstatements/Omissions

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE3 | A-1 | SAMI 2006-AR7 | A-2 |
| BSABS 2007-HE4 | *122 | BALTA 2006-6 | *89 |
| BSMF 2006-AR1 | A-9 | BALTA 2006-8 | *91 |
| BSMF 2006-AR4 | *76 | BALTA 2007-1 | *69 |
| BSMF 2006-AR5 | A-2 | BSARM 2006-4 | A-2 |
| SAMI 2006-AR5 | A-3 | BSARM 2007-1 | N/A |
| SAMI 2006-AR6 | A-2 | BSARM 2007-3 | *146 |

## CHART K

### Loan-To-Value Ratio Misstatements/Omissions

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE3 | N/A | SAMI 2006-AR7 | 57 |
| BSABS 2007-HE4 | N/A | BALTA 2006-6 | *166 |
| BSMF 2006-AR1 | S-36 | BALTA 2006-8 | *239 |
| BSMF 2006-AR4 | *27 | BALTA 2007-1 | *155 |
| BSMF 2006-AR5 | S-35 | BSARM 2006-4 | 57 |
| SAMI 2006-AR5 | S-49 | BSARM 2007-1 | S-53 |
| SAMI 2006-AR6 | 56 | BSARM 2007-3 | *238 |

## CHART L

### Credit Support Misstatements/Omissions

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE3 | S-11-12 | SAMI 2006-AR7 | S-15-16 |
| BSABS 2007-HE4 | *16-17 | BALTA 2006-6 | *17-18 |
| BSMF 2006-AR1 | S-9-10 | BALTA 2006-8 | *16-17 |
| BSMF 2006-AR4 | *11-12 | BALTA 2007-1 | *12-13 |
| BSMF 2006-AR5 | S-10 | BSARM 2006-4 | S-12-13 |
| SAMI 2006-AR5 | S-18-19 | BSARM 2007-1 | S-13-14 |
| SAMI 2006-AR6 | S-14-15 | BSARM 2007-3 | *14 |

## CHART M

### Ratings Misstatements/Omissions:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| BSABS 2007-HE3 | S-14 | SAMI 2006-AR7 | S-7 |
| BSABS 2007-HE4 | *19 | BALTA 2006-6 | *6 |
| BSMF 2006-AR1 | S-2 | BALTA 2006-8 | *7 |
| BSMF 2006-AR4 | *8 | BALTA 2007-1 | *6 |
| BSMF 2006-AR5 | S-2 | BSARM 2006-4 | S-5 |
| SAMI 2006-AR5 | S-7 | BSARM 2007-1 | S-5 |
| SAMI 2006-AR6 | S-7 | BSARM 2007-3 | *8 |

A-4

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel B. Rehns, counsel for Plaintiffs, hereby certify that on October 29, 2010, I filed an original of the foregoing by hand with the Clerk of the Court and delivered a copy to all parties named herein and/or counsel of record in the within action by electronic mail.

Daniel B. Rehns

894215.1 1