UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

IN RE BEAR STEARNS MORTGAGE
PASS-THROUGH CERTIFICATES LITIGATION

**This Document Relates To:**

All Actions

: Master File No.:
:
: 08 CV 8093 (LTS)(MHD)

---------------------------------------------------------------- x

**MEMORANDUM OF LAW OF THE BEAR STEARNS DEFENDANTS
AND INDIVIDUAL DEFENDANTS IN SUPPORT OF
MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

**Bingham McCutchen LLP
399 Park Avenue
New York, NY  10022
(212) 705-7000**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 6

ARGUMENT .................................................................................................................... 13

I.      LEGAL STANDARD ON A MOTION TO DISMISS ................................... 13

II.     PLAINTIFFS ALLEGE NO ACTIONABLE MISREPRESENTATION
OR OMISSION ............................................................................................... 14

      A.     The Allegations Regarding Departures From Underwriting
Guidelines Are Not Actionable .......................................................... 16

      B.     The Appraisal Allegations Do Not State A Claim ............................... 22

             1.     The Appraisal Allegations Concern Non-Actionable
Opinions .................................................................................. 22

             2.     The LTV Ratio Allegations Are Dependent on the
Appraisal Allegations and Similarly Defective ...................... 23

      C.     The Allegations Regarding Credit Ratings Fail To State
A Claim ............................................................................................... 23

             1.     Ratings Are Not Actionable Statements
under Section 11 ..................................................................... 23

                    a.     Ratings Are Not Part of the Registration
Statement ..................................................................... 23

                    b.     Ratings Are Statements of Opinion and
Not Actionable ............................................................. 24

             2.     The Risk of Downgrades and Potential Impact on
the Certificates Was Fully Disclosed ..................................... 25

             3.     Allegations of Ratings Downgrades Constitute
Impermissible "Fraud by Hindsight" ..................................... 26

      D.     The Impact Of External Market Factors Was Disclosed ..................... 28

E.  Plaintiffs Do Not Allege That Any Purported Misrepresentation Affected The Loans In The Pools Or Was Material ..................................28

III.  PLAINTIFFS' SOLE REMEDY IS THE CURE OF NON-COMPLYING LOANS ..........................................................................................29

IV.  PLAINTIFFS' CLAIMS ARE TIME-BARRED....................................................31

A.  Plaintiffs Were On Inquiry Notice Before August 20, 2007 ....................32

B.  Certain Of Plaintiffs' Claims Are Barred By The Three Year Statute Of Repose For '33 Act Claims ......................................39

C.  Claims First Alleged In The FAC Or Later Pleadings Do Not Relate Back To The Original Complaint And Are Not Tolled And, Hence, Are Time-Barred....................................................40

1.  There Is No Relation Back...........................................................40

2.  Plaintiffs' Claims Were Not Tolled ..............................................42

3.  Without "Relation Back" or Tolling, Plaintiffs' Post-2008 Claims Are Time-Barred..............................................44

V.  PLAINTIFFS ALLEGE NO COGNIZABLE HARM ..........................................45

VI.  PLAINTIFFS FAIL TO STATE A CONTROL PERSON CLAIM.....................47

A.  The Absence Of A Primary Violation Is Fatal...........................................48

B.  Plaintiffs Do Not Allege Culpable Conduct By Any Defendant ...............48

CONCLUSION................................................................................................50

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
  646 F. Supp. 2d 385 (S.D.N.Y. 2009), *aff'd*, 385 F. App'x 5 (2d Cir. 2010)..............46

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004).........................................................................47

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...................................................................................13, 47

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005).........................................................................41

*Am. Pipe & Constr. Co. v. Utah*,
  414 U.S. 538 (1974)....................................................................................................42

*Ashcroft v. Iqbal*,
  129 S.Ct. 1937 (2009)........................................................................................ *passim*

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  941 F. Supp. 1352 (W.D.N.Y. 1996)...........................................................................41

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................... *passim*

*Boilermakers Nat'l Annuity Trust v. WaMu Mortg.*
  *Pass-Through Certificates, Series AR1*, No. C09-00037MJP,
  2010 WL 3815796 (W.D. Wash. Sept. 28, 2010).....................................20, 38, 43, 49

*Campo v. Sears Holdings Corp.*,
  371 F. App'x 212 (2d Cir. 2010) ................................................................................20

*City of Ann Arbor Emps.' Ret. Sys. V. Citigroup Mortg. Loan Trust Inc.*,
  703 F. Supp. 2d 252 (E.D.N.Y. 2010) .........................................................................1

*Commercial Union Assurance Co., plc v. Milken*,
  17 F.3d 608 (2d Cir. 1994)..........................................................................................47

*In re Countrywide Fin. Corp. Sec. Litig.*,
  No. CV-07-05295-MRP, 2009 WL 943271 (C.D. Cal. Apr. 26, 2009) ......................39

*DO Denim v. Fried Denim, Inc.*,
  634 F. Supp. 2d 403 (S.D.N.Y. 2009).........................................................................13

*DeMaria v. Andersen*,
  153 F. Supp. 2d 300 (S.D.N.Y. 2001)....................................................................48, 49

*Dodds v. Cigna Sec., Inc.*,
  12 F.3d 346 (2d Cir. 1993).............................................................................................32

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase & Co.*,
  553 F.3d 187 (2d Cir. 2009)....................................................................................29, 48

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004).............................................................................31

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005).............................................................................49

*Freidus v. ING Groep N.V.*,
  No. 09 Civ. 1049 (LAK), 2010 WL 3554097 (S.D.N.Y. Sept. 14, 2010) ..................21

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009)..........29

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)............................................................................................15

*In re IAC/InterActiveCorp. Sec. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010).......................................................................20, 21

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*,
  936 F.2d 759 (2d Cir. 1991).......................................................................................14, 28

*In re IPO Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008).............................................................................47

*Jackson Nat'l Life Ins. Co. v. Ligator*,
  949 F. Supp. 200 (S.D.N.Y. 1996)..................................................................................46

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*,
  32 F.3d 697 (2d Cir. 1994)..............................................................................................39

*Korwek v. Hunt*,
  827 F.2d 874 (2d Cir. 1987)............................................................................................44

*Landmen Partners, Inc. v. Blackstone Group, L.P.*,
  659 F. Supp. 2d 532 (S.D.N.Y. 2009)......................................................................14, 31

*Lanza v. Drexel & Co.*,
  479 F.2d 1277 (2d Cir. 1973).......................................................................48

*In re Lehman Bros. Sec. & ERISA Litig.*,
  684 F. Supp. 2d 485, 489 (S.D.N.Y. 2010)................................................6, 24, 27, 37

*Lin v. Interactive Brokers Group, Inc.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008).........................................................29

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
  594 F.3d 383 (5th Cir. 2010) ......................................................29, 30, 31

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  597 F.3d 84 (2d Cir. 2010)...........................................................................43

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  No. 10-CV-00302-MRP-MANx, 2010 WL 4452571
  (C.D. Cal. Nov. 4, 2010)..............................................................1, 38, 39, 43

*Mass. Bricklayers & Masons Fund & Pipefitters' Ret. Fund
Local 598 v. Deutsche Alt-A Sec.*,
  No. CV 08-3178, 2010 WL 1370962 (E.D.N.Y. Apr. 6, 2010)....................................1

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990)........................................................................28

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) ..................................................................20

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  289 F. Supp. 2d 429 (S.D.N.Y. 2003).........................................................47

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  No. 09 Civ. 2137 (LTS), 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) ........... *passim*

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
  No. 08 Civ. 10783 (MGC), 2010 WL 4054149 (S.D.N.Y. Oct. 15, 2010)................46

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
  No. 08 CV 5653 (PAC), 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ..............22, 24

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
  No. 08 CV 8781 (HB), 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) .....................48

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*,
  No. 08 CV 5093 (HB), 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) ..........23, 24, 27

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)..............................................................................14, 15

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y 2007)......................................................32, 38

*P. Stolz Family P'ship, LP v. Daum*,
    166 F. Supp. 2d 871 (S.D.N.Y. 2001)......................................................48, 49

*Palmer v. Stassinos*,
    236 F.R.D. 460 (N.D. Cal. 2006)....................................................................43

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)..............................................15, 26, 27

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    658 F. Supp. 2d 299 (D. Mass. 2009) ................................................... *passim*

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009).............................................................20

*Republic Bank & Trust Co. v. Bear, Stearns & Co. Inc.*,
    707 F. Supp. 2d 702 (W.D. Ky. 2010)......................................................18, 19

*Robles v. Goddard Riverside Cmty. Ctr.*,
    No. 08 Civ. 4856 (LTS), 2009 WL 1704627 (S.D.N.Y. June 17, 2009) ....................13

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..........................................................................15, 49

*S. Cherry St., LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009).................................................................................13

*Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*,
    No. 03 Civ. 3120 (LTS), 2009 WL 1492196 (S.D.N.Y. May 27, 2009)...............13, 14

*Shah v. Meeker*,
    435 F.3d 244 (2nd Cir. 2006).............................................................................33

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008)...............................................................................33

*Take-Two Interactive Software v. Brant*,
    No. 06 Civ. 5279 (LTS), 2010 WL 1257351 (S.D.N.Y. Mar. 31, 2010)...................43

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   692 F. Supp. 2d 387 (S.D.N.Y. 2010)......................................................22, 23, 24, 25

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
   No. 09-CV-01376-LHK, 2010 WL 4117477
   (N.D. Cal. Oct. 19, 2010).............................................................................38, 41, 43

*In re WorldCom Sec. Litig.*,
   308 F. Supp. 2d 214 (S.D.N.Y. 2004).......................................................................41

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
   No. 07 Civ. 3994 (LTS), 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) ......................13

*Yu v. State St. Corp.*,
   686 F. Supp. 2d 369 (S.D.N.Y. 2010).................................................................24, 27

## FEDERAL STATUTES

15 U.S.C. §77k(a) ............................................................................................. *passim*

15 U.S.C. § 77l(a)(2)......................................................................................... *passim*

15 U.S.C. § 77m ................................................................................................ *passim*

17 C.F.R. § 229.1111(a)(3)......................................................................................31

17 C.F.R. § 240.12-b-2 ...........................................................................................48

Fed. R. Civ. P. 12(b)(6)......................................................................................13, 14

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Third Amended Complaint (the "TAC" or "Complaint") for failure to state a claim upon which relief can be granted and because the claims are time-barred.[1]

## PRELIMINARY STATEMENT

Over the past three years, the U.S. housing market has experienced an unprecedented downturn.  After decades of consistent appreciation, housing prices have fallen dramatically, at faster rates than at any time since the Great Depression.  Unsurprisingly, investors who bet heavily on the housing market's continued meteoric rise are now seeking to walk away from the assumed risks of these investments by suing anyone and everyone who participated in the mortgage business.

The eight named Plaintiffs,[2] each an alleged purchaser of mortgage pass-through certificates ("Certificates") that were issued and/or offered for sale by the Bear Stearns Defendants, are just such investors.  Collectively, Plaintiffs purchased Certificates in 14 separate offerings issued or sold by the Bear Stearns Defendants in 2006 and 2007 in 14 separate offerings, each with its own characteristics.  The Certificates, a form of mortgage-backed

---

[1] "Defendants" are: Bear, Stearns & Co. Inc. ("BSC"), Structured Asset Mortgage Investments II Inc. ("SAMI"), J.P. Morgan Securities, Inc. ("JPMSI"), Bear Stearns Asset Backed Securities I, LLC ("BSABSI"), EMC Mortgage Corporation ("EMC") (the "Bear Stearns Defendants"); and Joseph T. Jurkowski, Jeffrey L. Verschleiser, Michael B. Nierenberg, Jeffrey Mayer, Thomas F. Marano, Samuel L. Molinaro, Jr. (the "Individual Defendants").

[2] Plaintiffs, finally recognizing that they do not have standing to assert claims as to Certificates that no named plaintiff purchased, now assert claims only as to the 14 Certificates they allegedly purchased and have withdrawn other claims.  Plaintiffs have also failed to plead, as they must for standing purposes, what tranches of each offering they purchased.  *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-CV-00302, 2010 WL 4452571, at *4 (C.D. Cal. Nov. 4, 2010); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, 703 F. Supp. 2d 253, 260 (E.D.N.Y. 2010); *Mass. Bricklayers & Masons Funds & Pipefitters' Ret. Fund Local 598 v. Deutsche Alt-A Sec.*, No. CV 08-3178, 2010 WL 1370962, at *1 (E.D.N.Y. Apr. 6, 2010).  Moreover, in a last-ditch effort to expand the putative class, the TAC names five new plaintiffs and eight Certificates for which no plaintiff previously had standing.  As explained in Part IV, claims as to these plaintiffs and Certificates are time-barred.  Plaintiffs have also dropped any Section 12(a)(2) claims where they cannot allege that they purchased in the initial offering.

securities ("MBS"), gave their holders the right to a portion of the principal and interest payments generated by a pool of mortgages securing home loans.  Without alleging a single fact tying any of their allegations to the loans backing the Certificates they purchased, Plaintiffs bring this putative class action asserting violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "'33 Act") in a belated and misguided attempt to avoid the consequences of purchasing mortgage-backed securities at the wrong time.  Plaintiffs also assert a claim under Section 15 for control person liability against the Individual Defendants, as officers and/or directors of SAMI or BSABSI and signatories of one or both of the Registration Statements, and against all the corporate defendants except SAMI and BSABSI as control persons of the depositors.

The two lead Plaintiffs were particularly enthusiastic investors in the housing market, and, in the wake of the downturn, both have filed numerous lawsuits accusing an array of parties of misleading them about various mortgage-backed securities.  New Jersey Carpenters Health or Vacation Funds, represented by the same counsel as in this case, have brought at least five other actions in this District (pending before Judges Baer (two cases), Batts, Crotty and Kaplan) asserting '33 Act claims relating to the funds' purchases of mortgage-backed securities from an array of different issuers.[3]  MISPERS is another frequent plaintiff in MBS cases.  MISPERS has sued and/or sought appointment as lead plaintiff in at least seven other actions in District Courts in New York, and is serving as lead plaintiff in actions pending before Judges Baer, Jones, and Korman.  In each case, it asserts '33 Act claims relating to its MBS purchases.[4]

---

[3] *N.J. Carpenters Vacation Fund, et al. v. Royal Bank of Scotland Group, plc, et al.*, No. 08 CV 5093 (HB) (S.D.N.Y. June 3, 2009); *N.J. Carpenters Health Fund, et al. v. Residential Capital, LLC, et al.*, No. 08 CV 8781 (HB) (S.D.N.Y. May 18, 2009); *N.J. Carpenters Health Fund, et al. v. Royal Bank of Scotland Group, plc, et al.*, No. 08 CV 5310 (DAB) (S.D.N.Y. June 16, 2009); *In re Lehman Brothers Mortgage-Backed Sec. Litig.*, No. 08 Civ. 6762 (LAK) (S.D.N.Y. Feb. 23, 2009); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital Inc., et al.*, No. 08 CV 5653 (S.D.N.Y. Mar. 23, 2009).

[4] *Iron Workers Local No. 25 Pension Fund et al. v. Credit -Based Asset Servicing &*

The Offering Documents[5] pursuant to which the Certificates were sold, and upon which Plaintiffs admittedly relied in making their investments, wholly belie Plaintiffs' claims. Indeed, contrary to assertions that the true risks associated with their investments were misrepresented to or hidden from Plaintiffs, the Offering Documents in fact described in expansive detail the very risks about which Plaintiffs now claim they were misled. This includes disclosures that the mortgage loans, made to credit-impaired borrowers with little or no verification of their income or assets, included negative amortization loans and other products that did not conform to Fannie Mae and Freddie Mac guidelines. The Offering Documents made clear that these unconventional loans carried an enhanced risk of default. It thus could have come as no surprise to Plaintiffs that the dramatic decrease in property values throughout the United States, and the almost unprecedented loss of jobs during this recession, has resulted in record defaults and foreclosures. Unfortunately, as a result of the current economic crisis, a number of the very risks that are extensively outlined in the Offering Documents – risks of which Plaintiffs were necessarily aware – have come to pass. By purchasing the Certificates, Plaintiffs made a substantial investment in the United States housing market. That may turn out to have been a bad investment, but Plaintiffs were fully informed of the risks.

Even though the riskiness of the loans was clearly and explicitly disclosed, Plaintiffs allege that the Offering Documents contained misrepresentations or omissions regarding loan originators' underwriting standards, appraisals and loan-to-value ratios ("LTV ratios"). Plaintiffs

---

*Securitization LLC et al.*, No. 08-cv-10841 (S.D.N.Y. Dec. 12, 2008); *Public Empls.' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc. et al*, No. 09-cv-1110 (S.D.N.Y. Feb. 6, 2009); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust et al. v. J.P. Morgan Acceptance Corp. I et al.*, No. 08-cv-1713 (E.D.N.Y. Mar. 8, 2010); *Public Empls.' Ret. Sys. of Miss. v. Morgan Stanley et al.*, No. 09-cv-2137 (S.D.N.Y. Sept. 15, 2009); *Public Empls.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, No. 09-1392 (S.D.N.Y. Feb. 17, 2009); *NECA-IBEW Health & Welfare Fund et al. v. Goldman Sachs & Co. et al.*, No. 08-cv-10783 (S.D.N.Y. Dec. 11, 2008).

[5] The Registration Statement, Prospectus and Prospectus Supplement are referred to collectively as the "Offering Documents."

further allege that credit ratings assigned to the Certificates by independent rating agencies did not accurately reflect the risk of the investments because of insufficient credit enhancement and failure to disclose alleged conflicts of interest.  These are nothing more than fraud-by-hindsight claims that have no merit and, accordingly, Plaintiffs' allegations of purported misrepresentations do not withstand even modest scrutiny.

Plaintiffs' claims fail as a matter of law for a number of specific reasons:

*First*, Plaintiffs allege no actionable misrepresentation or omission.  Under *Twombly* and *Iqbal*, the type of generalized allegations about MBS featured in the Complaint are not sufficient to state a claim.  Plaintiffs do not and cannot tie any of their generalized allegations of industry-wide departures from underwriting standards or faulty loan servicing and collection to a single loan backing any of Plaintiffs' Certificates.  In addition, the robust risk disclosures in the Offering Documents specifically warned Plaintiffs of the possibility of departures from underwriting guidelines and that credit ratings are opinions and not a recommendation to buy or sell the Certificates.  The Offering Documents further warned that numerous factors, including a housing price collapse, could have a negative impact on Certificateholders' ability to receive pass-through payments.  These risk disclosures bespeak caution, and Plaintiffs cannot now be heard to complain that they were unaware of the risks inherent in these investments.  Indeed, one District Court recently dismissed a complaint that made virtually identical allegations concerning an offering of Bear Stearns Certificates, including one of the very Certificates at issue here.

