UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

IN RE BEAR STEARNS MORTGAGE
PASS-THROUGH CERTIFICATES LITIGATION

------------------------------------------------------x

Master File No. 08 Civ. 8093 (LTS)(KNF)

This Document Relates to All Actions

------------------------------------------------------x

## OPINION AND ORDER

APPEARANCES:

COHEN MILSTEIN SELLERS &
TOLL PLLC
  By: Joel P. Laitman
88 Pine Street
14th Floor
New York, NY 10005

*Counsel for Plaintiffs and the Proposed
Class*

BERNSTEIN LITOWITZ BERGER &
GROSSMAN LLP
  By: David R. Stickney
12481 High Bluff Drive, Suite 300
San Diego, California 92130

*Counsel for Plaintiffs and the Proposed
Class*

KOHN, SWIFT & GRAF, P.C.
  By: Joseph C. Kohn
One South Broad Street, Suite 2100
Philadelphia, PA 19107

*Counsel for Plaintiff the Police
and Fire Retirement System of the City of
Detroit*

BINGHAM MCCUTCHEN LLP
  By: Kenneth I. Schacter, Esq.
       Theo J. Robins, Esq.
399 Park Avenue
New York, NY 10022

*Counsel for Defendants Bear, Stearns &
Co. Inc., J.P. Morgan Securities, Inc.,
EMC Mortgage Corporation, Structured
Asset Mortgage Investments II Inc., Bear
Stearns Asset Backed Securities I, LLC
and Josepth T. Jurkowski*

SIMPSON THACHER & BARTLETT
LLP
  By: Michael J. Chepiga
       William T. Russell, Jr.
425 Lexington Avenue
New York, New York 10017

*Counsel for Defendant Samuel L.
Molinaro, Jr.*

MORRISON & FOERSTER LLP
  By: Joel C. Haims
       Ruti Smithline
1290 Avenue of the Americas
New York, New York 10104

*Counsel for Defendant Samuel L.
Molinaro, Jr.*

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
  By:  Dani R. James
1177 Avenue of the Americas
New York, New York 10036

GREENBERG TRAURIG, LLP
  By: Richard A. Edlin
        Ronald D. Lefton
        Candace Camarata
200 Park Avenue
New York, New York 10166

*Counsel for Defendant Jeffrey Mayer*

LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE

Plaintiffs have filed a Third Amended Complaint ("TAC") asserting claims on behalf of a putative class of investors against various Bear Stearns entities, Structured Asset Mortgage Investments II, Inc., ("SAMI"), and several individuals for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "33 Act"), 15 U.S.C. §§ 77k, 77l(a)(2), 77o, in connection with the sale of mortgage-backed security ("MBS") pass-through certificates ("Certificates") that were offered for sale by means of documents that allegedly contained untrue statements and material omissions.[1] Defendants have moved to dismiss the TAC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Court has jurisdiction

---

[1]     The full list of Defendants is as follows (capitalized terms not otherwise defined in this footnote have the meanings set forth elsewhere in this Opinion): Bear Stearns & Co., Inc. ("Bear Stearns"), an SEC-registered broker-dealer that served as the underwriter for all of the Certificates and assisted in drafting and disseminating the Offering Documents (TAC ¶ 25); Structured Asset Mortgage Investments II, Inc. ("SAMI Depositor"), the Depositor for certain Offerings and a wholly-owned subsidiary of Bear Stearns (id. ¶ 26); Bear Stearns Asset Backed Securities I, LLC ("Bear Stearns Depositor"), the Depositor for certain Offerings and a wholly-owned subsidiary of Bear Stearns (id. ¶ 27); EMC Mortgage Corp. ("EMC"), the Sponsor for each of the Offerings (id. ¶ 28); Jeffrey L. Verschleiser, who was President of the SAMI Depositor at all relevant times (id. ¶ 29); Michael B. Nierenberg, who was the Treasurer of the SAMI Depositor at all relevant times (id. ¶ 30); Jeffrey Mayer, who was a Director of the SAMI Depositor at all relevant times (id. ¶ 31); Thomas F. Marano, who was a Director of both the SAMI Depositor and the Bear Stearns Depositor at all relevant times (id. ¶ 32); Matthew E. Perkins, who was President and a Director of the Bear Stearns Depositor at all relevant times (id. ¶ 33); Joseph T. Jurkowski, Jr., who was Vice President of the Bear Stearns Depositor at all relevant times (id. ¶ 34); Samuel L. Molinaro, Jr., who was the Treasurer and a Director of the Bear Stearns Depositor at all relevant times (id. ¶ 35); Kim Lutthans, who was an Independent Director of the Bear Stearns Depositor at all relevant times (id. ¶ 36); and Katherine Garniewski, who was an Independent Director of the Bear Stearns Depositor at all relevant times. (Id. ¶ 37.) Verschleiser, Nierenberg, Mayer, Marano, Perkins, Jurkowski, Molinaro, Lutthans, and Garniewski are referred herein as "Individual Defendants."

of this matter under 28 U.S.C. § 1331.  For the reasons stated below, Defendants' motion is granted in part and denied in part.

BACKGROUND

I.     Mortgage-Backed Security Allegations

The following facts are taken from the TAC, the documents incorporated by reference therein, and other documents of which the Court may properly take judicial notice. Plaintiffs' factual allegations are taken as true for purposes of this motion practice.

On March 10, 2006, and March 31, 2006, SAMI Depositor and Bear Stearns Depositor, respectively, filed Registration Statements with the Securities and Exchange Commission ("SEC") indicating their intention to sell $50 billion in MBS Certificates.  (TAC ¶ 4.)[2]  The Registration Statements and the accompanying Prospectus and Prospectus Supplements (collectively referred to as "Offering Documents") contained untrue statements and omissions of material fact regarding the underwriting and appraising standards, the value of the collateral, the amount of credit support for each offering, and the credit ratings of the Certificates.  (Id. ¶ 9.)  These omissions and misstatements are alleged to have caused the Offering Documents to be materially false and misleading.  (Id.)

In brief, an MBS is created when a "depositor" buys an inventory of mortgages (or "loan pool") from a primary lender (or "originator").[3]  After the depositor obtains the loan pools, it places them in issuing trusts, securitizes them by organizing the loans into "tranches,"

---

[2]     The Certificates were sold in 14 offerings between May 30, 2006 and April 26, 2007.  (TAC ¶ 3.)

[3]     The originator is the entity that processes the borrower's mortgage application. The primary originators of the loans held by the trusts at issue here were EMC Mortgage Corp., Bear Stearns Residential Mortgage Corp., Countrywide Home Loans, Wells Fargo Mortgage Corporation, and Fieldstone Mortgage Corporation.

and issues securities backed by the loan pools.  The depositor uses the borrowers' monthly

payments as the revenue stream to pay investors who have bought the securities.  Each tranche

has a different risk profile and is assigned a credit rating – here, by the rating agencies S&P and

Moody's ("Rating Agencies").[4]  All of the tranches from which named Plaintiffs purchased

Certificates were initially rated AAA, which ostensibly indicated the lowest likelihood of

default.[5]  (TAC ¶¶ 40-41.)

Because the value of an MBS depends on the ability of the borrowers to repay the

principal and interest on the underlying loans as well as the adequacy of the collateral in the

event of default, thorough assessments of the borrowers' creditworthiness and the homes' values

are paramount.  (Id. ¶ 3.)  To this end, the MBS packaging process has three principal levels of

quality control.  First, underwriting and appraisal standards are crafted to assist the originator in

weeding out excessively risky loan applications; second, the depositor reviews the loan pools to

ensure that they meet the originator's stated underwriting standards (id. ¶¶ 55-58); and third, the

Rating Agencies review the securities' risk profiles and assign ratings.  (Id. ¶¶ 6, 184-85.)

The TAC details a systemic breakdown at each level, one that resulted largely

from the misalignment of incentives in the MBS industry.  Under the traditional mortgage

---

[4]     The tranches' risk profiles are related to the priority they are assigned for receipt
of payment if the pool revenues are insufficient to cover payments to all
investors.  As the Second Circuit has explained: "Subordinating the bonds creates
a tiered structure known as a 'waterfall.'  Losses from mortgage defaults,
delinquencies, or other factors are allocated in reverse seniority, with junior
tranches incurring losses first until their interests are reduced to zero."  In re
Lehman Bros. Mortgage-Backed Securities Litigation, 650 F.3d 167, 171 n.1 (2d
Cir. 2011); (TAC ¶ 41.)

[5]     As institutional investors, named Plaintiffs were prohibited from purchasing any
Certificates below investment grade.  Moody's investment grade ratings are from
"Aaa" to "Baa3"; S&P's investment grade ratings "AAA" to "BBB."

investment model, the loan originator held the mortgage to maturity and made its profits from the borrower's payment of interest and repayment of principal – an arrangement that gave the originator an economic interest in ensuring that (1) the borrower had the financial wherewithal to repay the promissory note, and (2) the underlying property had sufficient value to cover the lender's losses in the event of default. (Id. ¶¶ 44-47, 168.)  With the advent of securitization, originators quickly parted with the mortgages – and the attendant risk of default – by selling them to investors. (Id. ¶ 169).  The primary source of profit shifted from borrowers' interest payments to loan fees and sales revenue.  Largely free from the risk of defaults, originators began pushing high-risk loan products and deviating from underwriting and appraisal standards in an attempt to maximize loan volume. (Id. ¶¶ 169-70).  Wall Street banks like Bear Stearns, which profited enormously from the packaging and sale of MBS, were content to overlook the widespread degradation of underwriting and appraisal practices. (Id. ¶¶ 56-67, 171.)  The final guarantors of the securities' quality, the Rating Agencies, were equally compromised.  The Rating Agencies' models were outdated and failed to properly account for the increased riskiness of new loan products. (Id. ¶ 196.)  Compounding the problem, banks such as Bear Stearns shopped for Rating Agencies willing to assign their securities top credit ratings, pitting the Agencies against each other and provoking a race to the bottom in rating quality. (Id. ¶¶ 195.)

A.     Misrepresentations and Omissions Regarding Underwriting Standards and Appraisals

Plaintiffs allege that the Offering Documents misrepresented and omitted material facts regarding the underwriting standards applied by the loan originators.  EMC Mortgage Corp.

("EMC"),[6] Bear Stearns Residential Mortgage Corp. ("BSRM"), Countrywide Home Loans ("Countrywide"), American Home Mortgage ("AHM"), Wells Fargo Mortgage Corp. ("Wells Fargo"), Fieldstone Mortgage Corp. ("FMC"), as well as six additional corporations listed in the Prospectus Supplement, originated loans held by the trusts in which Plaintiffs invested.[7] (Id. ¶¶ 82, 94, 100, 126, 141, 157, 166.)

EMC was an originator of loans for the BSABS 2007-HE4, BSMF 2006-AR1, BSMF 2006-AR4, BSMF 2006-AR5, BALTA 2006-6, BALTA 2006-8, and BALTA 2007-1 trusts. (Id. ¶ 82.) The Offering Documents represented that: "Each mortgaged property relating to an EMC mortgage loan has been appraised by a qualified independent appraiser" in accordance with the "Uniform Standards of Professional Appraisal Practice." (Id. ¶ 84.) The Offering Documents further represented that "underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral" and elaborated that:

> In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, each lender generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.

(Id. ¶ 83.) The Prospectus Supplement also stated that, while certain loans did not require

---

[6]    EMC was also owned and operated by Bear Stearns and was a Sponsor for each of the offerings. (Id. ¶¶ 5, 28.)

[7]    The additional originators are Aegis Mortgage Corporation, Mid America Bank, U.S. Bank, NA, Provident Funding Associates, L.P., Synovus Mortgage Corporation, and American Mortgage Express Corp. d/b/a American Residential Mortgage Corp. (Id. ¶ 166.)

income verification, the originators would "obtain a telephonic verification of the borrowers' employment without reference to income" and that "[b]orrower's assets are verified." (Id. ¶ 85.)

