UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BEAR STEARNS MORTGAGE PASS-THROUGH CERTIFICATES LITIGATION | Case No. 1:08-cv-08093-LTS<br><br>Courtroom:  12D<br><br>Judge:        Hon. Laura Taylor Swain |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**
**AND APPROVAL OF PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS**

<p style="text-align:center"><strong><u>TABLE OF CONTENTS</u></strong></p>

<p style="text-align:right">Page</p>

TABLE OF AUTHORITIES ................................................................................................. ii

I. INTRODUCTION ..................................................................................................1

II. ARGUMENT ..........................................................................................................5

    A. The Proposed Settlement Warrants Final Approval .................................5

        1. The Settlement Was Reached After Arm's-Length Negotiations With The Assistance Of An Experienced Mediator And Is Procedurally Fair .........................................6

        2. Application Of The *Grinnell* Factors Supports Approval Of The Settlement As Fair, Reasonable, And Adequate .........................................................................8

            a. The Complexity, Expense And Likely Duration Of The Litigation Support Approval Of The Settlement ...........................9

            b. The Reaction Of The Class Supports Approval Of The Settlement ...............................................................................10

            c. The Stage Of The Proceedings And The Amount Of Discovery Completed Support Approval Of The Settlement .......11

            d. The Risks Of Establishing Liability And Damages Support Approval Of The Settlement........................................................13

            e. The Risks Of Maintaining The Class Action Through Trial Support Approval Of The Settlement ...........................................17

            f. The Ability Of The Defendant To Withstand A Greater Judgment Supports Approval Of The Settlement .........................17

            g. The Range Of Reasonableness Of The Settlement Amount, In Light Of The Best Possible Recovery And All Of The Attendant Risks Of Litigation, Supports Approval Of The Settlement ...................................................................................18

    B. The Plan of Allocation Is Fair, Reasonable, And Adequate ..................................20

    C. Notice To The Class Satisfied The Requirements Of Rule 23 And Due Process....................................................................................24

    D. Certification Of The Class Remains Warranted ...................................................25

III. CONCLUSION...................................................................................................26
</p>

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001)...................................................................................16, 21, 23

*American Pipe and Constr. Co. v. Utah*,
  414 U.S. 538 (1974).................................................................................................................13

*In re AOL Time Warner, Inc. Sec. and ERISA Litig.*,
  No. MDL 1500, 02 Civ. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ...............11, 12, 17

*Arace v. Thompson*,
  No. 08 Civ. 7905 (DC), 2011 WL 3627716 (S.D.N.Y. Aug. 17, 2011) ............................................25

*In re Austrian & German Holocaust Litig.*,
  80 F .Supp.2d 164 (S.D.N.Y.2000).................................................................................................12

*In re Bank of Am. Corp. Sec., Derivative and ERISA Litig.*,
  772 F.3d 125 (2d Cir. 2014).................................................................................................................24

*Beecher v. Able*,
  575 F.2d 1010 (2d Cir. 1978).................................................................................................................21

*Charron v. Pinnacle Grp. N.Y. LLC*,
  874 F. Supp. 2d 179 (S.D.N.Y. 2012).................................................................................................12

*Charron v. Wiener*,
  731 F.3d 241 (2d Cir. 2013).................................................................................................................17

*Chavarria v. N.Y. Airport Serv., LLC*,
  875 F. Supp. 2d 164 (E.D.N.Y. 2012) ......................................................................................... passim

*In re China Sunergy Sec. Litig.*,
  No. 07 Civ. 7895 (DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011)...........................................7

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)......................................................................................................... passim

*Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)......................................................................................................... passim

*In re Gilat Satellite Networks, Ltd.*,
  No. CV-02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ......................................................9, 22

*In re Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) .................................................................................................22

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)......................................................................................................6

*In re Holocaust Victim Assets Litig.*,
   413 F.3d 183 (2d Cir. 2001)...................................................................................................23

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) .............................................................................................9

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) .........................................................................................6, 9

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)........................................................................20, 23, 24

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ..........................................................................................6, 8

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009)....................................................................................................8

*In re Metlife Demutualization Litig.*,
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) ...................................................................................16

*In re MicroStrategy, Inc. Sec. Litig.*,
   148 F. Supp. 2d 654 (E.D. Va. 2001) ....................................................................................23

*Mirfasihi v. Fleet Mortg. Corp.*,
   356 F.3d 781 (7th Cir. 2004) .................................................................................................22

*Moore v. Verizon Commc'ns, Inc.*,
   No. C 09-1823 SBA, 2013 WL 4610764 (N.D. Cal. Aug. 28, 2013)......................................8

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
   No. 08-cv-5653-PAC, 2011 WL 3874821 (S.D.N.Y Aug. 16, 2011) ....................................15

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   272 F.R.D. 160 (S.D.N.Y. 2011) ...........................................................................................15

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012)...................................................................................................13

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)....................................................................................................6

*In re Nissan Radiator/Transmission Cooler Litig.*,
   No. 10 CV 7493(VB), 2013 WL 4080946 (S.D.N.Y. May 30, 2013)....................................12

*Padro v. Astrue,*
    No. 11-cv-1788 (CBA), 2013 WL 5719076 (E.D.N.Y Oct 18, 2013)........................ passim

*In re PaineWebber Ltd. P'ships Litig.,*
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).................................7

*Parker v. Time Warner Entm't Co.,*
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) ........................................................17

*In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.,*
    986 F. Supp. 2d 207 (E.D.N.Y. 2013) ........................................................23

*Pub. Emps' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.,*
    280 F.R.D. 130 (S.D.N.Y. 2012) .............................................................17

*In re Sinus Buster Prods. Consumer Litig.,*
    No. 12-cv-2429 (ADS), 2014 WL 5819921 (E.D.N.Y. Nov. 10, 2014)...................11, 12

*In re Sprint Corp. ERISA Litig.,*
    443 F. Supp. 2d 1249 (D. Kan. 2006) ........................................................22

*Tsereteli v. Residential Asset Securitization Trust 2006-A8,*
    283 F.R.D. 199 (S.D.N.Y. 2012) .............................................................17

*In re Veeco Instruments Inc. Sec. Litig.,*
    No. 05 MDL 0165 CM, 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)..................20, 21, 24

*In re Visa Check/Mastermoney Antitrust Litig.,*
    297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2d Cir. 2005) .......................................................20

*In re Vitamin C Antitrust Litig.,*
    No. 06-MD-1738 (BMC)(JO), 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ..................17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
    396 F.3d 96 (2d Cir. 2005)...............................................................5, 8, 24

