UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE BEAR STEARNS MORTGAGE
PASS-THROUGH CERTIFICATES
LITIGATION

Case No. 1:08-cv-08093-LTS

**JOINT DECLARATION OF DAVID R. STICKNEY AND
DANIEL S. SOMMERS IN SUPPORT OF MOTION FOR
FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION,
AND MOTION FOR APPROVAL OF ATTORNEYS' FEES AND EXPENSES**

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF EXHIBITS TO DECLARATION ............................................................1

I.  PRELIMINARY STATEMENT ...................................................................2

II.  PROSECUTION OF THE ACTION .............................................................7

    A.  Overview Of The Allegations..................................................................7

    B.  The Commencement Of The Actions, Consolidation And The Appointment Of Lead Plaintiffs.................................................................................................9

    C.  Filing Of The Consolidated Complaints And Two Rounds Of Briefing On Motions To Dismiss ........................................11

    D.  The Initial Conference Report And Defendants' Motion To Stay ..............................................................................17

    E.  Plaintiffs' Motion For Leave To Amend The Complaint To Conform To *NECA-IBEW* ......................................19

    F.  Defendants' Motion For Reconsideration After The Second Circuit Decides *IndyMac*.................................................20

    G.  Preparation For The October 16, 2013 Conference And Discovery ....................................................................21

    H.  Lead Counsel's Investigation And Review And Analysis of Documents and Testimony ..........................................23

        1.  Investigations To Prepare The Complaints..............................23

        2.  Ongoing Analysis Of Material In The Public Domain...............................................................................24

        3.  Bear Stearns' Documents.........................................................26

        4.  Working With Experts And Consultants ..................................28

III.  THE SETTLEMENT ..................................................................................28

    A.  Arm's-Length Settlement Negotiations ................................................29

    B.  Reasons For The Settlement .................................................................30

    C.  Notice To The Class Meets The Requirements Of Due Process And Rule 23 Of The Federal Rules Of Civil Procedure ......................................................................35

    D.  Plan Of Allocation ...............................................................................37

IV.    THE APPLICATION FOR ATTORNEYS' FEES AND
       EXPENSES ..................................................................................39

       A.    Application For Attorneys' Fees............................................40

             1.    The Requested Fee Of 16.25% Is A
                   Reasonable Percentage Of The Total
                   Recovery ......................................................40

             2.    The Time And Labor Expended By
                   Plaintiffs' Counsel .........................................41

             3.    The Magnitude And Complexity Of The
                   Action............................................................45

             4.    The Risks Of Litigation And The Need To
                   Ensure The Availability Of Competent
                   Counsel In High-Risk, Contingent Cases ..................46

             5.    Standing And Expertise Of Lead Counsel,
                   And Standing And Caliber Of Opposing
                   Counsel ..........................................................47

             6.    Lead Plaintiffs' Approval And The Reaction
                   Of The Class To Date .......................................48

       B.    Application For Reimbursement Of Expenses ....................48

## TABLE OF EXHIBITS TO DECLARATION

| EX. | DESCRIPTION |
|-----|-------------|
| 1-A | Declaration of George W. Neville, Special Assistant Attorney General, Legal Counsel to Lead Plaintiff the Public Employees' Retirement System of Mississippi, in Support of (A) Plaintiffs' Motion for Approval of Settlement and Plan of Allocation; (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and (C) Lead Plaintiff's Request for Reimbursement of Costs and Expenses |
| 1-B | Declaration of George R. Laufenberg, Fund Administrator of Lead Plaintiff the New Jersey Carpenters Health Fund, in Support of (A) Plaintiffs' Motion for Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 2 | Declaration of Jennifer M. Keough Re Notice Dissemination and Publication |
| 3 | Declaration of Brett Brandenberg in Support of Plan of Allocation |
| 4 | Schedule of Plaintiffs' Counsel's Lodestar and Expenses |
| 4-A | Declaration of David R. Stickney in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP |
| 4-B | Declaration of Daniel S. Sommers in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on Behalf of Cohen Milstein Sellers & Toll PLLC |
| 4-C | Declaration of John L. Gadow in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on Behalf of Pond Gadow & Tyler |
| 4-D | Declaration of Denis F. Sheils in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on Behalf of Kohn, Swift & Graf, P.C. |
| 4-E | Schedule of Expenses by Category |
| 5 | Declaration of the Mediator, Hon. Daniel H. Weinstein (Ret.), in Support of Approval of Class Action Settlement |

We, David R. Stickney of the law firm Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz" or "BLB&G") and Daniel S. Sommers of the law firm Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), submit this joint declaration in support of Plaintiffs' motion for final approval of the proposed Settlement and approval of the Plan of Allocation, as well as Lead Counsel's motion for approval of attorneys' fees and reimbursement of litigation expenses.

## I.    PRELIMINARY STATEMENT

1.    Our law firms are the Court-appointed Lead Counsel in this Action and counsel for Lead Plaintiffs Public Employees' Retirement System of Mississippi ("MissPERS") and New Jersey Carpenters Health Fund ("New Jersey Carpenters") (collectively, "Lead Plaintiffs").[1]  We are partners in our respective law firms and have actively supervised and participated in the prosecution of this Action.  As a result, we have personal knowledge of all material matters related to this Action.   Previously, we submitted a joint declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, together with supporting statements from the Lead Plaintiffs and the mediator.  ECF No. 266.  On February 19, 2015, the Court granted that motion and entered the Preliminary Approval Order.  ECF No. 268.  Since then, the Claims Administrator notified potential Class Members of the Settlement by mail in accordance with the Preliminary Approval Order.  Summary Notice was also published through *Investor's Business Daily,* in the *Wall Street Journal* and over the PR Newswire.

---

[1] When not defined herein, capitalized terms are defined in the Stipulation and Agreement of Settlement (ECF No. 264, the "Stipulation").  "Plaintiffs" refers to Lead Plaintiffs and Boilermaker Blacksmith National Pension Trust ("Boilermaker Pension Trust"), Police and Fire Retirement System of the City of Detroit ("Detroit P&F"), the State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employees Retirement Board on behalf of the Oregon Public Employees Retirement Fund (collectively, "OPERS"), Iowa Public Employees' Retirement System ("IPERS"), and San Antonio Fire and Police Pension Fund ("San Antonio F&P").

2.     The Court, having overseen this complex securities class action for more than six years, is familiar with the claims and defenses and the complicated factual and legal questions surrounding litigation arising from mortgage-backed securities ("MBS") that were issued in 2006 and 2007, amidst the housing and credit boom.  Accordingly, this declaration does not seek to detail each and every event that occurred during the litigation.  Rather, it provides highlights of the litigation, the events leading to the Settlement for $500 million, plus up to an additional $5 million in litigation and claims administration expenses, and the basis upon which Lead Plaintiffs and Lead Counsel recommend its approval.

3.     When this consolidated class action commenced in August 2008, there was no established precedent for MBS litigation; no court had sustained claims under the federal securities laws for purchasers of MBS; and no court had certified an MBS class or accepted plaintiffs' damages theories arising from such claims. Throughout the litigation, the stakes have been large, the risks substantial and the battles hard-fought with multiple law firms defending the thirteen defendants in the Action.  From the outset, Defendants raised multiple challenges, including to constitutional standing, application of the statute of repose, damages and the existence of untrue statements in the offering documents.  Defendants also asserted myriad defenses to liability, such as the "due diligence" defense, that if successful, would have resulted in no recovery from those Defendants.

4.     We respectfully submit that the Settlement represents an excellent result and is in the best interest of the Class.  The Settlement confers a guaranteed, immediate and substantial recovery and avoids the risks of protracted litigation, including the risk of recovering less or nothing after substantial delays.

5.      On March 2, 2015, Defendants caused $500 million to be deposited in an escrow account for the benefit of the Class.  On or about April 14, 2015, an additional $5 million was deposited in an escrow account to pay for litigation costs and expenses.  To put the amount of the Settlement into context, this is the largest recovery ever from a class action arising from the sale of mortgage-backed securities.[2]

6.      The proposed Settlement is the result of Lead Plaintiffs' and Lead Counsel's extensive investigation into the claims, preparation of detailed complaints, two rounds of dispositive motions, overcoming Defendants' motions to dismiss and developing a compelling record.  As explained below, Lead Counsel obtained and analyzed over 15 million pages of documents and 55 million additional pages of loan files.  Lead Counsel also consulted throughout with experts in areas requiring specialized knowledge. The parties reached an

_____

[2] *See, e.g., Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 10-cv-00302 (MRP) (C.D. Cal.), *appeal pending*, C.A. No. 14-55093 (9th Cir.) ($500 million for 429 offerings; no separate fund for costs); *In re IndyMac Mortgage-Backed Sec. Litig.,* 09-cv-04583 (LAK) (S.D.N.Y.), *appeal pending*, C.A. No. 15-892 (2d Cir.) ($346 million for 50 offerings); *New Jersey Carpenters Health Fund v. Residential Capital LLC,* 08-cv-8781 (KPF)(DCF) (S.D.N.Y.) ($335 million for 59 offerings; final approval pending); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.,* 08-cv-10841 (JSR) (S.D.N.Y.) ("*Merrill Lynch*") ($315 million for 18 offerings); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I,* 08-cv-1713 (PKC) (E.D.N.Y.) ("*J.P. Morgan*") ($280 million for 26 offerings); *N.J. Carpenters Vacation Fund v. The Royal Bank of Scotland Group, PLC,* 08-cv-5093 (LAP) (S.D.N.Y.) ($275 million for 14 offerings); *In re Wells Fargo Mortg.-Backed Certificates Litig.,* 09-cv-1376 (LHK) (N.D. Cal.) ("*Wells Fargo*") ($125 million for 28 offerings); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,* 09-cv-2137 (KBF) (S.D.N.Y.) ("*Morgan Stanley*") ($95 million for 29 offerings); *In re Lehman Bros. Mortg.-Backed Sec. Litig.,* 08-cv-6762 (LAK) (S.D.N.Y.) ($40 million for 17 offerings); *Mass. Bricklayers and Masons Trust Funds v. Deutsche Alt-A Sec., Inc.,* 08-cv-3178 (LDW) (E.D.N.Y.) ($32.5 million for 2 offerings); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.,* 09-cv-1110 (HB) (S.D.N.Y.) ("*Goldman Sachs*") ($26.6 million for 1 offering); *In re: Wash. Mut. Mortg.-Backed Sec. Litig.,* C09-0037 (MJP) (W.D. Wash.) ($26 million for 6 offerings); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.,* 08-cv-1418 (E.D.N.Y.) ($24.975 million for 2 offerings); *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3,* 09-cv-300 (JB) (D.N.M.) ($11.25 million for 3 offerings); *Tsereteli v. Residential Asset Securitization Trust 2006-A8,* 08-cv-10637 (LAK) (S.D.N.Y.) ($11 million for 1 offering).

agreement to settle only after six years of litigation and protracted negotiations facilitated by Judge Weinstein.  *See* Declaration of the Mediator, Hon. Daniel H. Weinstein (Ret.), in Support of Approval of Class Action Settlement, previously filed as ECF No. 266-1, and attached hereto as Exhibit 5.