Moreover, the allegations of inflated appraisals and LTV ratios, and flawed credit ratings, are not actionable as a matter of law.  These are opinions, and cannot form the basis of a '33 Act claim absent allegations that they were not genuinely held, as courts around the country – including several judges in this District – have recently held.  Plaintiffs' other allegations of misrepresentations or omissions constitute, at best, impermissible pleading of fraud by hindsight

and are insufficient.  Plaintiffs also fail to show that any of the purported misstatements or omissions is sufficiently material to be actionable.

*Second*, the Offering Documents provide that repurchase or replacement of non-complying loans is Plaintiffs' sole remedy for any breach of a representation concerning those loans.  Under the Fifth Circuit's *Lone Star* decision, this specific, built-in mechanism for the cure of any misrepresentations concerning the loans defeats Plaintiffs' '33 Act claims.

*Third*, clear "storm warnings," including extensive media coverage of the mortgage-backed securities industry, loan origination practices and the ratings for the Certificates put Plaintiffs on notice of their claims on *all* 14 Certificates more than one year before they filed suit.  For 11 of the 14, there can be no credible argument against dismissal as no plaintiff-purchaser sued until February 2010 (for three Certificates) and October 2010 (for eight Certificates).  Plaintiffs cannot possibly contend that they were not on inquiry notice of these claims by February 2009 and, *a fortiori,* by October 2009.  Indeed, plaintiff NJ Carpenters had filed its initial complaint in this action in August 2008, and by February 2009 various investment grade tranches of those 11 Certificates had been downgraded hundreds of times – a function of Plaintiffs' extraordinary delay in filing these claims, the number of Certificates, and the number of tranches in each offering.  In addition, the claims with respect to ten of the 14 Certificates now at issue were first asserted after the absolute three-year statute of repose applicable to '33 Act claims had expired, and are time barred for this independent reason.

Plaintiffs' claims are not rescued by the doctrines of tolling and relation back.  Even if the Original Complaint was timely filed, it asserted claims as to only *one* Certificate.  As is now well-established, Plaintiffs cannot rely on the filing of the Original Complaint to toll the statute of limitations for their claims regarding the other 13 Certificates at issue.  Nor do later filed claims "relate back" to the Original Complaint, as the claims contained in subsequent complaints

were asserted by different plaintiffs, concerned different Certificates, and were first asserted

more than 120 days after the Original Complaint was filed.  Under this Court's *Morgan Stanley*

decision, the claims relating to these 13 additional Certificates are time-barred.[6]

**Fourth**, Plaintiffs allege no legally cognizable harm with respect to the majority of the

Certificates, as required to maintain a Section 11 claim.  With a single exception, Plaintiffs have

alleged no interruption of the pass-through payments to which they are entitled and their

allegations of diminished secondary market value do not constitute injury.

**Fifth**, Plaintiffs' failure to allege a primary violation requires dismissal of their control

person claim under Section 15.  Plaintiffs have also failed to plead any facts demonstrating that

any of the Individual Defendants, BSC, EMC or JPMSI is a culpable "control person."

## FACTUAL BACKGROUND[7]

**Plaintiffs**

Plaintiffs are all highly sophisticated investors with the means – and likely the fiduciary

obligation – to have thoroughly reviewed and understood the Offering Documents before

purchasing their Certificates.  The Plaintiffs and the Certificates they purchased are as follows:

| Plaintiff | Certificate |
|---|---|
| New Jersey Carpenters Health Fund ("NJ Carpenters") | Bear Stearns Mortgage Funding Trust 2006-AR1 ("BSMFT 2006-AR1") |
| Boilermakers Blacksmith National Pension Trust ("Boilermakers") | Structured Asset Mortgage Investment II, Series 2006-AR5 ("SAMI 2006-AR5"); SAMI 2006-AR6 [8] |

---

[6] All documents referenced herein are annexed as exhibits to the Declaration of Theo J. Robins in Support of the Motion to Dismiss the Third Amended Complaint, dated December 3, 2010. Exhibits are identified as "Ex. __."  The TAC is Ex. A.

[7] For purposes of this Motion to Dismiss only, the well-pled allegations of the TAC are presumed true.  *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 489 (S.D.N.Y. 2010) ("*Lehman Bros.*").  For the Court's convenience, copies of all unpublished decisions are included in the Compendium of Unreported Decisions, filed concurrently herewith.

[8] Boilermakers' PSLRA certification also identifies the BSABSI 2007-HE1.  While this Certificate was identified in the FAC, Boilermakers withdrew this claim in the CCAC. Defendants note that there are no allegations in the TAC concerning BSABSI 2007-HE1 and thus assume that no plaintiff is asserting claims regarding this Certificate.

| Public Employees' Retirement System of Mississippi ("MISPERS") | Bear Stearns ARM Trust, Series 2006-4 ("ARM 2006-4"); Bear Stearns ARM Trust, Series 2007-3 ("ARM 2007-3"); Bear Stearns Alt-A Trust, Series 2006-6 ("BALTA 2006-6") |
| Police and Fire Retirement System of the City of Detroit ("Detroit") | Bear Stearns Alt-A Trust, Series 2006-8 ("BALTA 2006-8") |
| State of Oregon ("Oregon") | Bear Stearns Alt-A Trust, Series 2007-1 ("BALTA 2007-1"); Structured Asset Mortgage Investments II, Series 2006-AR7 ("SAMI 2006-AR7"); BALTA 2006-8 |
| Iowa Public Employees' Retirement System ("IPERS") | BSMFT 2006-AR1; Bear Stearns Asset Backed Securities Trust, Series 2007-HE4 ("BSABS 2007-HE4"); BALTA 2006-6, Bear Stearns Asset Backed Securities Trust; Series 2007-HE3 ("BSABS 2007-HE3"); SAMI 2006-AR7; BALTA 2007-1 |
| City of Fort Lauderdale Police & Fire Retirement System ("Ft. Lauderdale") | Bear Stearns ARM Trust 2007-1 ("ARM 2007-1") |
| San Antonio Fire and Police Pension Fund ("San Antonio") | Bear Stearns Mortgage Funding Trust 2006-AR4 ("BSMFT 2006-AR4"); Bear Stearns Mortgage Funding Trust 2006-AR5 ("BSMFT 2006-AR5") |

**Procedural History**

Plaintiff NJ Carpenters commenced this action by filing a complaint, dated August 20, 2008, in New York State Court (the "Original Complaint") (Ex. B).  The Original Complaint asserted claims on behalf of purchasers of Certificates in one offering, BSMFT 2006-ARI. Defendants then removed the case to this Court.  After being appointed lead plaintiff on January 26, 2009, NJ Carpenters filed an amended complaint on May 15, 2009 (the "FAC") (Ex. C).  The FAC purported to assert claims on behalf of purchasers in 43 new offerings, many of which were issued pursuant to a new Registration Statement.  The FAC also added plaintiff Boilermakers. Nearly two months later, on July 9, 2009, Pension Trust for Operating Engineers ("Pension Trust") filed a complaint (the "Pension Trust Complaint" (Ex. D)) asserting claims as to eight new offerings (and 11 listed in the FAC), including offerings in the BALTA and ARM series.

On August 13, 2009, this Court ordered that the lead-plaintiff process be re-done, finding that the Original Complaint (and related PSLRA notice) was insufficient to give potential class

members notice of the claims asserted in the FAC.  On December 23, 2009, NJ Carpenters and

MISPERS were named co-lead plaintiffs.  On February 19, 2010, Plaintiffs filed the

Consolidated Class Action Complaint ("CCAC") (Ex. E) on behalf of purchasers of 42 different

Certificates, although a named plaintiff had actually purchased only six of the 42.  The CCAC

included, for the first time, allegations that a plaintiff purchased the BALTA 2006-6, ARM

2006-4 and ARM 2007-3 Certificates.

The parties fully briefed a motion to dismiss the CCAC.  In their opposition

memorandum and in correspondence sent to the Court concerning its ruling in *In re Morgan

Stanley Mortgage Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS), 2010 WL 3239430,

at *7 (S.D.N.Y. Aug. 17, 2010) (Swain, J.) ("*Morgan Stanley*"), lead Plaintiffs argued that the

CCAC was sufficient, but requested that they be afforded the opportunity to amend it should the

Court find the allegations of the CCAC insufficient in any respect.  On September 29, the Court

issued an order authorizing the filing of a further amended complaint.  The new TAC was filed

on October 29, adding five new plaintiffs and eight Certificates not previously owned by a

plaintiff with standing.  Collectively, Plaintiffs have now had five opportunities to plead their

claims.

**The Securitization Process**

Plaintiffs' claims arise from their purchases of Certificates – the securitized home loans.[9]

These transactions worked as follows:  An entity called the "depositor" or "issuer" (here, SAMI

or BSABSI) purchased loans from one or more loan "originators" – either an affiliate of BSC or

other entities that provided home loans to borrowers.  After purchasing the loans, the

depositor/issuer placed the loans in a trust (the "loan pool") in exchange for securities (the

---

[9] Loan securitization has been going on for years.  It is only recently, as a result of the housing crash, that purchasers of Certificates have claimed to have been misled.

Certificates) that represent fractional interests in the trust and give the holder a right to a portion

of interest and principal payments made by the borrowers on the loans in the trust.  The depositor

(SAMI or BSABSI) then sold the Certificates to an underwriter (BSC), which then sold the

Certificates to the initial investors pursuant to a prospectus supplement.  (TAC ¶¶ 39-41).  The

Certificates on which Plaintiffs purport to assert claims were sold in 14 distinct offerings in 2006

and 2007.  The 14 separate loan pools backing the 14 offerings were made up of approximately

47,178 mortgages.  (*Id.* ¶ 3).  Each loan pool comprised a unique set of loans.

Because each offering involved a separate and distinct loan pool, the Registration

Statement and Prospectus contained only summary information about the securitization process,

the nature of the investment and a description of various risks inherent in the purchase of

Certificates.  Detailed information about the particular loan pool, including the appraised value

of the loans in the pool, the LTV ratio for the loans in the pool and the underwriting standards of

the relevant originators, was included in the Prospectus Supplement that was filed with each

offering.  Thus, each offering has its own Prospectus Supplement.  The descriptions of the loan

pools are unique to each of the 14 Prospectus Supplements.  The specific offerings that are the

subject of this action, along with the offering date for each, are listed in TAC paragraph 38.

**Plaintiffs' Certificates Are Backed By Loans With Risky Characteristics**

A review of the Prospectus Supplements for the 14 offerings at issue demonstrates the

extraordinary level of disclosure regarding individual loans and the information available to

Plaintiffs regarding the significant risks attendant to their purchases of Certificates.  Generally

speaking, the loan pools underlying Plaintiffs' Certificates are made up entirely of loans whose

interest rates adjust annually, if not more frequently.  *See, e.g.*, BALTA 2006-6 Prosp. Supp. at

S-41, A-4 (Ex. F); ARM 2006-4 Prosp. Supp. at S-25 (Ex. H); ARM 2007-3 Prosp. Supp. at S-24

(Ex. J).  The Offering Documents further disclose that the loans have an initial "interest only"

period, in which the borrower is not required to make any principal payments (meaning the borrower is not paying down the loan balance) for up to ten years.  *E.g.* BALTA 2006-6 Prosp. Supp. at S-41, A-5 (Ex. F); ARM 2006-4 Prosp. Supp. at S-25 - S-26 (Ex. H); ARM 2007-3 Prosp. Supp. at S-24 - S-25 (Ex. J).

Schedule A to each Prospectus Supplement discloses that, as a general matter, the loan pools were made up of particularly risky loans – the vast majority of loans were made under "stated income, stated asset," "stated income, verified asset," "reduced," "streamlined" or "no documentation" programs.  *See, e.g.*, SAMI 2006-AR6 Prosp. Supp. at A-4 (88.3%) (Ex. N); BSMFT 2006-AR1 Prosp. Supp. at A-5, A-12 (87%) (Ex. P); BALTA 2006-6 Prosp. Supp. at A-3, A-8, A-13 (nearly 90%) (Ex. F); SAMI 2006-AR7 Prosp. Supp. at A-4 (over 90%) (Ex. V).

In addition to being subject to minimal scrutiny, many of the loans backing Plaintiffs' Certificates had other features that increased their default risks.  For example, 93% of the loans in the SAMI 2006-AR5 loan pool had a negative amortization feature, meaning that borrowers could choose to pay less each month, with the result that the principal balance of the loan actually increased rather than decreased.  SAMI 2006-AR5 Prosp. Supp. at S-10 (Ex. L).  ***Every single one*** of the SAMI 2006-AR6 loans had this feature.  SAMI 2006-AR6 Prosp. Supp. at S-1 (Ex. N); *see also* BSMFT 2006-AR1 Prosp. Supp. at S-1 (Ex. P) (loan pool made up primarily of negative amortization loans).

The Prospectus Supplements also describe the ranges of principal balances owing on the loans at the time of closing, the geographic distribution of the loans, how many loans were originated with less than full documentation of the borrower's income, the type of mortgage properties, and the range of loan-to-value ratios on the loans (calculated at the time of origination).  *E.g.* SAMI 2006-AR5 Prosp. Supp. at A-1 - A-34 (Ex. L).  As explained in the Offering Documents for each, such factors may increase the risk of delinquencies.  *See, e.g.*,

BALTA 2006-6 Prosp. Supp. at S-41 (Ex. F).

In addition to the details about the loan pools, the Prospectus Supplements disclosed the credit rating given to each tranche (TAC ¶ 7) and contained lengthy and detailed risk disclosures. *See* Appendix A (summarizing significant risk disclosures in the Offering Documents, together with the alleged misrepresentations or omissions they refute).  The risk disclosures warned investors, *inter alia*, that a downturn in the housing markets might interrupt payments, that higher risk loans were more likely to default, that there were a number of different underwriting programs and that exceptions would be made to each.  What is clear from the risk disclosures is that the Prospectus Supplements provided detailed information about the risks inherent in the types of collateral and documentation programs used for origination of the loans.

## Plaintiffs' Claims

Plaintiffs' claims are based on allegations that the Offering Documents for each of the Certificates contained misrepresentations or omissions falling into three categories.  First, Plaintiffs say that loan originators "systematically disregarded the stated underwriting standards when issuing loans to borrowers."  (TAC ¶ 10; *see also id.* ¶¶ 79-176).  Second, Plaintiffs allege that the loans were based on inflated appraisals of the underlying properties, which additionally caused the LTV ratios of the loan pools to be overstated and the amount of credit support to be understated.  (*Id*. ¶¶ 10, 177-83).  Finally, Plaintiffs allege that the credit ratings assigned to the Certificates were inaccurate because of allegedly outdated rating models, relaxed rating criteria and inaccurate loan information.  (*Id*. ¶¶ 10, 184-97).

Plaintiffs contend that, as a result of the purported misrepresentations and omissions, purchasers of the Certificates were exposed to increased risk "with respect to ***absolute cash flow and the timing of payments***."  (TAC ¶ 12) (emphasis added).  However, the Offering Documents warned Plaintiffs of the risk that this might happen.  Specifically, the Offering Documents

disclosed that external market factors, such as a nationwide housing decline, could affect the payments on the Certificates, that, as a result, ratings could be downgraded or even withdrawn, and that the credit enhancement may be insufficient to cover any losses experienced by Certificateholders.  Plaintiffs nevertheless chose to invest.  They cannot now complain that the events they were warned about actually occurred.

Unfortunately, the housing price decline was more severe than expected; the country was faced with the single largest decline in single-home values in recorded history.  *See Dropping a Brick*, The Economist, May 29, 2008 (Ex. HH).  Even in the midst of the downturn, however, people did not grasp the full extent of the decline.  *See, e.g.*, *Treasury's Paulson - Subprime Woes Likely Contained*, Reuters Bus. & Fin., Apr. 20, 2007 (Ex. II) ("U.S. Treasury Secretary Henry Paulson said on Friday ***the housing market correction appears to be at or near its bottom*** and that troubles in the subprime mortgage market will not likely spread throughout the economy."  (Emphasis added)).  Ultimately, house prices fell far more sharply than ever before in U.S. history, leading to a rise in loan defaults.  *See Dropping a Brick*, The Economist.  Plaintiffs cannot claim to have been surprised by these events, however, as the possibility that these events might occur was disclosed in the Offering Documents.

Plaintiffs now seek to hold Defendants liable for alleged misstatements or omissions as issuers and/or sellers of the Certificates.  Additionally, Plaintiffs seek to hold the Individual Defendants liable because (1) each was an officer or director of SAMI or BSABSI and (2) each signed one or both of the Registration Statements.  (TAC ¶¶ 29-37).  There are no other allegations in the Complaint directed at the Individual Defendants.  Similarly, JPMSI is alleged to be liable, not because of any acts undertaken by it, but because it is a "successor-in-interest" to BSC.  (*Id.* ¶ 25).  There are no allegations regarding any action taken by JPMSI.

## ARGUMENT

### I.      LEGAL STANDARD ON A MOTION TO DISMISS

To avoid dismissal under Rule 12(b)(6), a complaint must allege the existence of a plausible, not merely possible, cause of action. *Robles v. Goddard Riverside Cmty. Ctr.*, No. 08 Civ. 4856, 2009 WL 1704627 (LTS), at *2 (S.D.N.Y. Jun. 17, 2009) (Swain, J.) (citing *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).  "'Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1950).  A claim has facial plausibility "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949).

The plaintiff's complaint "must provide the grounds upon which his claim rests through factual allegations sufficient to 'raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*. 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  In *Iqbal*, the Supreme Court reaffirmed this pleading threshold, explaining that "[a] pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 129 S.Ct. at 1949 (citations omitted); *see also In re Xinhua Fin. Media, Ltd. Sec. Litig*., No. 07 Civ. 3994 (LTS), 2009 WL 464934, at *6-9 (S.D.N.Y. Feb. 25, 2009) (Swain, J.) (dismissing Section 11 and Section 12(a)(2) claims).  Allegations that are "merely consistent with a defendant's liability" will not suffice.  *DO Denim v. Fried Denim, Inc*., 634 F. Supp. 2d 403, 407 (S.D.N.Y. 2009) (Swain, J.) (dismissing claims).