EMC systematically disregarded its own underwriting and appraisal standards and prioritized the pursuit of loan volume over loan quality. (Id. ¶ 86.)  According to one study, EMC breached its representations and warranties with respect to 89% of its loans by providing misrepresentations about borrower income, employment, and assets, and by failing to adhere to its own mortgage lending guidelines. (Id. ¶ 88.)  According to Matt Van Leeuwen, a former mortgage analyst with EMC, Bear Stearns forced EMC analysts to rush their loan analyses so that Bear Stearns would not have to hold the loans on its books. (Id. ¶ 92.)  Mr. Van Leeuwen further revealed that EMC analysts were allowed to falsify missing loan data, that the documentation level of the loans was often incorrectly identified, and that Bear Stearns would declare the loan "fit" rather than investigating to fill in the missing information. (Id.)  As of the date of the TAC, 98% ($7.3 billion) of the $7.45 billion of the initially AAA-rated Certificates from the seven trusts had been downgraded to or below speculative "junk" status. (Id. ¶ 93.)

BSRM was an originator of loans for the BSMF 2006-AR1, BSMF 2006-AR4, BSMF 2006-AR5, and BSABS 2007-HE4 trusts. (Id. ¶ 94.)  The Prospectus Supplements described stringent underwriting standards.  For example, the Prospectus Supplement for the BSMF Series 2006-AR1 Certificate Offering stated:

> ***The BSRM Alt-A Underwriting Guidelines are intended to ensure that (i) the loan terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability of the property are acceptable . . . .***
>
> Based on the documentation type each loan application package has an application completed by the prospective borrower that includes information with respect to the applicant's assets, liabilities, income, credit and employment history, as well as certain other personal information.  During the underwriting process, BSRM

> calculates and verifies the loan applicant's sources of income (except
> documentation types, which do not require such information to be stated or
> independently verified), reviews the credit history of the applicant, calculates the
> debt-to-income ratio to determine the applicant's ability to repay the loan, and
> reviews the mortgaged property for compliance with the BSRM Underwriting
> Guidelines.

(Id. ¶ 95) (emphasis in original.)  The Prospectus Supplements also described BSRM's prudent

underwriting standards for loans that required less documentation.  (Id. ¶ 97.)  However, BSRM

systematically disregarded its own underwriting and appraisal standards to maximize loan

volume. (Id. ¶ 98.)  As of the date of the TAC, almost 100% ($3.74 billion) of the $3.75 billion

of the initially AAA-rated Certificates from the above four trusts had been downgraded to or

below speculative "junk" status.  (Id. ¶ 99.)

   Countrywide was an originator of loans for the SAMI 2006-AR6, SAMI 2006-

AR7, BALTA 2006-6, BALTA 2007-1, BSARM 2006-4, BSARM 2007-3, and BSARM 2007-1

trusts.  The Prospectus Supplements describe Countrywide's rigorous, stated underwriting

standards.  For example, the Prospectus Supplement for the SAMI 2006-AR6 offering stated that

Countrywide evaluates "the prospective borrower's credit standing and repayment ability and the

value and adequacy of the mortgaged property as collateral" by verifying employment history and

appraising the property, in a manner "conform[ing] to Fannie Mae or Freddie Mac appraisal

standards then in effect." (Id. ¶¶ 101-102.)  The Prospectus Supplement represented that loans

requiring less documentation were "limited to borrowers with excellent credit histories" and that

the loan application would be "reviewed to determine that the stated income is reasonable for the

borrower's employment and that the stated assets are consistent with the borrower's income."

(Id. ¶ 103.)

   However, in an effort to originate as many loans as possible, Countrywide

routinely and systematically violated its stated underwriting standards. (Id. ¶ 104.) According to a confidential witness ("CW1"), a senior Countrywide underwriter, Countrywide regularly designated loans made to unqualified borrowers as "prime." (Id. ¶ 105.) According to a second confidential witness ("CW2"), Countrywide created a computer system that identified high risk loans and routed them out of the normal loan approval process; instead of being rejected, the loans were reviewed to evaluate whether they should require a higher price or higher interest rate. (Id. ¶ 106.) Other confidential witnesses ("CW3" and "CW4") stated that, between 2000 and 2007, Countrywide extended loans to individuals with increasing debt-to-income ratios, and that branch managers pressured underwriters to approve risky loans. (Id. ¶¶ 107-108.) According to a former Regional Vice President of Countrywide Mortgage Ventures, LLC, Countrywide also placed pressure on appraisers to appraise to predetermined values, which distorted the loan-to-value ratios and made the mortgage loans in the pool much riskier than suggested by the Offering Documents. (Id. ¶¶ 109-10.) As a result of these unlawful mortgage practices, Countrywide has been the target of federal investigations, lawsuits by several state attorneys general, and numerous civil actions. (Id. ¶¶ 111-124.) As of the date of the TAC, 98% ($9.31 billion) of the initially AAA-rated Certificates issued from the seven trusts had been downgraded to or below speculative "junk" status. (Id. ¶ 125.)

AHM was an originator of loans for the SAMI Series 2006-AR5 trust.

The Prospectus Supplement for that trust represented that:

> American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. . . .
>
> American Home underwrites a borrower's creditworthiness based solely on

information that American Home believes is *indicative of the applicant's willingness and ability to pay the debt they would be incurring.*

(Id. ¶ 127) (emphasis in original).  The Prospectus Supplement further represented that there would be "compensating factors such as higher credit score or lower loan-to-value requirements" for loans requiring less documentation.  (Id. ¶ 129.)  However, AHM systematically disregarded its underwriting guidelines and regularly approved low documentation loans in the absence of sufficient compensating factors in order to maximize its loan volume.  An internal report circulated in October 2005 relaxed the underwriting standards by no longer requiring verification of income sources on stated-income loans, reducing the time required to have elapsed since the borrower was last in bankruptcy or credit counseling, reducing the required documentation for self-employed borrowers, and broadening the acceptable use of second and third loans to cover the property value.  (Id. ¶ 131.)  According to confidential witnesses CW6, CW7, and CW8, each of whom held senior positions at AHM, it was commonplace to overrule underwriters' objections in order to complete a loan.  (Id. ¶ 134-36.)  Senior Executives encouraged loan officers to make risky loans, including stated-income loans, where neither the assets nor the income of the borrower were verified, "No Income" loans, which allowed for loans to be made without any disclosure of the borrowers' income or assets, and "No Doc" loans, which allowed loans to be made to borrowers who did not disclose their income, assets or employment history. (Id. ¶ 132.)  AHM's mortgage practices have also been the focus of several criminal probes and at least one AHM sales executive has admitted that he regularly falsified clients' income or assets, with AHM's knowledge, to get loans approved.  (Id. ¶¶ 138-139.)  On August 6, 2007, AHM filed for bankruptcy.  (Id. ¶ 137.)  As of the date of TAC, 77% ($687 million) of the initially AAA-rated Certificates issued from the SAMI Series 2006-AR5 trust had been

downgraded to or below speculative "junk" status.  (Id. ¶ 140.)

   Wells Fargo was an originator of loans for the BALTA 2006-8 and BSARM 2007-1 trusts.  The BSARM 2007-1 Prospectus Supplement represented that its "general" underwriting standards were:

> applied by or on behalf of Wells Fargo Bank *to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral.* The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk.

(Id. ¶ 143) (emphasis in original).  The Prospectus Supplement also disclosed that Wells Fargo's "modified" underwriting standards "permit different underwriting criteria, additional types of mortgaged properties or categories of borrowers . . . and include certain other less restrictive parameters."  (Id. ¶ 144.)  Finally, the Prospectus Supplement stated that in order to qualify for participation in Wells Fargo's mortgage loan purchase program:

> lending institutions must (i) meet and maintain certain net worth and other financial standards, (ii) demonstrate experience in originating residential mortgage loans, (iii) meet and maintain certain operational standards, (iv) *evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines and represent that each loan was underwritten in accordance with Wells Fargo Bank standards* and (v) utilize the services of qualified appraisers.

(Id. ¶ 146) (emphasis in original).

   However, Wells Fargo systematically disregarded its stated underwriting and appraisal standards.  According to a confidential witness ("CW9"), loan officers applied

"intense" pressure on underwriters to approve risky loans and rewarded "high producers."  (Id. ¶ 148.)  Another confidential witness and former Wells Fargo employee ("CW10") states that the mortgage unit would loosen its underwriting standards at the end of the year to meet the origination goals; those employees who did not approve risky loans "wouldn't be around very long."  (Id. ¶ 150.)  According to CW11, Wells Fargo instituted a program in 2006 called "courageous underwriting," which CW11 described as "following the guidelines but also finagling the guidelines if it meant getting the loan approved."  (Id. ¶ 152.)  According to CW12, a former Wells Fargo Home Mortgage employee who was employed as a Loss Mitigation Supervisor from 1999 through 2004, and as an REO Supervisor from July 2006 through May 2008, some of the information in the loans was "blatantly falsified."  (Id. ¶ 153.)    As of the date of the TAC, 93.6% ($2.08 billion) of the initially AAA-rated Certificates issued from the BALTA 2006-8 and BSARM 2007-1 trusts had been downgraded to or below speculative "junk" status.  (Id. ¶ 156.)

FMC was an originator of loans for the BSABS 2007-HE3 trust.  The BSABS 2007-HE3 Prospectus Supplement represented that:

> FMC's underwriting policy is to analyze the overall situation of the borrower and to take into account compensating factors that may be used to offset areas of weakness. These compensating factors include credit scores, proposed reductions in the borrower's debt service expense, employment stability, number of years in residence and net disposable income. . . .
>
> The underwriters review each non-conforming loan in one of FMC's regional funding centers.  FMC believes that this regionalized underwriting process provides them with the ability to fund loans faster than many of its competitors, and the experience of their loan originators and branch managers, information systems and rigorous quality control process **ensure the continued high quality of their loans.**

(Id. ¶ 158 (emphasis in original).)  The underwriting was not consistently monitored by FMC's supposed rigorous quality control process; rather, FMC's "underwriting personnel" regularly modified mortgage loan applications in order to increase the volume of loans and resulting fees. (Id. ¶ 159.)  The rising rate of foreclosures and delinquencies resulting from these practices forced FMC to file for bankruptcy in November 2007.  (Id. ¶ 163.)  According to press reports, an undercover operation resulted in fraud charges against 24 defendants, including brokers, business owners and appraisers who dealt regularly with FMC.  (Id. ¶ 164.)  As of the date of the TAC, 64.4% ($461.1 million) of the initially AAA-rated Certificates issued by the BSABS 2007-HE3 trust had been downgraded to or below speculative "junk" status.  (Id. ¶ 165.)

Six other originators – Aegis Mortgage Corporation, Mid America Bank, U.S. Bank, NA, Provident Funding Associates, L.P., Synovus Mortgage Corporation, and American Mortgage Express Corp. d/b/a American Residential Mortgage Corp. – contributed loans to several of the offerings at issue.  The Prospectus Supplements for those trusts contained untrue statements and omitted material facts.  (Id. ¶ 167.)  As a result of these originators' high-risk lending practices, 100% ($1.89 billion) of the initially AAA-rated Certificates backed by loans originated by these six entities had been downgraded to or below speculative "junk" status as of the date of the TAC.  (Id. ¶ 176.)

B.    Misrepresentations Regarding Appraisals

In each Prospectus Supplement, Defendants included Loan-to-Value ("LTV") ratios that were based on inflated appraisals of the collateral.  (Id. ¶¶ 177-78.)  The LTV ratio expresses the loan amount as a percentage of the collateral's value.  For example, if an individual seeks to borrow $90,000 to pay for a house worth $100,000, the LTV ratio is 90%; however, if

the home appraisal is artificially elevated to $120,000, the LTV ratio drops to 75%.  (Id. ¶ 178.)
Lower LTV ratios are indicative of less risk.