*In re WorldCom, Inc. Sec. Litig.,*
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)........................................................20, 21

**STATUTES**

15 U.S.C. § 77k, *et seq.*................................................................... passim

15 U.S.C. § 77z-1(a)(7)...................................................................20

Fed. R. Civ. P. 23 ........................................................................ passim

# I.    INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Public Employees' Retirement System of Mississippi ("MissPERS") and New Jersey Carpenters Health Fund ("New Jersey Carpenters") (collectively, "Lead Plaintiffs"), and the additional Plaintiffs, respectfully submit this memorandum of law in support of their Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation of Settlement Proceeds.[1]

The Settlement provides for payment of $500,000,000 in cash, plus payment of litigation and claims administration expenses up to $5,000,000. The Settlement is the product of more than six years of hard-fought litigation, and follows intensive arm's-length negotiations and mediation before Judge Daniel H. Weinstein, a former judge and highly-respected mediator with extensive experience overseeing negotiations of complex securities class actions, and who recommended the Settlement. *See* Declaration of the Mediator, Hon. Daniel H. Weinstein (Ret.), in Support of Approval of Class Action Settlement ("Weinstein Decl."), previously filed as ECF No. 266-1, and attached to the Lead Counsel Declaration as Exhibit 5.

Lead Plaintiffs and Lead Counsel believe that the Settlement is a very favorable result for the Class considering the risks and delay of continued litigation, including the risks surrounding liability and damages, and overcoming defenses based on causation, due

---

[1] Lead Plaintiffs respectfully refer the Court to the accompanying Joint Declaration of David R. Stickney and Daniel S. Sommers in Support of Motion for Final Approval of Settlement and Plan of Allocation, and Motion for Approval of Attorneys' Fees and Expenses ("Lead Counsel Decl.") for a detailed description of the case and the Settlement. Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated February 2, 2015 (ECF No. 264, the "Stipulation") and in the Lead Counsel Decl. "Plaintiffs" refers to Lead Plaintiffs and Boilermaker Blacksmith National Pension Trust, Police and Fire Retirement System of the City of Detroit, the State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employees Retirement Board on behalf of the Oregon Public Employees Retirement Fund, Iowa Public Employees' Retirement System, and San Antonio Fire and Police Pension Fund.

diligence, the statute of limitations and the statute of repose. It is Lead Plaintiffs' and Lead Counsel's informed opinion that, in light of the significant risks and the delay, expense, and uncertainty of pursuing the Action through trial and any subsequent appeals, the Settlement is fair, adequate and reasonable, and represents an excellent result for the Class.[2] We respectfully submit that the Settlement, along with the Plan of Allocation, should be approved by the Court.

The terms of the Settlement are set forth in the Stipulation, ECF No. 264. In the Court's February 19, 2015 Preliminary Approval Order (ECF No. 268), the Court preliminarily approved the Settlement, certified the Class for purposes of the Settlement, and directed notice to potential Class Members. On March 2, 2015, Defendants caused $500 million to be deposited into an escrow account for the benefit of the Class. On April 14, 2015, an additional $5 million was deposited in an escrow account to pay for litigation costs and expenses. Lead Counsel Decl. ¶5.

At the time the parties agreed to the Settlement, they had developed a full and clear understanding of the strengths and weaknesses of the claims and defenses asserted in the Action. During the course of the Action, Lead Plaintiffs and Lead Counsel: (i) conducted an extensive investigation (including review and analysis of the offering documents, SEC filings, press releases, court filings for other cases involving originators of the underlying loans, media reports

---

[2] See Declaration of George W. Neville, Special Assistant Attorney General, Legal Counsel to Lead Plaintiff the Public Employees' Retirement System of Mississippi, in Support of (A) Plaintiffs' Motion for Approval of Settlement and Plan of Allocation; (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (C) Lead Plaintiff's Request for Reimbursement of Costs and Expenses ("Neville Decl."), attached to the Lead Counsel Decl. as Exhibit 1-A, ¶7; Declaration of George R. Laufenberg, Fund Administrator of Lead Plaintiff the New Jersey Carpenters Health Fund in Support of (A) Plaintiffs' Motion for Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Laufenberg Decl."), attached to the Lead Counsel Decl. as Exhibit 1-B, ¶6.

and congressional testimony, and Lead Counsel's interviews and consultations with various witnesses); (ii) filed two consolidated complaints and proposed amendments to the Third Complaint; (iii) briefed two rounds of motions to dismiss and several related motions; (iv) analyzed a massive amount of evidence, including over 15 million pages of documents and 55 million additional pages of loan files; (v) engaged and conferred with experts and consultants on issues such as negative causation, materiality, damages, mortgage-loan underwriting, and statistics; (vi) researched the applicable law with respect to the claims of Plaintiffs and the Class, as well as Defendants' potential defenses and other litigation issues; and (vii) engaged in settlement negotiations with experienced defense counsel. Lead Counsel Decl. ¶¶12-91.

In reaching the Settlement, Lead Plaintiffs and Lead Counsel considered the numerous risks associated with continuing the litigation, including the risks of recovering less than the Settlement after substantial delay or of no recovery at all. Although Lead Plaintiffs had overcome Defendants' motions to dismiss, even assuming Defendants' pending motion for reconsideration were denied and Plaintiffs' pending motion to amend were granted, significant hurdles to establishing liability and proving damages would have persisted.

While Lead Plaintiffs and Lead Counsel believe that the Class has strong claims, they recognize that they would have faced significant risks in establishing all the elements of their claims. Even if Lead Plaintiffs prevailed on liability at trial, Defendants would still argue that damages should be reduced or eliminated because a portion – or even all – of the losses were due to causes other than the alleged misstatements and omissions, such as the overall economic downturn or housing-price declines. Defendants also raised numerous additional defenses, including challenges to constitutional standing, application of the statute of limitation and statute

of repose, the existence of untrue statements in the offering documents, as well as the "due diligence" defense that, if successful, would have resulted in no recovery from those Defendants.

All of these litigation risks were exacerbated by the lack of established precedent for class actions on behalf of purchasers of mortgage-backed securities ("MBS") at the time the case was filed. Finally, many of these contested issues, including proof of damages and Defendants' "negative causation" and due diligence defenses, would have required expert testimony, and there can be no certainty as to how a jury would have responded to such a "battle of the experts." Accordingly, Lead Plaintiffs and Lead Counsel recognized that the Class would have faced significant risks in overcoming these arguments and establishing all the elements of Lead Plaintiffs' claims against Defendants.