7.      In entering into the Stipulation, Lead Plaintiffs and Lead Counsel were fully informed about the strengths and weaknesses of the case.  In addition to understanding the support for, and challenges to, proving their claims and damages, Lead Plaintiffs and Lead Counsel were familiar with Defendants' affirmative defenses – including, for example, defenses that claims on certain of the offerings were time-barred; that investors had "actual knowledge" of the false and misleading statements at the time they purchased the securities; and that the evidence did not support a finding that the offering documents contained any material misstatements.  Damages were also far from certain, as the amount is subject to reduction, or elimination through Defendants' "negative causation" defense, contending that any losses allegedly suffered by the Class were caused by factors other than untrue statements in the offering documents (such as the collapse of the economy in general, and the housing market in particular).  The proposed Settlement, when viewed in the context of these risks and the uncertainties, is extremely beneficial to the Class.

8.      Lead Plaintiffs supervised Lead Counsel, participated in all aspects of the litigation, remained informed throughout the settlement negotiations, and ultimately approved the Settlement.  *See* Declaration of George W. Neville, Special Assistant Attorney General, Legal Counsel to Lead Plaintiff the Public Employees' Retirement System of Mississippi, in Support of (A) Plaintiffs' Motion for Approval of Settlement and Plan of Allocation; (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses;

and (C) Lead Plaintiff's Request for Reimbursement of Costs and Expenses ("Neville Decl."), attached hereto as Exhibit 1-A; Declaration of George R. Laufenberg, Fund Administrator of Lead Plaintiff the New Jersey Carpenters Health Fund in Support of (A) Plaintiffs' Motion for Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Laufenberg Decl."), attached hereto as Exhibit 1-B.

9.     In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  To prepare the Plan of Allocation, Lead Counsel engaged AlixPartners, a well-recognized firm of senior business and financial consulting professionals.  Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Class who timely submit valid proofs of claim based on their "Recognized Claim" amount as calculated based on the Plan of Allocation.  The Plan of Allocation is based on the methodology for calculating damages set forth in Section 11(e) of the Securities Act of 1933 (the "Securities Act") and takes into account that claims for certain offerings had been sustained while others remained in dispute. *See* Declaration of Brett Brandenberg in Support of Plan of Allocation ("Brandenberg Decl."), attached hereto as Exhibit 3.  Substantially similar plans have been approved and used effectively to distribute recoveries in other MBS class actions.

10.     In addition, Lead Counsel request an award of attorneys' fees for their extensive efforts in the face of enormous risk and reimbursement of litigation expenses.  Specifically, Lead Counsel are applying for an attorneys' fee of 16.25% of the $500 million Settlement Amount, to be paid out of the Settlement Fund, and for reimbursement of Plaintiffs' Counsel's Litigation

Costs in the amount of $1,381,611.60, to be paid out of the additional $5 million Cost Fund.[3]

The requested fee is well within the range of fees approved by courts in this District, including

for class actions arising from mortgage-backed securities, and is amply supported by each of the

relevant factors set forth in *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Circ. 2000).

The reasonableness of the 16.25% fee request is confirmed with a lodestar cross-check resulting

in a multiplier of 1.5, which is well within the range of multipliers awarded in other securities

class action settlements of similar size. Lead Counsel also request that the Court grant

reimbursement of expenses incurred by Lead Plaintiff MissPERS directly related to its

representation of the Class pursuant to 15 U.S.C. § 77z-1(a)(4), in the amount of $30,325.00.

11.     This Joint Declaration describes: (a) the efforts undertaken by Lead Counsel to

prosecute the Action (¶¶12-71); (b) the events leading up to the Settlement, the Settlement and

the risks that Lead Plaintiffs and Lead Counsel considered in determining that the Settlement

provides an outstanding recovery for the Class (¶¶72-91); (c) the Notice to members of the Class

(¶¶92-96); (d) the proposed Plan of Allocation for the Settlement (¶¶97-104); and (e) the fee and

expense application by Lead Counsel (¶¶105-143).

## II.     PROSECUTION OF THE ACTION

### A.     Overview Of The Allegations

12.     The allegations in this case relate to 22 Bear Stearns mortgage "securitizations."

In a securitization, mortgage loans are acquired, grouped together, and the interest and principal

payments that borrowers make on the loans are divided to create what are known as "mortgage-

backed securities" or "MBS."  Generally, the loans are placed into a trust for the benefit of MBS

---

[3] "Plaintiffs' Counsel" include the Court-appointed Co-Lead Counsel for the Class, Bernstein Litowitz and Cohen Milstein, and additional counsel for Lead Plaintiff MissPERS, Pond Gadow & Tyler ("Pond Gadow"); and Kohn, Swift & Graf, P.C., counsel for Plaintiff Detroit P&F.

investors, and when borrowers make payments, the cash flows "pass through" the trusts to investors. Each offering of MBS typically contains multiple classes of securities – which are also known as "tranches" or "certificates" – each of which has an established priority of payment on the cash flows. As a general matter, certificates from more senior tranches have a lower risk of nonpayment (in the event of a cash-flow shortfall) and generally pay a lower interest rate, whereas more junior tranches have a higher risk of nonpayment and generally pay a higher interest rate.

13.     Bear Stearns created the 22 MBS offerings at issue with over 64,000 mortgage loans sourced from nearly 500 third-party mortgage-loan originators. Bear Stearns then sold the offerings to investors pursuant to a shelf registration statement, and accompanying prospectuses and prospectus supplements (collectively known as "offering documents"). The offering documents represented that the mortgage loans underlying the MBS were originated generally in accordance with the underwriting guidelines described therein and that exceptions were only authorized in limited circumstances when "compensating factors" were present. The offering documents further represented that underwriting guidelines were applied to verify the borrower's willingness and ability to repay the loan and to ensure the value of the underlying property as collateral.

14.     Plaintiffs alleged that, contrary to these representations, Bear Stearns, EMC, and the originators: (i) systematically disregarded stated underwriting standards and regularly made exceptions in the absence of sufficient compensating factors; (ii) pursued loan volume at the expense of underwriting standards; and (iii) largely disregarded appraisal standards where the value of the underlying property was materially inflated.

15. Plaintiffs asserted claims for violation of Sections 11, 12(a)(2), and 15 of the Securities Act, which prohibit false and misleading statements and omissions in registration statements and accompanying offering documents. As explained herein, Defendants denied the existence of any material misstatements and omissions in connection with the issuance of a registration statement, and also asserted myriad defenses.

**B. The Commencement Of The Actions,
Consolidation And The Appointment Of Lead Plaintiffs**

16. New Jersey Carpenters filed the first complaint in this action on August 20, 2008, in the Supreme Court of the State of New York, County of New York. *See New Jersey Carpenters Health Fund v. Bear Stearns Mortgage Funding Trust 2006-AR1,* No. 08-602426. That complaint asserted Securities Act claims on behalf of all persons or entities that purchased certificates pursuant or traceable to Bear Stearns Mortgage Funding Trust 2006-AR1.

17. On September 18, 2008, Defendants removed the case to the United States District Court, Southern District of New York. On October 1, 2008, the case was assigned to the Honorable Laura Taylor Swain. On January 12, 2009, in accordance with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), the New Jersey Carpenters moved for appointment as lead plaintiff and approval of its choice of lead counsel. ECF No. 14. The Court granted the motion on January 26, 2009.[4]

18. On May 15, 2009, New Jersey Carpenters and Boilermaker Pension Trust filed the First Consolidated Amended Securities Class Action Complaint (the "May 15, 2009

_____

[4] ECF No. 16. The Court initially appointed the law firm of Schoengold Sporn Laitman & Lometti, P.C. ("SSLL") as Lead Counsel. On April 29, 2009, New Jersey Carpenters filed a motion for substitution of counsel, explaining that several lawyers had recently departed SSLL and joined Cohen Milstein, and that New Jersey Carpenters had terminated its relationship with SSLL and retained Cohen Milstein. ECF No. 28. On May 5, 2009, the Court granted the motion for substitution and appointed Cohen Milstein as Lead Counsel. ECF No. 31.

Complaint"), alleging Securities Act claims on behalf of a class of persons or entities that purchased or otherwise acquired beneficial interests in 44 Bear Stearns offerings issued from two shelf registration statements.

19.     On July 9, 2009, another plaintiff, Pension Trust Fund for Operating Engineers, filed a related class action complaint, alleging Securities Act claims on behalf of a class of purchasers in 11 of the same Bear Stearns offerings as in the May 15, 2009 Complaint, as well as additional offerings.  *See Pension Trust Fund for Operating Eng'rs v. Structured Asset Mortg. Invs. II, Inc.*, 09-cv-06172-LTS (S.D.N.Y.) (the "Operating Engineers Action").

20.     On August 6, 2009, and August 10, 2009, plaintiffs and defendants from the two pending Bear Stearns MBS actions submitted status reports to the Court.  ECF Nos. 60, 62. Among other items, the defendants contended that, in light of the filing of the Operating Engineers Action, the Court should direct the plaintiffs to publish a revised PSLRA notice and revisit the selection of the lead plaintiff.  The plaintiffs opposed the request.  On August 13, 2009, the Court held a status conference and ordered that the parties report to the Court by September 4, 2009, as to whether they would amend their pleadings and the status of the preparation of a revised PSLRA notice.

21.     On September 8, 2009, counsel for the plaintiffs in the pending actions submitted a Joint Status Report, along with a proposed revised PSLRA notice to alert class members of the pendency of both actions and of the opportunity to move for appointment as lead plaintiff.  ECF No. 67.  The Joint Status Report also informed the Court that plaintiffs did not intend to amend the complaints pending in the two actions until after the determination of the anticipated motions for consolidation and appointment of lead plaintiff.  On September 10, 2009, the Court approved

of the parties' proposed revised PSLRA notice.   ECF No. 68.   On September 11, 2009, the revised notice was published via a national business-oriented wire service, Business Wire, Inc.

22.      On November 10, 2009, MissPERS, New Jersey Carpenters, and Boilermaker Pension Trust jointly moved to consolidate the related actions, and for appointment as lead plaintiffs and approval of their selection of counsel.   *See* ECF Nos. 74-79.   On December 23, 2009, the Court consolidated the Operating Engineers Action into Case No. 08-cv-8093, re-designated the consolidated action as *In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, and appointed MissPERS and New Jersey Carpenters as Co-Lead Plaintiffs with Bernstein Litowitz and Cohen Milstein as Co-Lead Counsel.   ECF No. 89.