Further, while well-pled facts are presumed true on a motion to dismiss, "entirely conclusory [allegations are] not entitled to the presumption of truth at the Rule 12(b)(6) motion to dismiss stage." *Sedona Corp. v. Ladenburg Thalmann & Co., Inc*., No. 03 Civ. 3120 (LTS),

2009 WL 1492196, at *2, 10 (S.D.N.Y. May 27, 2009) (Swain, J.).  Courts in this district have

routinely dismissed complaints that, like this one, offer only "unadorned, the-defendant-

unlawfully-harmed-me accusation[s]."  *Id*. at *2.  Because the assertions offered in support of

Plaintiffs' claims "stop[] short of the line between possibility and plausibility of 'entitlement to

relief,'" the Complaint should be dismissed.  *Iqbal*, 129 S.Ct. at 1949 (citations omitted).

## II.     PLAINTIFFS ALLEGE NO ACTIONABLE MISREPRESENTATION OR OMISSION

Plaintiffs' failure to allege any actionable misrepresentation or omission requires

dismissal of the Complaint.  To state a Section 11 claim, "a plaintiff must allege that, as of its

effective date, the offering document contained a material misstatement or omission."  *Landmen*

*Partners, Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 539 (S.D.N.Y. 2009); *see also* 15

U.S.C. § 77k(a).  Similarly, to state a Section 12(a)(2) claim, a plaintiff must allege facts

showing that the defendant sold securities by using materials containing a material

misrepresentation or omission.  *See* 15 U.S.C. § 77l(a)(2).  "[C]laims under Sections 11 and 12

are usually evaluated in tandem because if a plaintiff fails to plead a cognizable Section 11

claim, he or she will be unable to plead one under Section 12(a)."  *Landmen*, 659 F. Supp. 2d at

539 n.6 (internal quotations omitted).  "The central inquiry in determining whether a prospectus

is materially misleading . . . is . . . whether defendants' representations, taken together and in

context, would have [misled] a reasonable investor about the nature of the investment."  *I. Meyer*

*Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761 (2d Cir. 1991) (emphasis

added) (internal quotations omitted).  When considering a Section 11 claim, the Offering

Documents "must be read as a whole" to determine whether they were false or misleading on

their effective date.  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).

Plaintiffs ignore that the Certificates they purchased were backed by obviously risky loans (*see supra* at pp. 10-11), and similarly disregard the robust risk disclosures in the Offering Documents.  *See generally* Appendix A.  These disclosures, which warned Plaintiffs of the very risks that have come to pass, are fatal to their claims.  As the Second Circuit has made clear, a Section 11 plaintiff cannot pursue claims when its losses are allegedly due to events that it had been warned of in a prospectus:

> Not every bad investment is the product of misrepresentation.  The fact that interest rates did not rise, and that therefore the Trusts for a period decreased in value as the prospectuses indicated they might, only shows that the investment may have turned out to be a bad one.  To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted.

*Olkey*, 98 F.3d at 8 (internal quotation omitted).  *See also Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008) ("these [offering] documents are not guarantees of an offering's subsequent success, nor do they insure investors against the vicissitudes of the technology and industry, nor the volatility of the stock market itself." (internal quotation omitted)).

The Offering Documents, taken as a whole, clearly warned Plaintiffs of the risk of the very events about which they now complain.  The Offering Documents thus "bespoke caution" and Plaintiffs' allegations are not actionable.  "Under the bespeaks caution doctrine, 'alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'"  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).  *See also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said

that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.").

Plaintiffs' three categories of alleged misstatements – (1) alleged misrepresentations concerning adherence to underwriting guidelines (*e.g.* TAC ¶¶ 79-176); (2) alleged failure to disclose the risk that appraisals would not accurately reflect the value of the properties underlying the mortgages in a mortgage pool and that LTV ratios would be misstated due to inflated appraisals (*id.* ¶¶ 79-176, 177-80); and (3) allegedly erroneous credit ratings of the Certificates and the impact of allegedly inaccurate ratings on the adequacy and nature of credit enhancement built into the Certificates (*id.* ¶¶ 69-76, 181-83, 184-97) – all disregard the detailed disclosures directed at these very topics.  Moreover, their allegations are entirely generalized, and untethered to the transactions that are the subject of their Complaint.  Indeed, they are all based upon media reports and allegations by ***other plaintiffs*** in ***other cases***.  None of those sources purport to discuss the particular loans in the loan pools backing ***the Certificates in this case***.  The allegations thus rest on speculation and innuendo, rather than facts demonstrating that any of the alleged origination or appraisal practices actually impacted Plaintiffs' Certificates.  These allegations do not satisfy the pleading standard established by *Twombly* and *Iqbal*.

### A.    The Allegations Regarding Departures From Underwriting Guidelines Are Not Actionable

In alleging that loans were improperly underwritten, Plaintiffs fail to recognize one simple truth: so long as the underwriting guidelines applicable to the particular loan documentation type were accurately disclosed in Schedule A of the Prospectus Supplements – and there is no allegation that they were not – the Offering Documents were not misleading. Despite pages of allegations purportedly supporting their allegations that mortgage originators "disregarded" underwriting guidelines, Plaintiffs proffer no facts linking these conclusory

assertions to the specific loans (and corresponding underwriting guidelines) backing Plaintiffs' Certificates.  Further, they ignore that the Prospectus Supplements said explicitly that ***there would be exceptions to the guidelines***.  The absence of any facts connecting Plaintiffs' assertion that underwriting guidelines were completely "disregarded" to the Certificates and underlying loans at issue here, or any facts demonstrating that the exceptions were anything more than that – disclosed and permitted exceptions – is fatal to their claims.

As Plaintiffs allege, each originator had its own documentation programs, with underwriting guidelines for each.  The Prospectus Supplement for each offering sets forth the underwriting guidelines for each documentation program for the principal originators, as well as the fact that exceptions would be made to those guidelines.  *See, e.g.*, ARM 2006-4 Prosp. Supp. at S-43 - S-51 (Ex. H); BALTA 2006-6 Prosp. Supp. at S-58 - S-64 (Ex. F); SAMI 2006-AR6 Prosp. Supp. at S-42 - S-47 (Ex. N).  Indeed, Plaintiffs acknowledge that there are numerous distinct documentation programs, each with its own fully disclosed underwriting guidelines. (TAC ¶ 97 (detailing the underwriting guidelines for the "Limited Documentation," "Lite Documentation," "Stated Income," No Ratio," Stated Income/Stated Assets," "No Income/No Assets," "No Doc" and "No Doc with Assets" programs used by BSRMC and disclosed in the BSMFT 2006-AR1 Prospectus Supplement).  *See also id*. ¶ 103 (listing Countrywide documentation programs and underwriting guidelines)).  Plaintiffs assert that the Offering Documents were misleading because of so-called "disregard[]" for underwriting standards in originating loans.  (*Id*. ¶ 81).  But Plaintiffs do not allege that any of their generalized allegations about loan underwriting applies to any of the loans backing Plaintiffs' Certificates.  Such conclusory assertions do not "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949).

Nor can Plaintiffs claim to have been surprised that there would be exceptions to underwriting guidelines; prospective investors *were explicitly told that originators would grant exceptions from stated underwriting guidelines*, regardless of which documentation program was used – as Plaintiffs themselves acknowledge.  (*See* Appendix A at A-2, A-4, A-7, A-10; TAC ¶¶ 83, 95, 101).  Plaintiffs cannot now be heard to allege that the originators' underwriting practices were misrepresented because the very exceptions they were told could occur did, in fact, occur.

The Offering Documents further disclosed that borrower income and assets were either not considered or not verified under certain documentation programs, and that in some cases loans were made based solely on the credit score of the borrower and the value of the collateral.  *E.g.*, BSMFT 2006-AR1 Prosp. Supp. at S-31 (Ex. P).  In many of those instances, moreover, investors were warned that, not only did the loans *not* comply with Fannie Mae or Freddie Mac underwriting guidelines generally, but that there would also be exceptions to those already less-than-stringent limited documentation programs.  *Id*. at S-30-31 ("loans typically differ from those underwritten to the guidelines established by Fannie Mae and Freddie Mac primarily with respect to the . . . required documentation . . . .  Exceptions to the underwriting guidelines are permitted when the seller's performance supports such action and the variance is approved by credit management."); SAMI 2006-AR6 Prosp. Supp. at S-24, S-43 (Ex. N) ("[e]xceptions to . . . underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower").  As a consequence, Plaintiffs were warned, the very types of loans backing Plaintiffs' Certificates were "*likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines*."  Appendix A at A-1.

In a recent decision, *Republic Bank & Trust Co. v. Bear, Stearns & Co. Inc.*, 707 F. Supp.

2d 702 (W.D. Ky. 2010), the court held that disclosures in Bear Stearns-sponsored Prospectus

Supplements – including one of the very offerings at issue here – concerning originators'

alternative documentation programs, loans made to higher risk borrowers, the fact that Fannie

Mae or Freddie Mac would not purchase the loans, and the fact that there would be exceptions to

stated underwriting guidelines required dismissal of a complaint alleging misstatements in

offering materials regarding these guidelines.  The court held that the plaintiff's allegations were

"***implausible given that Bear Stearns disclosed the originators' lax lending standards and the
fact that exceptions even from these lenient rules were permitted***."  *Id.* at 712 (emphasis added).

Notably, the court specifically found that the disclosures in the Prospectus Supplement for the

ARM 2006-4 Certificates (one of the 14 that Plaintiffs here purchased) were sufficiently detailed

on this subject to warrant dismissal.  *Id.*  The Prospectus Supplements for the other offerings at

issue in this action contain substantially similar disclosures.  *See* Appendix A at A-2 - A-13.  *See
also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F.

Supp. 2d 299, 307 (D. Mass. 2009) ("*Nomura*") (dismissing plaintiffs' Section 11 allegations for

failure to state a claim based on the "fusillade of cautionary statements" regarding underwriting

standards in the offering materials and holding that plaintiffs' argument that they were "not on

notice of the originator's 'soft' underwriting practices beg[ged] credulity").

        Rather than make any allegations regarding the particular loans backing their Certificates,

Plaintiffs improperly crib their "support" for their generalized allegations of purported

"disregard" for stated guidelines from various sources, including lawsuits by different plaintiffs,

regulatory actions concerning wholly unrelated matters brought in other jurisdictions (TAC

¶¶ 87-91, 112, 116-17, 118, 114-15, 121, 123-24, 138-39, 160-61), and statements by

"confidential witnesses" (*id.* ¶¶ 105-08, 133-36, 148-55).  None of these allegations is sufficient.

        Plaintiffs' reliance on the allegations in other litigants' complaints – assertions that have

never been tested, much less proven – cannot substitute for the factual support needed to support

Plaintiffs' allegations.  The law in the Second Circuit "is clear that paragraphs in a complaint that

are either based on, or rely on, complaints in other actions that have been dismissed, settled or

otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P.

12(f)."  *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (citing *Lipsky*

*v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976)), *aff'd*, 2010 WL 2838582

(2d. Cir. July 21, 2010).[10]  Accordingly, these allegations should be disregarded, if not stricken

from the Complaint.  *See id.*; *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218

F.R.D. 76, 78 (S.D.N.Y. 2003).

Similarly, courts have held that reliance on confidential witnesses, "without any facts that

might corroborate the statements of unidentified [witnesses] . . ." is "[s]ketchy at best [and]

do[es] not provide enough detail to nudge plaintiffs' claims across the line from conceivable to

plausible."  *In re IAC/InterActiveCorp. Sec. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010)

(internal quotations omitted); *see also Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216

n.4 (2d Cir. 2010) (questioning the use of confidential witnesses to sustain a complaint's

allegations and endorsing depositions of those witnesses to determine whether a complaint

should be dismissed).  The weakness of these allegations is particularly evident here.  First, the

allegations attributed to confidential witnesses are contradicted by the allegations of the

Complaint (*compare* TAC ¶ 105 (former Countrywide employee stated that Countrywide

---

[10] In an effort to cure this glaring defect, Plaintiffs cite a single decision issued by a California
District Court in the SEC's case against former officers of Countrywide that denied their motion
for summary judgment.  (TAC ¶¶ 123-24).  However, this decision is irrelevant as Plaintiffs have
not alleged any connection between the loans underlying the Certificates here and an action filed
by the SEC against former Countrywide officers in California.  As the court in *Boilermakers
Nat'l Annuity Trust v. WaMu Mortgage Pass-Through Certificates, Series AR1* held, such
allegations "offer[] no nexus to the Certificates at issue here.  The Court is left to assume there is
an identity between these loans and the ones at issue in the [] complaint. . . ."  No. C09-
00037MJP, 2010 WL 3815796, at *7 (W.D. Wash. Sept. 28, 2010) ("*WaMu*").

regularly labeled loans as "prime" even for high risk borrowers) with *id*. ¶ 3 (the Certificates

were "based on . . . largely subprime and Alt-A mortgage loans")).  Second, the alleged

omissions were specifically disclosed in the Offering Documents (*compare id.* ¶ 134 (American

Home's headquarters would approve exceptions to underwriting guidelines) with BSMFT 2006-

AR1 Prosp. Supp. at S-30 - S-31 (Ex. P) ("[e]xceptions to the underwriting guidelines are

permitted when the seller's performance supports such action and the variance is approved by

credit management.")).  Plaintiffs' reliance on these allegations is thus meritless.

     Moreover, none of the allegations that the Complaint borrows from other cases or that are

derived from so-called "confidential witnesses" have been connected in any way to the loans

underlying the Certificates at issue in this action.[11]  It thus has no bearing on this action whether,

for example, Ambac alleged in a lawsuit that certain loans breached representations and

warranties (TAC ¶ 88), that the Illinois Attorney General alleged that Countrywide issued loans

based on inflated borrower income (*id*. ¶ 114), or that unidentified sources asserted that

Countrywide, American Home or Wells Fargo management signed off on loans originated with

variations from underwriting guidelines (TAC ¶ 108, 133-36, 148-55).[12]  Moreover, Plaintiffs

have offered no facts to corroborate any confidential witnesses' statements, as is required.  *In re*

*IAC/InterActiveCorp. Sec. Litig.*, 695 F. Supp. 2d at 119.  In short, the allegations of industry-

wide disregard of underwriting standards are completely speculative and unconnected to the

Certificates at issue.  Plaintiffs' reliance on someone else's unproven allegations or statements by

---

[11] This is particularly true for Plaintiffs' allegations regarding the "Additional Originators."
(TAC ¶¶ 166-76).  These allegations lack any pretense of specificity – Plaintiffs rely wholly on
generalized statements regarding the mortgage industry as a whole without alleging any
wrongdoing by any of the named "Additional Originators," which is fatal here.  *See Freidus v.*
*ING Groep N.V.*, No. 09 Civ. 1049, 2010 WL 3554097, at *9 (S.D.N.Y. Sept. 14, 2010)
("[a]llegations of industry-wide or market-wide troubles alone ordinarily are insufficient").

[12] While these are but three examples, this defect exists with each of Plaintiffs' citations to a
pleading filed in a different action or to a statement from a confidential witness.  Nowhere in the
Complaint do Plaintiffs even attempt to link these allegations to Plaintiffs' Certificates.

confidential witnesses relating to loans not at issue stretches the bounds of plausibility and fails

to "raise [Plaintiffs'] right to relief above the speculative level. . . ."  *Twombly*, 550 U.S. at 555.

        **B.**      **The Appraisal Allegations Do Not State A Claim**

              1.      The Appraisal Allegations Concern Non-Actionable Opinions

Plaintiffs' scant and conclusory allegations of inflated appraisals (TAC ¶¶ 86, 98, 178-

80) – again, never tied to the loans at issue here – are also insufficient to state a claim.  In a series

of recent decisions, judges in this District have consistently recognized that "neither an appraisal

nor a judgment that a property's value supports a particular loan amount is a statement of fact.

Each is instead a subjective opinion based on the particular methods and assumptions the

appraiser uses."  *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d

387, 393 (S.D.N.Y. 2010) (Kaplan, J.); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,

No. 08 CV 5653 (PAC), 2010 WL 1473288, at *8 (S.D.N.Y. Mar. 29, 2010) ("*DLJ*").  "A

subjective opinion is actionable under the Securities Act only if the . . . complaint alleges that the

speaker did not truly have the opinion at the time it was made public."  *Tsereteli*, 692 F. Supp. 2d

at 393.  Judge Kaplan recently held that allegations that offering documents failed to disclose

that appraisals were not conducted in accordance with the Uniform Standards of Professional

Appraisal Practice and were inflated did not state a claim under Section 11.  *Id*.  Subjective

opinions are actionable only if a complaint "alleges that the speaker did not truly have the

opinion *at the time it was made public*."  *Id.* (emphasis added).  Finding the complaint devoid of

such allegations, Judge Kaplan dismissed the appraisal-related claims.

Here, Plaintiffs do not allege that any defendants were involved in appraising properties

or knew that the loans underlying the Certificates were based on "inflated appraisals."  At best,

the skeletal appraisal allegations constitute "legal conclusion[s] not entitled to the assumption of

truth unless supported by appropriate factual allegations."  *Tsereteli*, 692 F. Supp. 2d at 393

         

(holding that quoting from a third party's report, which concluded that defendants' appraisals were not in compliance, did not satisfy pleading standard on motion to dismiss).  Plaintiffs have thus alleged only disagreement with appraisal values, which is not actionable as a matter of law. *Id.* at 393-94.; *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, No. 08 CV 5093 (HB), 2010 WL 1172694, at *10 (S.D.N.Y. Mar. 26, 2010) ("*RBS*").

> 2.      The LTV Ratio Allegations Are Dependent on the
>          Appraisal Allegations and Similarly Defective

Plaintiffs' claims relating to LTV ratios should also be dismissed "for the evident reason that [they are] dependent upon plaintiffs' unsubstantiated allegations . . . with regard to the appraisal methods." *Nomura*, 658 F. Supp. 2d at 308.  Indeed, the Complaint makes clear that the LTV ratio allegations are duplicative of, and derived from, the flawed appraisal allegations: "***Due to the inflated appraisals***, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the trusts had greater collateral and thus were less risky than they really were."  (TAC ¶ 179) (emphasis added).