 The Offering Documents represented that the appraisals were conducted in
accordance with Fannie Mae and Freddie Mac appraisal standards.  (Id. ¶ 179.)  Contrary to those
representations, many appraisals were inflated, which resulted in class members paying more for
the Certificates than they were worth.  (Id. ¶¶ 178-80.)

 C. Misrepresentations and Omissions Regarding The Certificates' Credit Support

 The Offering Documents also contained material misrepresentations concerning
"credit support" or "credit enhancement," which provides holders of senior Certificates with a
degree of protection should there be a shortfall in payments received on the mortgage loans.  (Id.
¶¶ 181-82.)  Because the originators regularly disregarded their own underwriting and appraisal
standards, the supposed credit support was insufficient to cover the heightened risk of loss.  (Id.
¶ 183.)

 D. Bear Stearns' Failure to Conduct Due Diligence

 Prior to making bulk purchases of loans from third-party originators, Bear Stearns
sent information about the loans to the Rating Agencies to enable them to advise Bear Stearns as
to the appropriate purchase price.  (Id. ¶ 54.)  Once the Rating Agency's analysis was complete,
Bear Stearns submitted its bids; if the mortgage originator accepted the bid, Bear Stearns often
retained third-party due diligence firms such as Clayton Holdings and Bohan Group, ostensibly
to comb through the loan pools and eliminate loans that violated the underwriting standards.  (Id.
¶ 55.)  However, executives at these firms have characterized Bear Stearns' due diligence process
as lax and haphazard.  (Id. ¶ 56.)  Investment banks like Bear Stearns directed the due diligence

firms to drastically decrease the number of loans that they evaluated (id. ¶ 63), and routinely

ignored the numerous "red flags" about flaws in subprime mortgage loans.  (Id. ¶ 64.)

According to documents filed with the Financial Crisis Inquiry Commission, Clayton reviewed

19,248 Bear Stearns loans from January 2006 to June 2007, and initially rejected 4,494 (23%) of

them; Bear Stearns waived the exceptions related to 1,295 (29%) of those loans.  (Id. ¶ 65.)

During that same period, Clayton reviewed 53,131 EMC loans, and initially rejected 7,277

(13.7%); EMC waived the exceptions related to 3,628 (50%) of those loans.  (Id.)

      E.     Misrepresentations and Omissions Regarding The Certificates' Ratings

      Each of the Certificates was provided a rating by Standard & Poor ("S&P") and

Moody's.  (Id. ¶ 184.)  The Offering Documents stated that the Certificates' ratings:

> address the likelihood of the receipt by Certificateholders of all distributions to
> which the Certificateholders are entitled. These ratings address the structural,
> legal and issuer-related aspects associated with the Certificates and notes, the
> nature of the underlying mortgage assets and the credit quality of the guarantor, if
> any.

(Id.)  All of the ratings set forth in each of the Prospectus Supplements were within "Investment

Grade" range for Moody's (Aaaa through Baa3) and S&P (AAA through BBB.)  (Id. ¶ 185.)

      These ratings were premised on false representations that the originators had

complied with the underwriting guidelines.  (Id.)  Moreover, Rating Agency executives have

since admitted that the ratings were based on inaccurate data (id. ¶ 187), and relied on deficient

statistical models.  (Id. ¶¶ 188-195.)  The Rating Agencies succumbed to market pressure to

lower their standards.  According to former Moody's Managing Director Jerome S. Fons,

securities issuers were free to shop around for the Rating Agency that would give them the

highest rating and "typically chose the agency with the lowest standards, engendering a race to

the bottom in terms of rating quality." (Id. ¶ 195.)  These unreliable ratings made it impossible

for class members to accurately assess the risk of the Certificates and caused class members to

pay more for the Certificates than they were worth at the time of the Offerings.  (Id. ¶ 186.)

II.    Procedural History

On August 20, 2008, Plaintiff New Jersey Carpenters Health Fund ("NJ

Carpenters") filed a complaint (the "Original Complaint") in New York state court, asserting

claims against Bear Stearns and Structured Asset Mortgage Investments II, Inc. ("SAMI"), for

violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "33 Act"), 15

U.S.C. §§ 77k, 77l(a)(2), 77o, in connection with the sale of MBS Certificates that were offered

for sale by means of Offering Documents that allegedly contained untrue statements and material

omissions.  That action was removed to this Court on September 18, 2008.

Thereafter, this action accreted parties and offerings as follows.  On May 15,

2009, NJ Carpenters filed its first consolidated class action complaint ("FAC") with Plaintiff

Boilermaker Pension Trust ("Boilermaker"),[8] adding seven offerings.[9]  On July 9, 2009, Pension

Trust Fund filed a separate complaint ("Pension Trust Complaint") against Bear Stearns and

SAMI, listing six offerings.[10]  On December 23, 2009, this Court granted an application to

---

[8]     On January 26, 2009, the Court granted NJ Carpenters' unopposed motion for
appointment as lead plaintiff.  (See Order, docket entry no. 16.)

[9]     In addition to BSMF 2006-AR1, the FAC added: Structured Asset Mortgage
Investments II Trust, Series 2006-AR5 ("SAMI 2006-AR5"), SAMI 2006-AR6,
and SAMI 2006-AR7; Bear Stearns Asset Backed Securities Trust, Series 2007-
HE3 ("BSABS 2007-HE3") and BSABS 2007-HE4; and Bear Stearns Mortgage
Funding Trust, Series 2006-AR4 ("BSMF 2006-AR4") and BSMF 2006-AR5.

[10]    Those offerings were: Bear Stearns Alt-A Trust, Series 2006-6 ("BALTA 2006-
6"), BALTA 2006-8, BALTA 2007-1; Bear Stearns ARM Trust, Series 2006-4
("BSARM 2006-4"), BSARM 2007-1, and BSARM 2007-3.

consolidate the two suits and appointed NJ Carpenters and MissPERS as co-lead plaintiffs. (See Order, docket entry no. 89.) On February 19, 2010, co-lead plaintiffs NJ Carpenters and Public Employees' Retirement System of Mississippi ("MissPERS"), along with Boilermakers, filed a second consolidated class action complaint ("SAC"). Defendants moved to dismiss the SAC, in part on the grounds that the named plaintiffs lacked standing to assert claims with respect to offerings from which they had not purchased securities. On September 29, 2010, the Court denied Defendants' motion to dismiss the SAC without prejudice and granted Plaintiffs leave to file a final amended complaint. (See Order, docket entry no. 133.)

On October 29, 2010, Plaintiffs filed their third consolidated class action complaint ("TAC"), adding as named plaintiffs the Police and Fire Retirement System of the City of Detroit ("Detroit"), the Oregon Public Employee Retirement Fund ("OPERS"), the Iowa Public Employees' Retirement System ("IPERS"), the City of Fort Lauderdale Police & Fire Retirement System ("Fort Lauderdale"), and the San Antonio Fire and Police Pension Fund ("San Antonio"). The parties, offerings, and claims in each complaint are as follows ("X" designates offerings that were listed in the class definition even though no named Plaintiff purchased from that offering):

| Offering/Trust | Original Compl. (8/20/2008) | FAC (5/15/2009) | Pension Trust Compl. (7/9/2009) | SAC (2/19/2010) | TAC (10/29/2010) |
|---|---|---|---|---|---|
| BSMF 2006-AR1 | NJ Carpenters | NJ Carpenters | | NJ Carpenters | NJ Carpenters |
| SAMI 2006-AR5 | | Boilermakers | | Boilermakers | Boilermakers |
| SAMI 2006-AR6 | | Boilermakers | | Boilermakers, MissPERS | Boilermakers, MissMPERS |
| SAMI 2006-AR7 | | X | Pension Trust | X | IPERS, OPERS |
| BSABS 2007-HE3 | | X | | X | IPERS |
| BSABS 2007-HE4 | | X | | X | IPERS |
| BSMF 2006-AR4 | | X | | X | San Antonio |
| BSMF 2006-AR5 | | X | | X | San Antonio |
| BALTA 2006-6 | | | X | MissPERS | MissPERS, IPERS |
| BALTA 2006-8 | | | X | X | OPERS, Detroit |
| BALTA 2007-1 | | | X | X | IPERS, OPERS |
| BSARM 2006-4 | | | X | MissPERS | MissPERS |
| BSARM 2007-1 | | | X | X | Ft. Lauderdale |
| BSARM 2007-3 | | | X | MissPERS | MissPERS |

Plaintiffs bring this action on behalf of "all persons or entities who purchased or otherwise acquired beneficial interests in the Certificates" issued in the above-mentioned offerings. (TAC ¶¶ 1, 204.)

Defendants now move to dismiss the TAC, arguing that (1) all of Plaintiffs'

claims are time-barred by the applicable statute of limitations and that certain claims are barred

by the statute of repose, (2) Plaintiffs have failed to allege any actionable misrepresentation or

omission, (3) Plaintiffs' failure to allege a primary violation or plead facts demonstrating that

any Individual Defendant is a control person requires dismissal of the Section 15 claim, (4)

Plaintiffs have failed to allege any cognizable injury, (5) Plaintiffs' sole remedy under the

Offering Documents is repurchase or replacement of non-complying loans, and (6) Plaintiffs

lack standing to sue on behalf of purchasers of individual tranches within each offering that no

named Plaintiff purchased.

DISCUSSION

Sections 11, 12(a)(2), and 15 of the Securities Act impose civil liability on certain

persons when communications in connection with a registered securities offering contain

material misstatements or omissions. 15 U.S.C. §§ 77k, 77l(a)(2), 77o; In re Morgan Stanley

Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010).  Section 11 provides a cause of action

for material misstatements and omissions in registration statements; Section 12(a)(2) provides a

cause of action for material misstatements and omissions in prospectuses and oral

communications. 15 U.S.C. §§ 77k, 77l(a)(2); see also In re Morgan Stanley, 592 F.3d at 358-

59.  Section 15 provides a cause of action against "[e]very person who . . . controls any person

liable under [Sections 11 or 12(a)(2)] of this title." 15 U.S.C. § 77o.  A claim under Section 15,

therefore, can only succeed if a plaintiff can first demonstrate liability under Section 11 or

Section 12.  See In re Morgan Stanley, 592 F.3d at 358.

"[S]ections 11 and 12(a)(2) create[] three potential bases for liability based on

registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an

omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." In re Morgan Stanley, 592 F.3d at 360; see also 15 U.S.C. §§ 77k(a), 77l(a)(2). For a misstatement or omission to be actionable under Section 11 or 12(a)(2), a defendant must have a duty to disclose the information, and the omitted or misstated information must be material to the investor. In re Morgan Stanley, 592 F.3d at 360. Where a plaintiff establishes any of the three bases of liability, "the general rule in a Section 11 [or Section 12(a)(2)] case is that an issuer's liability . . . is absolute." Hutchison v. Deutsche Bank Securities Inc., 647 F.3d 479, 484 (2d Cir. 2011) (quoting Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715-16 (2d Cir. 2011)). "Plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." In re Morgan Stanley, 592 F.3d at 359.

On a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The movant bears the burden of demonstrating that the complaint fails to state a claim upon which relief may be granted. Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir. 2003). To survive a Rule 12(b)(6) motion, a complaint must "plead enough facts to state a claim that is plausible on its face." Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (internal quotation marks omitted) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "Where a

complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotations and citations omitted).

1.      Timeliness of Plaintiffs' Claims

Claims brought under Section 11 and Section 12(a)(2) are subject to the two-pronged timing provision of Section 13 of the Securities Act. 15 U.S.C. § 77m. The first prong of Section 13 is a statute of limitations, which provides that claims must be brought within one year of "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." Id. The statute of limitations may be tolled based on equitable considerations for up to three years, at which point a plaintiff's claim is extinguished by Section 13's second prong – the statute of repose – which provides that "[i]n no event shall any such action be brought . . . more than three years after the security was bona fide offered to the public." Id. (emphasis added).