The $500 million Settlement eliminates these risks and provides a certain recovery for the Class. In light of the obstacles to recovery, and the substantial time and expense that continued litigation would require, the Settlement is a very good result for the Class, and provides a fair and reasonable resolution of the claims. To put the amount of the Settlement into context, this is the largest recovery ever from a class action arising from the sale of mortgage-backed securities.[3]

---

[3] *See, e.g., Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 10-cv-00302 (MRP) (C.D. Cal.), *appeal pending*, C.A. No. 14-55093 (9th Cir.) ($500 million for 429 offerings; no separate fund for costs); *In re IndyMac Mortg.-Backed Sec. Litig.,* 09-cv-04583 (LAK) (S.D.N.Y.) ("*Indymac*"), *appeal pending*, C.A. No. 15-892 (2d Cir.) ($346 million for 50 offerings); *N.J. Carpenters Health Fund v. Residential Capital LLC,* 08-cv-8781 (KPF)(DCF) (S.D.N.Y.) ($335 million for 59 offerings; final approval pending); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.,* 08-cv-10841 (JSR) (S.D.N.Y.) ("*Merrill Lynch*") ($315 million for 18 offerings); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I,* 08-cv-1713 (PKC) (E.D.N.Y.) ("*J.P. Morgan*") ($280 million for 26 offerings); *N.J. Carpenters Vacation Fund v. The Royal Bank of Scot. Grp., PLC,* 08-cv-5093 (LAP) (S.D.N.Y.) ($275 million for 14 offerings); *In re Wells Fargo Mortg.-Backed Certificates Litig.,* 09-cv-1376 (LHK) (N.D. Cal.) ("*Wells Fargo*") ($125 million for 28 offerings); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,* 09-cv-2137 (KBF) (S.D.N.Y.) ("*Morgan Stanley*") ($95 million for 29 offerings); *In re Lehman Bros. Mortg.-Backed Sec. Litig.,* 08-cv-6762 (LAK) (S.D.N.Y.) ($40 million for 17 offerings); *Mass. Bricklayers and*

Lead Plaintiffs also request that the Court approve the proposed Plan of Allocation for the Settlement proceeds. The Plan will govern how Class Members' claims will be calculated and, ultimately, how money will be distributed to valid claimants. The Plan was prepared with the assistance of Lead Plaintiffs' damages consultant and is based on the methodology for calculating damages set forth in Section 11(e) of the Securities Act and takes into account the increased risk for claims that remained subject to additional legal challenges by Defendants. *See* Declaration of Brett Brandenberg in Support of Plan of Allocation ("Brandenberg Decl."), attached as Ex. 3 to the Lead Counsel Decl. It is substantively the same as plans that have been approved and successfully used to allocate recoveries in other MBS class actions. The Plan of Allocation is fair, reasonable and adequate and should be approved.

## II.    ARGUMENT

### A.    The Proposed Settlement Warrants Final Approval

Under Fed. R. Civ. P. 23(e), a class action settlement should be approved if the Court finds it "fair, reasonable, and adequate." "A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement."[4] In this Circuit, public policy favors the settlement of disputed claims among private litigants, particularly in

---

*Masons Trust Funds v. Deutsche Alt-A Sec., Inc.,* 08-cv-3178 (LDW) (E.D.N.Y.) ($32.5 million for 2 offerings); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.,* 09-cv-1110 (HB) (S.D.N.Y.) ("*Goldman Sachs*") ($26.6 million for 1 offering); *In re: Wash. Mut. Mortg.-Backed Sec. Litig.,* C09-0037 (MJP) (W.D. Wash.) ($26 million for 6 offerings); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.,* 08-cv-1418 (E.D.N.Y.) ($24.975 million for 2 offerings); *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3,* 09-cv-300 (JB) (D.N.M.) ($11.25 million for 3 offerings); *Tsereteli v. Residential Asset Securitization Trust 2006-A8,* 08-cv-10637 (LAK) (S.D.N.Y.) ($11 million for 1 offering).

[4] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir. 2005); *see also D'Amato v. Deutsche Bank,* 236 F.3d 78, 85 (2d Cir. 2001) ("The District Court must carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness, and that it was not a product of collusion.")

complex class actions such as this one.[5]  Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that, while a court should not give "rubber stamp approval" to a proposed settlement, it should "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by, Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  Because "'[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation,' the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial.'"[6]

1.      **The Settlement Was Reached After Arm's-Length Negotiations With The Assistance Of An Experienced Mediator And Is Procedurally Fair**

A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations, and great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.  *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 315 (E.D.N.Y. 2006).  A court may find the negotiating process is fair where, as here, "the settlement resulted from 'arm's-

---

[5] *See id.* ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'"); *Chavarria v. N.Y. Airport Serv., LLC*, 875 F. Supp. 2d 164, 171 (E.D.N.Y. 2012) ("Settlement approval is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement.'").

[6] *Newman v. Stein*, 464 F.2d 689, 691-92 (2d Cir. 1972); *see Chavarria*, 875 F. Supp. 2d at 172 (a court may not "conduct a mini-trial of the merits of the action."); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 138 (S.D.N.Y. 2010) ("In deciding whether to approve a settlement, a court 'should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute[s] one complex, time consuming and expensive litigation for another.'").

length negotiations and that plaintiffs' counsel have possessed the experience and ability . . . necessary to effective representation of the class's interests.'"[7]

This initial presumption of fairness and adequacy applies here because all parties in the Action are represented by counsel with extensive experience in litigating these types of claims (Lead Counsel Decl. ¶¶130-131); the Settlement was the result of intense, arm's-length negotiations (*id.* ¶¶73-78); and the parties understood the strengths and weaknesses of the claims and defenses before settlement was reached (*id.* ¶¶79-91). Lead Counsel researched and analyzed huge volumes of documents and information available from multiple sources, such as SEC filings and reports, media reports, and documents from other private and government investigations and litigation involving Defendants or originators, as well as congressional testimony and testimony and exhibits presented to the Financial Crisis Inquiry Commission. Lead Counsel also obtained from Defendants and analyzed over 15 million pages of documents and 55 million additional pages of loan files, and consulted with experts. *Id.* ¶¶61-71.