### C.      Filing Of The Consolidated Complaints And Two Rounds Of Briefing On Motions To Dismiss

23.      On February 19, 2010, Lead Plaintiffs and Plaintiff Boilermaker Pension Trust filed the Consolidated Class Action Complaint (the "Consolidated Complaint").   The Consolidated Complaint alleged Securities Act claims against Defendants and others on behalf of a class of persons or entities that purchased or otherwise acquired beneficial interests in 42 Bear Stearns MBS offerings pursuant or traceable to two registration statements.   The Consolidated Complaint was based on an in-depth investigation conducted by Lead Counsel which included, *inter alia*:  (i) review and analysis of the relevant offering documents, SEC filings, press releases and other public statements; (ii) review and analysis of relevant court filings from other cases related to the originators of the underlying loans; (iii) review and analysis of relevant media reports and congressional testimony; (iv) analysis of the Securities and Exchange Commission's Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies; and (v) interviews with witnesses.

24.     On April 21, 2010, Defendants filed a motion to dismiss the Consolidated Complaint.  Defendants' motion raised complicated issues related to the MBS offering process and Lead Plaintiffs' Securities Act claims.   Defendants contended that the Consolidated Complaint should be dismissed because, *inter alia*: (i) the allegations regarding false underwriting and appraisal guidelines and credit ratings were not actionable; (ii) the offering documents disclosed the risks associated with purchasing the Certificates, including the impact of external market factors; (iii) the alleged misrepresentations were not material; (iv) Lead Plaintiffs' sole remedy was the cure of non-complying loans; (v) Lead Plaintiffs' claims were time-barred; and (vi) Lead Plaintiffs failed to allege cognizable harm.  ECF Nos. 114, 115.  One particular point on which Defendants focused was that Lead Plaintiffs lacked standing to assert claims for offerings in which they had not purchased certificates.

25.     In addition to its complexity, Defendants' motion was voluminous, spanning 49 pages, and attaching a 10-page appendix detailing extensive disclosures contained in the offering documents.  In addition, Defendants submitted a declaration attaching hundreds of pages of exhibits, including articles and public material that Defendants contend put Lead Plaintiffs on notice of their claims more than one year prior to the filing of the Consolidated Complaint.  ECF No. 109.

26.     The McGraw-Hill Companies, Inc. and Moody's Investors' Service, Inc. (the "Rating Agencies"), also named as defendants in the Consolidated Complaint, moved to dismiss on many of the same grounds and further contended that the Rating Agencies were not liable as "underwriters" under Section 11.  ECF Nos. 104, 105.  The Rating Agencies, like Defendants, submitted a declaration with hundreds of pages of exhibits, including excerpts from prospectus supplements and legal opinions from related cases.   ECF No. 106.

27.     On June 15, 2010, Lead Plaintiffs prepared and submitted a detailed 48-page opposition to Defendants' motion and a detailed 25-page opposition to the Rating Agencies' motion.   ECF Nos. 121, 122.   In their oppositions, Lead Plaintiffs addressed each of the arguments that Defendants raised.   In particular, Lead Plaintiffs argued that the vast collection of public material that Defendants submitted with their motion was not specific enough to put Lead Plaintiffs on notice of their Securities Act claims more than one year before the Consolidated Complaint was filed.   Lead Plaintiffs also requested that, in the event the Court was inclined to grant Defendants' motion to dismiss on the standing issue, Lead Plaintiffs be afforded leave to amend to allow investors that purchased in additional offerings to step forward and serve as named plaintiffs.   ECF No. 121 at 11 n.14.   Defendants and the Rating Agencies filed replies in support of their motions to dismiss on July 21, 2010.   ECF Nos. 124, 127.

28.     On August 17, 2010, the Court issued a decision in a separate MBS securities class action that related to the standing issue raised in Defendants' motion in this case.   In *In re Morgan Stanley Mortgage Pass-Through Certificates Litigation*, No. 09-cv-2137-LTS-MHD (S.D.N.Y.) ("*Morgan Stanley*"), the Court dismissed the plaintiff's claims on the grounds that the plaintiff:  (i) was on notice of its claims more than one year before the filing of its complaint; and (ii) lacked standing to pursue claims related to offerings in which it had not purchased.

29.     On September 8, 2010, Defendants submitted *Morgan Stanley* to the Court as support for their argument that Lead Plaintiffs did not have standing to assert claims concerning certificates other than the ones in which they purchased.   ECF No. 131.   Defendants also requested leave to file a supplemental declaration to provide the Court with additional materials in support of their argument that Lead Plaintiffs' claims were untimely.   The Court granted the request, and Defendants filed a declaration containing a chart and nearly 100 pages of rating

agency "downgrades" for certificates in the case.  ECF No. 132.  Referring to the materials in the supplemental declaration, Defendants' letter contended that, following *Morgan Stanley*, such "downgrades" – some of which occurred more than one year prior to the filing of the Consolidated Complaint – were sufficient to put Lead Plaintiffs on notice.

30.   On September 24, 2010, Lead Plaintiffs responded to Defendants' September 8 letter and the materials in the supplemental declaration.  First, Lead Plaintiffs reiterated their request that, in the event the Court followed the reasoning of *Morgan Stanley*, Lead Plaintiffs be afforded leave to amend so that absent class members could serve as plaintiffs.  Second, as to the timeliness issue, Lead Plaintiffs explained that Defendants' supplemental materials were not sufficient to confer notice, particularly because many of the purported "downgrades" were only insignificant "ratings watches," and that no AAA-rated Certificate was downgraded to below investment grade more than one year before the filing of the Consolidated Complaint.   Thereafter, on September 29, 2010, the Court issued an order granting Lead Plaintiffs leave to amend in light of *Morgan Stanley*.  ECF No. 133.

31.   On October 29, 2010, Lead Plaintiffs, along with additional plaintiffs Boilermaker Pension Trust, Detroit P&F, OPERS, IPERS, San Antonio F&P, and the City of Fort Lauderdale Police & Fire Retirement System, filed the Third Amended Class Action Complaint ("Third Complaint" or the "Complaint").   As with the Consolidated Complaint, the Third Complaint incorporated the results of Lead Plaintiffs' ongoing investigation into the claims, including analysis of additional investigations, media reports, articles, and testimony and exhibits presented to the Financial Crisis Inquiry Commission in late 2010.  The Third Complaint alleged Securities Act claims against Defendants and others on behalf of a class of all persons or entities who purchased or otherwise acquired beneficial interests in the certificates in 14 offerings issued

pursuant to two registration statements.  As a result of the Court's prior guidance, Lead Plaintiffs

omitted claims relating to offerings in which the named plaintiffs had not purchased.[5]

32.     On December 3, 2010, Defendants moved to dismiss the Third Complaint.  ECF

No. 138.  Defendants' motion asserted many of the same arguments as their prior motion to

dismiss, including that: (i) the allegations regarding departures from the underwriting and

appraisal guidelines were not actionable; (ii) Plaintiffs' sole remedy was the cure of non-

complying loans; and (iii) Plaintiffs failed to allege cognizable harm.  ECF No. 140. As before,

Defendants contended that Plaintiffs' claims were time-barred, and Defendants submitted

volumes of public materials in support, including 68 exhibits spanning over 2,200 pages.

33.     On January 26, 2011, Plaintiffs submitted a detailed 50-page opposition brief.

Plaintiffs reiterated that Defendants' statute-of-limitations defense raised intensely factual

questions that should not be resolved at the pleading stage.  Plaintiffs also argued that their

claims were timely because they benefitted from tolling under *American Pipe & Construction*

*Co. v. Utah,* 414 U.S. 538 (1974).  Defendants filed a reply in support of their motion on

February 24, 2011.  ECF No. 153.

34.     After Defendants' motion to dismiss was fully briefed, Judge Castel issued a

decision in a separate MBS action that related to the timeliness of the plaintiffs' claims.  In

*Footbridge Ltd. Trust v. Countrywide Financial Corp.*, No 10-cv-0367 – PKC (S.D.N.Y.

Mar. 16, 2011), the court held that *American Pipe* did not toll the Securities Act's three-year

---

[5] Although the Third Complaint asserted claims against certain individuals, including Matthew Perkins, Kim Lutthans and Katherine Garniewski, following *NECA-IBEW* and *IndyMac* Lead Plaintiffs agreed to omit claims against them. ECF No. 204-1.  Such individuals are not defendants for claims arising from the 22 Offerings, and Plaintiffs are not bringing claims against them.  Plaintiffs have been informed by the Institutional Defendants and believe that Perkins, Lutthans and Garniewski are Released Parties as defined in the Stipulation.

statute of repose.   Defendants submitted *Footbridge* for this Court's consideration, and contended that claims related to 10 of the 14 offerings in the Third Complaint were time-barred because no plaintiff with standing asserted claims related to those offerings prior to the expiration of the statute of repose.   ECF No. 154.   On April 7, 2011, Plaintiffs responded to Defendants' submission.

35.     Between April 7, 2011, and February 15, 2012, the parties submitted nine additional letter briefs to draw the Court's attention to eleven decisions that were relevant to issues raised in the parties' motion-to-dismiss briefing.   Given that the law related to all aspects of claims based on MBS offerings was continuously evolving during this time, the parties' letter briefs related to myriad issues, including whether:   (i) Plaintiffs' claims were timely under the statute of limitations and statute of repose; (ii) Plaintiffs had sufficiently pled false underwriting and appraisal statements in the offering documents; (iii) Plaintiffs' sole remedy was the substitution of loans; (iv) Plaintiffs' claims related back to the filing of prior complaints; (v) the Certificates' diminution in value constituted "cognizable loss" for purposes of damages under Section 11; and (vi) Plaintiffs had standing to represent all investors in each offering, or only those who purchased the "tranche" the Plaintiffs purchased.

36.     On March 30, 2012, the Court granted in part and denied in part Defendants' motion to dismiss the Third Complaint.   ECF No. 164; *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012) (the "March 30 Order").   The March 30 Order held that Plaintiffs had adequately alleged that "the loan pools were inferior in credit quality to loans that would have been selected had Defendants' originators employed the sort of underwriting standards described in the Offering Documents." *Id.* at 768. Additionally, the Court held that the Complaint's assertion that "the Offering Documents failed to disclose the

allegedly rampant violation of appraisal standards is sufficient to state a claim." *Id.* at 770.  The March 30 Order also held that Plaintiffs had standing to pursue claims related to all 14 Bear Stearns offerings in the Complaint, but dismissed claims "premised on the alleged unreliability of the ratings of securities included in the investment pools." *Id.* at 779-80.  The Court referenced 11 of the 14 confidential witnesses that Lead Counsel had interviewed before filing the Third Complaint, including former employees of originators Countrywide, American Home and Wells Fargo.  *See id.* at 754-56; 767-68, 767 n.23 ("the Complaint is replete with public reports and detailed statements by numerous confidential witnesses").