**C.      The Allegations Regarding Credit Ratings Fail To State A
          Claim**

> 1.      Ratings Are Not Actionable Statements under Section 11

>> a.      Ratings Are Not Part of the Registration Statement

In the CCAC, Plaintiffs conceded that "pursuant to Securities Act Rule 436(g), the ratings assigned to a class of debt securities shall not be considered part of the Registration Statement 'prepared or certified by a person within the meaning of Section 11 of the Securities Act.'"  (CCAC ¶ 36).  Notwithstanding this concession – now tellingly omitted from the TAC – Plaintiffs allege that "the ratings were based in large part on the representations in the Offering Documents regarding the originators' purported compliance with underwriting guidelines" and "[a]s a result, the Certificates' ratings were unjustifiably high, lacked reasonable basis and did

not accurately reflect the Certificates' true risk."  (TAC ¶¶ 185-86).  Even if Plaintiffs'

allegations regarding the credit ratings assigned to the Certificates were true – and they are not –

that is irrelevant because a rating cannot give rise to '33 Act liability.  Indeed, ratings do not

even relate to the Certificates' value but are instead intended to reflect the likelihood that

scheduled payments will be made.  *See, e.g.,* BSMFT 2006-AR1 Prosp. Supp. at S-93 (Ex. P).

<div style="text-align:center">b.      Ratings Are Statements of Opinion and Not Actionable</div>

Plaintiffs do not allege that the ratings were inaccurately reported in the Offering

Documents.  There are "no misstatement[s] on the face of the documents."  *RBS*, 2010 WL

1172694, at *14; *see also Yu v. State St. Corp.*, 686 F. Supp. 2d 369, 376 (S.D.N.Y. 2010).

Rather, Plaintiffs allege that the ratings in the Offering Documents "were mischaracterized in

light of the undisclosed systematic disregard for the stated underwriting standards.  Additionally,

the Rating Agencies used models that were based primarily on the performance of fixed interest

loans and failed to consider the performance of subprime, Alt-A, no- or limited documentation

loans, or loans with interest only, option ARM and negative amortization provisions."  (TAC

¶ 185).  As an initial matter, there is no duty to disclose the methodologies or models used by the

Rating Agencies, so the alleged failure to disclose this information cannot constitute an

omission.  *Tsereteli*, 692 F. Supp. 2d at 395.  Moreover, as a matter of law, ratings are "a

statement of opinion by each agency that it believed, based on the models it used and the factors

it considered, that the credit quality of the mortgage pool underlying each Certificate was

sufficient to support the assigned rating."  *Id.* at 394.  These statements are not actionable

because the Complaint fails to allege that the speaker "did not truly hold [these] opinions at the

time they were made public."  *Id.  See also Lehman Bros.*, 684 F. Supp. 2d at 495 (S.D.N.Y.

2010), *DLJ*, 2010 WL 1473288, at *7.

Plaintiffs attempt to cure this fatal deficiency by offering excerpts from various news

articles, after-the-fact statements by Moody's and S&P employees, and a 2008 Summary Report from the SEC (*see* TAC ¶¶ 188-89, 191-95, 196-97), but none of the proffered quotations relate to the ratings of the Certificates at issue here.  In *Nomura*, the court held that snippets of quotes like these were insufficient to show that an opinion was an actionable misstatement.  In fact, the *Nomura* court held that "[n]one of the purported comments made by S&P and Moody's employees in the wake of the collapse of the sub-prime mortgage market (in 2007) 'support the inference' that the ratings were compromised as of the dates (in 2005 and 2006) when the registration statements and prospectus supplements became effective."  658 F. Supp. 2d at 309-10.  To the extent that any of the statements cited by Plaintiffs were made prior to the effective date of the Offering Documents – and Plaintiffs have not alleged that they were – these statements are also insufficient because Plaintiffs "offer nothing that suggests" that the statements are related to the ratings of the Certificates at issue here.  *Id.* at 307-08.  At best, Plaintiffs' allegations support an inference that a "different set of models, based on a different set of assumptions, might have resulted in a different rating."  *Tsereteli*, 692 F. Supp. 2d at 395.  Such allegations are not actionable and must be dismissed.  *Nomura*, 658 F. Supp. 2d at 309-10.

> 2.   The Risk of Downgrades and Potential Impact on the
>       Certificates Was Fully Disclosed

Even if allegedly flawed credit ratings were actionable, the risk disclosures in the Offering Documents are fatal to Plaintiffs' claims.  The Offering Documents expressly inform investors that, for example, ratings "address the likelihood of the receipt of all distributions . . . by the related certificateholder" (BSMFT 2006-AR1 Prosp. Supp. at S-93) (Ex. P), and that a rating "***is not a recommendation to buy, sell or hold securities and may be subject to revision*** or withdrawal at any time" by the Rating Agencies (*id*. (emphasis added); SAMI 2006-AR6 Prosp. Supp. at S-22) (Ex. N)).  The risk disclosures further made investors like Plaintiffs aware that a

rating downgrade could affect the liquidity and market value of the Certificates.  SAMI 2006-AR6 Prosp. Supp. at S-32 (Ex. N).  Plaintiffs cannot now be heard to complain that the rating downgrades demonstrate an omission from the Offering Documents when the risk of such downgrades was specifically disclosed.

> 3.     Allegations of Ratings Downgrades Constitute
>        Impermissible "Fraud by Hindsight"

It is well established that a plaintiff may not plead fraud by hindsight.  *Panther Partners*, 538 F. Supp. 2d at 668-69.  Yet that is exactly what Plaintiffs attempt to do here by alleging that many ratings were later downgraded, so they must have been wrong to begin with.  Moreover, the Offering Documents specifically disclosed that "[t]he ratings of the offered certificates by the rating agencies may be lowered following the initial issuance thereof as a result of losses on the mortgage loans in the related sub-hyphen loan group or groups in excess of the levels contemplated by the rating agencies at the time of their initial rating analysis."  *E.g.* SAMI 2006-AR5 Prosp. Supp. at S-22 (Ex. L).  Nothing Plaintiffs allege overcomes this fact.

The allegations purportedly supporting Plaintiffs' assertion that rating downgrades reflect misrepresentations are based on the flawed allegations of improper underwriting in the loan origination process discussed previously.  Plaintiffs allege that when reports of originators disregarding underwriting guidelines came out, the Rating Agencies downgraded the Certificates.  (*See* TAC ¶¶ 93, 99, 125).  But Plaintiffs do not point to any facts indicating that any downgrade was the result of the disclosure of information regarding improper loan underwriting or appraisals.  In fact, Plaintiffs point to no facts at all.

Not surprisingly, given the significant downturn in the housing market, the Rating Agencies have downgraded thousands of mortgage backed securities issued by dozens of issuers.  *See* Erkan Erturk & Thomas G. Gillis, *Transition Study:  Structured Financing Rating Transition*

*and Default Update as of Feb. 27, 2009*, Standard & Poor's Ratings Direct, Mar. 6, 2009, at 2

(Ex. JJ) (31% of all U.S. securities in this sector issued from 2005 through 2007 have been

downgraded and another 27% are on CreditWatch negative).  But, again, ***the specific risk of***

***downgrades was explicitly disclosed in the Offering Documents***.  There is thus nothing in the

TAC that evidences any misrepresentation in the Offering Documents involving the ratings for

the Certificates.  Judge Holwell found similar allegations deficient in *Yu*:

> Of course, from our vantage point on the other side of the financial crisis, it
> is conventional wisdom that highly rated, investment grade securities were
> exposed to risks that the rating agencies did not perceive. . . .  In hindsight,
> then, it could be alleged that investments that were viewed by defendants –
> and the marketplace – to be 'high-quality . . . investment grade instruments'
> in fact stood on shaky foundations.  But the accuracy of offering documents
> must be assessed in light of information available at the time they were
> published.  A backward-looking assessment of the infirmities of mortgage-
> related securities, therefore, cannot help plaintiffs' case.

686 F. Supp. 2d at 376-77 (internal citations omitted).  The *Nomura* court rejected similar

allegations as insufficient to show that a misrepresentation occurred.  "A securities case must be

dismissed where a complaint merely pleads subsequent facts and developments in the attempt to

establish an inference that these eventualities must have been known (or knowable) to defendants

on the effective date of the registration statement."  *Nomura*, 658 F. Supp. 2d at 309.  *See*

*Panther Partners*, 538 F. Supp. 2d at 669-70 (allegations that "have been craftily drafted to

imply that what only became clear due to subsequent events was somehow known . . . earlier in

time . . . is pleading with 20/20 hindsight" and "must fail").[13]

---

[13] The Rating Agencies' role in the transactions was well-known.  It is well-established that there
is no duty to disclose that which is publicly known.  *RBS*, 2010 WL 1172694, at *12.  Moreover,
"the rating agencies' role in structuring the Certificates is not material as a matter of law."
*Lehman Bros.*, 684 F. Supp. 2d at 492.

### D.     The Impact Of External Market Factors Was Disclosed

The Offering Documents warned Plaintiffs in no uncertain terms that external market factors and specific loan characteristics could impact the receipt of pass-through payments and/or the value of Plaintiffs' Certificates.  The warnings could not have been clearer:

- There may be no secondary market, limiting Certificateholders' ability to sell their Certificates.  *E.g.* SAMI 2006-AR5 Prosp. Supp. at S-22 (Ex. L);

- The interest-only feature of most of the loans is a new feature and the "***performance of these mortgage loans may be significantly different than mortgage loans that fully amortize***."  *E.g. id.* at S-31;

- A market-wide decline in real estate values would likely affect the loans backing the Certificates, potentially leading to losses.  *E.g. id.* at S-32; and

- Conditions in the mortgage market were changing and "***[d]elinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase*** . . . ."  ARM 2007-3 Prosp. Supp. at S-23 (Ex. J).

Plaintiffs were warned that deteriorating economic conditions, particularly in the real estate market, could cause their Certificates to lose value.  Everyone agrees that real estate values have declined and economic conditions have significantly worsened occurred since the issuance of the Certificates.  The Offering Documents specifically warned that such events could negatively affect the value of the Certificates, and these disclosures belie Plaintiffs' allegations.

### E.     Plaintiffs Do Not Allege That Any Purported Misrepresentation Affected The Loans In The Pools Or Was Material

Plaintiffs' claims also fail because they have alleged no facts indicating that any of the alleged misrepresentations would have misled a reasonable investor as to the nature or value of the Certificates.  *See, e.g., McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *see also I. Meyer Pincus & Assocs.*, 936 F.2d at 761.  Plaintiffs do not tie any of the allegations of disregard for underwriting guidelines, inaccurate property appraisals, improper servicing and collection practices or inaccurate credit ratings to any of the loans in any of the

mortgage loan pools backing Plaintiffs' Certificates.  Further, even assuming that some "non-

complying" loans were included in some loan pool for some offering, Plaintiffs do not allege that

the amount of "non-complying" loans reached material levels, either relative to the number of

loans held in the mortgage pools or to the performance of similarly-situated loans during the

housing meltdown.  Without such allegations, Plaintiffs cannot state a Section 11 claim.  *See*

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187,

206-07 (2d Cir. 2009) (dismissing Section 11 claim for lack of materiality); *Garber v. Legg*

*Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (dismissing Sections 11 and 12(a)(2)

claims as "too conclusory, as they offer no possibility at all of assessing materiality"), *aff'd*, 347

F. App'x 665 (2d Cir. 2009); *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 419

(S.D.N.Y. 2008) ("[i]f the alleged omission or misstatement is explicitly addressed in the risk

disclosures of the offering documents, it is immaterial.").

## III.   PLAINTIFFS' SOLE REMEDY IS THE CURE OF NON-COMPLYING LOANS

Even if Plaintiffs were correct that there were material misrepresentations or omissions

regarding the loans backing the Certificates – and their allegations do not support such an

inference – under the Offering Documents, the sole remedy for breach of any representations or

warranties is for the seller to repurchase or replace that specific loan.  This "sole remedy"

provision negates Plaintiffs' '33 Act claims, as the Fifth Circuit recently held.  *Lone Star Fund V*

*(U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 389 (5th Cir. 2010).

In each securitization, the seller of the loans made certain representations and warranties

in the mortgage loan purchase agreement ("MLPA") regarding each loan.  *See, e.g.*, BALTA

2006-6 MLPA, § 7.  (Ex. KK).  These included representations that:

> (xiv) at the time of origination, each Mortgaged Property was the subject
> of an appraisal which conformed to the underwriting requirements of the

originator of the Mortgage Loan; . . .

(xxiii) each Mortgage Loan was originated in accordance with the underwriting guidelines of the related originator . . . .

*Id.*, § 7.  Such provisions are part of the Offering Documents' representations concerning the loan pools, and, as noted below, are specifically referenced in the relevant Prospectuses.  To the extent there was a breach of these representations, or any other representations regarding the loans, the MLPA provided the built-in remedy for such a breach:

> The obligations of [the Mortgage Loan Seller] to cure, purchase or substitute a qualifying Substitute Mortgage Loan shall constitute **the Purchaser's, the Trustee's and the Certificateholder's sole and exclusive remedies under this Agreement or otherwise respecting a breach of representations or warranties hereunder with respect to the Mortgage Loans**, except for the obligation of [the Mortgage Loan Seller] to indemnify the Purchaser for such breach as set forth in and limited by Section 4 hereof.

BALTA 2006-6 MLPA, § 7(xxvii) (Ex. KK).  The MLPAs were incorporated by reference in the Offering Documents.  Each Prospectus similarly described Certificateholders' "sole remedy" for any breach of representations and warranties about the individual loans.  *See, e.g.*, BALTA 2006-6 Prosp. at 23 (Ex. G) ("[t]he foregoing [repurchase or substitution] obligations will constitute **the sole remedies available to securityholders** or the trustee **for a breach of any representation by a Seller or for any other event giving rise to the obligations as described above**."); ARM 2006-4 Prosp. at 23 (Ex. I) (same); BSMFT 2006-AR1 Prosp. at 20 (Ex. Q) (same).

In *Lone Star*, the Fifth Circuit found that an identical "sole remedy" provision appearing in a prospectus for an essentially identical offering precluded the plaintiffs' '33 Act claims because the sole remedy provision "change[s] the nature of [the issuer's] representation."  *Id.* at 390.  In essence, the court found, the issuer had represented that "the mortgages *should* be non-delinquent, but if some mortgages were delinquent then [defendants] would either repurchase them or substitute performing mortgages into the trusts.  One way or another, [defendants]

committed that the mortgage loan pools would be free of delinquent mortgages." *Lone Star*, 594

F.3d at 389 (emphasis in original).  In dismissing plaintiffs' Section 11, 12(a)(2) and 15 claims,

the Fifth Circuit held that plaintiffs, as sophisticated investors, had "no basis to ignore these

provisions or their consequences." *Id*.

      This reasoning applies equally to the Certificates purchased by Plaintiffs.  The Offering

Documents for each of the Certificates incorporated the MLPA and set forth Plaintiffs' "sole

remedy" for any breach of a representation or warranty regarding a loan underlying the

Certificates, *i.e.*,  repurchase or replacement of specific loans.  This was a critical component of

the deal structure that "change[d] the nature of" the representations at issue here.  *Id*. at 390.

There was thus no misrepresentation upon which Plaintiffs can base a claim and the Complaint

must be dismissed.  *Lone Star*, 594 F.3d at 389-90.[14]

## IV.    PLAINTIFFS' CLAIMS ARE TIME-BARRED

      Plaintiffs failed to timely assert their claims.  They were on inquiry notice before August

2007, one year before NJ Carpenters filed the Original Complaint.  Over the next two years and

two months, four additional complaints were filed, adding seven new plaintiffs on 13

Certificates.  *A fortiori*, absent "relation back" to the Original Complaint or tolling – and neither

doctrine applies here – all of these later-filed claims are also time-barred.  Plaintiffs can offer no

credible argument as to the timeliness of the claims relating to these 13 Certificates.  Moreover,

---

[14] Indeed, Plaintiffs do not even allege that defendants here were aware of any non-complying loans, which is itself a basis for dismissal.  Section 1111 of SEC Regulation AB requires only that "known" deviations from stated underwriting guidelines be disclosed in offering materials for mortgage-backed securities.  17 C.F.R. § 229.1111(a)(3); *Landmen Partners*, 659 F. Supp. 2d at 545 (dismissing '33 Act claims where plaintiff did not allege that defendants had knowledge of omitted information); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 255 (S.D.N.Y. 2004) ("When a plaintiff claims that the defendant failed to disclose information in a prospectus, the plaintiff must plead facts demonstrating the defendant possessed the omitted information when the registration statement became effective and that the defendant had a duty to disclose that information.").

the claims on 10 of the 14 Certificates were asserted after expiration of the three year statute of

repose in 15 U.S.C. § 77m and are barred for this independent reason.

For the convenience of the Court, the below chart sets forth the relevant dates:

| Certificate | Plaintiff-Purchaser | Pleading | Date First Asserted by Plaintiff-Purchaser | Inquiry Notice Date | Date Statute of Repose Expired |
|---|---|---|---|---|---|
| BSMFT 2006-AR1 | NJ Carpenters | Orig. Compl. | Aug. 20, 2008 | Aug. 20, 2007 | N/A |
| SAMI 2006-AR5 SAMI 2006-AR6 | Boilermakers | FAC | May 15, 2009 | May 15, 2008 | N/A N/A |
| ARM 2006-4 ARM 2007-3 BALTA 2006-6 | MISPERS | CCAC | Feb. 9, 2010 | Feb. 9, 2009 | Sept. 28, 2009 N/A Sept. 29, 2009 |
| BALTA 2006-8 | Detroit | TAC | Oct. 29, 2010 | Oct. 29, 2009 | Dec. 28, 2009 |
| BALTA 2007-1 SAMI 2006-AR7 | Oregon | TAC | Oct. 29, 2010 | Oct. 29, 2009 | Aug. 31, 2010 Aug. 31, 2009 |
| BSABS 2007-HE3 BSABS 2007-HE4 | IPERS | TAC | Oct. 29, 2010 | Oct. 29, 2009 | Mar. 29, 2010 Apr. 12, 2010 |
| ARM 2007-1 | Ft. Lauderdale | TAC | Oct. 29, 2010 | Oct. 29, 2009 | Feb. 27, 2010 |
| BSMFT 2006-AR4 BSMFT 2006-AR5 | San Antonio | TAC | Oct. 29, 2010 | Oct. 29, 2009 | Nov. 30, 2009 Dec. 29, 2009 |

### A.    Plaintiffs Were On Inquiry Notice Before August 20, 2007

Claims under the '33 Act are timely if brought "within one year after the discovery of the

untrue statement or the omission, or after such discovery should have been made by the exercise

of reasonable diligence."  15 U.S.C. § 77m.  Actual, constructive, or inquiry notice of facts

giving rise to a claim causes the '33 Act statute of limitations to begin to run.  *Dodds v. Cigna*

*Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).  Inquiry notice arises "'when the circumstances

would suggest to an investor of ordinary intelligence the probability' that she has a cause of

action."  *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 245 (S.D.N.Y 2007) (quoting

*Levitt v. Bear, Stearns & Co. Inc.*, 340 F.3d 94, 101 (2d Cir. 2003)).  The circumstances giving

rise to the duty to inquire are referred to as "storm warnings."  *Id.*  Storm warnings need not

detail every aspect of the alleged wrongdoing; "[r]ather a totality-of-the-circumstances analysis

applies."  *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).  "[T]he more widespread and prominent the public information disclosing the facts underlying the fraud, the more accessible this information is to plaintiffs, and the less company-specific the information must be."  *Id.* at 432.[15]

As this Court recently held, it is Plaintiffs' burden "to plead, among other things, the time and circumstances of its discovery of the fraudulent statement upon which its claim is based."  *Morgan Stanley*, 2010 WL 3239430, at *6.  But, as in *Morgan Stanley*, Plaintiffs here do not "allege the precise timing or the means by which [they] gained knowledge of the relevant facts."  *Id.*  In fact, Plaintiffs say nothing about how and when they "discovered" that, according to them, there was something wrong with the offering materials for the 14 Certificates at issue here.