Defendants argue that each of Plaintiffs' claims is time-barred by the statute of limitations because various news reports and other publicly accessible information placed Plaintiffs on inquiry notice more than one year prior to the filing of the operative complaint. Defendants further argue that the claims first asserted by Plaintiffs with standing more than three years after the initial offerings are barred by the statute of repose.[11]

---

[11]      These include all claims brought by MissPERS, IPERS, Detroit, San Antonio, OPERS, and Ft. Lauderdale. It also includes any claims asserted with respect to the SAMI 2006-AR7, BSABS 2007-HE3, BSABS 2007-HE4, BSMF 2006-AR4, and BSMF 2006-AR5 trusts. The FAC (filed May 15, 2009 by NJ Carpenters and Boilermakers) asserted claims as to those offerings; however, neither of the named plaintiffs in the FAC had purchased securities from the offerings.

A.     Statute of Limitations

The Court must first determine whether the inquiry notice standard is still applicable, or whether, as Plaintiffs contend, it was rendered inoperative by the Supreme Court's decision in Merck & Co. v. Reynolds, 130 S. Ct. 1784 (2010).

Inquiry notice has been held to arise when circumstances – often called "storm warnings" – "'suggest to an investor of ordinary intelligence the probability' that she has a cause of action." In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 245 (S.D.N.Y 2007) (quoting Levitt v. Bear, Stearns & Co. Inc., 340 F.3d 94, 101 (2d Cir. 2003)). The emergence of storm warnings triggers the potential plaintiff's duty to investigate. If the potential plaintiff makes an inquiry when that duty arises, the one-year statute of limitations begins to run when a plaintiff "in the exercise of reasonable diligence[] should have discovered" the violation. Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005), accord In re IndyMac Mortgage-Backed Securities Litigation, 718 F. Supp. 2d 495, 502-03 (S.D.N.Y. 2010). Where, on the other hand, the plaintiff fails to investigate, the statute of limitations begins to run on the date the storm warnings triggered the duty to inquire. Id. In effect, the inquiry notice standard can penalize the heedless would-be plaintiff by commencing the limitations period before a reasonably diligent plaintiff could have discovered the actionable conduct.

Plaintiffs argue that the Supreme Court's recent ruling in Merck & Co. v. Reynolds, 130 S. Ct. 1784 (2010), invalidated inquiry notice as a statute of limitations measuring point in securities cases. In Merck, the Supreme Court rejected the inquiry notice standard in the context of a claim brought under Section 10(b) of the Securities Act of 1934 ("34 Act"), holding that "the discovery of facts that put a plaintiff on inquiry notice does not automatically begin the

running of the limitations period." Id. at 1798. Rather, the Court held, "the limitations period does not begin to run until . . . a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' . . . irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." Id. at 1792 (quoting 28 U.S.C. § 1658(b)). The Second Circuit elaborated on Merck in City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc., 637 F.3d 169 (2d Cir. 2011), holding that a fact is not deemed "discovered" for limitations purposes until "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." Id. at 175. Put differently, "the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." Id.

The question before the Court is whether the Supreme Court's invalidation of the inquiry notice standard for '34 Act claims extends to claims brought under Sections 11 and 12(a)(2) of the '33 Act. The Court concludes, in accord with the majority of judges in this district, that it does. See In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 370-71, n.39 (S.D.N.Y. 2011) (applying Merck to claims under Sections 11 and 12(a)(2) of the '33 Act); New Jersey Carpenters Health Fund v. Residential Capital, LLC, Nos. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011); Brecher v. Citigroup Inc., 797 F. Supp. 2d 354, 367 (S.D.N.Y. 2011); but see In re IndyMac Mortgage-Backed Securities Litigation, 793 F. Supp. 2d 637, 648 (S.D.N.Y. 2011) (holding that Merck is limited to claims brought under the '34 Act). The limitations provisions for '33 Act and '34 Act claims are functionally identical.[12] Compare 28 U.S.C. § 1658(b) (limitations period commences "after the

---

[12]     Indeed, the concept of inquiry notice was articulated principally in the context of '34 Act claims, see, e.g., Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983),

discovery of the facts constituting the violation") with 15 U.S.C. § 77m (limitations period

commences after "the discovery of the untrue statement or the omission, or after such discovery

should have been made by the exercise of reasonable diligence").  In both instances, the

limitations clock starts when the plaintiff discovers, or should have discovered,[13] the factual

predicates of the offense – whether it be facts constituting the fraud in the case of a Section 10(b)

claim, or the facts constituting the "untrue statement or the omission" in the case of a Section 11

or 12(a)(2) claim.  See Dodds v. Cigna Sec., Inc., 12 F.3d 346, 349-50 (2d Cir. 1993) (treating §

77m and § 1658(b) as equivalent).  Given this identity of operation, the Court finds no principled

basis for cabining Merck's holding to Section 1658(b).

     In light of Merck and City of Pontiac, the Court finds that Defendants' focus on

inquiry notice is misplaced.  The operative question is no longer when a reasonable plaintiff

would have known that she had a likely cause of action and inquired further.  Rather, the

question is whether a plaintiff could have pled '33 Act claims with sufficient particularity to

survive a 12(b)(6) motion to dismiss more than one year prior to the filing of the operative

complaint.  Whether sufficient facts existed at that time is, by definition, a fact-intensive inquiry

and, thus, generally ill-suited for resolution at the motion to dismiss stage.  Cf. In re Dreyfus, No.

98 Civ. 4318(HB), 2000 WL 10211, at *3 (S.D.N.Y. Jan. 6, 2000) ("[T]he issue of constructive

----

    and transplanted without modification to claims brought under the '33 Act.  See
    e.g., Dodds v. Cigna Sec., Inc., 12 F.3d 346, 349-50 & n.1 (2d Cir. 1993).

[13]    While a plain reading of the text suggests that the Section 1658(b) clock – unlike
    Section 77m's – commences only upon actual discovery, courts have
    unanimously construed "discovery of the facts constituting the violation" to
    contemplate actual and constructive discovery.  See Merck, 130 S. Ct. at 1794
    ("'discovery of the facts constituting the violation' occurs not only once a
    plaintiff actually discovers the facts, but also when a hypothetical reasonably
    diligent plaintiff would have discovered them") (citing cases).

knowledge and inquiry notice should more properly be resolved by the trier of fact at a later stage

in this litigation.").  Accordingly, a motion to dismiss will only be granted where

"uncontroverted evidence irrefutably demonstrates [that the] plaintiff discovered or should have

discovered" facts sufficient to adequately plead a claim.  Newman v. Warnaco Group, Inc., 335

F.3d 187, 193 (2d Cir. 2003) (quoting Nivram Corp. v. Harcourt Brace Jovanovich, Inc., 840 F.

Supp. 243, 249 (S.D.N.Y. 1993)).

        1.      Timeliness of the Original Complaint

Defendants provide the following pre-August 2007 documents in support of their

claim that the statute of limitations began to run more than one year before the August 20, 2008,

filing of the Original Complaint by NJ Carpenters: 1) two news articles documenting a mortgage

fraud scheme in Alaska (Exs. LL, MM);[14] 2) a news article describing AHM's financial troubles

due to its investment in subprime mortgage loans (Ex. NN); 3) two news articles describing the

loosening of lending standards across the country and the high rates of defaults (Exs. OO, PP); 4)

a news article and congressional testimony describing widespread pressure on appraisers to

inflate home values to clear loans (Exs. QQ, WW); 5) a news article describing government

allegations that certain brokers pressured Manhattan-based appraisers to inflate property values

(Ex. RR); 6) a Moody's report describing increased foreclosure rates and their adverse impact on

mortgage-backed securities (Ex. SS); 7) a news article describing flaws in mortgage rating

methodologies (Ex. TT); 8) a news article describing a decision by Moody's and S&P to

downgrade hundreds of mortgage-backed securities (Ex. UU); 9) a news article describing a suit

---

[14]      All exhibits referenced in this Opinion and Order are attached to the Declaration
of Theo J. Robins ("Robins Decl.") accompanying Defendants' motion to
dismiss.  (Docket entry no. 139.)

against EMC for violating consumer protection laws by, among other things, posting mortgage payments inaccurately (Ex. VV); 10) a report on the impact of widespread appraisal fraud (Ex. XX); and 11) two lawsuits alleging that Countrywide violated Truth in Lending laws and misrepresented the quality of its mortgage investments. (Exs. MMM, NNN.) In addition, Defendants cite to events and reports that Plaintiffs referenced in the earlier complaints but "sanitized" from the TAC – specifically, a news report that two Bear Stearns hedge funds that invested in mortgage-backed securities had filed for bankruptcy in July 2007 (Original Compl.¶ 49), and a news report that Moody's had revised its model for evaluating subprime mortgages in April 2007. (FAC ¶ 180.)

Defendants' own motion papers persuasively explain why a complaint assembled from the information contained in the above exhibits would not survive a 12(b)(6) motion. The bulk of these exhibits canvass general, industry-wide practices that are not merely "untethered to the transactions that are the subject of [the Original] Complaint" (Defs' Memo. at 16), but are unconnected to any of the entities that were involved in the origination, packaging, and sale of the BSMF 2006-AR1 trust.[15] "Allegations of industry-wide or market-wide troubles alone

---

[15]     The loans constituting the BSMF 2006-AR1 trust were originated by EMC and BSRM. (TAC ¶ 94.) The only pre-August 2007 events connected to those, or any other business involved in that trust are (1) the suit against EMC; (2) the collapse of two Bear Stearns hedge funds in July 2007; and (3) the Rating Agencies' reassessments of their rating models. None constitute facts that would enable a plaintiff to meet its pleading burden. The EMC suit concerned a species of lending practices (charging improper fees and failing to post timely payments) wholly different from those alleged in the complaint. There is no information linking the collapse of the two Bear Stearns hedge funds to any aspect of the BSMF 2006-AR1 trust. Finally, Defendants' exhibits indicate that the Rating Agencies acknowledged flaws in their models and began downgrading MBS securities in the spring and summer of 2007; however, those corrective steps apparently did not affect <u>NJ Carpenters'</u> Certificates, which were not subjected to

ordinarily are insufficient to state a [securities] claim." <u>Freidus v. ING Groep N.V.</u>, 736 F.

Supp. 2d 816, 831 (S.D.N.Y. 2010); <u>see also Yu v. State St. Corp.</u>, 686 F. Supp. 2d 369, 380

(S.D.N.Y. 2010) ("To survive a motion to dismiss, plaintiffs must allege some facts to close the

loop between the market turmoil and the accuracy of the Fund's valuations.").

   More significantly, even though evidence of improprieties and irresponsible risk-

taking in the MBS industry began to emerge in early 2007, there is no indication that the <u>BSMF

2006-AR1</u> Certificates declined in value.  Indeed, according to Defendants' chart detailing

Certificate downgrades, the earliest downgrade of any Certificate issued from the BSMF 2006-

AR1 trust occurred on December 14, 2007, and the earliest downgrade of a AAA-rated

Certificate (the only Certificates any Plaintiff held) from that trust occurred on June 19, 2008.

(Ex. ZZ.)  The fact that the Certificates retained their ratings amidst growing concerns about the

MBS industry is significant for two reasons.

   First, absent a decline in the Certificates' ratings (or some other indicator of a

steep decline in the Certificates' value), it is difficult to see how a plaintiff could have plausibly

pled that the epidemic of indiscretions in the MBS industry had infected his or her Certificates.

A complaint couched in nothing more than the sweepingly general allegations contained in

Defendants' exhibits would almost certainly "stop[] short of the line between possibility and

plausibility of entitlement to relief." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quotations

omitted); <u>Freidus v. ING Groep N.V.</u>, 736 F. Supp. 2d at 831; <u>Yu v. State St. Corp.</u>, 686 F. Supp.

2d at 380.  Second, absent a showing that the Certificates' value had diminished by August 2007,

NJ Carpenters could not have stated a claim supportive of statutory damages.  While a complaint

---

   any downgrades until the following year.