Moreover, Judge Weinstein, a retired judge and experienced mediator who oversaw the mediation and ultimately recommended the Settlement for $500 million plus payment of litigation and administration expenses up to $5 million, states that the Settlement "was achieved only after aggressive and extensive arm's-length negotiations based on the significant, sophisticated work and diligence of the parties' counsel," and believes that the Settlement is "fair, reasonable, and adequate," and represents "an equitable settlement for all concerned." *See*

---

[7] *D'Amato*, 236 F.3d at 85; *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at **3-4 (S.D.N.Y. May 13, 2011); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement."), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

Weinstein Decl. ¶¶7, 15-16.  The active involvement of an experienced independent mediator is strong evidence of the absence of collusion and further supports the presumption of fairness.[8]

### 2. Application Of The *Grinnell* Factors Supports Approval Of The Settlement As Fair, Reasonable, And Adequate

The Settlement is also substantively fair, reasonable and adequate and in the best interests of the Class.  In the Second Circuit, the following factors are to be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[9]

"A court need not find that every factor militates in favor of a finding of fairness; rather, a court considers the totality of these factors in light of the particular circumstances."  *Padro v. Astrue*, 2013 WL 5719076, at \*4 (E.D.N.Y. Oct. 18, 2013) (citation omitted).  Here, the Settlement easily satisfies the criteria set forth in *Grinnell*.

---

[8] *See D'Amato*, 236 F.3d at 85 (a mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"); *J.P. Morgan, supra* (approving MBS settlement mediated by Judge Weinstein); *Moore v. Verizon Commc'ns, Inc.*, 2013 WL 4610764, at \*8 (N.D. Cal. Aug. 28, 2013) (approving settlement mediated by Judge Weinstein); *Marsh*, 265 F.R.D. at 141 (same, and referring to Judge Weinstein as "a highly regarded mediator" and noting that, in light of Judge Weinstein's declaration "strong[ly] support[ing]" the settlement, "the Court has no reason to doubt that the Settlement is procedurally fair").

[9] 495 F.2d at 463 (internal citations omitted); *see also McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009); *Wal-Mart*, 396 F.3d at 117.

### a. The Complexity, Expense And Likely Duration Of The Litigation Support Approval Of The Settlement

"In evaluating the settlement of a securities class action, federal courts, including this Court, have long recognized that such litigation is notably difficult and notoriously uncertain." *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 189 (S.D.N.Y. 2012) (citation omitted). Indeed, courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute." *In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007). Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *Luxottica*, 233 F.R.D. at 310.

Here, Lead Plaintiffs would have to overcome numerous hurdles in order to achieve a litigated verdict in this Action. Assuming they were successful in the pending motions for reconsideration and to amend the complaint, and that Lead Plaintiffs' claims on behalf of a certified litigation class survived summary judgment, a jury trial would have required a substantial amount of factual and expert testimony. Whatever the outcome at trial, it is virtually certain that an appeal would be taken. All of the foregoing would have posed considerable expense and would have delayed the Class' recovery for several years – assuming that Lead Plaintiffs were ultimately successful on the claims.

The subject matter involved in the Action, as well as the structured nature of the securities, also added to the complexity of the litigation. As discussed in the Lead Counsel Declaration, the case involved 22 offerings constructed from over 64,000 underlying mortgage loans sourced from nearly 500 originators. The process for originating the loans, securitizing them, structuring the offerings, creating offering documents and selling the loans is necessarily complex. Moreover, complicated issues of valuation and causation pervade. Lead Plaintiffs and

Lead Counsel recognized that they would need to marshal and analyze a great deal of complex information concerning the design and structure of the certificates; the disclosures in the offering documents; and the relevant details about the loans underlying the MBS, including the true nature of the underwriting of the loans. Lead Plaintiffs and Lead Counsel would have worked closely with their experts to present the voluminous supporting data to a jury in a simple and comprehensible manner at trial. The multiple defenses that Defendants would have interposed to liability and damages, as previewed in their motions to dismiss, motion for reconsideration, opposition to Plaintiffs' motion to amend, and confidential mediation briefs – including negative causation, constitutional standing, due diligence, the statute of limitations, the statute of repose, and Class Members' knowledge of the alleged misstatements, among others – would have added significantly to the complexity of the case. *Id*. ¶¶79-91. In contrast, the Settlement here provides an immediate, significant and certain recovery of $500 million for the Class. Accordingly, this factor supports approval of the Settlement.

### b. The Reaction Of The Class Supports Approval Of The Settlement

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."[10] Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, Garden City Group, LLC ("GCG"), began mailing copies of the Notice and Claim Form to potential Class Members and nominees on March 4, 2015. *See* Declaration of Jennifer M. Keough Re Notice Dissemination and Publication, Exhibit 2 to the Lead Counsel Declaration ("Keough Decl."), ¶¶2-10. As of April 16, 2015, over 7,500 copies of the Notice and Claim Form had been disseminated to

---

[10] *See, e.g., Chavarria*, 875 F. Supp. 2d at 173; *see also Padro*, 2013 WL 5719076, at *5 ("The fact that a small number of objections were received weighs in favor of settlement," as does "the positive reaction of the class, particularly in light of its size.").

potential Class Members and their nominees. *Id*. ¶10. In addition, a Summary Notice was published in the national edition of the *Investor's Business Daily* and in *The Wall Street Journal* and over the PR Newswire on March 10, 2015, *id*. ¶11, and the Notice and related settlement documents are available on the website specifically created for the Settlement, as well as Lead Counsel's websites, *id*. ¶13; Lead Counsel Decl. ¶94.

The Notice sets out the essential terms of the Settlement and informed potential Class Members of, among other things, their right to opt out of the Class or object to any aspect of the Settlement, as well as the procedure for submitting Claim Forms. While the deadline set by the Court for Class Members to exclude themselves or object to the Settlement has not yet passed, to date, Lead Counsel has received no objections to the Settlement or the Plan of Allocation and no requests for exclusion from Class Members.[11]

<div align="center">

c. **The Stage Of The Proceedings And The Amount Of Discovery Completed Support Approval Of The Settlement**

</div>

"Under this factor the relevant inquiry 'is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement.'"[12] "The parties 'need not have engaged in extensive discovery as long as they have engaged in sufficient investigation of the facts to enable the Court to

---

[11] One request for exclusion has been received from an entity that is already excluded from the definition of the Class as a result of being listed on Appendix 1 to the Stipulation. The deadline for submitting objections and requesting exclusion from the Class is May 6, 2015. As provided in the Preliminary Approval Order, Lead Plaintiffs will file reply papers on May 13, 2015, addressing any objections and requests for exclusion that may be received.

[12] *In re Sinus Buster Prods. Consumer Litig.,* 2014 WL 5819921, at *9 (E.D.N.Y. Nov. 10, 2014) (quoting *In re AOL Time Warner, Inc. Sec. & ERISA Litig.,* 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006)).