37.     On May 14, 2012, Defendants filed their Answer to the Complaint, which denied virtually all allegations in the Complaint and asserted 28 affirmative defenses, including that: (i) Plaintiffs lacked standing to pursue their claims; (ii) the claims were time-barred; (iii) the offering documents did not contain false and misleading statements; (iv) Defendants acted with reasonable care and due diligence in issuing the offerings; (v) Plaintiffs had not suffered any damages; (vi) Plaintiffs should have known about the allegedly false and misleading statements in the offering documents; (vii) the "cure, repurchase or substitute" provisions in the offering documents were Plaintiffs' sole remedy; and (viii) the Action could not be maintained as a class action.  ECF No. 183.

### D.     The Initial Conference Report And Defendants' Motion To Stay

38.     On April 3, 2012, the Court scheduled a pretrial conference for May 17, 2012. ECF No. 172.  The order instructed the parties to meet and confer pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, and to file with the Court a written report seven days before the May 17 conference.  In accordance with the Court's order, counsel for the parties met and conferred telephonically on April 25, 2012, and thereafter.  While the parties agreed on several

issues, areas of disagreement included: (1) the pretrial schedule; (2) Defendants' request to bifurcate discovery between class-certification discovery and merits discovery; and (3) Defendants' request to stay the Action.

39.     On May 10, 2012, the parties submitted an Initial Conference Report setting forth their respective positions.  Throughout the litigation, Plaintiffs advocated to move the case forward and to obtain a trial date, while Defendants generally advocated to slow the pace of the case.  This dynamic was reflected in the parties' competing pre-trial schedule proposals in the Initial Conference Report.  Plaintiffs advocated for concurrent merits and class discovery, while Defendants favored bifurcated discovery.  Likewise, Plaintiffs proposed ten months for fact discovery and a trial date of September 2013, while the Defendants proposed twenty months for fact discovery and a trial date not before April 2015.

40.     While the parties conferred on case management issues, Defendants filed a motion for interlocutory appellate review of the March 30 Order and to stay the Action pending the outcome of that motion, or in the alternative, stay the Action pending the outcome of the appeal before the Second Circuit in *Police and Fire Retirement System of the City of Detroit v. IndyMac MBS, Inc.,* No. 11-2998-cv (2d Cir.) ("*IndyMac*"), a case related to the application of the Securities Act's statute of repose.  ECF No. 174.

41.     On April 27, 2012, Plaintiffs submitted a 19-page opposition brief, explaining that Defendants had not met the standard for interlocutory review and that a continued stay was unjustified and would prejudice Plaintiffs.  ECF No. 177.

42.     On May 16, 2012, the Court granted Defendants' motion to stay the Action pending the outcome of *IndyMac* and adjourned the May 17, 2012 pretrial conference *sine die*.

**E.    Plaintiffs' Motion For Leave To Amend**
**The Complaint To Conform To *NECA-IBEW***

43.    On September 6, 2012, the Second Circuit issued its decision in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) ("*NECA-IBEW*"), holding that plaintiffs have standing to represent investors that purchased in MBS offerings in which the plaintiffs did not purchase when the additional offerings and the plaintiffs' offering share common originators.

44.    On October 5, 2012, Plaintiffs moved for leave to amend the Third Complaint to include claims arising from 26 additional offerings in accordance with *NECA-IBEW* and to lift the stay.  ECF No. 185.  Specifically, Plaintiffs explained that amendment was appropriate because the 14 offerings from which Plaintiffs purchased securities and the 26 additional offerings were issued pursuant to the same registration statements and were backed by loans from the same originators, including EMC Mortgage, Bear Stearns Residential Mortgage, Countrywide, Encore, Fieldstone Mortgage, Performance Credit Corporation and HomeBanc Mortgage.  Plaintiffs further argued to lift the stay because *NECA-IBEW* largely mooted *IndyMac's* potential impact on Plaintiffs' claims.

45.    Defendants opposed Plaintiffs' motion to amend, contending that the claims for 26 additional offerings were untimely.  ECF No. 189.  Defendants also continued to oppose Plaintiffs' request to lift the stay on the grounds that the timeliness of some offerings – whether or not the Court granted Plaintiffs' motion to amend – could not be determined until *IndyMac* was decided.  Plaintiffs' reply brief responded that all claims associated with the 26 additional offerings were timely and that Plaintiffs had appropriately omitted them from the Third Complaint based on the Court's guidance following *Morgan Stanley*.  ECF No. 191.

**F.    Defendants' Motion For Reconsideration
       After The Second Circuit Decides _IndyMac_**

46.    On June 27, 2013, the Second Circuit issued _IndyMac_, holding that the Securities

Act's statute of repose is not tolled under _American Pipe_.    On July 3, 2013, Defendants

submitted a letter notifying the Court of the decision, and stating that the parties had agreed to

meet and confer on the effect that _IndyMac_ had on the offerings in the Third Complaint, as well

as the additional 26 offerings that were the subject of Plaintiffs' pending motion to amend.    On

July 11, 2013, the Court endorsed the letter, restored the case to the active calendar, and

scheduled a pretrial conference for October 11, 2013.

47.    On July 8, 2013, the parties met and conferred to address _IndyMac_, _NECA-IBEW_

and the scope of the case.    Although the parties agreed on some issues, they disagreed on others.

Accordingly, the parties jointly proposed supplemental briefs.    On July 16, 2013, the Court

granted the request.

48.    On July 23, 2013, Defendants formally filed a motion for reconsideration of the

March 30 Order in light of _IndyMac_.    ECF Nos. 198-99.    That same day, Plaintiffs submitted

their opening supplemental brief describing the impact of _IndyMac_ and _NECA-IBEW_.    Both

parties filed responsive briefs on August 2, 2013. ECF Nos. 203-04.    Following the various

supplemental briefs, the parties agreed that 8 of the 22 Offerings would proceed to discovery

regardless of the outcome of Plaintiffs' motion to amend and Defendants' motion for

reconsideration.    On November 14, 2013, the Court ordered the parties to provide a joint

submission containing additional information regarding:  (i) the Offerings that the parties agreed

were timely and would proceed regardless of the outcome of Defendants' pending motion for

reconsideration; and (ii) the Offerings where there remained a dispute as to timeliness.

49.     Counsel for the parties conferred to address the Court's requested submission.  On December 2, 2013, in response to the Court's request, the parties filed a Joint Response which identified the 8 Offerings that they agreed were timely and the 14 Offerings where timeliness continued to be disputed.  ECF No.  205.  These are the 22 Offerings subject to this Settlement.

50.     On March 10, 2014, the Supreme Court granted a writ of certiorari regarding the Second Circuit's *IndyMac* decision.   On September 29, 2014, however, just prior to oral argument in the case, the Supreme Court dismissed the writ as "improvidently granted."

### G.     Preparation For The October 16, 2013 Conference And Discovery

51.     In advance of the October 11, 2013 pretrial conference, counsel for the parties conferred telephonically on October 3 and 7 to address the case management issues.   On October 9, 2013, the parties filed a joint preconference statement, submitting their positions on: (i) the pretrial schedule; (ii) Plaintiffs' motion to amend; and (iii) Defendants' motion for reconsideration.  Again, Plaintiffs advocated to move the litigation forward and to obtain a trial date.  Given the passage of time since the prior proposed schedule, Plaintiffs proposed a revised pre-trial schedule that brought the case to trial by August 15, 2015.  Defendants' proposed schedule was dependent on the resolution of pending motions and was substantially longer. Additionally, the parties disagreed about the commencement of discovery.  Plaintiffs advocated that discovery could and should proceed, especially given that the parties agreed that at least eight of the sustained Offerings would proceed regardless of how the pending motions were resolved.  Defendants, however, contended that formal discovery should not commence until after the Court resolved the pending motions.

52.     On October 11, 2013, the Court rescheduled the pretrial conference to January 31, 2014.

21

53.     On November 1, 2013, Plaintiffs propounded document requests related to the eight MBS Offerings that the parties agreed would proceed regardless of the pending motions. Plaintiffs requested that Defendants produce relevant documents and communications from 54 categories including: (i) communications with, or documents or testimony provided to, any government body; (ii) deal and loan files for the Offerings; (iii) organizational charts; (iv) documents produced in related civil litigation; (v) any audits or investigations of Bear Stearns' securitization business; (vi) due-diligence reports; (vii) repurchase requests; (viii) insurance policies; (ix) document retention and destruction policies; and (x) documents related to the construction and issuance of the Offerings.

54.     On December 4, 2013, Defendants served written objections to Plaintiffs' document requests and continued to maintain that the requests were premature.

55.     On December 11, 2013, counsel for the parties met and conferred and Plaintiffs proposed, *inter alia*, that (i) the parties negotiate a protocol for production of electronic discovery; and (ii) Defendants allow Plaintiffs to access material that had been produced in other matters, including transcripts of testimony and due-diligence materials. In this regard, Plaintiffs prepared and provided to Defendants a draft electronic discovery protocol, proposing search terms, time periods and custodians.   Following the December 11, 2013 meet and confer, Defendants continued to maintain that discovery was stayed.

56.     On January 24, 2014, in advance of the January 31, 2014 pretrial conference, the parties filed an Updated Joint Conference Report.  In the Report, the parties again submitted their positions on (i) the pretrial schedule; (ii) Plaintiffs' motion to amend; (iii) Defendants' motion for reconsideration; and (iv) whether discovery should proceed while the motions were pending. As before, Plaintiffs advocated for a pre-trial schedule and trial date now to commence by

November 2, 2015.  Defendants again submitted a pre-trial schedule that would not begin until the resolution of the pending motions and would be substantially longer than Plaintiffs' proposal.

57.     On January 28, 2014, the Court rescheduled the January 31, 2014 pre-trial conference to April 25, 2014.

58.     Thereafter, the parties continued to disagree over the commencement of formal discovery.  On February 11, 2014, Plaintiffs submitted a letter to the Court, explaining the outstanding document requests and reiterating their request that discovery commence.  On February 18, 2014, the Court denied Plaintiffs' request, ruling that the PSLRA stay remained in effect due to the pending motion for reconsideration.

59.     On April 17, 2014, the Court adjourned the April 25, 2014 pretrial conference *sine die*.

60.     On May 20, 2014, in an effort to ensure that relevant evidence was preserved, Plaintiffs requested permission from the Court to serve document-preservation subpoenas on certain third parties believed to have discovery probative of the issues in the case, including originators, clearing banks, rating agencies, trustees, servicers, and due-diligence firms. ECF No. 248.  On May 21, 2014, the Court approved the request and shortly thereafter Plaintiffs served subpoenas on approximately 65 third parties.