In its recent decision in *Morgan Stanley*, this Court held that a May 2009 class action complaint in which the plaintiff alleges that the defendants made misleading statements and omissions in connection with the securitization and sale of mortgage-backed securities in violation of the '33 Act complaint was not timely filed.  This Court took note of, *inter alia*, news articles, SEC reports, ratings downgrades and a similar complaint filed by the plaintiff's counsel in another action, and held that "[t]his body of information makes it plain that inquiry notice arose well before May 2008."[16]  *Morgan Stanley*, 2010 WL 3239430, at *8.

As in *Morgan Stanley*, such "storm warnings" had sounded by August 20, 2007 – one year before NJ Carpenters filed the Original Complaint.  Indeed, by then, the storm had already hit, and media reports and court filings had transformed from "storm warnings" to damage

---

[15] In considering whether a plaintiff was on inquiry notice, courts, including this one, regularly "take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings containing certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice . . . ."  *Staehr*, 547 F.3d at 425; *see also Shah v. Meeker*, 435 F.3d 244, 249 (2nd Cir. 2006) (collecting cases dismissing claims based on as few as two articles or lawsuits); *Morgan Stanley*, 2010 WL 3239430, at *7.
[16] May 2008 was one year before the *Morgan Stanley* complaint was filed.

reports.  Plaintiffs had more than enough information by then to suggest that they should inquire as to whether there were any misstatements in the Offering Documents for the Certificates regarding the underwriting practices of loan originators, appraisal values and rating agency models.  Plaintiffs cited many of these pre-August 2007 reports in the Original Complaint and the FAC, but – obviously aware that these citations showed that they had failed to bring suit within a year of inquiry notice – they conspicuously deleted such references in the CCAC and the TAC.  What is clear, however, is that despite the very "storm warnings" on which Plaintiffs based their various complaints, they have done no investigation of their own, as evidenced by the lack of any specific factual allegations regarding the loan pools backing Plaintiffs' Certificates.

Instead of basing their allegations on their own thorough investigation, Plaintiffs rely exclusively on media reports on the housing industry, government inquiries and actions filed by other plaintiffs.  Indeed, the TAC is ***entirely bereft*** of allegations that any of the generalized issues Plaintiffs identify in the mortgage industry affected a single loan in any of the Certificates at issue here.  Although Plaintiffs have now sanitized their pleading to remove pre-August 20, 2007 events, they cannot escape the fact that previous iterations of their pleading referenced articles, criminal charges and government inquiries from more than one year prior to instituting this action that conclusively demonstrate that Plaintiffs were on inquiry notice.  For example, in the Original Complaint, Plaintiffs cited reports that two Bear Stearns hedge funds, which invested in AAA rated tranches of subprime, mortgage backed securities, filed for bankruptcy in July 2007.  (Original Compl. ¶ 49).  Realizing that they pled themselves out of court in their prior complaints, Plaintiffs go to great lengths to conceal this fact by deleting references to certain articles in the TAC that they previously cited.  (*See* FAC ¶ 180 (citing to a "stunning admission" by Moody's in ***April 2007*** that "it was revising the model it used to evaluate subprime mortgages, which was 'first introduced in 2002'"); ¶ 193 (citing an April 24, 2007

Wall Street Journal article that described an instance in which Moody's increased the proportion

of AAA ratings within a mortgage-backed security after its client complained)).  Plaintiffs'

clever draftsmanship cannot obscure the fact that, by their own allegations, they were on notice

of the very issues about which they claim to have been misled before August 20, 2007.

Like the previous pleadings, the TAC continues to cite to 2007 reports that (1) American

Home (one of the principal originators of loans underlying a number of Certificates at issue here)

entered bankruptcy on August 6, 2007 (TAC ¶ 137), and (2) a former employee of both

American Home and Countrywide was indicted for engaging in mortgage fraud in April 2007

(TAC ¶ 138).[17]  Additional media coverage of similar topics, also predating August 20, 2007,

confirms that sufficient information was available to Plaintiffs that should have caused them to

conduct a thorough investigation.  *See, e.g.*, Ruthie Ackerman, *AHM Infected By Subprime*

*Problems*, Forbes, July 26, 2007 (Ex. NN); Vikas Bajaj, *East Coast Money Lent Out West*, N.Y.

Times, May 8, 2007 (Ex. OO); Ruth Simon & Michael Hudson, *Bad loans draw bad blood*, Wall

Street Journal, Oct. 09, 2006 (Ex. PP) (mortgages are defaulting early because of flawed property

appraisals); Kenneth R. Harney, *Appraisers Under Pressure to Inflate Values*, Washington Post,

Feb. 3, 2007 (Ex. QQ) (reporting that appraisers were being pressured to inflate valuations);

Sharon L. Crenson, *New York State Subpoenas Appraiser, Broker in Probe*, Bloomberg.com,

May 18, 2007 (Ex. RR) (same); Joseph Rocco, *Early Defaults Rise in Mortgage Securitization,*

Moody's Investors Service, Jan. 18, 2007 (Ex. SS) (report stating that Certificates issued in

2005-2006 had sharply higher foreclosure than earlier-issued ones); Danielle Reed, *EXTRA*

*CREDIT:  Investor Beware of Subprime Risk Models*, Dow Jones Newswires, July 18, 2007 (Ex.

---

[17] Plaintiffs allege only that the employee was convicted "as early as March 2008" (TAC ¶ 138),
ignoring that he was indicted much earlier and pled guilty in ***April 2007*** – facts that were widely
reported at the time.  *See Alaska Originator Indicted for Mortgage Fraud with Stated Income*
*Documentation*, Mortgage Fraud Blog, Jan. 10, 2007 (Ex. LL); *Alleged ring leader pleads guilty*
*in mortgage fraud case*, Associated Press, Apr. 23, 2007 (Ex. MM).

TT) ("S&P . . . announced changes to its model for rating subprime bonds, including making higher assumptions about default expectations for certain types of common subprime loans."); *Moody's Downgrades Residential Mortgage-Backed Securities*, CNBC.com, July 10, 2007 (Ex. UU); E. Scott Reckard & Mike Hudson, *More Mortgage Lenders Targeted*, L.A. Times, Jan. 31, 2006 (Ex. VV) (multiple lawsuits filed against EMC in connection with loan servicing practices).

In addition, industry and SEC reports, and U.S. Senate hearings targeted at the subjects of Plaintiffs' allegations were all published before August 20, 2007. *See, e.g.*, *Ending Mortgage Abuse: Safeguarding Homebuyers*, Testimony of Alan Hummel, Chair of the Government Relations Committee Appraisal Institute and Senior Vice President and Chief Appraiser of Forsythe Appraisals, LLC, before the U.S. Senate Subcommittee on Hous., Transp. & Cmty. Dev., June 26, 2007 (Ex. WW) (testifying that appraisers experienced conflicts of interest and were pressured to doctor appraisals).  David Callahan, *Home Insecurity*, Demos Briefing Paper, Mar. 2005 (Ex. XX) (noting that "Appraisal fraud is not a new problem, but the refinancing boom . . . has created fresh incentives," and "[u]p to half of all appraisers have reported feeling pressure from lenders or brokers to overstate property values.").  U.S. Sec. & Exch. Comm'n, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, Jan. 2003 at 40 n.109 (Ex. YY) ("Among other things, concerns had been expressed that a rating agency might be tempted to give a more favorable rating to a large issue because of the large fee, and to encourage the issuer to submit future large issues to the rating agency.").

Moreover, more than one year before the FAC was filed in May 2009 – and more than *two years* before the TAC was filed in October 2010 – rating agencies had begun downgrading investment grade tranches of 13 of the 14 Certificates (all but the BSMFT 2006-AR1 offering). For example, S&P and Moody's made *192 downgrades* to investment grade BALTA 2006-6 certificates before February 19, 2009, starting in August 2007.  *See* Ex. CCC.  Similarly, S&P

and Moody's made *112 downgrades* to investment grade BSMFT 2006-AR5 certificates before

February 19, 2009, beginning in April 2008.  *See* Ex. BBB.  *See also* Ex. ZZ at 2-11 (chart of

ratings downgrades).  In total, there were 977 downgrades to investment grade Certificates in

these 13 Certificates.  *See id.*  The large number of downgrades – by comparison, in *Morgan*

*Stanley*, this Court held that 17 downgrades of tranches of a single Certificate put the plaintiff on

notice (*see* 2010 WL 3239430, at *8) – is a direct result of Plaintiffs' extraordinary delay in

asserting their claims.[18]

Finally, court filings have either put Plaintiffs on notice of their claims or confirmed that

the basis of their claims was well known long before they sued.  *See Bigverdi v. Countrywide*

*Bank FSB*, No. 07-3454 (AHS), Docket No. 7, at 3-5 (C.D. Cal. May 25, 2007) (Ex. MMM)

(alleging that Countrywide failed to disclose information about loan interest rates to get

borrowers to take on loans they could not afford); *Pappas v. Countrywide Fin. Corp. et al.*, No.

07 CV 05295, Dkt. No. 1, (C.D. Cal. Aug. 14, 2007) (Ex. NNN) (alleging that Countrywide's

increasing impairment charges were due to "the erosion of underwriting guidelines."); *Lehman*

*Bros.*, 684 F. Supp. 2d at 489 ("the risk that the ratings agencies operated under a conflict of

interest because they were paid by the issuers *had been known publicly for years*" (emphasis

added) (citing *2003* Congressional testimony).

At the very least, the filing of the Original Complaint in this case by NJ Carpenters put

the other seven named plaintiffs on notice of their claims by August 2008.  As the Western

District of Washington recently stated:

---

[18] Exhibit ZZ, which lists each of the downgrades, shows that the vast majority occurred between
May 2008 (the inquiry notice date in *Morgan Stanley*) and October 2009 (the last inquiry notice
date here).  This was the very heart of the economic downturn and it is unsurprising that there
would be a large number of downgrades during the additional 17 months these Plaintiffs waited
to assert their claims.  Additionally, the sheer number of Certificates at issue in the two actions –
14 here, one in *Morgan Stanley* – further explains the disparity.

> Plaintiffs cannot, however, ignore their own allegations.  Plaintiffs'
> allegations are based on substantially identical statements in the Offering
> Documents and focus almost exclusively on the shelf Registration
> documents.  If these allegations are sufficient to state a claim as to the
> earlier Certificates, they must also be sufficient to put other holders of
> WaMu certificates on notice of underwriting and appraisal issues.

*WaMu*, 2010 WL 3815796, at *9 (dismissing claims involving certificates not pled within one year of inquiry notice).  *See also Maine State Ret. Sys.*, 2010 WL 4452571, at *4 (dismissing as time-barred claims first filed more than three years after the offering date or more than one year after first complaint identifying the certificates at issue, where plaintiffs had no standing to assert claims in original complaint); *In re Wells Fargo Mortgage-Backed Certificates Litig.*, No. 09-CV-01376-LHK, 2010 WL 4117477, at *7 (N.D. Cal. Oct. 19, 2010) ("*Wells Fargo*") (dismissing claims where plaintiffs with standing first asserted them in amended complaint filed more than one year after plaintiffs were put on notice by filing of original complaint).

As in *Morgan Stanley*, this body of information makes it plain that Plaintiffs were on inquiry notice long before August 2007, one year before the filing of the Original Complaint, and their claims are time-barred.  *A fortiori*, the FAC, Pension Trust Complaint, CCAC and TAC (filed in May 2009, July 2009, February 2010 and October 2010, respectively), in which claims relating to 13 Certificates for which no Plaintiffs previously had standing were first asserted, were not timely filed.  *In re Openwave Sys.*, 528 F. Supp. at 245 (inquiry notice arises "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has a cause of action") (citation omitted).

**B.      Certain Of Plaintiffs' Claims Are Barred By The Three Year
          Statute Of Repose For '33 Act Claims**

Plaintiffs' claims concerning ten Certificates[19] – all first asserted by a plaintiff with

standing in 2010 – are time barred because they were not asserted within the three year statute of

repose set forth in 15 U.S.C. § 77m.  The statute provides: "In no event shall any . . . action be

brought to enforce a liability created under [§ 11] more than three years after the security was

bona fide offered to the public, or under [§ 12(a)(2)] more than three years after the sale."  In

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 704 (2d Cir. 1994), the

Second Circuit held that "[t]he three year period is an absolute limitation which applies whether

or not the investor could have discovered the violation."  Each of these offerings and purchases

occurred more than three years before a plaintiff with standing to sue first sued on these

Certificates.[20]

        Similarly, all claims against the Individual Defendants must be dismissed for the

additional reason that the statute of repose for officers and directors runs from the date of the

shelf registration, not the prospectus supplement.  *See Maine State Ret. Sys.*, 2010 WL 4452571,

at *4 n.8 (noting that the SEC changed the rules regarding the trigger date for the statute of

repose for issuers and underwriters, but not as they relate to directors and officers) (citing 17

C.F.R. §§ 230.430B(f)(2, 4); *In re Countrywide Fin. Corp. Sec. Litig.*, No. CV-07-05295, 2009

WL 943271, at *6-7 (C.D. Cal. Apr. 26, 2009)).  Accordingly, because the two Registration

Statements were filed on March 10 and March 31, 2006 (TAC ¶ 1), all claims first asserted after

---

[19] The ten Certificates are: ARM 2006-4, BALTA 2006-6, BALTA 2006-8, BALTA 2007-1,
SAMI 2006-AR7, BSABS 2007-HE3, BSABS 2007-HE4, ARM 2007-1, BSMFT 2006-AR4 and
BSMFT 2006-AR5.

[20] The BALTA 2006-6 and BSARM 2006-4 certificates were issued in September 2006 (TAC
¶ 38), but MISPERS did not assert its claims until the CCAC was filed in February 2010.  The
eight Certificates on which a plaintiff with standing first sued in the TAC were issued between
August 31, 2006 and April 27, 2007 (*id.*), but the new plaintiffs did not assert their claims until
October 2010, more than three years after the ***last*** of the new Certificates was issued.

March 31, 2009 – that is, all claims except those relating to the BSMFT 2006-AR1 offering in the Original Complaint – are time-barred as against the Individual Defendants.

### C. Claims First Alleged In The FAC Or Later Pleadings Do Not Relate Back To The Original Complaint And Are Not Tolled And, Hence, Are Time-Barred

#### 1. There Is No Relation Back

The Original Complaint asserted claims with respect to only one offering – the BSMFT 2006-AR1. The FAC, filed on May 15, 2009, added a new plaintiff (Boilermakers) and purported to state claims relating to a new Registration Statement and 43 new offerings.[21] The CCAC, filed on February 19, 2010, added a new plaintiff (MISPERS) and included claims relating to 42 offerings. The TAC, filed on October 29, 2010, purports to add five new plaintiffs (Detroit, Oregon, IPERS, Ft. Lauderdale and San Antonio) and includes claims relating to 14 offerings, eight of which (BALTA 2006-8, BALTA 2007-1, SAMI 2006-AR7, BSABS 2007-HE4, BSABS 2007-HE3, ARM 2007-1, BSMFT 2006-AR4 and BSMFT 2006-AR5) were not owned by any plaintiff that had previously asserted any claims in this case. *See supra* at p. 32 (chart of claims). Because none of the offerings added to this action through amended pleadings was included in the Original Complaint, claims relating to those offerings do not relate back to the initial pleading and are thus time-barred. Plaintiffs' attempts to expand the proper time frame of their claims through amendments must be rejected. "Rule 15(c) may not be used as an end-run around the statute of limitations to add a party that 'filed a separate complaint that was time-barred.'" *Morgan Stanley*, 2010 WL 3239430, at *9 (quoting *Levy v. U.S. Gen. Accounting Office*, 175 F.3d 254, 255 (2d Cir. 1999).

In *Morgan Stanley*, this Court rejected the plaintiff's effort to have a new complaint's

---

[21] The Pension Trust Complaint, filed on July 9, 2009, asserted claims as to eight additional Certificates. These claims have since been withdrawn as they have not been included in any subsequent consolidated pleading.

claims regarding additional offerings relate back to the original filing.  The original *Morgan Stanley* plaintiff filed suit in December 2008, more than 120 days before the new plaintiff filed suit in May 2009.  "Accordingly, Defendants did not receive notice of [the new plaintiff's claims] against it within the period required by Rule 4(m).  Nor is there any indication that Defendants knew or should have known prior to the filing of the [new complaint] that [new plaintiff's] claims would have been asserted against them but for a mistake concerning the proper plaintiff's identity."  *Id.* at *9.  Similarly, in *Wells Fargo*, the court held that newly added plaintiffs could not "show an identity of interests with the [original] plaintiffs regarding [the new offering] because no [original] plaintiff invested in that Trust."  2010 WL 4117477, at *7.