"is not required to plead damages under Section 11, it fails to state a claim if the allegations of the complaint do not support any conceivable statutory damages." NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., 743 F. Supp. 2d 288, 290-91 (S.D.N.Y. 2010); see also In re Initial Public Offering Securities Litigation, 241 F. Supp. 2d 281, 347 (S.D.N.Y. 2003) (dismissing claims for failure to allege cognizable damages where plaintiffs sold securities for an amount in excess of the offering price).

Because Defendants have failed to show that NJ Carpenters could have pled facts sufficient to survive a 12(b)(6) motion in August 2007, the Court concludes that the Original Complaint was timely.

2.    <u>Timeliness of Subsequent Complaints</u>

Defendants also allege that the FAC (filed May 15, 2009) and the Pension Trust Complaint (filed July 9, 2009) are untimely. Defendants marshal publicly available sources that refer to missteps, misfortunes, and malefactions of corporations involved in the packaging and sale of the securities at issue here, including: 1) two complaints from May and July 2007 against Countrywide for violating Truth in Lending laws and misrepresenting the quality of its mortgage investments (Ex. MMM, NNN); 2) the collapse of Bear Stearns in March 2008 (FAC ¶ 105); and 3) AHM's worsening financial condition as a result of its investment in subprime mortgages. (Ex. NN.) In addition, Defendants catalogue more than 900 downgrades to investment grade Certificates issued by the 13 trusts added after the Original Complaint. (See Defs' Memo. at 37; Ex. ZZ.)

It is not clear that a complaint whose allegations were supported solely by this body of information would survive a Rule 12(b)(6) motion. The two complaints against

Countrywide detail conduct that is only tangentially related to the TAC's allegations concerning underwriting practices and improper appraisals. (See Ex. MMM (suit alleging deceitful lending practices); Ex. NNN (suit alleging insider trading, artificial inflation of stock prices, and misrepresentations concerning stock prospects)).[16] As for the collapse of Bear Stearns, there is nothing in Defendants' submission suggesting that Plaintiffs knew or should have known by May or July of 2008 that their securities were tainted by the irresponsible practices that drove Bear Stearns into bankruptcy; the same holds for the collapse of AHM. It is far from clear that speculative attempts to link those events to the securities in question would have survived a motion to dismiss.

Defendants' treatment of the downgrade history is equally unpersausive. As an initial matter, downgrades alone do not convey facts sufficient to plead a Section 11 or 12(a)(2) claim. As Defendants point out in their papers, a downgrade can occur for any number of reasons – for example, a recession or a collapse in housing prices – that are unrelated to the problematic underwriting and quality control practices that form the basis of each complaint. Cf. Public Employees' Retirement System of Mississippi v. Goldman Sachs Group, Inc., No. 09 CV 1110(HB), 2011 WL 135821, at *8 (S.D.N.Y. Jan. 12, 2011) (while minor downgrades and negative watches "may have been an indication that the Certificates were performing badly, [they] do[] not constitute triggering information [that] relate[s] directly to the misrepresentations and omissions that the Plaintiff alleges") (internal quotations omitted).

---

[16]     Moreover, these two lawsuits were not discussed in any of the press articles submitted by Defendants and there is no indication that they received wide press coverage. Plaintiffs cannot be charged with knowledge of every suit filed against an originator. See Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406, 418 (2d Cir. 2008).

Defendants' downgrade figure is also severely misleading.  First, it characterizes hundreds of "negative watches" as downgrades even though the latter do not constitute rating changes.[17]  Cf. In re Morgan Stanley Mortg. Pass-Through Certificates Litigation, --- F. Supp. 2d ---, No. 09 Civ. 2137(LTS), 2011 WL 4089580, at *12-13 (S.D.N.Y. Sept. 15, 2011) (declining to find inquiry notice based on "negative watches" where securities maintained their investment-grade rating); Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc., 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010); New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC, 720 F. Supp. 2d 254, 267 (S.D.N.Y. 2010).  Second, Defendants' figure includes as many as nine months of legally irrelevant downgrades that occurred less than a year prior to the filing of the relevant complaint.[18]  Third, Defendants arrive at their downgrade count primarily by itemizing downgrades to the most subordinate tranches, which exist to absorb losses to the underlying collateral and protect the cash flow of higher-rated Certificates.  (See Pls' Opp. at 36.)  It bears emphasis that Plaintiffs purchased exclusively from the AAA-rated tranches.  When Defendants' chart is re-examined with a focus on the tranches from which Plaintiffs purchased their securities, the following picture emerges: in the year prior

---

[17]   Plaintiffs explain – and Defendants do not dispute – that a negative watch is not a downgrade, but "merely indicates that the rating agency is putting the issuer on notice that it is being reviewed closely.  At the close of the review period, the rating agency removes the issuer (or issue) from watch with either its old rating intact or a new rating assigned." (Pls' Opp. at 35-36; see also TAC ¶ 42.)

[18]   For example, Defendants tabulates 112 downgrades to investment grade BSMFT 2006-AR5 Certificates from April 2008 to February 19, 2009 (Defs' Memo. at 37, citing Exs. BBB and ZZ.)  As the complaint listing that offering was filed on May 15, 2009, only six weeks of those downgrades are germane to the statute of limitations inquiry.

to being listed in a complaint, only one trust had AAA-rated tranches that were downgraded;[19] five trusts had AAA-rated tranches that were subject to scattered negative watches (i.e., from AAA to AAA*- or Aaa to Aaa*-);[20] the AAA-rated tranches from the remaining seven offerings retained their AAA ratings unblemished.[21]  In sum, a year prior to the filing of the operative complaint, the securities that Plaintiffs held were (at least as judged by the ratings) seemingly untarnished by the problems that plagued the MBS industry as a whole.  As with the Original Complaint, it is far from clear that Plaintiffs could have adequately pled, one year prior to the filing of the operative complaint, that the Offering Documents for their securities contained material misrepresentations and omissions, or that they suffered cognizable injuries.

Accordingly, the Court finds that the subsequent complaints were timely filed.

B.    Statute of Repose

Defendants further argue that Plaintiffs' claims are untimely to the extent they were first asserted by actual buyers from offerings more than three years after the offering date. The Court recently addressed this very argument in In re Morgan Stanley Mortg. Pass-Through Certificates Litigation, --- F. Supp. 2d ---, No. 09 Civ. 2137(LTS), 2011 WL 4089580 (S.D.N.Y. Sept. 15, 2011).  That decision concluded that, under the tolling rule announced in American

---

[19]    That trust was BSABS 2007-HE3.  Moody's downgraded three Aaa-rated tranches from Aaa to Aa1.  (Ex. ZZ.)  Whatever significance this minor downgrade might have had, it is mitigated by the fact that those tranches retained their AAA S&P rating until February 27, 2009.  (Id.)

[20]    The five trusts are BALTA 2006-6, BALTA 2006-8, BALTA 2007-1, BSARM 2006-4, SAMI 2006-AR5.  (Ex. ZZ.)

[21]    The seven trusts are are SAMI 2006-AR6, SAMI 2006-AR7, BSABS 2007-HE4, BSMF 2006-AR4, BSMF 2006-AR5, BSARM 2007-1, and BSARM 2007-3. (Ex. ZZ.)

Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), the commencement of the original class action tolled the statute of repose for all members of the putative class, even where the original named plaintiffs lacked standing to bring some of the claims. In re Morgan Stanley, 2011 WL 4089580, at *14-19. Here, named Plaintiffs had asserted claims on behalf of purchasers of Certificates from each of the 14 trusts as of July 19, 2009, Pension Trust Complaint – less than three years after each of the offerings' issuance dates.[22] Accordingly, none of the claims is barred by the statute of repose. Because the Court finds that the statute of repose was tolled under American Pipe, it need not decide whether relation back could save the later claims.

II.     Pleading Actionable Misrepresentations/Omissions

The Court will address Defendants' arguments that Plaintiffs have failed to state viable claims of misrepresentations or omissions as they relate to the three categories of allegations – underwriting standards, appraisals, and investment ratings – made in the TAC.

A.      Misrepresentations and Omissions Regarding Underwriting Standards

Defendants first contend that Plaintiffs fail to meet their pleading burden under Twombly and Iqbal by failing to proffer facts linking the alleged disregard for underwriting standards with the decline in the Certificates' value. This contention is without merit. The Complaint is replete with public reports and detailed statements by numerous confidential witnesses[23] that describe the systematic disregard of underwriting standards by the specific

---

[22]    The FAC (filed May 15, 2009) asserted claims on behalf of purchasers of securities from eight Offerings, and the Pension Trust Complaint (filed July 9, 2009) asserted claims on behalf of purchasers of securities from the remaining six Offerings.

[23]    Defendants' attack on the use of confidential witnesses in the TAC is unavailing. It is well-established that confidential sources may be relied upon in a complaint so long as plaintiffs also rely on "other facts [that] provide an adequate basis for

parties involved in the origination of the loans populating the offerings, as well a failure to

conduct proper due diligence by the depositors.  (TAC ¶¶56-67, 87-93, 98-99, 105-25, 131-40,

148-55, 160-65.)[24]  The facts alleged in the TAC are sufficient to support a reasonable inference

_____

believing" the allegations in the complaint.  Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000); see also Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011) ("Novak removed a requirement that confidential sources be named when corroborative facts exist.").  The TAC contains a multitude of corroborative facts that reinforce the claims made by the confidential sources.  In any event, "even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  Novak, 216 F.3d at 313-14.  Here, every confidential witness (with the sole exception of CW9 (see TAC ¶ 148)) is identified by job title, office location, and duration of employment.

[24]     Defendants also argue that the sections of the TAC that rely on allegations put forth in other litigants' complaints should be disregarded or stricken.  The Court disagrees.  The authority on which Defendants anchor this argument emanates from Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir. 1976), which held that a plaintiff's pleadings could not reference a complaint that resulted in a consent decree.  The Circuit's rationale was that the consent decree was inadmissible under Fed. R. Evid. 410; thus, the plaintiff could not derive any evidentiary benefit from the complaint that proceeded it.  Id. at 893.  The Circuit reiterated the strong presumption against striking portions of the pleadings and cautioned that its holding was limited to "the facts of this case."  Id.  Nonetheless, some courts in this district have stretched the holding in Lipsky to mean that any portion of a pleading that relies on unadjudicated allegations in another complaint is immaterial under Rule 12(f).  See, e.g., RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009).  Neither Circuit precedent nor logic supports such an absolute rule.  Not all complaints are created equal – while some barely satisfy the pleading requirement, others are replete with detailed factual information of obvious relevance to the case at hand.  To take but one example, the Ambac complaint cited in the TAC (¶ 87), recounts a detailed study by Ambac Assurance Corp. that revealed "widespread breaches of representations in almost 80 percent of the documents" supporting the loans it reviewed.  It makes little sense to say that information from such a study – which the TAC could unquestionably rely on if it were mentioned in a news clipping or public testimony – is immaterial simply because it is conveyed in an unadjudicated complaint.  The other complaints on which the TAC relies are of a similar character.  Accordingly, the Court will not strike references to them from the TAC.  In any event, nothing

that the loan pools were inferior in credit quality to loans that would have been selected had Defendants' originators employed the sort of underwriting standards described in the Offering Documents.

Defendants next contend that the Offering Documents contained "robust risk disclosures " (Defs' Memo. at 15), including disclaimers that a downturn in the housing market could adversely affect the value of Plaintiffs' Certificates, and that the originators would grant exceptions from stated underwriting guidelines.  These warnings, Defendants contend, "bespoke caution."  Under the "bespeaks caution" doctrine, "[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002).

The "bespeaks caution" doctrine is inapposite to the market-downturn disclosure.  The doctrine only applies where a plaintiff alleges that the defendant made misleading statements about the possibility that future, unforeseen events could undermine an investment's value; it does not apply to cases, such as this, where a plaintiff alleges omissions or misrepresentations of historical fact – i.e., that the underwriting standards were followed.  P. Stolz Family Partnership L.P. v. Daum, 355 F.3d 92, 97 (2d Cir. 2004).  The doctrine is also inapposite to the disclaimer that exceptions had been granted.  For the "bespeaks caution" doctrine to shield a seller from liability, the "cautionary language . . . must relate directly to that by which the plaintiffs claim to have been misled."  Hunt v. Alliance N. Am. Gov't Income

---

rides on how much weight the Court gives the sections of the TAC that rely on other parties' pleadings.  Even if the Court struck every such paragraph, the TAC would still contain sufficient factual allegations to plead claims under Sections 11 and 12(a)(2).