'intelligently make an appraisal' of the settlement.'"[13]   Here, the successful resolution of this Action required more than six years of hard-fought litigation that included extensive motion practice, obtaining and analyzing over 70 million pages of documents and loan files, researching proceedings and transcripts in related litigations and investigations, and consulting with multiple experts.  Lead Counsel Decl. ¶¶12-71.  Accordingly, Lead Plaintiffs and Lead Counsel had a firm grasp of the strengths and weaknesses of the claims when negotiating with Defendants, evaluating Defendants' asserted defenses, and ultimately accepting the mediator's recommendation to resolve the litigation.

As set forth in greater detail in the Lead Counsel Declaration, Lead Counsel extensively developed the record by, among other things:

- conducting a thorough investigation, including an in-depth review and analysis of the offering documents and careful analyses of court filings, investigations, media reports, congressional testimony, SEC filings, press releases, and public statements made by Defendants and various originators, as well as Lead Counsel's interviews and consultations with various witnesses with first-hand knowledge of the events (*id* ¶¶61-70);

- drafting complaints, including a detailed, 90-page, Third Amended Class Action Complaint (the "Complaint") based on their extensive factual investigation and legal research into the applicable claims (*id*. ¶¶23-31);

- preparing extensive briefing in response to motions to dismiss the Complaint, including multiple submissions addressing supplemental authority that could potentially affect the outcome of the motions to dismiss (*id*. ¶¶32-36);

---

[13] *Id.* (quoting *AOL*; *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000)); *see also In re Nissan Radiator/Transmission Cooler Litig.*, 2013 WL 4080946, at *7 (S.D.N.Y. May 30, 2013) (finding the factor to weigh in favor of approval where "[a]lthough the parties have not engaged in extensive discovery . . . the plaintiffs conducted an investigation prior to commencing the action, retained experts, and engaged in confirmatory discovery in support of the proposed settlement"); *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 195 (S.D.N.Y. 2012) (finding this factor to weigh in favor of approval where "Class Counsel undertook a comprehensive pre-suit investigation lasting over a year" and "Class Counsel and Defendants engaged in certification discovery involving the exchange of documents and several depositions").

- drafting a motion for leave to amend the Complaint to include claims arising from additional offerings after the Second Circuit issued its decision in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,* 693 F.3d 145 (2d Cir. 2012) (Lead Counsel Decl. ¶¶43-45);

- preparing briefs in response to Defendants' motion for reconsideration after the Second Circuit issued *IndyMac*, holding that the statute of repose is not tolled under *American Pipe and Constr. Co. v. Utah,* 414 U.S. 538 (1974) (*id.* ¶¶46-50).

- preparing and issuing requests to Defendants seeking documents and communications from 54 categories, and issuing preservation subpoenas to approximately 65 third parties, including originators, clearing banks, rating agencies, trustees, servicers, and due diligence firms (*id.* ¶¶51-60);

- obtaining over 15 million pages of documents and 55 million additional pages of loan origination files underlying the MBS (*id.* ¶¶64-70);

- analyzing prior deposition testimony from 60 witnesses, including, for example, Individual Defendants Nierenberg, Verschleiser, Marano, and Mayer, and the Co-Head of Mortgage Finance at Bear Stearns & CEO of EMC, the Associate Director of Mortgage Finance, the Vice President of Risk Management, and the Bear Stearns Vice President of Due Diligence (*id.* ¶69);

- conferring extensively with experts and consultants concerning the specialized areas of the MBS industry, negative causation, materiality, damages, mortgage loan underwriting, and statistics (*id.* ¶71); and

- drafting mediation statements and responses, and participating in other discovery-related negotiations with Defendants (*id.* ¶¶73-78).

Thus, at the time the Settlement was reached, Lead Plaintiffs "obtained sufficient information to be able to intelligently assess the strengths and weaknesses of the case and appraise settlement proposals." *Padro*, 2013 WL 5719076, at *6. As a result, they had a well-informed basis for their belief that the Settlement is a favorable resolution for the Class, and this factor strongly supports approval of the Settlement.

### d. The Risks Of Establishing Liability And Damages Support Approval Of The Settlement

*Grinnell* holds that, in assessing the fairness, reasonableness and adequacy of a settlement, courts should consider such factors as the "risks of establishing liability [and] . . . the

risks of establishing damages." 495 F.2d at 463. While Lead Plaintiffs believe that the claims asserted against Defendants have merit, they also recognize that there were significant risks as to whether they would ultimately be able to prove liability and establish damages on their claims in the Action, as well as with respect to the amount of damages that Lead Plaintiffs could establish. These risks included challenges in proving that there were misstatements and omissions in the offering documents that also contained warnings. Further risks included overcoming Defendants' arguments that some or all of the declines in the value of the certificates were due to causes other than the alleged misstatements (the "negative causation" defense); that Defendants had conducted a "reasonable investigation" and thus could satisfy their "due diligence" defense; that Plaintiffs' claims were untimely; and that various Class Members had actual knowledge of the misstatements and thus could not bring valid claims. Lead Counsel Decl. ¶¶80-85, 88-91.

*Risks of Establishing Liability.* Plaintiffs alleged that, contrary to the statements in the offering documents, Bear Stearns, EMC, and the originators: (i) systematically disregarded stated underwriting standards and regularly made exceptions in the absence of sufficient compensating factors; (ii) pursued loan volume at the expense of underwriting standards; and (iii) largely disregarded appraisal standards where the value of the underlying property was materially inflated. To avoid summary judgment and prevail at trial, Lead Plaintiffs would need to present evidence that the offering documents contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein. The passage of time since the underlying events raised risks to obtaining such evidence. Lead Counsel ¶84. Moreover, Defendants argued that the offering documents contained no untrue statements or omissions.

*Risks of Establishing Damages.* Defendants also contended that establishing damages under the Securities Act posed significant obstacles for the Class. Under Section 11(e) of the

Securities Act, damages may be reduced or eliminated if the defendant proves that a portion or all of the statutory damages are attributable to causes other than the misstatements or omissions. Defendants asserted that the overall economic downturn and general decline in housing prices – and not the alleged misstatements and omissions – were responsible for the declines in the certificates' value. Lead Counsel Decl. ¶82.

*Risks of Getting A Class Certified.* Plaintiffs faced additional risks at class certification, including the possibility that the Court might not certify a litigation class at all. Although courts have granted motions to certify litigation classes of investors in MBS, at least one district court has denied such a motion.[14] Moreover, even if the Court did certify a class, Defendants would argue to certify a smaller class than Lead Plaintiffs proposed.