### H.     Lead Counsel's Investigation And Review And Analysis of Documents and Testimony

#### 1.     Investigations To Prepare The Complaints

61.     Prior to filing the complaints in this case, Lead Counsel engaged in an extensive investigation related to claims that the offering documents contained materially false and misleading statements and omissions.  The investigation was multi-faceted and included, for example: (i) review and analysis of the offering documents; (ii) examination of other relevant

documents that Bear Stearns filed with the Securities and Exchange Commission ("SEC"), including financial statements, pooling and servicing agreements and press releases; (iii) review and analysis of other relevant public statements made by Bear Stearns or its employees; (iv) review and analysis of relevant court filings, including related litigation against Bear Stearns and certain of the originators that contributed loans to the Offerings; (v) review and analysis of media reports and congressional testimony; (vi) review and analysis of testimony and exhibits presented to the Financial Crisis Inquiry Commission ("FCIC"), along with the final FCIC report; (vii) review and analysis of materials presented to the Senate Permanent Subcommittee on Investigations related to its investigation into Wall Street and the Financial Crisis, along with the final Senate Report; (viii) review and analysis of performance, downgrade and pricing data related to the offerings at issue; (ix) review and analysis of other publicly available information regarding Bear Stearns, including media and analyst reports; (x) consultations with relevant industry experts; and (xi) interviews and consultations with various witnesses, including the 14 confidential witnesses cited in the Third Complaint.

### 2. Ongoing Analysis Of Material In The Public Domain

62.     During the course of the Action, an increasing volume of information concerning Bear Stearns, its mortgage business, the conduct of the underlying originators, and potential witnesses entered the public domain.  Sources of information included, for example, government investigations, government litigation, court files for private civil litigation, media reports, tell-all books, and movies.  Examples of such sources include:

Government Investigations/Litigation

- *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*
- *Nat'l Credit Union Admin. Bd. v. Bear, Stearns & Co.*
- *FDIC v. Bear Stearns Asset Backed Sec. I LLC*
- FCIC Report

- U.S. Senate Permanent Subcommittee on Investigations Report: Wall Street and the Financial Crisis: Anatomy of a Financial Collapse
- Report to the U.S. Senate Committee on Banking, Housing, and Urban Affairs and U.S. House of Representatives Committee on Financial Services: Default Risk Evaluation in the Single-Family Mortgage Market
- *SEC v. J.P. Morgan Sec. LLC*
- *SEC v. Angelo Mozilo, David Sambol, and Eric Sieracki*
- *State of N.Y. v. J.P. Morgan Sec. LLC*

<u>Private Litigation</u>

- *David H. Luther v. Countrywide Home Loans Serv. L.P.*
- *N.J. Carpenters Health Fund v. Bear Stearns Mortg. Funding Trust 2006-AR1*
- *In re the Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*
- *Fed. Home Loan Bank of Seattle v. Bear, Stearns & Co.*
- *Fed. Home Loan Bank of San Francisco v. Credit Suisse Sec. (USA) LLC*
- *Maine State Ret. Sys. v. Countrywide Corp.*
- *Charles Schwab Corp. v. JPMorgan Sec. Inc.*
- *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec. Inc.*
- *Allstate Bank v. JPMorgan Chase Bank N.A.*
- *Ambac Assurance Corp. v. EMC Mortg. LLC*
- *Mass. Mut. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*
- *Assured Guar. Muni. Corp. v. EMC Mortg. Corp.*
- *Dexia SA/NV v. Bear, Stearns & Co., Inc.*
- *John Hancock Life Ins. Co. v. JPMorgan Chase & Co.*
- *Syncora Guar., Inc. v. EMC Mortg. LLC*
- *Prudential Ins. Co. of Am. v. J.P. Morgan Sec. LLC*

<u>Articles and Media Coverage</u>

- *More Corruption: Bear Stearns Falsified Information as Raters Shrugged*, The Atlantic, May 14, 2010
- *Bear Stearns: The 'Immaculate Calamity,'* The Daily Capitalist, May 5, 2010
- *The Cases Against Bear Stearns*, CNN Money, Aug. 4, 2008
- *Wall Street's Naked Swindle*, Rolling Stone, Apr. 25, 2010
- *The Bear Stearns Lucky Bastards*, The Daily Beat, Jan. 14, 2009
- *JPMorgan's EMC Mortgage Sued Over Home Loan Documents*, Bloomberg, Jan. 18, 2011
- *Ambac Says JPMorgan Refused Mortgage Repurchases It Also Sought*, Bloomberg, Jan. 24, 2011
- *E-mails Suggest Bear Stearns Cheated Clients Out of Billions*, The Atlantic, Jan. 25, 2011

Books and Films

- House of Cards: A Tale of Hubris and Wretched Excess on Wall Street, William D. Cohan (2010)
- The Fall of Bear Stearns: The Bear Trap, Bill Bamber (2008)
- Street Fighters: The Last 72 Hours of Bear Stearns, Kate Kelly (2010)
- The Rise and Fall of Bear Stearns, Alan Greenberg (2010)
- Confidence Game (movie), released, 2011

63.     Lead Counsel systematically and consistently searched for additional evidence in the public domain, analyzed the material, and used it to develop lists and internal memoranda for prosecuting the Action.

### 3.     **Bear Stearns' Documents**

64.     In connection with settlement negotiations, the parties agreed to exchange certain information that likely otherwise would have been available to Plaintiffs during discovery.  On August 4, 2014, the parties informed the Court by letter that they had agreed to exchange documents and information in connection with an upcoming mediation before the Honorable Daniel Weinstein (Ret.).  ECF No. 251.  In order to facilitate the exchange of information, the parties prepared and submitted to the Court a Confidentiality Stipulation and Order Relating to Exchange of Mediation Material Containing Non-Party Borrower Information, which the Court approved.  ECF No. 253.

65.     Plaintiffs requested the production of categories of documents, including electronically stored information and prior testimony from percipient witnesses.  Defendants agreed to produce certain categories of documents, but disagreed on other categories.  Lead Counsel and counsel for Defendants conducted several meet and confer sessions related to Defendants' document production, including related to the scope of the requests, the timing of production of the agreed-upon categories, and the form of production.

66.     The mandate to the mediator, Judge Weinstein, included monitoring the exchange of such information and documents.  Judge Weinstein, together with Jed Melnick of JAMS, held regular and periodic telephonic status calls to oversee the ongoing production and resolve disputes.  *See* Weinstein Decl. ¶12.   The parties resolved several disagreements without the involvement of the mediator.  When, however, the parties were unable to resolve disputes, Judge Weinstein and Mr. Melnick participated and assisted in resolving the disputes.

67.     Defendants began producing documents in connection with the mediation process on August 20, 2014.   After reviewing and analyzing a significant volume of documents, Plaintiffs requested that Defendants provide additional documents including those related to high-priority custodians.

68.     In total, Lead Plaintiffs obtained over 15 million pages of documents and 55 million additional pages of loan files.  Given the number and types of documents produced, the production came in a wide variety of formats and styles.  The effective review of documents required the analysis of not only typical images of documents, but also detailed analyses of spreadsheets, databases, and other complex compilations of financial data.  Lead Counsel used a sophisticated electronic system to perform the necessary review and analysis.

69.     The document production also included prior deposition testimony from 60 witnesses.  Such witnesses, included, for example:

- Individual Defendant Michael Nierenberg:   Senior Managing Director, Head of ARM & CDO Desk;
- Individual Defendant Jeffrey Verschleiser:   Senior Managing Director ABS & Whole Loan Desk;
- Individual Defendant Thomas Marano:  Head of Global Mortgage Trading & Origination Operations;
- Individual Defendant Jeffrey Mayer:  Co-Head of Fixed Income;
- Mary Haggerty:  Co-Head of Mortgage Finance at Bear Stearns & CEO of EMC;
- Pattie Sears:  Associate Director of Mortgage Finance;

- Alison Malkin:  Vice President of Risk Management; and
- John Mongelluzzo:  Bear Stearns Vice President of Due Diligence.

70.     Lead Counsel devoted the resources and team of attorneys necessary to review, comprehend and analyze the large amount of documents, testimony and information efficiently and expeditiously in order to develop a compelling record for the mediation and also to intelligently assess a potential settlement in a compact period of time.

### 4.     Working With Experts And Consultants

71.     In prosecuting the claims, Lead Counsel worked extensively with experts and consultants at different stages of the litigation.  Consultants were utilized to prepare the mediation briefs, analyze estimated damages, review Defendants' affirmative defenses, and prepare for negotiations.  Experts were consulted in the complex and specialized areas of the MBS industry, negative causation, materiality, damages, mortgage-loan underwriting, and statistics.  For example, Lead Counsel worked with consultants to select loan samples and "re-underwrite" loans.

## III.     THE SETTLEMENT

72.     The Settlement of $500 million (plus interest), plus payment of litigation and claims administration costs up to $5 million, was the result of arm's-length negotiations overseen by Judge Weinstein.  The Settlement provides the Class an immediate and substantial benefit and eliminates the significant risks of continued litigation under circumstances where a favorable outcome could not be assured.  Lead Counsel believe that the Settlement is fair, reasonable, and an excellent result for the Class considering the risk of recovering nothing or less after further substantial delay.

A.     <u>Arm's-Length Settlement Negotiations</u>

73.     During the pendency of Plaintiffs' motion for leave to amend and Defendants' motion for reconsideration, the parties first explored potential settlement opportunities through direct negotiations between experienced senior attorneys.  After the parties reached an impasse, they agreed to pursue a mediation process before Judge Weinstein.

74.     Following the parties' agreement to select Judge Weinstein as the mediator and initial conference calls, Lead Counsel obtained and analyzed a substantial volume of additional documents and material relevant to the claims, including loan files, deposition transcripts, key databases, internal reports, e-mail and additional material related to Plaintiffs' claims.

75.     On October 1, 2014, the parties filed a status report and noted for the Court that settlement discussions were ongoing and productive.  ECF No. 255.  The parties further informed the Court that the exchange of documents and information was underway, that the parties had regular communications, and that an in-person mediation session had been scheduled for October 30, 2014.

76.     Lead Counsel prepared detailed mediation statements with a supporting record of exhibits.  On October 14, 2014, the parties exchanged and submitted their opening mediation statements and voluminous case-related materials to Judge Weinstein.   The parties also exchanged and submitted reply statements and additional materials to Judge Weinstein before the in-person settlement discussions.

77.     Lead Counsel and representatives for Lead Plaintiffs appeared for an in-person mediation session on October 30, 2014.  Although the session ended without an agreement, the parties remained in communication with the mediator.  To break the impasse, Judge Weinstein recommended settlement for $500 million in cash and payment of litigation expenses and claims administration expenses up to $5 million.  *See* Weinstein Decl. ¶11, attached hereto as Exhibit 5.