    This Court's holding is well-grounded in precedent.  In *WorldCom*, Judge Cote rejected a similar effort to "relate back" an amended complaint's new claims regarding an additional bond offering.  *In re WorldCom Sec. Litig.*, 308 F. Supp. 2d 214 (S.D.N.Y. 2004).  "The original complaints were based on an entirely separate transaction and the Section 11 claims in the amended pleading that are based on the May 2000 Bond Offering do not relate back to the original complaints."  *Id*. at 232 (emphasis added).  Also, in *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005), the court held that the claims of a class of plaintiffs that first appeared in an amended complaint did not relate back to the filing of the original complaint because "[n]othing in the initial complaint put Defendants on notice that they would be subject to claims for stock purchases before the October 20, 2000 Optronics IPO."  *Id.* at 529.  *See also In re Bausch & Lomb, Inc. Sec. Litig.,* 941 F. Supp. 1352, 1363-65 (W.D.N.Y. 1996) (claims alleged in amended complaint on behalf of new class of plaintiffs who purchased stock in different period do not relate back and are time-barred).

    Here, even if the Original Complaint was filed within the one year inquiry notice period – and it was not – nothing in the Original Complaint put Defendants on notice that they would be

subject to claims for anything other than the single offering referenced in that pleading.  Plaintiff Boilermakers first asserted its claims in the FAC, which was filed on May 15, 2009, more than 120 days after the filing of the Original Complaint.  MISPERS did not appear in the case until it filed a lead plaintiff application in November 2009 and did not sue until its claims were included in the CCAC, filed in February 2010 – both more than a year after the Original Complaint and more than nine months after the FAC.  And Detroit, Oregon, IPERS, Ft. Lauderdale and San Antonio did not surface until the current TAC was filed on October 29, 2010, more than two years after the Original Complaint.  As in *Morgan Stanley*, there is no indication that any of these new plaintiffs were not named in the Original Complaint "because of a mistake concerning [their] identity."  2010 WL 3239430, at *9.  Accordingly, Defendants "had not received adequate notice of the new plaintiff[s'] claims against" them within the 120-day period.  *Id.*  As a consequence, all claims relating to the BALTA 2006-6, ARM 2006-4 and the eight Certificates held by the plaintiffs added in the TAC are time-barred by the absolute three-year statute of repose contained in 15 U.S.C. § 77m.

### 2.      Plaintiffs' Claims Were Not Tolled

The doctrine of tolling does not save Plaintiffs' claims, as it does not apply to any claim first asserted in a pleading post-dating the Original Complaint.  Although, under *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), statutes of limitations are tolled for absent class members seeking to intervene in a pending class action, the tolling is available only to "asserted members of the class" described in the original complaint.  *Id*. at 554.  Here, the Original Complaint defined the class solely by reference to the single BSMFT 2006-AR1 offering.  (*See* Original Compl. ¶ 1 (claims asserted on behalf of class of plaintiffs "who purchased pursuant to or traceable to the Offering of $973,112,000 of Mortgage Loan Pass-Through Certificates, Series 2006-AR1 Groups I and II, issued by Bear Stearns Mortgage Funding Trust 2006-AR1 on or

about July 28, 2006.")).  The claims in the FAC, the CCAC and the TAC are made on behalf of purchasers of new Certificates not identified in the Original Complaint.  Indeed, many of the Certificates first identified in the FAC were issued pursuant to a different Registration Statement than the BSMFT 2006-AR1 Certificates, which were the subject of the Original Complaint.

There is no tolling of the statute of limitations as to the various new Certificates added in post-2008 pleadings because no plaintiff had standing to assert claims as to any Certificate other than the BSMFT 2006-AR1.  Under now-established law, the absence of standing precludes tolling.  *See Maine State Ret. Sys.*, 2010 WL 4452571, at *6 ("This Court shares the concern of other district courts that extending *American Pipe* tolling to class action claims the original named plaintiffs had no standing to bring will encourage filings made merely to extend the period in which to find a class representative."); *Wells Fargo*, 2010 WL 4117477, at *6; *WaMu*, 2010 WL 3815796, at *10; *Palmer v. Stassinos*, 236 F.R.D. 460, 466 n.6 (N.D. Cal. 2006) (holding that where original plaintiff had no standing, claim is not tolled because "it would be beyond the constitutional power of a federal court to toll a period of limitations based on a claim that failed because the claimant had no power to bring it.").  Further, statutes of repose are not subject to tolling.  *See Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 88 n. 4 (2d Cir. 2010) (contrasting a statute of limitations, which is "often subject to tolling principles," with a statute of repose, which "extinguishes a plaintiff's cause of action after the passage of a fixed period of time, usually measured from one of the defendant's acts"); *Take-Two Interactive Software v. Brant*, No. 06 Civ. 5279 (LTS), 2010 WL 1257351, at *5 (S.D.N.Y. Mar. 31, 2010) (Swain, J.) (three-year statute of repose under Securities Exchange Act of 1934 is a "cutoff that is not subject to tolling principles").

Additionally, even if *American Pipe* tolling were applicable here, such tolling is limited to actions filed by *individual* class members; *American Pipe* does not permit so-called

"piggyback" tolling of later-filed *class* claims.  In *Korwek v. Hunt*, 827 F.2d 874, 878-79 (2d Cir.

1987), the Second Circuit refused to extend the *American Pipe* rule to successive class actions

and agreed with the Fifth Circuit's observation that "'putative class members may [not]

piggyback one class action onto another and thus toll the statute of limitations indefinitely.'"  *Id.*

at 878 (quoting *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1351 (5th

Cir. 1985)).

<div style="text-align:center">

3.    Without "Relation Back" or Tolling, Plaintiffs' Post-2008
Claims Are Time-Barred

</div>

Absent "relation back" or tolling, all claims asserted after the Original Complaint are

time-barred.  Even if Plaintiffs were not on inquiry notice by August 20, 2007 (one year before

the Original Complaint was filed), they cannot credibly argue that events occurring prior to May

15, 2008 (one year before the FAC was filed), February 19, 2009 (one year before the CCAC

was filed), or October 29, 2009 (one year before the TAC was filed) were insufficient to put

them on notice of potential claims.  In addition to NJ Carpenters' own August 2008 pleading,

storm warnings were clear upon the following widely publicized events, each of which Plaintiffs

cite and each of which was sufficient to put them on inquiry notice:

- The collapse of Bear Stearns's stock price and ultimate sale in March 2008 (FAC ¶ 105);

- Allegations made in a federal action filed on April 11, 2008 that Countrywide departed from underwriting standards (CCAC ¶ 88); and

- Reports on investigations into American Home's departure from underwriting guidelines as early as March 2008 (*id.* ¶¶ 112, 113).

Additionally, before the end of 2007, lawsuits had already been filed alleging claims relating to

ratings similar to those in the FAC.  *See Teamsters Local 282 Pension Trust Fund v. Moody's*

*Corp.*, No. 07 CV 8375, Docket No. 1, at ¶ 4 (S.D.N.Y. Sept. 26, 2007) (Ex. OOO).  By the end

of 2008, the financial crisis had hit, dozens of MBS litigations had been filed – including NJ

Carpenters' initial complaint in this case – and "subprime" was a household word, yet no Plaintiff owning 11 of the 14 Certificates at issue here sued until February 2010, when the CCAC was filed (adding three Certificates), or October 2010, when the TAC was filed (adding eight Certificates).  Thus, even if the Original Complaint, which involved a single offering and a single Certificate, was timely filed, claims regarding the other 13 Certificates added through the FAC, the CCAC and the TAC are plainly time-barred.

Finally, Plaintiffs' claims concerning ten of the 14 Certificates are time-barred because the claims were not asserted by any plaintiff with standing within the three year statute of repose and *American Pipe* tolling does not apply here, as explained in Point IV(C)(2), *supra*.

## V.    PLAINTIFFS ALLEGE NO COGNIZABLE HARM

Plaintiffs' claims suffer from an additional fatal flaw – there are no allegations of any cognizable harm suffered by Plaintiffs with respect to 13 of the 14 Certificates.  Plaintiffs allege that they suffered losses either because they sold some of their Certificates for less than they paid or because their Certificates are "valued" at less than the purchase price.  (TAC ¶¶ 17-24).  But such a decline in value, whether realized by a sale or not, ignores the clear and prominent risk disclosures in the Offering Documents that the absence of a defined market for the Certificates could result in substantial price fluctuations, limit the liquidity of the investment and, in some cases, might result in Plaintiffs having to sell their positions at a loss.  *E.g.* ARM 2007-3 Prosp. Supp. at S-16 (Ex. J) ("The Offered Certificates will have limited liquidity, so ***you may be unable to sell your securities or may be forced to sell them at a discount*** from their fair market value."  (Emphasis added)).  *See also* Appendix A at A-19.  That this prominently disclosed risk came to pass for some of plaintiffs' Certificates does not give rise to a legally cognizable injury

such that Plaintiffs can assert claims as to these 13 Certificates.[22]

Indeed, absent allegations that a pass-through payment had been missed, the risk disclosures preclude claims asserting a loss of value.  *See NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, No. 08 Civ. 10783 (MGC), 2010 WL 4054149, at *3-4 (S.D.N.Y. Oct. 15, 2010) ("*Goldman*").  Here, other than Plaintiffs' passing allegation concerning a single missed payment on a single Certificate (TAC ¶ 18),[23] Plaintiffs conspicuously fail to allege that they have not received all pass-through payments to which they are entitled.  Nor is it sufficient to allege that default is "imminent," as Plaintiffs seem to believe.  (*Id*. ¶ 74).  *See Jackson Nat'l Life Ins. Co. v. Ligator*, 949 F. Supp. 200, 208 (S.D.N.Y. 1996) (holding that plaintiffs failed to plead a claim under Section 11 because a "***mere unlikelihood*** [of repayment] is simply not sufficient to support an action. . . ." (emphasis added, internal quotation marks omitted)).  In *Goldman*, Judge Cedarbaum dismissed virtually identical '33 Act claims where plaintiffs in a class action did not allege that any pass-through payments had been missed and the offering documents specifically warned that there might not be a secondary market for the certificates. *Goldman*, 2010 WL 4054149, at *3-4.  "Because [plaintiff] made an investment that it knew might not be liquid, it may not allege an injury based upon the hypothetical price of the Certificates on the secondary market at the time of suit."  *Id*. at *3.  Where the securities at issue are asset-backed securities, such as the Certificates, "loss" is measured in terms of reduction in the amount paid to a plaintiff over the course of the securitization.  *See AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009) (in asset-backed

---

[22] Moreover, MISPERS alleges that it purchased the SAMI 2006-AR6 Certificates at a ***40% discount to face value***.  (TAC ¶ 17).  Given this huge discount, plaintiffs cannot credibly claim that they relied on any statements made in the offering documents or that any purported misrepresentations were material.  The same is true for the BALTA 2006-8 Certificates, which Detroit purchased at a 39% discount to the face value.

[23] Defendants dispute this accuracy of this allegation, but, as required on a motion to dismiss, assume its truth for purposes of this motion.

securities case, "the plaintiffs' loss was not a decrease in market price, but a decrease in the amount of money returned to them over the course of the securitization."), *aff'd*, 385 F. App'x. 5 (2d Cir. 2010).

Moreover, Plaintiffs' purported losses with respect to the BALTA 2006-6, BSABS 2007-HE3 and SAMI 2006-5 Certificates are, at best, *de minimis*, reflecting nothing more than a minor fluctuation in price.  "Where it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) is proper."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003) (citations omitted).  *See also Commercial Union Assurance Co., plc v. Milken*, 17 F.3d 608, 615 (2d Cir. 1994) (affirming dismissal of plaintiffs' Section 12 claims because plaintiffs did not "suffer[] compensable damages").  This is fatal to Plaintiffs' claims on these Certificates.  *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004) (dismissing Section 11 claim for failure to plead a cognizable loss).

With respect to the SAMI 2006-AR5 and BALTA 2007-1 Certificates, Plaintiffs do no more than allege, without support, that Plaintiffs "have sustained damages" (TAC ¶ 218) and that "[c]lass members who have sold their Certificates are entitled to rescissory damages" (*id*. ¶ 227). Plainly this satisfies neither *Goldman*, nor the requirement that Plaintiffs allegations must rise above the speculative level.  *See ATSI Commc'ns, Inc.* 493 F.3d at 98.

As Plaintiffs allege no cognizable loss concerning 13 of the 14 Certificates, their claims as to those 13 must be dismissed.  *See In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 299 (S.D.N.Y. 2008) (Scheindlin, J.) ("If a plaintiff has no conceivable damages under Section 11, . . . her Section 11 claims must be dismissed.").

## VI.    PLAINTIFFS FAIL TO STATE A CONTROL PERSON CLAIM

Plaintiffs' "control person" claim against BSC, EMC, the Individual Defendants and the

Rating Agencies fails to state a claim because Plaintiffs have failed to allege an underlying

violation and because they do not allege facts demonstrating that BSC, JPMSI or the Individual

Defendants are "control persons."

### A.     The Absence Of A Primary Violation Is Fatal

Control person liability under Section 15 is contingent on proof of a primary violation of

the '33 Act by a controlled person.  *See ECA & Local 134 IBEW Joint Pension Trust of Chicago*,

553 F.3d at 207 (affirming dismissal of plaintiffs' Section 15 claim "for want of a primary

violation").  As set forth *supra* at Part II, the Complaint fails to state a claim under Sections 11 or

12(a)(2) and so the Section 15 claims also fail.

### B.     Plaintiffs Do Not Allege Culpable Conduct By Any Defendant

Plaintiffs have not alleged any "meaningful culpable conduct . . . beyond mere status as a

director or officer."  *P. Stolz Family P'ship, LP v. Daum*, 166 F. Supp. 2d 871, 873 (S.D.N.Y.

2001) (internal quotations omitted); 17 C.F.R. § 240.12-b-2 (defining a control person as a

person with the "power to direct or cause the direction of the management and policies of a

person . . . .").  To satisfy this requirement, a complaint must articulate "particularized facts as to

the controlling person's culpable participation in the [primary] violation of the controlled

person."  *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001).  "Although

[p]laintiffs make a number of assertions about the influence and participation of these separate

companies, they do not sufficiently allege that they had actual control over the [issuer]."  *N.J.*

*Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 WL 1257528,

at *7 (S.D.N.Y. Mar. 31, 2010) (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F.

Supp. 2d 429, 458 (S.D.N.Y. 2005)).  "Control in this context is not the mere ability to persuade,

but almost always means the practical ability to *direct* the actions of people who issue or sell

securities."  *Id.* (emphasis in original, internal quotations omitted).

Plaintiffs' failure is particularly stark with respect to the Individual Defendants.  The Complaint alleges nothing more than that the Individual Defendants (a) are officers or directors of either SAMI or BSABSI and (b) each signed one or both of the Registration Statements at issue.[24]  (TAC ¶¶ 29-37).  This does not in any way establish "meaningful . . . culpable conduct," much less "particularized facts as to the controlling person's culpable participation" as required to assert a Section 15 claim against the Individual Defendants.  *See P. Stolz Family P'ship*, 166 F. Supp. 2d at 873; *DeMaria*, 153 F. Supp. 2d at 314; *WaMu*, 2010 WL 3815796, at *9 (dismissing Section 15 claim where plaintiffs alleged only that they were officers and/or directors of the issuer, with no individualized allegations).

Nor is there any basis for Plaintiffs' allegations that BSC, JPMSI or EMC are or were control persons.  With no factual support, the Complaint alleges that each of these defendants "controlled" SAMI and BSABSI simply because they "had the power to influence, and exercised that power and influence, to cause the Depositors to engage in violations of the Securities Act . . . ."  (TAC ¶ 230).  BSC, as Plaintiffs acknowledge, was the corporate parent of EMC, SAMI and BSABSI.  (*Id.* ¶¶ 5, 26, 27).  EMC, SAMI and BSABSI were sister corporations.  But the mere corporate relationship of BSC and EMC to SAMI, without the "practical ability to direct the actions" of the depositors, is insufficient to state a Section 15 claim.  *In re Flag Telecom Holdings*, 352 F. Supp. 2d at 458.  JPMSI cannot be held liable under Section 15, as its liability is entirely derivative of that of BSC.

---

[24] It goes almost without saying that an Individual Defendant cannot be held liable for offerings pursuant to a Registration Statement he or she did not sign.  *See Rombach*, 355 F.3d at 168 n.2 ("Section 11 of the Securities Act imposes civil liability on issuers and signatories, such as officers of the issuer and underwriters, of a registration statement."); *see also Lanza v. Drexel & Co.,* 479 F.2d 1277, 1283-83 (2d Cir. 1973) (noting that Section 11 liability stems from being a signatory to a registration statement).

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint be should dismissed.