Trust, Inc., 159 F.3d 723, 729 (2d Cir. 1998).  No language in the Offering Documents disclosed,

for example, that the originators had systematically violated their own stated underwriting

standards, that exceptions were improperly granted, or that Bear Stearns had directed its third-

party due diligence firms to keep non-conforming loans in the Offering pools.  (TAC ¶¶55-67.)[25]

Accordingly, the Court finds that the TAC properly states a claim as to the

underwriting allegations.

B.     Misrepresentations and Omissions Regarding Appraisals

Defendants also argue that Plaintiffs' appraisal-related allegations fail to state a

claim.  According to the allegations in the TAC, the Offering Documents represented that the

property appraisals conformed to the Uniform Standard of Professional Appraisal Practice

("USPAP") and were conducted by "qualified independent appraisers."  (TAC ¶¶ 80, 84, 96,

102.)  In fact, originators systematically disregarded their stated appraisal standards, and strong-

armed appraisers to inflate property values.  (See, e.g., id. ¶¶ 58, 109-10, 121, 154, 190.)  In

moving to dismiss the appraisal-related claims, Defendants rely principally on Tsereteli v.

Residential Asset Securitization Trust 2006–A8, 692 F. Supp. 2d 387 (S.D.N.Y. 2010), which

held that property appraisals and corresponding LTV ratios are "subjective opinion[s]" that are

"actionable under the Securities Act only if the [plaintiff] alleges that the speaker did not truly

have the opinion at the time it was made."  Id. at 393-94.  Defendants argue that the appraisal

---

[25]     Defendants also argue that an unforeseen event – namely, the housing collapse –
and not the abandonment of underwriting standards caused the Certificates to
decline in value.  However, "any decline in value is presumed to be caused by the
misrepresentation in the registration statement."  McMahan & Co. v. Wherehouse
Entertainment, Inc., 65 F.3d 1044, 1048 (2d Cir. 1995).  If Defendants wish to
challenge that presumption they may present evidence at a later stage establishing
an alternative cause of loss.  Id.

claims fail because the TAC does not allege that any Defendants were involved in appraising properties or knew that the loans underlying the Certificates were based on "inflated appraisals."

Defendants' argument misses the mark. Plaintiffs do not merely allege that the appraisal amounts were incorrect; they allege that the appraisals were not conducted in accordance with the industry standards identified in the Offering Documents. The former allegation differs from the latter in the same way the statement "the cook baked a delicious cake" differs from the statement "the cook followed the cake recipe on the box": the former is opinion, the latter an assertion of fact. Likewise, the conclusion that a house is worth $500,000 may be a statement of subjective opinion, but the assurance that the $500,000 figure was reached in accordance with a body of professional appraisal standards is a statement of verifiable fact.

Second, to the extent the TAC does bring a claim based on the inaccuracy of the appraisal values – as opposed to appraisal methodology used – Plaintiffs have pled facts supporting an inference that these opinions were not only objectively false, but also subjectively false. Because the appraisal "opinions" were expressed by both the originators and Bear Stearns (by incorporating the originators' representations into the Offering Documents), Plaintiffs can state a claim by showing that either one disbelieved the appraisal amounts. Cf. In re Twinlab Corp. Sec. Litig., 103 F. Supp. 2d 193, 203 (E.D.N.Y. 2000) (liability under '33 Act may attach even for innocent misrepresentation); Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 775 (1st Cir. 2011) (liability may attach for accurately conveying ratings that are false and misleading). The TAC alleges that, during the due diligence stage, Clayton submitted reports to Bear Stearns which revealed that many of the loans contained no appraisals at all. (Compl. ¶ 58.) The TAC also alleges that the originators pressured their

employees to inflate appraisal values. (Id. ¶¶ 109-10, 121, 154.) These allegations suffice to support an inference that Bear Stearns and the originators did not believe that the appraisal numbers were accurate.

Accordingly, the TAC's allegations that the Offering Documents failed to disclose the allegedly rampant violation of appraisal standards is sufficient to state a claim.

### C.    Misrepresentations and Omissions Regarding Investment Ratings

Defendants further contend that the TAC fails to state a claim regarding the investment ratings.[26] The Offering Documents stated that the Certificates' ratings:

> address the likelihood of the receipt by certificateholders of all distributions to which the certificateholders are entitled. These ratings address the structural, legal and issuer-related aspects associated with the certificates and notes, the nature of the underlying mortgage assets and the credit quality of the guarantor, if any.

(TAC ¶184.) The Offering Documents also stated that "[i]t is a condition to the issuance of each class of Offered Certificates that it receives at least the ratings set forth [in the prospectus supplement] from S&P and Moody's." (Id.) The TAC alleges that the Offering Documents failed to disclose that the ratings process relied on inaccurate mortgage loan data, stale delinquency, and outdated models, and that the ratings process was compromised by conflicts of interest. While the TAC does not allege that the Offering Documents misstated the ratings that

---

[26]    Defendants' first argument – that, under SEC Rule 436(g), the ratings cannot be considered part of the Registration Statement and, thus, cannot be a basis for liability under Section 11 – is meritless. See SEC Rule 436(g)(1), 17 C.F.R. § 230.436(g)(1) ("the security rating assigned . . . by a nationally recognized statistical rating organization . . . shall not be considered a part of the registration statement prepared or certified by a person within the meaning of Sections 7 and 11 of the Act."). Rule 436(g) was intended to shield the Rating Agencies, not the issuers who incorporate the ratings, from civil liability under Section 11. See SEC Release No. 33–6336, 46 Fed. Reg. 42024–01, 42024 (Aug. 18, 1981). See also Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc., 714 F. Supp. 2d 475, 481 (S.D.N.Y. 2010).

the Agencies assigned to the Certificate, Plaintiffs argue that Defendants nonetheless had a duty, under 17 C.F.R. § 230.408(a),[27] to disclose flaws underlying the ratings to prevent the ratings from being misleading to investors.

It is well-settled that investment ratings are subjective opinions and, accordingly, only actionable where "the speaker did not truly believe the statements at the time it was made public," see, e.g., N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653, 2010 WL 1473288, at *7-8 (S.D.N.Y. Mar. 29, 2010); In re IndyMac Mortg.-Backed Sec. Litig., 718 F. Supp. 2d 495, 511-12 (S.D.N.Y. 2010), or if the speaker "knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 775 (1st Cir. 2011). Here, there are two "speakers": the agencies that rated the Certificates, and Defendants, who presented those ratings to investors in the Offerings Documents. Thus, Plaintiffs can state a claim by pleading that the Rating Agencies or Defendants did not believe that the ratings accurately reflected the quality of the securities. As to the former, Plaintiffs do not need to plead that Defendants were aware that the Rating Agencies believed the ratings to be false or misleading. See, e.g., In re Twinlab Corp. Sec. Litig., 103 F. Supp. 2d 193, 203 (E.D.N.Y. 2000) ("the defendant's knowledge of the misrepresentations is not an element of a ['33 Act] claim; indeed, a defendant can be held liable even for an innocent misstatement."); see also Plumbers' Union, 632 F.3d at 775 (liability may attach for accurately conveying false or misleading ratings).

---

[27]    Section 230.408(a) provides in relevant part that: "In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."

Plaintiffs have not, however, adequately pled a claim based on the theory that the Rating Agencies disbelieved their ratings. The TAC includes excerpts of reports from 2007 and 2008 in which Moody's and S& P personnel admitted that, in hindsight, their rating models and procedures were flawed. (See, e.g., TAC ¶187 (quoting Moody's Managing Director as saying: "There is a lot of fraud that's involved there, things that we didn't see . . . We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis."); id. ¶ 193 (quoting former S&P Managing Director as saying: "[E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred.")). These retrospective remarks are insufficient to support an inference that the Rating Agencies disbelieved the ratings at or before the time of the offerings. Plumbers' Union, 632 F.3d at 775.

However, Plaintiffs also argue that Defendants could not reasonably have believed that the ratings were accurate because "the information Bear Stearns provided to the Rating Agencies regarding the loans underlying the pools at issue was faulty and inaccurate." (Pls' Opp. at 22.) Unlike Plaintiffs' allegations about the conflict of interest[28] and flawed data models,[29] this one potentially has merit. However, the exact contours of this allegation are

---

[28]   See e.g., In re Morgan Stanley Mortg. Pass-Through Certificates Litigation, --- F. Supp. 2d ---, No. 09 Civ. 2137(LTS), 2011 WL 4089580, at *21 (S.D.N.Y. Sept. 15, 2011) (dismissing claims based on conflict of interest between the MBS issuers and Rating Agencies); In re IndyMac Mortgage-Backed Securities Litigation, 718 F. Supp. 2d 495, 512 (S.D.N.Y. 2010) ("there was no duty to disclose the ratings agencies' conflicts of interest, as the information was known widely").

[29]   See, e.g., Plumbers' Union, 632 F.3d at 775 ("ratings were not false or misleading because rating agencies should have been using better methods and data"); Tsereteli, 692 F. Supp. 2d at 395 (issuers had no obligation to disclose the Rating Agencies' models and methodologies).

obscure. It is unclear what the faulty loan information consisted of. It is also unclear when, in

Plaintiffs view, Bear Stearns became aware that the Rating Agencies had relied on inaccurate

information in assigning the Certificate ratings. The TAC recounts the following chronology:

prior to making bulk loan purchases, the originators sent Bear Stearns a spreadsheet containing

detailed information about the loans, which Bear Stearns passed to the Rating Agencies. (TAC

¶¶ 52-54.) The Agencies ran the spreadsheet through their models and determined the appropriate

bid price. (Id.) Once the originator accepted the bid, Bear Stearns retained third-party due-

diligence firms, ostensibly to conduct a more thorough review of the loan pools. (Id. ¶¶ 55-56.)

According to the TAC, it was during the due-diligence process that Bear Stearns first discovered

(and ignored) the fact that loans were missing critical documentation or failed to comply with

underwriting standards. (Id. ¶¶ 56-60). The narrative stops there – the TAC does not reveal at

what stage the Agencies rated the Certificates, nor what information the Agencies relied upon to

arrive at those ratings.

This missing information is crucial. If Bear Stearns knowingly fed incomplete or

inaccurate information to the Rating Agencies, or discovered after the Agencies rated the

Certificates that they did so based on defective loan data, it follows that Bear Stearns could not

have reasonably believed that the ratings accurately reflected the Certificates' risk. In either

case, the ratings' unqualified reproduction in the Offering Documents would constitute an

actionable misrepresentation and omission.[30] Accordingly, the Court will grant, without

---

[30]    Defendants argue that even if the ratings were actionable misrepresentations,
the risk disclosures in the Offering Documents shield them from liability. (See
e.g., SAMI 2006-AR5 Prosp. Supp. at S-22, Ex. L to Robins Decl. ("[t]he ratings
of the offered certificates by the rating agencies may be lowered following the
initial issuance thereof as a result of losses on the mortgage loans . . . in excess of
the levels contemplated by the rating agencies at the time of their initial rating

prejudice, the motion to dismiss claims based on the securities' ratings.  Plaintiffs will be

granted leave to amend the complaint to plead facts demonstrating that Bear Stearns was aware,

when it released the Offering Documents, that the Certificates' ratings were based on inaccurate

or incomplete information.[31]

III.     Section 15 Claim

          Defendants move to dismiss all claims against the Individual Defendants.  In

order to establish a prima facie Section 15 claim, a plaintiff must show (1) control, and (2) an

underlying violation of Section 11 or Section 12(a)(2).  In re Lehman Bros. Mortgage-Backed

Securities Litigation, 650 F.3d 167 (2d Cir. 2011).  As explained above, the complaint's

allegations are sufficient to state claims for primary violations of Sections 11 and 12.  Thus, the

remaining relevant question is whether Plaintiffs have adequately pled control.