*Risks Related to Other Defenses.* Defendants raised numerous other defenses in this Action, which they could be expected to continue to press, including, *inter alia*, (i) statute of limitations and statute of repose defenses; (ii) a statutory "due diligence" defense; (iii) standing to pursue claims related to certain offerings; (iv) that certain Class Members had "knowledge" of the alleged misstatements; and (v) that Lead Plaintiffs and certain Class Members had suffered no loss and the Plaintiffs' sole remedy was the "cure" of non-complying loans.

- *Statute of Limitations.* Defendants argued that claims were time-barred under both the statute of repose and the statute of limitations. Defendants argued that Plaintiffs' claims were asserted more than one year after Plaintiffs knew or should have known they had viable claims, including as a result of news articles that were cited in the initial complaints that, according to Defendants, should have triggered inquiry notice. Although the Court denied Defendants' motion to

---

[14] *Compare Merrill Lynch,* No. 08-cv-10841-JSR (S.D.N.Y. June 15, 2011), ECF No. 149 (certifying litigation class of MBS investors), *with N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2011 WL 3874821 (S.D.N.Y Aug. 16, 2011) (certifying litigation class of MBS investors), with *N.J. Carpenters Health Fund v. Residential Capital, LLC,* 272 F.R.D. 160 (S.D.N.Y. 2011) (denying motion to certify litigation class of MBS investors).

dismiss on this ground, Defendants continued to press such a defense and it would be raised again at summary judgment and trial.

- ***Due Diligence.*** Defendants also asserted a "due diligence" defense and contended that they conducted appropriate reviews and analysis of the character and quality of loans prior to the loans being securitized in the offerings, and thus they "had reasonable ground to believe and did believe" that the offering documents contained no untrue statements or omissions. 15 U.S.C. § 77k(b)(3)(A). *See* Lead Counsel Decl. ¶90. While these Defendants would have the burden of establishing this "due diligence" defense, if they were successful in establishing the reasonableness of their investigation, it could provide a complete defense to liability.

- ***Knowledge.*** Defendants argued that Plaintiffs and members of the Class had "actual knowledge" of the false and misleading statements at the time they purchased the securities and thus could not bring viable claims. *Id.* ¶82.

Several of these contested issues, notably the "negative causation" defense and the "due diligence" defense, would ultimately have required expert testimony before the jury. While Lead Plaintiffs expected to present persuasive expert testimony establishing causation and damages and opining that Defendants' investigation was not reasonable or sufficient, Defendants likely would have presented experts in support of their positions. Defendants, moreover, undoubtedly would assert *Daubert* challenges as to each of Lead Plaintiffs' experts. Assuming that Lead Plaintiffs prevailed in such challenges, Lead Plaintiffs could not be certain which experts' views would be credited by the jury and who would prevail at trial in this "battle of the experts."[15] The Settlement enables the Class to recover a substantial sum of money, while avoiding continued protracted litigation and significant challenges. In light of all of these risks, the proposed Settlement is fair, reasonable and adequate.

---

[15] *See, e.g., In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 332 (E.D.N.Y. 2010) ("The proof on many disputed issues – which involve complex financial concepts – would likely have included a battle of experts, leaving the trier of fact with difficult questions to resolve."); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) ("In such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants.").

### e. The Risks Of Maintaining The Class Action
###    Through Trial Support Approval Of The Settlement

Apart from the risk that a litigation class might not be certified, discussed *supra*, even if

Lead Plaintiffs were successful in getting a class certified, there was no guarantee that they

would be able to maintain it because courts may always exercise their discretion to re-evaluate

the appropriateness of class certification at any time.  The Settlement avoids any uncertainty with

respect to this issue, which militates in favor of approval.[16]  Moreover, even when motions for

class certification for litigation purposes have been granted in similar MBS cases, the Second

Circuit has granted petitions to appeal pursuant to Fed. R. Civ. P. 23(f).[17]  Thus, there was a risk

that the Class may not have been certified or may have been de-certified.  At the very least, such

a petition would cloud the certainty of certification for an extended period of time.

### f. The Ability Of The Defendant To Withstand A
###    Greater Judgment Supports Approval Of The Settlement

Although Defendants may have been able to pay a judgment in excess of the Settlement

Amount, "defendants' ability to withstand a higher judgment . . . standing alone, does not

suggest that the settlement is unfair."[18]  Here, there could be no guarantee as to the financial

---

[16] *See, e.g., Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013) ("[W]e cannot find that the district court abused its discretion in finding that the class faced significant risks of decertification, that decertification would drastically reduce the chances of any member of the class achieving meaningful relief, and that the litigation risks attendant to these possibilities weighed heavily in favor of the fairness of a settlement.").

[17] *See, e.g., Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199 (S.D.N.Y. 2012), *permission to appeal granted*, No. 12-2790 (2d Cir. Mar. 19, 2014); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130 (S.D.N.Y. 2012), *permission to appeal granted*, No. 12-614 (2d Cir. Jan. 4, 2013).

[18] *D'Amato*, 236 F.3d at 86; *see Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242, 261 (E.D.N.Y. 2009) ("The fact that a defendant is able to pay more [than] it offers in settlement does not, standing alone, indicate the settlement is unreasonable or inadequate.") (citation omitted); *AOL*, 2006 WL 903236, at *12 ("the mere ability to withstand a greater judgment does not suggest that the Settlement is unfair"); *see also In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *6 (E.D.N.Y. Oct. 23, 2012) (noting that courts have observed that "in any class

capability of Defendants to withstand a substantially larger judgment several years in the future at the conclusion of trial and any appeals. In any event, the fact that Defendants may have the ability to pay a greater judgment is outweighed here by the other strong considerations favoring the Settlement, most notably, the risks to the Class of establishing liability and damages and the reasonableness of the Settlement Amount in light of those risks.

**g.** **The Range Of Reasonableness Of The Settlement Amount, In Light Of The Best Possible Recovery And All Of The Attendant Risks Of Litigation, Supports Approval Of The Settlement**

The last two substantive factors that courts consider are the range of reasonableness of the settlement fund in light of (i) the best possible recovery and (ii) litigation risks. In analyzing these two factors, the issue for courts is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case. A court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462 (citations omitted). "The determination of a reasonable settlement 'is not susceptible of a mathematical equation yielding a particularized sum,' but turns on whether the settlement falls within a range of reasonableness." *Chavarria*, 875 F. Supp. 2d at 174 (citation omitted). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455. "In fact, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a

_____

action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement").

thousandth part of a single percent of the potential recovery." *Chavarria*, 875 F. Supp. 2d at 175 (citation omitted).