The parties separately agreed to the recommendation, subject to satisfaction of certain conditions such as completion of Lead Plaintiffs' diligence into the reasonableness and adequacy of the settlement within a finite period, negotiation of a detailed settlement agreement, and Court approval.  On November 17, 2014, counsel for the parties executed a binding Term Sheet, reflecting their agreement.

78.    On January 8, 2015, the parties informed the Court that they had reached an agreement in principle to settle the Action, subject to the satisfaction of certain conditions, including Court approval in accordance with Fed. R. Civ. P. 23(e).

**B.**    **<u>Reasons For The Settlement</u>**

79.    Lead Plaintiffs and Lead Counsel endorse the Settlement.  *See* Lead Plaintiffs' Decls., Exhibits 1-A and 1-B hereto.  Lead Plaintiffs are sophisticated institutional investors who have actively overseen the prosecution of the Action.  They are also experienced with litigation arising from MBS, having served as lead plaintiffs in *Merrill Lynch, supra*; *J.P. Morgan, supra*; *Goldman Sachs, supra*; *Morgan Stanley, supra*; *New Jersey Carpenters Health Fund v. Residential Capital LLC,* 08-cv-8781 (KPF)(DCF) (S.D.N.Y.); *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,* 08-cv-5653 (PAC) (S.D.N.Y.); and *New Jersey Carpenters Health Fund v. NovaStar Mortgage, Inc.,* 08-cv-5310 (DAB) (S.D.N.Y.).  Lead Counsel are law firms that specialize in complex securities litigation, including litigation involving MBS, and are highly experienced in such litigation.  *See* Exhibits 4-A5 and 4-B4 (firm biographies).  Based on their experience and knowledge of the facts and applicable law, Lead Counsel and Lead Plaintiffs determined that the Settlement was in the best interest of the Class.

80.    Although Lead Plaintiffs and Lead Counsel believe that the claims asserted in the Action are meritorious, continued litigation against Defendants posed significant risks that made any recovery uncertain.  From the outset, Lead Counsel and Lead Plaintiffs appreciated the

unique and significant risks inherent in this litigation.  At the time of the initial filing, there was little established precedent for MBS litigation, and no court had sustained claims under the federal securities laws for purchasers of MBS securities.  Likewise, no court at that time had certified an MBS class or accepted plaintiffs' damages theories arising from such claims.  *See N.J. Carpenters Health Fund v. Residential Capital, LLC,* 272 F.R.D. 160 (S.D.N.Y. 2011) (denying class certification), *aff'd,* 477 Fed. Appx. 809 (2d Cir. 2012) (unpubl.).  While Lead Plaintiffs believe their claims are strong, they were aware of the limited precedent that existed for MBS-specific class litigation, and how that limited precedent could influence the inevitable dispositive motions, not to mention at trial and on appeal.

81.    Lead Counsel and Lead Plaintiffs were aware that they faced numerous affirmative defenses to the claims at issue.  For example, Defendants argued throughout that claims related to certain offerings were time-barred, both under the statute of repose for 14 offerings and the statute of limitations for all offerings.  The law governing the statute of repose evolved during the course of the litigation, and there is a risk that the Court could agree with Defendants' position on that defense as to claims on the 14 offerings.  Defendants also argued that Plaintiffs' claims were asserted more than one year after Plaintiffs knew or should have known they had viable claims, including as a result of news articles that were cited in the initial complaints that, according to Defendants, should have triggered inquiry notice.  Although the Court denied Defendants' motion to dismiss on this ground, Defendants continued to press the defense and it would be raised again at summary judgment and trial.

82.    Defendants also contended that:  (i) Plaintiffs lacked standing to pursue claims related to certain offerings; (ii) Plaintiffs did not adequately allege that the offering documents contained material misstatements; (iii) Plaintiffs' sole remedy was the "cure" of non-complying

loans; (iv) Plaintiffs did not allege any cognizable harm; and (v) Plaintiffs had "actual knowledge" of the false and misleading statements at the time they purchased the securities. Defendants also contended that the offering documents adequately warned investors that a meaningful dip in housing prices could result in losses, issuers made exceptions to underwriting guidelines, loan pools included sub-prime loans, and the mortgage industry faced difficulties and changed economic conditions which could adversely affect the value of the certificates.

83.     Even assuming that Plaintiffs prevailed at trial in establishing untrue statements and omissions in the offering documents, recoverable damages under Section 11 are based on the lesser of the difference between the purchase price of the security and (i) the value of the security on the date the lawsuit was filed; or (ii) the price at which the security was disposed.  Section 11 damages are also subject to reduction or elimination as a result of "negative causation" (*i.e.,* that some or all of the losses were attributable to causes other than the misstatements or omissions). Defendants contended that any losses were caused by factors other than untrue statements in the offering documents (such as the collapse of the economy in general, and the housing market in particular), and they would have had additional opportunities to persuade the Court or a jury that their position was meritorious.  At the very least, Defendants' "negative causation" defense was an argument that would have to be resolved through extensive expert testimony, and likely would have remained an issue through a trial, and potentially, on appeal.

84.     Moreover, Plaintiffs faced additional challenges to proving their claims based on the passage of time and the automatic stay of discovery.  The case commenced six years ago for alleged misconduct that occurred nine to ten years ago.  With the passage of time, evidence often becomes stale, documents scatter, witnesses disappear and memories fade.  Even assuming the pending motions for reconsideration and to amend would be resolved in Lead Plaintiffs' favor,

the time required for further proceedings, the discovery process and summary judgment motions would have necessarily imposed additional delay and risks to recovery.  The Settlement enables the Class to recover a substantial sum of money, while avoiding continued protracted litigation.

85.     In addition to the foregoing defenses, Defendants would have likely opposed certification of a class for litigation purposes.  Although courts have granted motions to certify litigation classes of investors in MBS, as mentioned above, at least one district court has denied such a motion.  *Compare Merrill Lynch,* No. 08-cv-10841-JSR (S.D.N.Y. June 15, 2011), ECF No. 149 (certifying litigation class of MBS investors), *with N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08-cv-5653-PAC, 2011 WL 3874821 (S.D.N.Y Aug. 16, 2011) (certifying litigation class of MBS investors), with *Residential Capital,* 272 F.R.D. 160 (S.D.N.Y. 2011) (denying motion to certify litigation class of MBS investors).

86.     The Settlement eliminates the above litigation risks and guarantees the Class a favorable cash recovery.   As explained above (*see* ¶5), the Settlement amount here – $500 million and up to $5 million for costs – is the largest recovery to our knowledge from a class action arising from the sale of mortgage-backed securities.  Lead Counsel firmly believe that settling the Action at this juncture is in the best interest of the Class.

87.     Lead Counsel engaged a consultant to assist in estimating potentially recoverable damages using the statutory measure under Section 11 of the Securities Act.  Estimating *aggregate* damages for MBS offerings is inherently problematic due to limited trading data and the dependence on assumptions.  Such estimate, before taking into account re-paid principal, causation or other defenses to damages, could amount to billions of dollars in the aggregate, based on certain assumptions.  However, under Section 11(e) of the Securities Act, damages may be reduced or eliminated if the defendant proves that a portion or all of the statutory damages are

attributable to causes other than the misstatements or omissions. Throughout the litigation, Defendants claimed that factors other than the untrue statements or omissions (such as the overall economic downturn and general decline in housing prices) caused some, if not all, of any alleged losses. Defendants also would have likely argued that Lead Plaintiffs would have difficulty establishing damages because certain Certificates did not regularly miss principal and interest payments.

88.     The Settlement enables the Class to immediately recover a substantial sum of money, while avoiding protracted litigation and significant challenges. Indeed, as discussed above, from the outset, Lead Counsel and Lead Plaintiffs appreciated the unique and significant risks inherent in this litigation. While Lead Counsel and Lead Plaintiffs believe the claims are strong, they were aware of the limited precedent that existed for MBS-specific class litigation, and how that limited precedent could influence the inevitable motions for summary judgment, not to mention at trial and on appeal.

89.     To avoid summary judgment and prevail at trial, Lead Plaintiffs would need to present evidence that the offering documents contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein. Lead Plaintiffs expected Defendants to argue that there was insufficient evidence to support a potential jury finding of false statements, and that the offering documents contained substantial disclosures of the very economic risks that occurred and the effect they might have on the Certificates.

90.     Defendants also asserted a "due diligence" defense and contended that they conducted appropriate reviews and analyses of the character and quality of loans prior to the loans being securitized in the Offerings.

91.     The Settlement eliminates the above litigation risks and guarantees the Class a cash recovery now.  Lead Counsel firmly believe that settling the Action at this juncture is in the best interest of the Class.

**C.     Notice To The Class Meets The
         Requirements Of Due Process And
         Rule 23 Of The Federal Rules Of Civil Procedure**

92.     As required by the Court's Preliminary Approval Order, beginning on March 4, 2015, Lead Plaintiffs, through the Claims Administrator, Garden City Group, LLC ("GCG"), notified potential Class Members of the Settlement by mailing a copy of the Notice to potential Class Members and their nominees.   GCG utilized several resources of data to reasonably identify Class Members, including:  (i) a list that Defendants produced identifying potential Class Members; (ii) a list of dozens of major custodial banks that Lead Plaintiffs subpoenaed as potentially maintaining Class Member contact information, including, for example, Bank of America Securities LLC, Bank of New York Mellon, Barclays Capital, Inc., Citigroup Global Markets, Inc., Credit Suisse Securities, Inc., Deutsche Bank Securities, Inc., Goldman Sachs & Co., JP Morgan Chase & Co., Morgan Stanley & Co. LLC, RBS Securities, Inc., State Street Bank and Trust Company, UBS Securities LLC, U.S. Bank NA, and Wells Fargo Securities, Inc.; (iii) contact information obtained through searches of the documents and information that Lead Plaintiffs received in this case; and (iv) a proprietary list maintained by GCG of 1,966 of the largest and most common U.S. banks, brokerage firms, and nominees, and the Depository Trust Company, which acts as a clearinghouse to process and settle trades in securities.  *See* Declaration of Jennifer M. Keough Re Notice Dissemination and Publication, attached hereto as Exhibit 2 ("Keough Decl.").

93.     The Court-approved Notice requires nominees, within seven days, to either (i) send a copy of the Notice to the beneficial owner of such certificates, or (ii) provide to GCG

the names and addresses of such persons.  In the aggregate, as of April 16, 2015, GCG has disseminated 7,561 copies of the Notice to potential Class Members and their nominees.  *See* Keough Decl. ¶¶2-10.