Dated:   New York, New York
        December 3, 2010

Respectfully submitted,

**BINGHAM MCCUTCHEN LLP**

By: /s/ Kenneth I. Schacter _____

    Kenneth I. Schacter
    kenneth.schacter@bingham.com
    Theo J. Robins
    theo.robins@bingham.com
    399 Park Avenue
    New York, NY  10022-4689
    Tel: (212) 705-7000
    Fax: (212) 752-5378

    *Attorneys for Defendants Bear, Stearns &
    Co. Inc., J.P. Morgan Securities, Inc.,
    EMC Mortgage Corporation, Structured
    Asset Mortgage Investments II Inc., Bear
    Stearns Asset Backed Securities I, LLC and
    Joseph T. Jurkowski*

**SIMPSON THACHER & BARTLETT LLP**

By: /s/ Michael J. Chepiga
    Michael J. Chepiga
    mchepiga@stblaw.com
    William T. Russell, Jr.
    wrussell@stblaw.com
    Mark D. Villaverde
    mvillaverde@stblaw.com
    425 Lexington Avenue
    New York, New York 10017
    Tel: (212) 455-2000
    Fax: (212) 455-2502

    *Attorneys for Defendant Samuel L. Molinaro, Jr.*

**MORRISON & FOERSTER LLP**

By: /s/ Joel C. Haims
    Joel C. Haims
    JHaims@mofo.com
    Ruti Smithline
    RSmithline@mofo.com
    1290 Avenue of the Americas
    New York, New York  10104
    Tel: (212) 468-8000
    Fax: (212) 468-7900

    *Attorneys for Defendants Thomas F. Marano and Michael B. Nierenberg*

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

By: /s/ Dani R. James
    Dani R. James
    djames@kramerlevin.com
    1177 Avenue of the Americas
    New York, New York 10036
    Tel.: (212) 715-9363
    Fax:  (212) 715-8000

    *Attorneys for Jeffrey L. Verschleiser*

**GREENBERG TRAURIG, LLP**

By: /s/ Richard A. Edlin
    Richard A. Edlin
    edlinr@gtlaw.com
    Ronald D. Lefton
    rlefton@gtlaw.com
    Candace Camarata
    camaratac@gtlaw.com
    200 Park Avenue
    New York, New York 10166
    Tel:  212-801-9200
    Fax: 212-801-6400

    *Attorneys for Defendant Jeffrey Mayer*

## APPENDIX OF DISCLOSURES

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| *Alleged Departures from Underwriting Guidelines* | *General Disclosure Regarding Underwriting Standards* |
| "The Registration Statements provided that underwriting was to include assessments of borrower or mortgagor creditworthiness and appraisals of the mortgaged properties …" (TAC ¶ 79).<br><br>"[T]he originators systematically disregarded their stated underwriting and appraisal standards."  (TAC ¶ 81).<br><br>"The Prospectus Supplements set forth the underwriting standards for additional originators who originated 20% or more of the underlying mortgages in any one trust.  These statements were untrue and omitted material facts because many originators industry-wide systematically failed to follow their stated underwriting standards."  (TAC ¶ 167). | "Some of the mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family 'non-conforming' mortgage loans.  ***A "non-conforming" mortgage loan means a mortgage loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines for "A" credit mortgagors.  These credit characteristics include mortgagors whose creditworthiness and repayment ability do not satisfy such Fannie Mae or Freddie Mac underwriting  guidelines and mortgagors who may have a record of credit write-offs, outstanding judgments, prior bankruptcies and other credit items that do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines.  These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, mortgage loans underwritten under the originator's non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines.*** Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to |

---

[1] The Certificates at issue generally have the same or substantially similar risk disclosures.  For ease of reference, individual documents are cited as representative samples.