---

analysis.").)  They also argue that the ratings allegations constitute impermissible
"fraud by hindsight" because Plaintiffs failed to plead facts demonstrating that the
downgrades resulted from the disclosure of information regarding improper
lending practices opposed to the housing market collapse.  Neither argument is
availing.  The TAC suggests that Plaintiffs could plead facts sufficient to support
an inference that the widespread violation of underwriting standards left the
Certificates more vulnerable to economic shocks and that the inaccurate loan
information relied upon in assigning the ratings resulted in assessments that
significantly understated the risk that the underlying loans would experience high
rates of delinquency or default.  The boilerplate disclaimers notified Plaintiffs of
the prospective risk that unforeseen events could cause rating downgrades; they
did not disclose that the ratings in the Offering Documents were tainted by their
reliance on deficient loan data.  See Rombach v. Chang, 355 F.3d 164, 173 (2d
Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the
failure to disclose that the risk has [already] transpired.").

[31]     In its order denying without prejudice Defendants' motion to dismiss the SAC,
the Court granted Plaintiffs leave to file a final amended complaint.  (See docket
entry no. 133)  However, given that the Court's order did not address Defendants'
argumentation about the Certificate ratings, the Court deems it appropriate to give
Plaintiffs another opportunity to amend the complaint.

The Second Circuit has defined control as "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise." In re Lehman Bros., 650 F.3d at 185 (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996)). While the Second Circuit has yet to address the question of whether a plaintiff bringing a Section 15 claim must allege "culpable participation," a majority of judges in this District – including the undersigned – have held such an allegation is not required. Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I, No. 08 Civ. 1713(ERK), 2012 WL 601448, at *20-21 (E.D.N.Y. Feb. 23, 2012); In re Deutsche Bank AG Securities Litigation, No. 09 Civ. 1714(DAB), 2011 WL 3664407, at *11 (S.D.N.Y. Aug. 19, 2011); In re Refco, Inc. Securities Litigation, 503 F. Supp. 2d 611, 637 n.24 (S.D.N.Y. 2007); American High-Income Trust v. Alliedsignal, 329 F. Supp. 2d 534, 549 (S.D.N.Y. 2004). Here, Plaintiffs have alleged that Individual Defendants are (1) officers or directors of the Depositors who (2) each signed one or both of the Registration Statements at issue. These allegations satisfy Plaintiffs' obligation to plead control. See, e.g., In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429, 457 (S.D.N.Y. 2005) (officers or directors of defendant corporation who signed the Registration Statement exercised control), abrogated on other grounds, 574 F.3d 29 (2d Cir. 2009); In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (same).

Accordingly, the Court finds that Plaintiffs have adequately pled a Section 15 claim.

IV.     Pleading of Cognizable Injury

Plaintiffs allege that the value of the Certificates at issue has diminished greatly

since their original offering, as has the price at which Plaintiffs and other members of the Class could dispose of them. Plaintiffs have also realized losses by disposing of many of the Certificates at as little as one-third of their purchase price. The decline in value and the losses that Plaintiffs suffered as a result of the sale of their Certificates are alleged with specificity.[32]

Defendants contend that the Offering Documents disclosed the risk that the Certificates could diminish in value, and that purchasers might be forced to sell them at a loss. In light of these disclosures, Defendants argue that Plaintiffs can only show cognizable injury if they demonstrate that pass-through payments were missed. This argument is essentially the same one Defendants made in support of their contention that Plaintiffs had failed to state a claim based on underwriting practices, and it fails for the same reason – the Offering Documents' generic disclosures about market fluctuations did not advise purchasers that the Certificates' value would decline due to noncompliance with appraisal and underwriting guidelines. Plaintiffs' allegations regarding the Certificates' decline in value and their resale at a loss identify legally cognizable injuries. See In re Morgan Stanley, 2011 WL 4089580, at *19-20; New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc., 08 Civ. 5653(PAC), 2010 WL 1473288, at *4-5 (S.D.N.Y. Mar. 29, 2010); In re Countrywide Financial Securities Litigation, 588 F. Supp. 2d 1132, 1169-70 (C.D. Cal. 2008) (holding that a complaint is sufficient with respect to damages if a plaintiff "allege[s] facts creating the reasonable inference that the value of the securities on the presumptive damages date – that is, either the value at the time plaintiff sold the securities; or the value at the time of suit, if the plaintiff still holds the

---

[32]    Defendants incorrectly claim that Plaintiffs fail to specify damages for SAMI 2006-AR5 and BALTA 2007-1. In fact, the TAC states quite clearly that the values of those Certificates dropped from approximately $1 to $0.3586 and $0.3817, respectively. (TAC ¶¶ 19, 21.)

securities – is less than the purchase price").

Accordingly, the Court denies Defendants' motion to the extent it seeks to dismiss the TAC for failure to plead a legally cognizable injury.

V.      The "Sole Remedy" Provision

In each securitization, the mortgage loan seller made representations and warranties in the mortgage loan purchase agreement ("MLPA") regarding each loan, including representations that "at the time of origination, each Mortgaged Property was the subject of an appraisal which conformed to the underwriting requirements of the originator of the Mortgage Loan" and that "each Mortgage Loan was originated in accordance with the underwriting guidelines of the related originator." (See, e.g., BALTA 2006-6 MLPA, § 7, attached as Ex. KK to the Robins Decl.)  The MLPA further provided that:

> The obligations of [the Mortgage Loan Seller] to cure, purchase or substitute a qualifying Substitute Mortgage Loan shall constitute the Purchaser's, the Trustee's and the Certificateholder's sole and exclusive remedies under this Agreement or otherwise respecting a breach of representations or warranties hereunder with respect to the Mortgage Loans . . . .

(Id. § 7(xxvii).)  The Prospectus for BALTA 2006-6 recited the general content of certain representations that each mortgage seller made, described the seller's obligation under the MLPA to cure violations of the representations, or repurchase or substitute loans whose characteristics are inconsistent with the representations, and described the obligations of the master servicer or trustee in connection with the enforcement of the seller's obligations under the MLPA; the Prospectus provides that the obligations described "will constitute the sole remedies available to securityholders or the trustee for a breach of any representation by a Seller or for any other event giving rise to the obligations as described above." (See BALTA 2006-6 Prosp. at 20-

25, attached as Ex. G to the Robins Decl.)

Relying on Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383

(5th Cir. 2010), Defendants argue that, even if Plaintiffs have adequately pled material

misrepresentations or omissions, the sole remedy for breach of any representations or warranties

is for the seller to repurchase or replace the particular non-conforming loans.

Defendants' reliance on Lone Star is misplaced. There, the plaintiffs discovered a

number of delinquent mortgages in the loan pools and brought a misrepresentation claim based

specifically on the breach of a representation in a prospectus supplement that there were "no

delinquent loans." 594 F.3d 383, 388. The prospectus supplement contained a "sole remedy"

provision, similar to that in the BALTA 2006-6 documentation, providing that the defendant

would "substitute or repurchase" delinquent loans. The Fifth Circuit affirmed the dismissal of

the claim, holding that the plaintiffs could not state a misrepresentation claim based on the

limited number of delinquencies that had been identified because the defendant never

represented that the pools were "absolutely free" of delinquent mortgages. Id. at 388. To the

contrary, the repurchase and substitution clause amounted to an implicit acknowledgment that

some amount of delinquency was unavoidable, thereby qualifying the defendant's representation

that there were "no delinquent loans." Id. at 390.[33] The Fifth Circuit did not rule, as Defendants

here suggest, that their remedies would still be limited to repurchase or substitution even if

---

[33]     As the Fifth Circuit noted: "[There are] difficulties . . . investigating the
underlying residential mortgages. Even the best due diligence may overlook
problems. A mortgage may become delinquent from a single missed payment.
Some of the loans might fall into delinquency during the pendency of the
transactions leading to an investor's purchases. Because mistakes are inevitable,
both seller and purchaser are protected by a promise that the mortgage pools will
be free from later-discovered delinquent mortgages [by including the repurchase
and substitute clause]." Id. at 388.

plaintiffs had shown a misrepresentation.

Nor are the claims in the instant case as limited as those in Lone Star.  Here, Plaintiffs point not only to seller representations as to the conformity of specific loans, but to representations in the Registration Statement and other Offering Documents concerning the underwriting and appraisal practices that were employed in constituting the pools.  Rather than claiming a limited number of deviations from the underwriting and appraisal standards, Plaintiffs claim that the representations were belied by systemic noncompliance.   While the "sole remedy" clause could be read as an acknowledgment of occasional underwriting violations, it cannot be read as an acknowledgment of the pandemic of violations that Plaintiffs allege.  See City of Ann Arbor Employees' Retirement System v. Citigroup Mortg. Loan Trust Inc., 08 No. 1418(LDW), 2010 WL 6617866, at *7 (E.D.N.Y. Dec. 23, 2010) (distinguishing Lone Star on the same grounds); Emps. Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., et al., 09 Civ. 3701(JGK), 2011 WL 1796426, at *7 (S.D.N.Y. May 10, 2011) (same); Boilermakers Nat. Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1, 748 F. Supp. 2d 1246, 1256 (W.D. Wash. 2010) (same).

Moreover, preclusion of statutory remedies through limiting language in the Offering Documents would violate the well-established rule that "individual security holders may not be forced to forego their rights under the federal securities laws due to a contract provision." McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d 1044, 1051 (2d Cir. 1995); see also 15 U.S.C.A. § 77n (West 2010) ("Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter . . .

shall be void.").[34]

Accordingly, Defendants' argument that the "sole remedy" language precludes Plaintiffs' damages claims under Sections 11 and 12(a)(2) fails.

V.    Tranche Standing

Although not raised in their moving papers, Defendants argue in post-briefing letters that the named Plaintiffs lack standing to bring suit on behalf of purchasers of tranches that no named Plaintiff purchased.  Defendants cite a handful of recent cases from other districts which hold that the Securities Act explicitly limits standing to a person who acquires or purchases a specific security, and that every tranche is a unique security because each one "has its own certificates, credit rating, interest rate, risk profile and a unique CUSIP identifier" (Defs' Dec. 22, 2011, Letter at 2), and because each was backed by a different assortment of loans.  See Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I ("Plumbers"), No. 08 Civ. 1713(ERK), 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012); In re Washington Mutual Mortgage–Backed Secs. Litig. ("WaMu"), 276 F.R.D. 658 (W.D. Wash. Oct. 21, 2011); Maine State Retirement Sys. v. Countrywide Fin. Corp., No. 10 Civ. 0302(MRP), 2011 WL 4389689 (C.D. Cal. May 5, 2011).  These cases also hold that named plaintiffs lack

---

[34]    Cf. Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I, No. 08 Civ. 1713(ERK), 2012 WL 601448, at *19 (E.D.N.Y. Feb. 23, 2012) (declining to follow Lone Star as incompatible with the anti-waiver provision and inconsistent with strict liability under Sections 11 and 12); Emps. Ret. System of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 804 F. Supp. 2d 141, 155 (S.D.N.Y. 2011) (same); Genesee County Employees' Retirement System v. Thornburg Mortg. Securities Trust 2006-3, --- F.Supp.2d ---, No. 09 Civ. 0300(JB), 2011 WL 5840482, at *85-87 (D.N.M. Nov. 12, 2011) (same); City of Ann Arbor Emps. Ret. System v. Citigroup Mortg. Loan Trust Inc., No. 08 Civ. 1418(LDW), 2010 WL 6617866, at *7 (E.D.N.Y. Dec. 23, 2010) (same).

constitutional standing to bring claims based on tranches they did not purchase because they cannot have been injured by the decline in value of a security they did not hold.