The Settlement here – the largest recovery ever from a class action arising from the sale of mortgage-backed securities – is well within the range of reasonableness in light of the substantial risks presented by this litigation. Estimating *aggregate* damages for MBS offerings is inherently problematic due to limited trading data and the dependence on assumptions. Although Lead Plaintiffs' damages consultant estimated that statutory damages under Section 11 – before taking into account re-paid principal, causation or other defenses to damages – could amount to billions of dollars in the aggregate based on certain assumptions, Defendants had substantial arguments with respect to various defenses that could greatly reduce or eliminate altogether the amount of damages for which they were liable.[19] Lead Plaintiffs have concluded that, in light of these risks, the Settlement, which provides an immediate and substantial benefit to Class Members, outweighs the benefits of continued litigation. Lead Counsel Decl. ¶¶87-88. A court may not "substitute its judgment for that of the parties who negotiated the settlement." *Chavarria*, 875 F. Supp. 2d at 172.

Lead Counsel are intimately familiar with the facts of the case and have extensive experience prosecuting comparable securities class actions. In these circumstances, Lead

---

[19] For example, under Section 11, recoverable damages are based on the difference between the purchase price of the security and the value of the security on the date the lawsuit was filed, subject to reduction for "negative causation." As discussed above, Defendants here contended that any losses were caused by factors other than untrue statements in the offering documents, such as the downturn in the economy and the housing market. Given that the timing of the price declines at issue coincided with the national economic downturn, Defendants' "negative causation" defense was an argument that, at the very least, would have to be resolved through expert testimony at trial. Defendants also would have likely argued that Lead Plaintiffs would have difficulty establishing damages because certain senior Certificates did not regularly miss principal and interest payments. Lead Counsel Decl. ¶87.

Counsel's opinion that the Settlement is reasonable is entitled to "great weight."[20]   The

recommendation of Lead Plaintiffs, sophisticated institutional investors, also strongly supports

the fairness of the Settlement.   Representatives of Lead Plaintiffs took an active role in

supervising this litigation, as envisioned by the Private Securities Litigation Reform Act of 1995

("PSLRA"), and Lead Plaintiffs endorse the Settlement.   *See* Neville Decl. ¶7; Laufenberg Decl.

¶6.  A settlement reached "under the supervision and with the endorsement of a sophisticated

institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'"   *In re*

*Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) (citation

omitted).  In sum, a review of the *Grinnell* factors, including the complexity, expense and delay

of further litigation, discovery completed and the stage of the proceedings, and the substantial

risks of the Action, strongly supports a finding that the Settlement is fair, reasonable and

adequate.

### B.       The Plan of Allocation Is Fair, Reasonable, And Adequate

The standard for approval of a plan of allocation is the same as the standard for approving

the settlement as a whole:  "'namely, it must be fair and adequate.'"[21]  "'As a general rule, the

adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and

reasonable' under the particular circumstances of the case."[22]  A plan of allocation "need only

have a reasonable, rational basis, particularly if recommended by 'experienced and competent'

---

[20] *Padro*, 2013 WL 5719076, at *7 ("Where, as here, settlement has been reached after an arms-length negotiation, 'great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.'") (citation omitted).

[21] *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005).

[22] *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 518 (E.D.N.Y. 2003), *aff'd sub nom., Wal-Mart*, 396 F.3d 96.

class counsel."[23]  Further, courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably."[24]

Here, the Plan of Allocation, which was fully described in the Notice, has a rational basis and was formulated by Lead Counsel, in consultation with their damages consultant, ensuring its fairness and reliability.  *See Veeco*, 2007 WL 4115809, at *13.  Under the proposed Plan of Allocation, each Authorized Claimant will receive a *pro rata* share of the Net Settlement Fund, with that share to be determined by the ratio that the Authorized Claimant's allowed claim bears to the total allowed claims of all Authorized Claimants.  *See* Brandenberg Decl., attached as Ex. 3 to the Lead Counsel Declaration.

The Plan allocates the Settlement proceeds based principally on the statutory measure of damages set out in Section 11(e) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77k(e).[25]  Lead Plaintiffs engaged Brett Brandenberg, a Director at AlixPartners and a Chartered Financial Analyst, to examine the Plan of Allocation.  The Brandenberg Declaration explains the methodology for determining each Authorized Claimant's Recognized Claim under the Plan and the basis for the analysis.  As explained more fully in the Notice – including through illustrative examples – and in the Brandenberg Declaration, a Claimant's Net

---

[23] *Am. Bank Note*, 127 F. Supp. 2d at 429-30; *see also WorldCom*, 388 F. Supp. 2d at 344.

[24] *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978).

[25] Section 11 provides for calculation of damages as the "difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . ."  Securities Act, § 11(e).

Recognized Losses will be calculated for each Claimant's purchases of the certificates. The calculation will depend on several considerations, including: (i) when the certificates were purchased or acquired and the price on the date of purchase; (ii) any principal payments received; (iii) whether the certificates were sold, and if so, when they were sold and for how much; (iv) if held on the applicable Date of Suit for the certificates, the price of the certificates on that date; and (v) whether the Court sustained claims for purchasers of the certificates. Brandenberg Decl. ¶6.[26]

Although the formula has a degree of complexity necessary to allocate the Settlement Fund fairly among Authorized Claimants, investors in mortgage-backed securities are typically familiar with the language utilized in the Plan because it is consistent with industry terminology. *Id*. ¶7. In addition, specific examples of how to calculate hypothetical examples under various

---

[26] The Plan provides that if any Claimant's Distribution Amount calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to such Claimant. The Recognized Claims of any Claimants whose Distribution Amounts would be less than $10.00 are then excluded and the total Recognized Claims of all other Claimants are totaled to determine the *pro rata* Distribution Amounts for the Authorized Claimants who will receive $10.00 or more. A $10 minimum for distribution is necessary given the administrative costs involved and to prevent depletion of the Settlement Fund to pay *de minimis* claims. Courts routinely approve settlements that require a class member's payment to exceed a minimum threshold in order to recover from a settlement fund. *See, e.g., In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1268 (D. Kan. 2006) ($25 minimum allowed); *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004) ($10 minimum allowed); *see also Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783 (7th Cir. 2004) (Posner, J.) (stating that a settlement may give nothing to people with claims "worth too little to justify a distribution"). *See Gilat Satellite*, 2007 WL 1191048, at *9 ("*de minimus* thresholds for payable claims are beneficial to the class as a whole since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs and courts have frequently approved such thresholds, often at $10.").