94.     In addition, on March 10, 2015, the Summary Notice was published in the national edition of *Investor's Business Daily* and in *The Wall Street Journal* and over the PR Newswire.  *See id.* ¶11.  Information regarding the Settlement, including copies of the Notice and Claim Form, was posted on the website established by the Claims Administrator specifically for this Settlement, www.BearStearnsCertificateSettlement.com, *id.* ¶13, and on Lead Counsel's websites, www.blbglaw.com and www.cohenmilstein.com.  This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]."  Fed. R. Civ. P. 23(e)(1).

95.     The Notice advises Class Members of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time and place of the final approval.  The Notice also contains information regarding Lead Counsel's fee application and the proposed plan of allocating the Settlement proceeds among Class Members.

96.     As explained in the accompanying Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation, the Notice fairly apprises Class Members of their rights with respect to the Settlement and therefore is the best notice practicable under the circumstances and complies with the Court's February 19, 2015 Preliminary Approval Order (ECF No. 268), Federal Rule of Civil Procedure 23, and due process.

D. __Plan Of Allocation__

97.     Lead Plaintiffs have proposed a plan to allocate the proceeds of the Settlement among Class Members who submit valid Proofs of Claim.  The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds to those Class Members who suffered economic losses as a result of the alleged misrepresentations and omissions.

98.     Lead Plaintiffs engaged Brett Brandenberg to examine the plan to allocate the Settlement proceeds among Claimants.  The Plan of Allocation, as set forth in the Notice, is based on the statutory calculation embodied in Section 11 of the Securities Act.  Section 11 provides for calculation of damages as the "difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . ."  Securities Act, § 11(e).

99.     The Brandenberg Declaration, attached hereto as Exhibit 3, explains the methods used to determine the Recognized Claims and the basis for the analysis.  As explained more fully in the Notice – including through illustrative examples – and in the Brandenberg Declaration, a Claimant's Net Recognized Losses will be calculated for each Claimant's purchases of the Certificates.  The calculation will depend on several considerations, including:  (a) when the Certificates were purchased or acquired and the price on the date of purchase; (b) any principal payments received; (c) whether the Certificates were sold, and if so, when they were sold and for how much; (d) if held on the applicable Date of Suit for the Certificates, the price of the

Certificates on that date; and (e) whether the Court sustained claims for purchasers of the Certificates.[6]

100.    The same or substantially similar plans have been approved and used successfully in other MBS settlements.  *See Morgan Stanley, supra; J.P. Morgan, supra; Goldman Sachs, supra; Merrill Lynch, supra; Wells Fargo, supra.*

101.    The Notice explained the proposed Plan of Allocation to Class Members.  It was prepared in consultation with Lead Plaintiffs' damages consultant, tracks the theory of damages asserted by Lead Plaintiffs, accounts for the reduced likelihood of success on claims that had not been sustained, and is fair, reasonable and adequate to the Class as a whole.

102.    In response to over 7,500 Notices, there have been no objections to date of the proposed Plan of Allocation.

103.    Pursuant to paragraph 27 of the Stipulation, prior to distributing the Net Settlement Fund to Class Members who submit valid claims, Lead Counsel will apply to the Court, with reasonable notice to Defendants, for a Class Distribution order, *inter alia*, approving the Claims Administrator's administrative determinations concerning the acceptance and rejection of the Claims submitted.   In the event that any Claimant disagrees with the administrative determination as to his, her or its claim, and seeks the Court's review of that determination, they will be given the opportunity to dispute the determination and provide input to the Court at that time.  To date there are no disputed claims.

104.    As set forth in paragraph 11 of the Stipulation, if any portion of the $500 million Settlement Fund remains after further distributions to Authorized Claimants become no longer

---

[6] Brandenberg Decl. ¶6.  As explained in the Notice, to account for the reduced likelihood of success on claims arising from 14 offerings that remained subject to additional legal challenges by Defendants, the Plan of Allocation applies a 50% discount to the value of those claims.

economically feasible, then pursuant to paragraph 11 of the Stipulation, Lead Plaintiffs will seek

Court approval for distribution to a nonsectarian non-profit charitable organization selected by

Lead Plaintiffs in consultation with the Institutional Defendants, or other distribution as directed

by the Court.

## IV.    THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

105.    In addition to seeking final approval of the Settlement and Plan of Allocation,

Lead Counsel are also applying to the Court for an award of attorneys' fees and litigation

expenses.  Specifically, Lead Counsel are applying for a fee of 16.25% of the Settlement Amount

(*i.e.,* $81.25 million), plus interest at the same rate as that earned on the Settlement Fund (from

the time of funding to the time of award), to be paid from the Settlement Fund.  Lead Counsel

also request reimbursement of $1,381,611.60 in Plaintiffs' Counsel's Litigation Costs, to be paid

from the $5 million Cost Fund.

106.    In determining whether a requested award of attorneys' fees is fair and

reasonable, district courts are guided by the factors first articulated by the Second Circuit in *City

of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).  As summarized in *Goldberger v.

Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000), these factors include:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities
> of the litigation; (3) the risk of the litigation…; (4) the quality of representation;
> (5) the requested fee in relation to the settlement; and (6) public policy
> considerations.

*Id.* at 50.  Based on consideration of each of the foregoing factors as further discussed below, and

on the additional legal authorities set forth in the accompanying Memorandum of Law in Support

of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation

Expenses (the "Fee Memorandum") filed contemporaneously herewith, we respectfully submit

that Lead Counsel's requested fee should be granted.

A.      **Application For Attorneys' Fees**

      1.      **The Requested Fee Of 16.25% Is A
              Reasonable Percentage Of The Total Recovery**

107.    For the extensive efforts on behalf of the Class, Lead Counsel are applying for compensation from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, has been recognized as appropriate by the Supreme Court for cases of this nature and represents the overwhelming current trend in the Second Circuit and most other circuits.

108.    Based on the result achieved for the Class, the extent and quality of work performed, the risks of the litigation and the contingent nature of the representation, Lead Counsel submit that a 16.25% fee award is justified and should be approved.  The institutional investor Lead Plaintiffs approve of Lead Counsel's fee request.  *See* Lead Plaintiffs' Decls., Exhibits 1-A and 1-B hereto.

109.    As discussed in the Fee Memorandum, a 16.25% fee is fair and reasonable for attorneys' fees in common fund cases such as this and is well within, or below, the range of the percentages typically awarded in securities class actions in this Circuit.

110.    We respectfully submit that the work undertaken by Lead Counsel in prosecuting this case and arriving at this Settlement has been time-consuming and challenging.  From the outset, Lead Counsel and Lead Plaintiffs appreciated the unique and significant risks inherent in litigation arising from complex structured securities.  As explained above, as of the filing of this Action, to our knowledge, no court had ever sustained similar securities law claims relating to

MBS; accepted the theory of damages; certified a class of similar MBS investors; or addressed many of the legal and factual issues presented in the Action. As a result, it was unclear at the time of the filing of the original complaint whether Lead Plaintiffs would overcome Defendants' anticipated motion to dismiss – much less obtain class certification, survive summary judgment, and prevail at trial and on any post-trial appeals. As the Court is well aware, the law governing key aspects of the case evolved frequently during the course of the litigation as a result of Second Circuit precedent. In addition, no court at that time had certified an MBS class or accepted plaintiffs' damages theories arising from such claims. *See Residential Capital,* 272 F.R.D. 160 (S.D.N.Y. 2011) (denying class certification).

111.    Lead Counsel took this case on a contingency basis, committed their resources and litigated it for approximately six years without any compensation or guarantee of success. Against this backdrop, Lead Counsel's efforts successfully achieved a recovery of $500 million plus payment of litigation and claims administration expenses, the largest recovery of any class action for violations of the federal securities laws arising from the sale of MBS. *See supra* note 2. Based on the excellent result achieved for the Class, the quality of work performed, the risks of the Action and the contingent nature of the representation, Lead Counsel submit that the request for a 16.25% fee award is fair and reasonable and consistent with other similar cases in the Second Circuit.

## 2.    The Time And Labor Expended By Plaintiffs' Counsel

112.    Lead Counsel entered into the Stipulation only after they overcame substantial legal and factual challenges. To do so, Lead Counsel conducted an extensive investigation (including studying articles and other material related to the Offerings and the mortgage industry, and reviewing the offering documents and other publicly-filed materials associated with the Offerings as well as Lead Counsel's interviews of numerous confidential witnesses); filed two

consolidated complaints and proposed amendments to the Third Amended Complaint; briefed two rounds of motions to dismiss and several related motions; analyzed a massive amount of evidence, including over 15 million pages of documents and 55 million additional pages of loan files; engaged and conferred with experts and consultants on issues such as negative causation, materiality, damages, mortgage loan underwriting, and statistics; researched the applicable law with respect to the claims of Plaintiffs and the Class, as well as Defendants' potential defenses and other litigation issues; and engaged in hard-fought settlement negotiations with experienced defense counsel.

113.   We maintained daily control and monitoring of the work performed in this case. While we personally devoted substantial time to this case, other experienced attorneys at our respective firms undertook particular tasks appropriate to their levels of expertise, skill and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels.

114.   In this regard, Lead Counsel devoted substantial resources and assembled a team of attorneys to develop a record within five months that otherwise may have required more than a year of discovery.  As discussed above, beginning in August 2014, Defendants commenced a rolling production of an enormous volume of documents and material before the mediation session with Judge Weinstein at the end of October 2014.  We devoted teams of lawyers to analyze the material in a compressed period of time for use in mediation statements and during negotiations.  We developed a compelling record for negotiations and also completed our due diligence into the reasonableness and adequacy of the Settlement.  In this regard, we planned our analysis to assure that we had appropriately evaluated the strengths of Plaintiffs' claims, the defenses and assertions from Defendants during the course of the mediation.  We carefully

planned our efforts to ensure that the necessary work was being conducted effectively and in the required timeframe.   We monitored the activities of the team of attorneys to ensure that schedules were met and unnecessary expenditure of time and funds was avoided.   While we oversaw the case on a daily basis, we delegated associates and senior counsel to the tasks of, for example, creating a comprehensive discovery plan, performing research and preparing initial drafts or portions of legal briefs and mediation statements, overseeing the review and analysis of documents and information that were produced, and performing certain analyses in connection with the settlement negotiations.

115.   The review of evidence obtained was organized both by subject matter and across particular securitization transactions.   In order for the attorneys undertaking the review to effectively understand the significance of any documents and other information produced, senior attorneys from our firms trained and closely interacted with the team of attorneys and supervised them on a regular basis.   This allowed us, along with our partners, senior counsel and associates, to routinely advise the teams of developments in the case.   The attorneys were able to bring significant information to the attention of other Lead Counsel attorneys as it was being identified.   This required the attorneys working on the case to utilize their legal experience, judgment and training to fully understand the documents and determine their significance and how they impacted the legal theories and affirmative defenses at issue in the case.