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | maturity of the offered certificates."  SAMI 2006-AR6 Prosp. Supp. at S-20–S-21 (emphasis added).  *See also* ARM 2006-4 Prosp. at 81-82; BALTA 2006-6 Prosp. Supp. at S-31–S-32; BALTA 2006-8 Prosp. Supp. at S-24–S-25; BALTA 2007-1 Prosp. Supp. at S-17; BSABS 2007-HE3 Prosp. Supp. at S-108; BSABS 2007-HE4 Prosp. Supp. at S-100; BSARM 2007-1 Prosp. Supp. at S-43; BSARM 2007-3 Prosp. Supp. at S-36–S-37; BSMFT 2006-AR1 Prosp. Supp. at S-15; BSMFT 2006-AR4 Prosp. Supp. at S-11; BSMFT 2006-AR5 Prosp. Supp. at S-14; SAMI 2006-AR5 Prosp. Supp. at S-24–S-25; SAMI 2006-AR7 Prosp. Supp. at S-21–S-22. |
| *EMC Mortgage Corporation*<br><br>"The statements in the Offering Documents related to EMC's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein, EMC (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors; (2) pursued loan volume at the expense of underwriting standards, thereby failing to take the steps necessary to safeguard the quality of the product; and (3) largely disregarded appraisal standards and bought loans without regard to the riskiness of the loan because the values of the underlying mortgage properties were materially inflated in the loan underwriting process."  (TAC ¶ 86). | *EMC Mortgage Corporation's Underwriting Standards*<br><br>"The mortgage loans originated by EMC, or EMC mortgage loans, *are 'conventional non-conforming mortgage loans' (i.e., loans that are not insured by the Federal Housing Authority, or FHA, or partially guaranteed by the Veterans Administration or which do not qualify for sale to Fannie Mae or Freddie Mac)* and are secured by first liens on one-to four-family residential properties.  *These loans typically differ from those underwritten to the guidelines established by Fannie Mae and Freddie Mac primarily with respect to the original principal balances, loan-to value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property, property types and/or mortgage loans with loan-to-value ratios over 80% that do not have primary mortgage insurance*.  The EMC mortgage loans have either been originated or purchased by an originator and were generally underwritten in accordance with the standards described herein.  Exceptions to the underwriting guidelines are permitted when the seller's performance supports' such action and the variance request is approved by credit management. |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | […]<br><br>"Under a stated income/verified asset documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower.  Although ***the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income***.  Borrower's assets are verified.<br><br>"Under the no ratio documentation program the ***borrower's income is not stated and no ratios are calculated.  Although the income is not stated nor verified, lenders obtain a telephonic verification of the borrower's employment without reference to income.***  Borrower's assets are verified.<br><br>"Under ***the stated income/stated asset documentation program, the borrower's income and assets are stated but not verified.***  The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower.<br><br>"Under the ***no income/no asset documentation program, the borrower's income and assets are neither stated nor verified.***  The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower."  BSMFT 2006-AR1, Prosp. Supp. at S-30–S-32.  *See also* BALTA 2006-6, Prosp. Supp. at S-55–S-57; BALTA 2006-8, Prosp. Supp. at S-53–S-55; BALTA 2007-1, Prosp. Supp. at S-40–S-43; BSMFT 2006-AR4, Prosp. Supp. at S-25–S-26; BSMFT 2006-AR5, Prosp. Supp. at S-30–S-31. |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| *Bear Stearns Mortgage Corp.*<br><br>"The statements in the Offering Documents related to Bear Stearns Mortgage Corp. and Encore's underwriting standards were untrue and omitted statements necessary to make them not misleading because, as described herein, Bear Stearns Mortgage Corp. and Encore:  (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors; (2) pursued loan volume at the expense of underwriting standards, thereby failing to take the steps necessary to safeguard the quality of the product; and (3) largely disregarded appraisal standards leading to the values of the underlying mortgage properties being materially inflated in the loan underwriting process."  (TAC ¶ 98). | *Bear Stearns Residential Mortgage Corporation Underwriting Standards*<br><br>"***The BSRM Alt-A Underwriting Guidelines are less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac*** with regard to: (i) documentation parameters and (ii) debt to income ratios.<br><br>[…]<br><br>"Exceptions to the BSRM Underwriting Guidelines are considered with reasonable compensating factors on a case-by-case basis and at the sole discretion of senior management.  When exception loans are reviewed, all loan elements are examined as a whole to determine the level of risk associated with approving the loan including appraisal, credit report, employment, compensating factors and borrower's willingness and ability to repay the loan.  Compensating factors may include, but are not limited to, validated or sourced/seasoned liquid reserves in excess of the program requirements, borrower's demonstrated ability to accumulate savings or devote a greater portion of income to housing expense and borrowers' potential for increased earnings based on education, job training, etc.  Loan characteristics such as refinance transactions where borrowers are reducing mortgage payments and lowering debt ratios may become compensating factors as well.<br><br>"*Documentation Types*<br><br>[…]<br><br>"*Stated Income:* The Stated Income documentation type requires the applicant's employment and income sources covering the past two (2) year period to be stated on the application.  Self-employed borrowers must be |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | self-employed in the same business or have received 1099 income in the same job for the past two years.  The applicant's income as stated must be reasonable for the related occupation, borrowers' credit profile and stated asset, in the loan underwriter's discretion. ***However, the applicant's income as stated on the application is not independently verified.*** Assets must be documented and independently verified by means of a written verification of deposit (YOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.  A verbal verification of employment is also completed within 10 days of funding the loan.<br><br>    "*No Ratio:* The No Ratio documentation type requires the applicant's employment sources covering the past two (2) year period to be stated on the application.  Self-employed borrowers must be self-employed in the same business or have received 1099 income in the same job for the past two years*.  **The applicant's employment is independently verified through a verbal verification of employment, however the income is not stated on the application.*** Assets must be documented and independently verified by means of a written verification of deposit (VOD) with two (2) months' average balance; most recent bank statements, stocks or securities statements covering a two-(2) month period.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.<br><br>    "*Stated Income/Stated Assets:* The Stated Income/Stated Assets documentation type requires the applicant's employment and income sources covering the past two (2) year |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | period to be stated on the application.  Self-employed borrowers must be self-employed in the same business or have received 1099 income in the same job for the past two years.  The applicant's income as stated must be reasonable for the related occupation, borrowers' credit profile and stated asset, in the loan underwriter's discretion.  ***However, the applicant's income as stated on the application is not independently verified.  Assets as stated on the application are not independently verified***.  The borrower must demonstrate that they have sufficient reserves (sourced and seasoned) of greater than or equal to three months principal, interest, taxes and insurance.  A verbal verification of employment is also completed within 10 days of funding the loan.<br><br>        "*No Income/No Assets (NINA):* The NINA documentation type requires the applicant's employment sources covering the past two (2) year period to be stated on the application.  Self-employed borrowers must be self-employed in the same business or have received 1099 income in the same job for the past two years.  The applicant's employment is independently verified through a verbal verification of employment; however the income and the assets are not stated on the application.  Borrower's ability to repay the loan is based upon past credit history and FICO score.<br><br>        "*No Doc:* ***The No Doc documentation type does not require the applicant's income, employment sources or assets to be stated on the application.***  Borrower's ability to repay the loan is based upon past credit history and FICO score."  BSMFT 2006-AR1 Prosp. Supp. at S-33–S-36.  *See also* BSABS 2007-HE4, Prosp. Supp. at S-40–S-42 (disclosing "Limited Documentation," "Lite Documentation" and "Stated Income" loan programs); BSMFT 2006-AR4, Prosp. Supp. at |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | S-27–S-29; BSMFT 2006-AR5, Prosp. Supp. at S-32–S-35. |
| *Countrywide* | *Countrywide Home Loans, Inc. Underwriting Standards* |
| "The statements in the Offering Documents related to Countrywide's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein, Countrywide: (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting standards in the absence of sufficient compensating factors.  Despite assurances that lesser loans were limited to borrowers with excellent credit histories, Countrywide routinely extended these loans to borrowers with weak credit histories; and (2) largely disregarded appraisal standards and did not prepare appraisals in conformity with Fannie May or Freddie Mac appraisal standards." (TAC ¶ 104). | "***Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.***  Additionally, Countrywide Home Loans does permit its adjustable rate mortgage loans, hybrid adjustable rate mortgage loans and negative amortization mortgage loans to be assumed by a purchaser of the related mortgage property so long as the mortgage loan is in its adjustable rate period . . . and the related purchaser meets Countrywide Home Loans' underwriting standards that are then in effect." |
| | […] |
| | "Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines.  The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines." |
| | […] |
| | "Under the No Income/No Asset Documentation Program, ***no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for*** |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | ***purposes of the underwriting analysis***.  This program is limited to borrowers with excellent credit histories.  Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.<br><br>       "Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%.  Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac." SAMI 2006-AR6 Prosp. Supp. at S-41–S-47. *See also* ARM 2006-4, Prosp. Supp. at S-42–S-48; ARM 2007-1 Prosp. Supp. at S-40–S-46; ARM 2007-3 Prosp. Supp. at S-33–S-40; BALTA 2006-6, Prosp. Supp at S-58–S-64; BALTA 2007-1 Prosp. Supp. at S-44–S-50; SAMI 2006-AR7 Prosp. Supp. at S-43–S-49. |
| <div align="center">*American Home*</div><br>"The statements in the Offering Documents related to American Home's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein, American Home:  (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors.  As such, American Home disregarded crucial risk factors in making determinations on loan | <div align="center">*American Home Mortgage Corp. Underwriting Standards*</div><br>"The following information generally describes American Home's underwriting guidelines with respect to mortgage loans originated pursuant to its 'conforming' or 'prime' underwriting guidelines and its Alt-A underwriting guidelines.<br><br>[…]<br><br><div align="center">"***American Home's non-conforming underwriting guidelines are similar to those***</div> |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| applications, specifically approving loan applications for Option-Arm and loans with Negative Amortization features to borrowers with bad credit history or insufficient income to repay the loan once the rates adjusted upwards.  Moreover, American Home's controls were inadequate to prevent it from originating suspect loans which were sure to default absent rapid, significant price appreciation of the underlying property; and (2) largely disregarded appraisal standards and did not prepare appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards."  (TAC ¶ 131). | *of the government sponsored enterprises Fannie Mae and Freddie Mac but these loans are 'non-conforming' in that they may not conform to the maximum loan amounts and in some cases to the underwriting guidelines of Fannie Mae and Freddie Mac.*  These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the Department of Veterans Affairs." <br><br> […] <br><br> "Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. *Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require.*  For these Alt-A products the borrower may not be required to verify employment income, assets required to close or both. <br><br> "*For some other Alt-A products the borrower is not required to provide any information regarding employment income, assets required to close or both.*  Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements. <br><br> […] <br><br> "American Home realizes that *there may be some acceptable quality loans that fall outside published guidelines and encourages* |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
|  | *'common sense' underwriting.*  Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." SAMI 2006-AR5 Prosp. Supp. at S-47–49. |
| *Wells Fargo*<br><br>"The statements in the Offering Documents related to Wells Fargo's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein, Wells Fargo:  (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwritings standards in the absence of sufficient compensating factors; and (2) largely disregarded appraisal standards and did not prepare appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards."  (TAC ¶ 147). | *Wells Fargo*<br>*Underwriting Standards*<br><br>"With respect to all mortgage loans underwritten by Wells Fargo Bank, Wells Fargo Bank's underwriting of a mortgage loan may be based on data obtained by parties other than Wells Fargo Bank that are involved at various stages in the mortgage origination or acquisition process. . . .  The underwriting of mortgage loans acquired by Wells Fargo Bank pursuant to a Delegated Underwriting arrangement with a Correspondent is not reviewed prior to acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to confirm that certain documents are included in the file.<br><br>[…]<br><br>"*Verifications of income, assets or mortgages may be waived under certain programs offered by Wells Fargo Bank, but Wells Fargo Bank's underwriting guidelines require, in most instances, a verbal or written verification of employment to be obtained.*  In some cases, employment histories may be obtained through one of various employment verification sources, including the borrower's employer, employer-sponsored web sites, or third-party services specializing in employment verifications.  In addition, the loan applicant may be eligible for a loan approval process |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
|  | permitting reduced documentation. ***The above referenced reduced documentation options and waivers limit the amount of documentation required for an underwriting decision and have the effect of increasing the relative importance of the credit report and the appraisal.***  Documentation requirements vary based upon a number of factors, including the purpose of the loan, the amount of the loan, the ratio of the loan amount to the property value and the mortgage loan production source. Wells Fargo Bank accepts alternative methods of verification, in those instances where verifications are part of the underwriting decision; for example, salaried income may be substantiated either by means of a form independently prepared and signed by the applicant's employer or by means of the applicant's most recent paystub and/or W-2. Loans underwritten using alternative verification methods are considered by Wells Fargo Bank to have been underwritten with 'full documentation.'<br><br>[…]<br><br>"Wells Fargo Bank permits debt-to-income ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines such as documented excess funds in reserves after closing, a history of making a similar sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when a financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income.<br><br>"In comparison to Wells Fargo Bank's 'general' underwriting standards described above, the underwriting standards applicable to mortgage loans under Wells Fargo Bank's |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | 'alternative' mortgage loan underwriting program permit different underwriting criteria, additional types of mortgaged properties or categories of borrowers such as 'foreign nationals' without a FICO Score who hold certain types of visas and have acceptable credit references (such Mortgage Loans, 'Foreign National Loans'), and include certain other less restrictive parameters. ***Generally, relative to the 'general' underwriting standards, these standards include higher loan amounts, higher maximum Loan-to-Value Ratios, higher maximum 'combined' Loan-to-Value Ratios (in each case, relative to Mortgage Loans with otherwise similar characteristics) in cases of simultaneous primary and secondary financings, less restrictive requirements for 'equity take out' refinancings, the removal of limitations on the number of permissible mortgage loans that may be extended to one borrower financing a primary residence and the ability to originate mortgage loans with Loan-to-Value Ratios in excess of 80% without the requirement to obtain primary mortgage insurance if such loans are secured by cooperatives or investment properties.***"  ARM 2007-1 Prosp. Supp. at S-50–S-53 (emphasis added). |
| *Fieldstone Mortgage Corp.*<br><br>"The statements in the Offering Documents related to Fieldstone's underwriting standards were materially untrue and omitted statements necessary to make them not misleading because, as described herein:  Fieldstone's "underwriting personnel" consistently modified mortgage loan applications in order to increase the volume of loans and fees derived from such mortgage loans.  As such, the underwriting was generally not monitored by Fieldstone's supposed rigorous quality control process."  (TAC ¶ 159) | *Fieldstone*<br>*Underwriting Standards*<br><br>"Fieldstone Mortgage Company ( "FMC") is a nationwide mortgage banking company and wholly-owned subsidiary of Fieldstone Investment Corporation ("FIC") that originates, finances, sells and interim services both conforming loans and non-conforming loans secured by single-family, two- to four-family, condominium units, units of planned unit developments, townhomes and modular homes.  FMC focuses on providing the best loan available for a given borrower's needs and credit history.  FMC's conforming loans are loans that meet the underwriting criteria |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | required for a mortgage loan to be saleable to a federally owned or sponsored mortgage agency, such as Ginnie Mae, Fannie Mae or Freddie Mac, the borrowers of which generally have strong credit payment histories and relatively low levels of consumer debt, or are eligible for  government guaranteed mortgages. ***A non-conforming loan generally does not meet the eligibility requirements of Ginnie Mae, Fannie Mae or Freddie Mac because the borrower's cash flow, credit history and/or collateral value do not meet the specific standards of the conforming loan market. FMC's non-conforming borrowers generally have good credit backgrounds, but tend to have higher loan-to-value (LTV) ratios, less income documentation, and/or higher debt ratios than conforming borrowers.***"  BSABS 2007-HE3 Prosp. Supp. at S-46 (emphasis added). |
| *Alleged Inflated Appraisal Values and Inaccurate Loan-to-Value Ratios*  "The true facts that were omitted from the Offering Documents were: . . . The underlying mortgages were based on collateral appraisals that overstated the value of the underlying properties." (TAC ¶ 10).  Defendants "largely disregarded appraisal standards and bought loans without regard to the riskiness of the  loan because the values of the underlying mortgage properties were materially inflated in the loan underwriting process." (TAC ¶ 86, 98).  "As explained above, the appraisals for a material number of the properties underlying the mortgage loans were not prepared in conformity with Fannie Mae or Freddie Mac appraisal standards and were inaccurate and inflated.  Furthermore, the stated sales price of a material number of properties underlying the mortgage loans did not accurately reflect the true value of the properties.  These inflated | "No assurance can be given that the values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans.  If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry.  In some areas of the United States, real estate values have risen at a greater rate in recent years than in the past.  In particular, mortgage loans with high principal balances or high loan-to-value ratios will be affected by any decline in real estate values.  Real estate values in any area of the country may be affected by several factors, including population trends, mortgage interest rates, and the economic well-being of that area.  Any decrease in the value of the mortgage |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| appraisals and misleading sales prices were used to form the LTV ratios listed in the Prospectus Supplements. . . .  Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the trusts had greater collateral and thus were less risky than they really were."  (TAC ¶ 179). | loans may result in the allocation of losses which are not covered by credit enhancement to the offered certificates."  ARM 2007-3 Prosp. Supp at S-20–S-21.  *See also* ARM 2006-4 Prosp. Supp. at S-22; ARM 2007-1 Prosp. Supp. at S-23; BALTA 2006-6 Prosp. Supp. at S-38; BALTA 2006-8 Prosp. Supp. at S-32; BALTA 2007-1 Prosp. Supp. at S-21; BSABS 2007-HE3 Prosp. at 143; BSABS 2007-HE4 Prosp. at 143; BSMFT 2006-AR1 Prosp. Supp. at S-20; BSMFT 2006-AR4 Prosp. Supp. at S-16; BSMFT 2006-AR5 Prosp. Supp. at S-20; SAMI 2006-AR5 Prosp. Supp. at S-32; SAMI 2006-AR6 Prosp. Supp. at S-26; SAMI 2006-AR7 Prosp. Supp. at S-27.<br><br>"A mortgage pool may include mortgage loans that do not meet the purchase requirements of Fannie Mae and Freddie Mac.  ***These mortgage loans are known as nonconforming loans.  The mortgage loans may be nonconforming because they exceed the maximum principal balance of mortgage loans purchased by Fannie Mae and Freddie Mac, known as jumbo loans, because the mortgage loan may have been originated with limited or no documentation, because they are sub-prime mortgage loans, or because some other failure to meet the purchase criteria of Fannie Mae and Freddie Mac.***  The related prospectus supplement will detail to what extent the mortgage loans are nonconforming mortgage loans."  ARM 2007-3 Prosp. at 13 (emphasis added).  *See also* ARM 2006-4 Prosp. at 13; ARM 2007-1 Prosp. at 13; BALTA 2006-6 Prosp. at 13; BALTA 2006-8 Prosp. at 13; BALTA 2007-1 Prosp. at 13; BSMFT 2006-AR1 Prosp. at 12; BSMFT 2006-AR4 Prosp. at 13; BSMFT 2006-AR5 Prosp. at 13; SAMI 2006-AR5 Prosp. at 12; SAMI 2006-AR6 Prosp. at 12; SAMI 2006-AR7 Prosp. at 13. |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | "Notwithstanding the foregoing, ***Loan-to-Value Ratios will not necessarily provide an accurate measure of the risk of liquidation loss in a pool of mortgage loans.  For example, the value of a mortgaged property as of the date of initial issuance of the related series of securities may be less than the Value determined at loan origination, and will likely continue to fluctuate from time to time based upon changed in economic conditions and the real estate market.***"  BSMFT 2006-AR1 Prosp. at 18 (emphasis added).  *See also* ARM 2006-4 Prosp. at 19; ARM 2007-1 Prosp. at 19; ARM 2007-3 Prosp. at 19; BALTA 2006-6 Prosp. at 19; BALTA 2006-8 Prosp. at 19; BALTA 2007-1 Prosp. at 19; BSMFT 2006-AR4 Prosp. at 19; BSMFT 2006-AR5 Prosp. at 19; SAMI 2006-AR5 Prosp. at 18; SAMI 2006-AR6 Prosp. at 18; SAMI 2006-AR7 Prosp. at 19.<br><br>"No assurance can be given that the value of any mortgage property has remained or will remain at the level that existed on the appraisal or sales date.  ***If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the mortgage loans.***"  ARM 2007-3 Prosp. Supp. at S-34 (emphasis added).  *See also* ARM 2006-4 Prosp. Supp. at S-43; ARM 2007-1 Prosp. Supp. at S-40; BALTA 2006-6 Prosp. Supp. at S-58; BALTA 2007-1 Prosp. Supp. at S-44; SAMI 2006-AR6 Prosp. Supp. at S-26; SAMI 2006-AR7 Prosp. Supp. at S-44.<br><br>"***The appraisal of any mortgaged property reflects the individual appraiser's judgment as to value, based on the market values of comparable homes sold within the recent past in comparable nearby locations and on the estimated replacement cost.***  The appraisal relates both to the land and to the structure; in |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | fact, a significant portion of the appraised value of a mortgaged property may be attributable to the value of the land rather than to the residence. ***Because of the unique locations and special features of certain mortgaged properties, identifying comparable properties in nearby locations may be difficult. The appraised values of such mortgaged properties will be based to a greater extent on adjustments made by the appraisers to the appraised values of reasonably similar properties rather than on objectively verifiable sales data.***" ARM 2007-1 Prosp. Supp. at S-53 (describing Wells Fargo origination practices) (emphasis added). |
| *Alleged Insufficient Credit Enhancement*<br><br>The Offering Documents' "statements regarding credit enhancement failed to disclose that the Originators systematically disregarded their underwriting and appraisal standards and thus the supposed credit enhancement was deficient. Further, they failed to disclose that the level of credit enhancement for each certificate lacked reasonable basis and was inaccurate since the Rating Agencies' models were based on inaccurate information and did not accurately reflect the performance of the underlying mortgage loans." (TAC ¶ 183). | "***Credit Enhancement Is Limited; the Failure of Credit Enhancement to Cover Losses on the Trust Fund Assets May Result in Losses Allocated to the Offered Certificates.*** . . . The ratings of the offered certificates by the rating agencies may be lowered following the initial issuance thereof as a result of losses on the mortgage loans in the related sub-loan group or groups in excess of the levels contemplated by the rating agencies at the time of their initial rating analysis. Neither the depositor, the master servicer, the servicer, the securities administrator, the trustee nor any of their respective affiliates will have any obligation to replace or supplement any credit enhancement, or to take any other action to maintain the ratings of the offered certificates." BSMFT 2006-AR1 Prosp. Supp. at S-13–S-14. *See also* ARM 2006-4 Prosp. Supp. at S-17–S-18; ARM 2007-1 Prosp. Supp. at S-18–S-19; ARM 2007-3 Prosp. Supp. at S-16–S-17; BALTA 2006-6 Prosp. Supp. at S-28–S-29; BALTA 2006-8 Prosp. Supp. at S-21–S-22; BALTA 2007-1 Prosp. Supp. at S-14–S-15; BSMFT 2006-AR4 Prosp. Supp. at S-10; BSMFT 2006-AR5 Prosp. Supp. at S-13–S-14; SAMI 2006-AR5 Prosp. Supp. at S-22; SAMI 2006-AR6 Prosp. Supp. at S-18–S-19; SAMI 2006- |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | AR7 Prosp. Supp. at S–19–S–20. <br><br> "*[W]e cannot assure you that enough excess spread will be generated on the mortgage loans to establish or maintain the required level of overcollateralization*. . . . If the protection afforded by overcollateralization is insufficient, then you could experience a loss on your investment."  BSMFT 2006-AR1 Prosp. Supp. at S-16.  *See also* ARM 2006-4 Prosp. at 7; BALTA 2006-6 Prosp. Supp. at S-35; BALTA 2006-8 Prosp. Supp. at S-28; BSABS 2007-HE4 Prosp. Supp. at S-19; BSABS 2007-HE3 Prosp. Supp. at S-19; BSMFT 2006-AR4 Prosp. Supp. at S-13; BSMFT 2006-AR5 Prosp. Supp. at S-16; SAMI 2006-AR6 Prosp. Supp. at S-23; SAMI 2006-AR7 Prosp. Supp. at S-24. |
| *Alleged Misrepresentations with Respect to Credit Ratings* <br><br> "The ratings were based in large part on the representations in the Offering Documents regarding the originators' purported compliance with underwriting guidelines.  As discussed above, these representations were mischaracterized in light of the undisclosed systemic disregard for the stated underwriting standards.  Additionally, the Rating Agencies used models that were based primarily on the performance of fixed interest loans and failed to consider the performance of subprime, ALT-A, no- or limited documentation loans, or loans with interest only, option ARM and negative amortization provisions."  (TAC ¶ 185). <br><br> "As a result, the Certificates' ratings were unjustifiably high, lacked reasonable basis and did not accurately reflect the Certificates' true risk.  The Certificates were therefore secured by assets that had a much greater risk profile than represented.  Despite their investment-grade ratings, the Certificates were far riskier than other investments with the same ratings.  This cause Plaintiffs and the Class to pay more | "The ratings assigned by S&P and Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates were issued.  S&P's and Moody's ratings take into consideration the credit quality of the related mortgage pool, structural and legal aspects associated with such certificates and the extent to which the payment stream in the mortgage pool is adequate to make payments required under such certificates. *S&P's and Moody's ratings on such certificates do not, however, constitute a statement regarding frequency of prepayments on the mortgages.*"  BSMFT 2006-AR1 Prosp. Supp. at S-93 (emphasis added).  *See also* ARM 20007-3 Prosp. Supp. at S-13–S-14; ARM 2006-4 Prosp. at 98; ARM 2007-1 Prosp. Supp. at S-15; BALTA 2006-6 Prosp. Supp. at S-132; BALTA 2006-8 Prosp. Supp. at S-114; BALTA 2007-1 Prosp. Supp. at S-90; BSABS 2007-HE3 Prosp. Supp. at S-139; BSABS 2007-HE4 Prosp. Supp. at S-130; BSMFT 2006-AR4 Prosp. Supp. at S-81; |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| for the Certificates than they were worth at the time of the suit."  (TAC ¶ 186) | BSMFT 2006-AR5 Prosp. Supp. at S-97; SAMI 2006-AR5 Prosp. Supp. at S-136–S-137; SAMI 2006-AR6 Prosp. Supp. at S-115; SAMI 2006-AR7 Prosp. Supp. at S-146.<br><br>"The ratings assigned to the Offered Certificates should be evaluated independently from similar ratings on other types of securities. *A rating is not a recommendation to buy, sell or hold securities and may be subject to revisions or withdrawal at any time by the Rating Agencies.*"  BSMFT 2006-AR1 Prosp. Supp. at S-93 (emphasis added).  *See also* ARM 2006-4 Prosp. Supp. at S-110; ARM 2007-1 Prosp. Supp. at S-120; ARM 2007-3 Prosp. Supp. at S-131; BALTA 2006-6 Prosp. Supp. at S-132; BALTA 2006-8 Prosp. Supp. at S-114; BALTA 2007-1 Prosp. Supp. at S-90; BSABS 2007-HE3 Prosp. Supp. at S-139; BSABS 2007-HE4 Prosp. Supp. at S-130; BSMFT 2006-AR4 Prosp. Supp. at S-81; BSMFT 2006-AR5 Prosp. Supp. at S-97; SAMI 2006-AR5 Prosp. Supp. at S-137; SAMI 2006-AR6 Prosp. Supp. at S-115; SAMI 2006-AR7 Prosp. Supp. at S-146.<br><br>"The Ratings on the Offered Certificates are Not Recommendation to Buy Sell or Hold the Offered Certificates and are Subject to Withdrawal at any Time Which May Affect the Liquidity or the Market Value of the Offered Certificates."  BSMFT 2006-AR1 Prosp. Supp. at S-20.  *See also* ARM 2006-4 Prosp. Supp. at S-22; ARM 2007-1 Prosp. Supp. at S-27; ARM 2007-3 Prosp. Supp. at S-21; BALTA 2006-6 Prosp. Supp. at S-38; BALTA 2006-8 Prosp. Supp. at S-32; BALTA 2007-1 Prosp. Supp. at S-22; BSABS 2007-HE3 Prosp. Supp. at S-23; BSABS 2007-HE4 Prosp. Supp. at S-23; BSMFT 2006-AR4 Prosp. Supp. at S-16; BSMFT 2006-AR5 Prosp. Supp. at S-20; SAMI 2006-AR5 Prosp. Supp. at S-32; SAMI 2006-AR6 Prosp. Supp. at S-26; SAMI 2006-AR7 Prosp. Supp. at S-27. |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | "No person is obligated to maintain the rating on any offered certificate, and, accordingly, there can be no assurance that the ratings assigned to any offered certificate on the date on which the offered certificates are initially issued will not be lowered or withdrawn by a rating agency at any time thereafter.  In the event any rating is revised or withdrawn, the liquidity or the market value of the related offered certificates may be adversely affected."  BSMFT 2006 AR-1 Prosp. Supp. at S-20–S-21.  *See also* ARM 2007-3 Prosp. Supp. at S-21; BALTA 2006-6 Prosp. Supp. at S-38; SAMI 2006-AR5 Prosp. Supp. at S-32; BALTA 2006-8 Prosp. Supp. at S-32; BALTA 2007-1 Prosp. Supp. at S-22; ARM 2006-4 Prosp. Supp. at S-22; ARM 2007-1 Prosp. Supp. at S-23; BSMFT 2006-AR4 Prosp. Supp. at S-16; BSMFT 2006-AR5 Prosp. Supp. at S-20; SAMI 2006-AR6 Prosp. Supp. at S-26; SAMI 2006-AR7 Prosp. Supp. at S-27. |
| *Offering Documents Disclosed that Certificates Will Have Limited Liquidity* | "***The Offered Certificates Will Have Limited Liquidity, So You May Be Unable to Sell Your Securities or May Be Forced to Sell Them at a Discount from Their Fair Market Value***."  BALTA 2006-6 Prosp. Supp. at S-28 (emphasis added).  *See also* ARM 2006-4 Prosp. Supp. at S-17; ARM 2007-1 Prosp. Supp. at S-18; ARM 2007-3 Prosp. Supp. at S-16; BALTA 2006-8 Prosp. Supp. at S-21; BALTA 2007-1 Prosp. Supp. at S-14; BSMFT 2006-AR1 Prosp. Supp. at S-13; BSMFT 2006-AR4 Prosp. Supp. at S-10; BSMFT 2006-AR5 Prosp. Supp. at S-13; SAMI 2006-AR5 Prosp. Supp. at S-22; SAMI 2006-AR6 Prosp. Supp. at S-18; SAMI 2006-AR7 Prosp. Supp. at S-19.  "The secondary markets for asset backed securities have experienced periods of illiquidity and can be expected to do so in the future.  Illiquidity can have a severely adverse effect on the prices of  certificates that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | to meet the investment requirements of limited categories of investors."  BSABS 2007-HE3 Prosp. Supp. at S-26.  *See also* BSABS 2007-HE4 Prosp. Supp. at S-26. |
| *Offering Documents Warned that Market Forces Could Impact the Certificates* | "The Securities Are Not Suitable Investments for All Investors.  The certificates are complex investments that are not appropriate for all investors.  The interaction of the factors described above is difficult to analyze and may change from time to time while the certificates are outstanding.  ***It is impossible to predict with any certainty the amount or timing of distributions on the certificates or the likely return on an investment in any such securities.  As a result, only sophisticated investors with the resources to analyze the potential risks and rewards of an investment in the certificates should consider such an investment***."  BALTA 2006-6 Prosp. Supp. at S-36 (emphasis added).  *See also* BALTA 2006-8 Prosp. Supp. at S-30; BALTA 2007-1 Prosp. Supp. at S-19; BSMFT 2006-AR1 Prosp. Supp. at S-20; BSMFT 2006-AR4 Prosp. Supp. at S-15–S-16; BSMFT 2006-AR5 Prosp. Supp. at S-19; SAMI 2006-AR5 Prosp. Supp. at S-30; SAMI 2006-AR6 Prosp. Supp. at S-25; SAMI 2006-AR7 Prosp. Supp. at S-26. |
| | "Real estate values in any area of the country may be affected by several factors, including population trends, mortgage interest rates, and the economic well-being of that areal.  ***Any decrease in the value of the mortgage loans may result in the allocation of losses which are not covered by credit enhancement to the offered certificates***."  BALTA 2006-6 Prosp. Supp. at S-38 (emphasis added).  *See also* ARM 2006-4 Prosp. Supp. at S-22; ARM 2007-1 Prosp. Supp. at S-23; ARM 2007-3 Prosp. Supp at S-20–S-21; BALTA 2006-8 Prosp. Supp. at S-32; BALTA 2007-1 Prosp. Supp. at S-21; BSABS 2007-HE3 Prosp. at 143; BSABS 2007-HE4 Prosp. at 143; BSMFT 2006-AR1 Prosp. Supp. at S-20; BSMFT |

| Alleged Misrepresentation or Omission | Actual Disclosures[1] |
|---|---|
| | 2006-AR4 Prosp. Supp. at S-16; BSMFT 2006-AR5 Prosp. Supp. at S-20; SAMI 2006-AR5 Prosp. Supp. at S-32; SAMI 2006-AR6 Prosp. Supp. at S-26; SAMI 2006-AR7 Prosp. Supp. at S-27.<br><br>"Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the performance and market value of your securities. ***Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase***, particularly with respect to second homes and investor properties and with respect to any residential mortgage loans whose aggregate loan amounts (including any subordinate liens) are close to or greater than the related property values.  Another factor that may in the future contribute to higher delinquency rates is the potential increase in monthly payments on adjustable rate mortgage loans.  Borrowers with adjustable payment mortgage loans may be exposed to increased monthly payments if the related mortgage interest rate adjusts upward from the initial fixed rate or a low introductory rate, as applicable, in effect during the initial period of the mortgage loan to the rate computed in accordance with the applicable index and margin.  This increase in borrowers' monthly payments, together with any increase in prevailing market interest rates, after the initial fixed rate period, may result in significantly increased monthly payments for borrowers with adjustable rate mortgage loans. ***You should consider that the general market conditions discussed above may adversely affect the performance and market value of your securities***."  ARM 2007-3 Prosp. Supp. at S-23 (emphasis added).  *See also* ARM 2007-1 Prosp. Supp. at S-26; BALTA 2007-1 Prosp. Supp. at S-21–S-22; BSABS 2007-HE3 Prosp. Supp. at S-29–S-30; BSABS 2007-HE4 Prosp. Supp. at S-29–S-30. |