Plaintiffs argue that they have standing to sue as to every tranche because at least one named Plaintiff purchased from every offering; the tranches in each offering were constituted from "a single pool of mortgages" and the Certificates from each tranche were "issued pursuant to identical Offering Documents containing the exact statements Plaintiffs allege [are] untrue." (Pls' Jan. 4, 2012, Letter at 5.) Thus, Plaintiffs contend, the untrue statements and omissions in the Offering Documents regarding the quality of the underlying loan pool negatively affected all tranches within each respective offering in a like manner. See Genesee County Employees' Retirement System v. Thornburg Mortg. Securities Trust 2006-3, No. 09 Civ. 0300(JB), 2011 WL 5840482, at *105-06 (D.N.M. Nov. 12, 2011) (rejecting tranche-based standing).

A.    Constitutional Standing

To have standing under Article III, "a plaintiff must allege an actual or threatened injury to himself that is fairly traceable to the allegedly unlawful conduct of the defendant." Lamar Advertising of Penn, LLC v. Town of Orchard Park, New York, 356 F.3d 365, 373 (2d Cir. 2004) (citation omitted). This requirement is "no less true with respect to class actions than with respect to other suits." Lewis v. Casey, 518 U.S. 343, 357 (1996); Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 199 (2d Cir. 2005). To bring suit on behalf of a class, the named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Warth v. Seldin, 422 U.S. 490, 502 (1975). Put differently, the named plaintiff "must be a part of that class, that is,

he must possess the same interest and suffer the same injury shared by all members of the class he represents." Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 216 (1974). "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." O'Shea v. Littleton, 414 U.S. 488, 494 (1974).

It is uncontested here that at least one named Plaintiff purchased securities from every offering. It is likewise uncontested that each tranche within a given offering was constituted from a single pool of mortgages, issued pursuant to the same set of Offering Documents, each with the same alleged misrepresentations and omissions.[35] As a result of these common misrepresentations and omissions, named Plaintiffs assert, every tranche experienced a higher rate of defaults and delinquencies than anticipated. Paraphrased in standing terminology, named Plaintiffs and the members of the class have suffered an identical form of injury (a decline in their Certificates' value) traceable to a single, allegedly unlawful act by Defendants (disseminating Offering Documents with misrepresentations and omissions). As such, named Plaintiffs have clearly established that they, and the purchasers of all other tranches within the offerings, are part of the same case and controversy with Defendants. Cf. N.J. Carpenters Health Fund v. Residential Capital, LLC, 272 F.R.D. 160, 166-67 (S.D.N.Y. 2011) ("Plaintiffs show that the [loans] . . . were originated under identical loan underwriting guidelines, and by the same four principal loan originators . . . The alleged disregard for those guidelines thus impacted all proposed class members in the same manner, irrespective of which tranche they purchased."); see

---

[35]    There is no indication in the record that there were separate Offering Documents for individual tranches within the various offerings.

also Genesee County Employees' Retirement System v. Thornburg Mortg. Securities Trust 2006-3, No. 09 Civ. 0300(JB), 2011 WL 5840482, at *105-06 (D.N.M. Nov. 12, 2011) (finding that named plaintiffs have constitutional standing to sue with respect to tranches which they did not purchase because "the same misrepresentations flow to all of the tranches"); In re Am. Int'l Group, Inc., 741 F. Supp. 2d 511, 538 (S.D.N.Y. 2010) (plaintiffs had standing to sue on behalf of offerings from which they did not purchase because each offering was issued pursuant to shelf registration statements that incorporated the same misstatements, which meant plaintiffs could "trace the injury of the purchasers in each of the 101 offerings to the same underlying conduct on the part of the defendants").

Defendants' central contention – that named Plaintiffs lack standing to sue over losses in the tranches which they did not purchase because an investor is not injured when a security she does not hold declines in value – reflects an excessively narrow view of the standing requirements for a lead plaintiff.[36] That view is expressed most aptly in Maine State Retirement Sys. – a case on which Defendants rely heavily – which held that "[a] lead plaintiff cannot

---

[36]    Defendants' argument also appears to be based on a false premise. While the point is not developed in Plaintiffs' briefs, the TAC pleads that a decline in value in the more junior tranches does, in fact, decrease the value of the higher tranches. (See TAC ¶ 41 ("Of course, because the lower tranches are designed to provide a cushion, diminished cash flow to the lower tranches results in impaired value of the higher tranches.").) See also Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co., 277 F.R.D. 97, 108 (S.D.N.Y. 2011) ("because of the 'waterfall' method of repaying investors in order of the quality of security purchased, false statements in Offering Documents affect all Certificates in the Offering"). If this is correct, purchasers of senior tranches are not merely part of the same case and controversy as purchasers of junior tranches – the former can also trace personal injury to declines in securities they did not hold. However, because the Court finds that there is a common case and controversy, it need not rely on this underdeveloped aspect of the record to find that named Plaintiffs have constitutional standing.

prosecute a class action based on claims he could not advance individually." 2011 WL 4389689

at *3 (quoting In re Wells Fargo Mortgage–Backed Certificates Litig., 712 F. Supp. 2d 958, 965

(N.D. Cal. 2010)).  If, by "claim," the court meant "a cause of action arising from a discrete case

and controversy," the statement is both correct and consistent with Plaintiffs' assertion that they

have constitutional standing to bring claims as to all tranches.  However, if "claim" is supposed to

mean a cause of action based on a discrete manifestation of an injury – which is apparently what

Defendants intend – that statement is demonstrably false.  Every time a lead plaintiff prosecutes

an action on behalf of a class, she brings claims based on injuries she did not personally suffer –

in other words, claims she could not have advanced individually.  For example, the cancer-

stricken lead plaintiff in an asbestos case brings claims based on other peoples' cancers; a lead

plaintiff, paralyzed from the waist down due to a car brake malfunction, can bring product liability

claims on behalf of other people who were paralyzed from the neck down due to the same faulty

brake design.  To say, as Defendants do, that named Plaintiffs cannot bring claims on behalf of

purchasers of other securities because they cannot trace an injury to securities they did not hold is

analogous to asserting that a driver who suffered injury when her brakes malfunctioned cannot sue

on behalf of purchasers of cars with the same defective brake design because a plaintiff cannot

claim to have been harmed by a car she never drove.

    Defendants' assertion that named Plaintiffs lack standing over tranches they did

not purchase because each tranche differs in its particularities is no more convincing.  Arguing

that named Plaintiffs lack standing because each tranche has, for example, a unique CUSIP

number and a different interest rate is akin to asserting that the hypothetical plaintiff who drove a

red two-door model lacks standing to sue on behalf of those who were driving the blue four-door

model with the same faulty brake design.  They are, in short, legally inconsequential distinctions.

Defendant has identified no substantive differences among the tranches that would warrant

treatment of the tranches as separate securities here for Article III standing purposes.

   Once, as here, a named plaintiff has established that she suffered the same species

of injury as the members of the class, traceable to the same unlawful conduct by a defendant, she

has fulfilled the requirements of constitutional standing.  Having satisfied Article III's standing

criteria, the dissimilarities between the tranches is an issue appropriately left to the class

certification stage.  See 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure §1785.1, at 388-89 (2d ed. 2005) ("Representative parties who have a direct and

substantial interest have standing; the question whether they may be allowed to present claims on

behalf of others who have similar, but not identical, interests depends not on standing, but on an

assessment of typicality and adequacy of representation.").

  B.  Statutory Standing

   Section 11(a) provides that where "any part of the registration statement . . .

contained an untrue statement of a material fact or omitted to state a material fact . . . any person

acquiring such security" may sue.  15 U.S.C.A. § 77k(a) (West 2010).  Section 12(a)(2) similarly

provides that, where an individual "offers or sells a security . . . by means of a prospectus or oral

communication, which includes an untrue statement of a material fact or omits to state a material

fact," that individual will be liable to "the person purchasing such security."  15 U.S.C.A.

§ 77l(a)(2) (West 2010).  The dispute here centers on the meaning of the phrase "such security" in

either section.  Relying on Maine State Retirement Sys., WaMu, and Plumbers, Defendants

interpret "such security" to encompass securities with certain shared attributes.  2011 WL

4389689, at *6; 276 F.R.D. 658, 663-64; 2012 WL 601448, at *7.  Defendants again point to the rate of return, rating, interest rate, and CUSIP number as the salient attributes.  In addition, Defendants appear to argue that "such security" only encompasses Certificates that are backed by the same mixture of loans, but have not pointed to anything in the record illuminating the differences in the nature or composition of the loans underlying the various tranches.  Plaintiffs, on the other hand, argue that "such security" means any security issued pursuant to an offering document that contains an actionable misrepresentation or omission.

The text of Sections 11 and 12(a)(2) does not support Defendants' interpretation.  While the phrase "such security" has no grammatical referent in Section 11(a), the text makes clear that the only prerequisite to filing suit is the presence of a misrepresentation or omission in its registration statement.  Section 12(a)(2) is even clearer: there, the referent of "such security" is "a security [sold] . . . by means of a prospectus or oral communication" that contains a material misrepresentation or omission.  Neither makes any reference to the characteristics of the security outside the flaw in its offering documents.  There is no mention of common rates of return, equivalent ratings, shared interest rates, or investors' needs and expectations.  Cf. Maine State Retirement Sys., 2011 WL 4389689, at *7 (emphasizing that the tranches "provided a different investment opportunity with unique characteristics" to allow each investor to choose the security "that best matched its needs").  In short, there is nothing in the record that indicates that the differences between the tranches that the Defendants' identify warrant treating the tranches – which were issued pursuant to the same, allegedly defective Offering Documents – as "different" securities for the purpose of Sections 11 and 12(a)(2).  See, e.g., In re Countrywide Financial Corp. Securities Litigation, 588 F. Supp. 2d 1132, 1165-66 (C.D. Cal. 2008) ("[Section 11] grants

standing to anyone who buys 'such security' – one traceable to a defective registration

statement."); see also In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288(DLC), 2004 WL

540450, at *6-7 (S.D.N.Y. Mar. 19, 2004) (purchasers of one type of debt security (domestic) had

standing to pursue claims of purchasers of a second type of debt security (foreign) issued pursuant

to the same registration statement); In re Fleming Cos. Sec. & Derivative Litig., No. 5-03-MD-

1530 (TJW), 2004 WL 5278716, at *49 (E.D. Tex. June 10, 2004) ("purchasers of one type of

security have standing to sue on behalf of purchasers of other types of security issued pursuant to

a single registration statement"); see also In re Citigroup Bond Litig., 723 F. Supp. 2d 568, 584-85

(S.D.N.Y. 2010) (named plaintiff has standing under Sections 11 and 12(a)(2) to bring suit based

on offerings from which it did not purchase where alleged misrepresentations were in a

registration statement common to all offerings); accord In re Am. Int'l Group, Inc., 741 F. Supp.

2d 511, 538 (S.D.N.Y. 2010).

      The Court recognizes that the dissimilarities between the tranches can be highly

relevant to those who purchased them; but there is nothing in the text of Sections 11 and 12(a)(2)

that enables the Court to assign any statutory standing significance in this case to the mere fact

that the securities differ in their bibliographic, payment priority, or rate of return particulars.  As

with constitutional standing, to the extent these differences are relevant, they may be appropriately

addressed at the class certification stage.

## CONCLUSION

      Defendants' motion to dismiss the TAC is granted without prejudice insofar as

Plaintiffs' claims are premised on the alleged unreliability of the ratings of securities included in

the investment pools.  Plaintiffs are granted leave to file a Fourth Amended Complaint alleging

facts sufficient to state a claim or claims based on the securities' ratings, by April 16, 2012.

Failure to timely file such an amended pleading may result in dismissal of the ratings-related

claims with prejudice and without further advance notice.  The motion to dismiss is denied in all

other respects.

        This opinion and order resolves docket entry no. 138.


        SO ORDERED.


Dated: New York, New York
      March 30, 2012

                                     LAURA TAYLOR SWAIN
                                     United States District Judge