scenarios are included in the Plan for clarification. A similar approach has been accepted and used successfully in other MBS class action settlements.[27]

"To warrant approval, the plan of allocation must also meet the standards by which the . . . settlement was scrutinized – namely, it must be fair and adequate."[28] It is appropriate for interclass distributions to be based upon, among other things, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue.[29] Moreover, in assessing a proposed plan of allocation, the Court may give great weight to the opinion of informed counsel.[30]

The proposed Plan of Allocation in this case is based on the statutory damages permitted under Section 11 of the Securities Act and was fully explained in the Notice sent to Class Members. It was prepared in consultation with Lead Plaintiffs' consultant and tracks the theory of damages asserted by Lead Plaintiffs. Accordingly, the Plan is fair, reasonable and adequate to

---

[27] *See, e.g., Morgan Stanley, supra*; *J.P. Morgan, supra*; *Goldman Sachs, supra*; *Merrill Lynch, supra; Wells Fargo, supra.*

[28] *Maley*, 186 F. Supp. 2d at 367; *see also In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 668 (E.D. Va. 2001).

[29] *See In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001). Here, for example, to account for the reduced likelihood of success on claims that remained subject to additional legal challenges by Defendants, the Plan of Allocation applies a 50% discount to the value of those claims. *See, e.g., Am. Bank Note,* 127 F. Supp. 2d at 429 ("Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim.").

[30] *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 240 (E.D.N.Y. 2013) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."); *Chavarria*, 875 F. Supp. 2d at 175 ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel. That is, 'as a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information.'").

the Class as a whole. Lead Counsel Decl. ¶¶97-104. The Plan is supported by the Brandenberg Declaration and should be approved by the Court. To date, there are no objections to the Plan.[31]

### C. Notice To The Class Satisfied The Requirements Of Rule 23 And Due Process

The Notice provided to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable." Fed. R. Civ. P. 23(e)(1). Notice is reasonable if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to Class Members satisfied these standards. *See In re Bank of Am. Corp. Sec., Derivative and ERISA Litig.,* 772 F.3d 125, 133 n.5 (2d Cir. 2014) (affirming sufficiency of similar notice). As noted above, in accordance with the Court's Preliminary Approval Order, as of April 16, 2015, the Claims Administrator has sent more than 7,500 copies of the Notice to potential Class Members and their nominees. Keough Decl. ¶10. The Claims Administrator utilized several resources of data to reasonably identify Class Members.[32] In addition, Lead Plaintiffs caused the Summary Notice

---

[31] *Id.* ¶95. *See Veeco*, 2007 WL 4115809, at *14; *Maley*, 186 F. Supp. 2d at 367.

[32] These sources include: (i) a list from Defendants identifying potential Class Members; (ii) a list of dozens of major custodial banks that Lead Plaintiffs subpoenaed as potentially maintaining Class Member contact information, including, for example, Bank of America Securities LLC, Bank of New York Mellon, Barclays Capital, Inc., Citigroup Global Markets, Inc., Credit Suisse Securities, Inc., Deutsche Bank Securities, Inc., Goldman Sachs & Co., JP Morgan Chase & Co., Morgan Stanley & Co. LLC, RBS Securities, Inc., State Street Bank and Trust Company, UBS Securities LLC, U.S. Bank NA, and Wells Fargo Securities, Inc.; (iii) contact information obtained through searches of the documents and information that Lead Plaintiffs received in this

to be published in the national edition of *Investor's Business Daily* and in *The Wall Street Journal* and over the PR Newswire, and copies of the Notice and Claim Form were made available on a dedicated website maintained by the Claims Administrator and on Lead Counsel's websites. *See* Keough Decl. ¶¶11, 13; Lead Counsel Decl. ¶94.

This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by notice in appropriate, widely-circulated publications, and set forth on Internet websites, was "the best notice . . . practicable under the circumstances" and satisfies the requirements of due process and Rule 23.[33]

### D. Certification Of The Class Remains Warranted

On February 19, 2015, the Court granted Plaintiffs' motion for preliminary approval of the Settlement and preliminarily certified the Class for settlement purposes only, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. Nothing has changed to alter the propriety of certification for settlement purposes and, for all the reasons stated in Plaintiffs' preliminary approval brief (ECF No. 306), and supported by the Joint Declaration of David R. Stickney and Daniel S. Sommers in Support of Preliminary Approval of Settlement (ECF No. 266), Plaintiffs request that the Court grant final certification of the Class pursuant to Rules 23(a) and (b)(3).

---

case; and (iv) a proprietary list maintained by GCG of 1,966 of the largest and most common U.S. banks, brokerage firms, and nominees, and the Depository Trust Company, which acts as a clearinghouse to process and settle trades in securities. Keough Decl. ¶6.

[33] Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *Padro*, 2013 WL 5719076, at *3 ("Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members."); *see also Arace v. Thompson*, 2011 WL 3627716, at *4 (S.D.N.Y. Aug. 17, 2011) (describing *Investor's Business Daily* as "a nationally-circulated business-oriented publication catering to investors," and finding notice of settlement published therein "sufficient[] [to] apprise[] . . . shareholders of the nature of the proposed settlement").

## III. CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the

proposed Settlement and Plan of Allocation as fair, reasonable and adequate.

Dated: April 22, 2015                             Respectfully submitted,
      San Diego, California

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP

By:   /s/ David R. Stickney

David R. Stickney
Niki L. Mendoza
Richard D. Gluck
Matthew P. Jubenville
L. Reza Wrathall
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323
davids@blbglaw.com
nikim@blglaw.com
richard.gluck@blbglaw.com
matthewj@blbglaw.com
laurence.wrathall@blbglaw.com
-and-
Max W. Berger
James A. Harrod
Katherine Stefanou
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:   (212) 554-1400
Fax:   (212) 554-1444
MWB@blbglaw.com
jim.harrod@blbglaw.com
katherine.stefanou@blbglaw.com


COHEN MILSTEIN SELLERS & TOLL PLLC

By:   /s/ Daniel S. Sommers

Daniel S. Sommers
S. Douglas Bunch
1100 New York Avenue, NW, Suite 500 East

Washington, D.C. 20005
Tel:     (202) 408-4600
Fax:     (202) 408-4699
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com
-and-
Joel P. Laitman
Christopher Lometti
Richard Speirs
Daniel B. Rehns
88 Pine Street, 14th Floor
New York, NY 10005
Tel:     (212) 838-7797
Fax:     (212) 838-7745
jlaitman@cohenmilstein.com
clometti@cohenmilstein.com
rspeirs@cohenmilstein.com
drehns@cohenmilstein.com

*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Class*