116.   There were regular and periodic meetings among the attorneys during which the most important documents, testimony and other significant case issues were discussed.   Such meetings and the daily on-site interaction between Lead Counsel's more senior attorneys and more junior attorneys effectively assisted Lead Counsel to understand key evidence, to best utilize the evidence to effectively and cohesively support the theories being pursued in the case,

and to test the assertions made by Defendants.  The process culminated with a presentation to confirm the reasonableness of the Settlement.

117.    As described in Lead Counsel's Fee Memorandum, the requested fee is not only fair and reasonable under the percentage approach but a lodestar cross-check confirms the reasonableness of the fee.  Attached hereto as Exhibits 4-A through 4-D are declarations from Plaintiffs' Counsel in support of an award of attorneys' fees and litigation expenses.  Included with each firm's declaration is a schedule summarizing the lodestar of each firm, as well as the litigation expenses incurred by category.[7]

118.    As set forth in Exhibit 4, based on the declarations attached hereto, Plaintiffs' Counsel expended a total of 138,804.45 hours in the prosecution and investigation of this Action.  The resulting lodestar is $52,319,720.50.  The requested fee, therefore, yields a 1.5 multiplier and is fair and reasonable based upon the significant risk of the litigation and the quality of representation by Plaintiffs' Counsel in achieving the exceptional Settlement.   Indeed, as discussed in the Fee Memorandum, when using a lodestar cross-check, courts have routinely awarded fee requests with similar and larger lodestar multipliers in securities class actions.

119.    As represented in the Plaintiffs' Counsel's Declarations, the lodestar summaries were prepared from daily time records regularly prepared and maintained by the respective firms in the ordinary course of business.  The hourly rates are the same as, or comparable to, the rates submitted by Plaintiffs' Counsel's firms for lodestar cross-checks in other securities class action litigation for fee applications that have been granted.

---

[7] Exhibit 4 is a summary chart of the lodestar and expense totals of all of the Plaintiffs' Counsel's firms.

120.    Attached hereto as Exhibits 4-A5 and 4-B4 are biographies of our respective firms.  Many of the firms' attorneys – at all levels – have worked for Lead Counsel for years, and have extensive experience in securities class action litigation, having worked for Lead Counsel on multiple large securities litigation matters.   Each attorney that prosecuted this Action performed substantive work that directly benefited the Class.  The time spent by each attorney was reasonable, non-duplicative, beneficial to the effective and efficient litigation, and was important to Lead Counsel's and Plaintiffs' ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, ultimately leading to the successful resolution of the case.

### 3.    The Magnitude And Complexity Of The Action

121.    This case raised many novel and complex issues surrounding structured securities and the nationwide economic downturn.  The process for originating the loans, securitizing them, structuring the offerings, creating offering documents and selling the loans is necessarily complex.  This complexity was compounded in this case as Plaintiffs' claims related to 22 MBS Offerings constructed from over 64,000 underlying mortgage loans sourced from nearly 500 originators.   Additionally, complicated issues of valuation and causation pervade all the Offerings.

122.    The litigation also raised a number of complex questions that required substantial efforts by Lead Counsel, often through analysis of the factual record and consultation with experts.  Lead Counsel's consultation with experts was necessarily extensive given the complex nature of the subject matter underlying the claims and the structured nature of the securities.

123.    Many of the arguments asserted by Defendants in their voluminous briefing raised complex and rapidly evolving legal issues, including issues of standing, cognizable damages, the statute of limitations and statute of repose, and others.

124.     Lead Counsel undertook to create a compelling record addressing these and other complicated issues.   Accordingly, the magnitude and complexity of the Action support the conclusion that the requested fee is fair and reasonable.

### 4.     The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk, Contingent Cases

125.     As noted above, the Action was undertaken on a wholly contingent basis.  From the outset, Lead Counsel understood that they were embarking on a complex and expensive litigation with no guarantee of compensation for the investment of time, money and effort that the case would require.  At the outset of the case, Lead Counsel understood that very limited precedent existed for similar claims arising from the purchase of MBS.  In addition, Lead Counsel understood that Defendants would raise myriad challenges based on the structured nature of the securities and that liability, damages and class certification would be heavily contested with no assurance of success.

126.     In undertaking the responsibility for prosecuting the Action, Lead Counsel assured that sufficient attorney resources were dedicated to the investigation of the Class claims against the Defendants and that sufficient funds were available to advance the expenses required to pursue and complete such complex litigation.  Plaintiffs' Counsel received no compensation and, in total, incurred $1,381,611.60 in expenses in prosecuting this Action for the benefit of the Class.

127.     Lead Counsel also bore the risk that no recovery would be achieved.   As discussed herein, this case presented a number of risks and uncertainties which could have prevented any recovery whatsoever.   Despite the vigorous and competent efforts of Lead Counsel, success in contingent-fee litigation, such as this, is never assured.

128.    Lead Counsel firmly believe that the commencement of a securities class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations.

129.    Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs − particularly institutional investors − take an active role in protecting the interests of securities purchasers.  If this important public policy is to be carried out, plaintiffs' counsel should be adequately compensated, taking into account the risks undertaken in prosecuting securities class actions.

**5.    Standing And Expertise Of Lead Counsel,
And Standing And Caliber Of Opposing Counsel**

130.    The expertise and experience of counsel are other important factors in setting a fair fee.  As demonstrated by Lead Counsel's biographies, attached hereto as Exhibits 4-A5 and 4-B4, the attorneys at Bernstein Litowitz and Cohen Milstein are experienced and skilled class action securities litigators and have a successful track record in securities cases throughout the country – including within this Circuit – and in MBS litigation, in particular.

131.    The quality of the work performed by counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel.  Lead Counsel were opposed in this case by five very skilled and highly-respected defense firms.  The Defendants were represented by Greenberg Traurig, LLP, Sullivan & Cromwell LLP, Bingham McCutchen LLP, Morrison & Foerster LLP, and Kramer Levin Naftalis & Frankel LLP, who spared no effort in the defense of their clients.  In the face of this knowledgeable and formidable defense, Lead Counsel were

nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are favorable to the Class.

      **6.**    **Lead Plaintiffs' Approval And**
             **The Reaction Of The Class To Date**

132.    As set forth above, Notices have been disseminated to over 7,500 potential Class Members and their nominees.   Keough Decl. ¶10.   In addition, the Summary Notice was published in *Investor's Business Daily* and *The Wall Street Journal*, and over the PR Newswire. *See id*. ¶11.   The Notice explains the Settlement and that Lead Counsel would seek fees up to 17% of the Settlement Amount.   The actual request now, 16.25%, is less than the maximum percentage stated in the Notice.   The deadline to object to Lead Counsel's fee request is May 6, 2015.  To date, no Class Member has objected.

133.    In sum, given the time and labor expended by counsel, the magnitude and complexities of the Action, the responsibility undertaken by Lead Counsel, the difficulty of proof on liability and damages, the experience of Lead Counsel and defense counsel, and the contingent nature of Lead Counsel's agreement to prosecute this Action, Lead Counsel respectfully submit that the requested attorneys' fees are reasonable and should be approved.

      **B.**    **Application For Reimbursement Of Expenses**

134.    Lead Counsel also request $1,381,611.60 in expenses reasonably and necessarily incurred by Plaintiffs' Counsel in the prosecution of this Action.[8]  Pursuant to the Stipulation, the Litigation Costs, along with claims administration expenses, will be paid from the $5 million Cost Fund.   Lead Counsel respectfully submit that the application for payment of Plaintiffs'

---

[8] As set forth in the declarations attached hereto as Exhibits 4-A, 4-B, and 4-D, the expenses of Plaintiffs' Counsel for which reimbursement is sought are reflected on the books and records of their respective firms, which are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred.

Counsel's Litigation Costs is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

135.    From the beginning of the case, Lead Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Lead Counsel also understood that, even assuming that the case was ultimately successful, an award of expenses would not compensate them for the lost use of the funds advanced to prosecute this Action.  Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

136.    The expenses were necessary and appropriate for the prosecution of this Action. These include charges from an electronic document vendor that assisted in the collection of documents and maintained a discovery database; charges for experts and consultants; computer research devoted to the case; costs incurred in out-of-town travel; charges for photocopying; telephone, postal and express mail charges; and similar case-related costs.  A chart reflecting all expenses by category for which reimbursement is sought is attached hereto as Exhibit 4-E.

137.    Included in the amount of expenses is $307,274.18 paid or payable to Lead Plaintiffs' experts and consultants.  As discussed above in paragraph 71, Lead Plaintiffs worked extensively with experts and consultants at the different stages of the litigation.  Consultants were utilized to prepare the mediation briefs, analyze estimated damages, review Defendants' affirmative defenses, and test Defendants' assertions during negotiations.  Experts were consulted in the complex and specialized areas of the MBS industry, negative causation, materiality, damages, mortgage loan underwriting, and statistics.

138.     In addition, Lead Counsel obtained over 15 million pages of documents and information and an additional 55 million pages of loan files from Defendants.  To effectively and efficiently review and analyze those documents, a document management system was necessary. Included in the expense request is $875,267.88 for Plaintiffs' Counsel's expenses related to document management and litigation support.   This encompasses over 63% of Plaintiffs' Counsel's total Litigation Costs.

139.     The expenses also include the costs of online research in the amount of $33,656.96.  These are the charges for computerized factual and legal research services such as *Lexis-Nexis* and *Westlaw*.  It is standard practice for attorneys to use *Lexis-Nexis* and *Westlaw* to assist them in researching legal and factual issues, and, indeed, courts recognize that these tools create efficiencies in litigation and, ultimately, save clients and the class money.

140.     In addition, Plaintiffs' Counsel were required to travel in connection with prosecuting and settling the Action, and thus incurred the related costs of airline tickets, meals and lodging.   Included in the expense request above is $44,693.45, for travel expenses necessarily incurred for the prosecution of this litigation, and $81,341.37 for mediation fees.

141.     Lead Counsel also seek approval for reimbursement of certain costs and expenses incurred by Lead Plaintiff MissPERS directly relating to its representation of the Class pursuant to 15 U.S.C. § 77z-1(a)(4), as set forth in Exhibit 1-A, attached hereto, in the amount of $30,325.00.

142.     The application for expenses is less than half of the upper limit of $3 million contained in the Notice mailed to the Class.  As noted above, in response to over 7,500 Notices, as of the date of this Declaration, there are no objections to such expenses.

143.    Approval of the Settlement is independent from approval of Lead Counsel's application for an award of attorneys' fees and expenses; any determination with respect to Lead Counsel's application for an award of attorneys' fees and expenses will not affect the Settlement, if approved.

We declare under penalty of perjury that the foregoing facts are true and correct and that this declaration was executed this 22nd day of April, 2015.


_____*/s/ David R. Stickney*_____          _____*/s/ Daniel S. Sommers*_____
David R. Stickney                                  Daniel S. Sommers